# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| CHICKEN SOUP FOR THE SOUL ENTERTAINMENT, INC., *et al.*, | Case No. 24-11442 (MFW) |
| Debtors.[1] | (Jointly Administered) |
| GEORGE L. MILLER, CHAPTER 7 TRUSTEE, | Adv. Proc. No. 25-ap-_____ (MFW) |
| Plaintiff. | |
| v. | |
| WILLIAM J. ROUHANA, JR., AMY L. NEWMARK, CHRISTOPHER MITCHELL, FRED M. COHEN, COSMO DENICOLA, MARTIN POMPADUR, CHRISTINA WEISS LURIE, DIANA WILKIN, VIKRAM SOMAYA, JASON MEIER, AMANDA R. EDWARDS, CHICKEN SOUP FOR THE SOUL PRODUCTIONS, LLC, CHICKEN SOUP FOR THE SOUL, LLC, CHICKEN SOUP FOR THE SOUL HOLDINGS, LLC, | |
| Defendants. | |

**COMPLAINT FOR (I) BREACH OF FIDUCIARY DUTY; (II) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY; (III) AVOIDANCE OF FRAUDULENT TRANSFERS; (IV) RECOVERY OF ILLEGAL DIVIDENDS; (V) DAMAGES FOR NON-PAYMENT OF EMPLOYEE WAGES, BENEFITS AND PAYROLL TAXES; (VI) EQUITABLE SUBORDINATION; AND (VII) DISALLOWANCE OF CLAIMS**

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number (where applicable), are: 757 Film Acquisition LLC (4300); Chicken Soup for the Soul Entertainment Inc. (0811); Chicken Soup for the Soul Studios, LLC (9993); Chicken Soup for the Soul Television Group, LLC; Crackle Plus, LLC (9379); CSS AVOD Inc. (4038); CSSESIG, LLC (7150); Digital Media Enterprise, LLC; Halcyon Studios, LLC (3312); Halcyon Television, LLC (9873); Landmark Studio Group LLC (3671); Locomotive Global, Inc. (2094); Pivotshare, Inc. (2165); RB Second Merger Sub LLC (0754); Redbox Automated Retail, LLC (0436); Redbox Entertainment, LLC (7085); Redbox Holdings, LLC (7338); Redbox Incentives LLC (1123); Redwood Intermediate, LLC (2733); Screen Media Films, LLC; Screen Media Ventures, LLC (2466); and TOFG LLC (0508).

## TABLE OF CONTENTS

INTRODUCTION .......................................................................................................................1

JURISDICTION AND VENUE ................................................................................................2

THE PARTIES ...........................................................................................................................3

    The Trustee Plaintiff .........................................................................................................3

    The Director & Officer Defendants .................................................................................3

    The CSS Entity Defendants ..............................................................................................5

STATEMENT OF FACTS ........................................................................................................6

    A.    Rouhana's Unchecked Control Over the Company ...................................6

    B.    The Failure of Internal Controls and the Debtors' Demise.........................8

    C.    The Redbox Merger .................................................................................10

    D.    The Insider Release Agreement ...............................................................19

    E.    The Company Transferred 10% of Its Net Revenues to Its Controlling Shareholder Each Quarter........................................................21

    F.    The Intellectual Property License Agreements.........................................23

    G.    The Company Paid Millions in Dividends to Shareholders While It Was Insolvent............................................................................................25

    H.    The Company's Insiders Failed to Pay Employee Wages, Medical Benefits and Payroll Taxes .....................................................................27

    I.    The CSS and Rouhana Proofs of Claim and Potential Claims That May Be Asserted by Other Defendants ...................................................28

CAUSES OF ACTION ............................................................................................................28

    FIRST CLAIM FOR RELIEF Against Rouhana for Breach of Fiduciary Duty ..............28

    SECOND CLAIM FOR RELIEF Against Each Non-Rouhana Board Defendant for Breach of Fiduciary Duty......................................................................................31

    THIRD CLAIM FOR RELIEF Against Each Non-Rouhana Officer Defendant for Breach of Fiduciary Duty......................................................................................34

FOURTH CLAIM FOR RELIEF Against Each CSS Entity Defendant for Breach of Fiduciary Duty ................................................................................................37

FIFTH CLAIM FOR RELIEF Against All Defendants For Aiding & Abetting Breaches of Fiduciary Duties...............................................................................40

SIXTH CLAIM FOR RELIEF Against CSS, Rouhana, Newmark and the Other CSS Entities to Avoid and Recover Insider Revenue Transfers as Fraudulent Transfers (11 U.S.C. §§ 548(a)(1)(B) and 550(a)) .............................41

SEVENTH CLAIM FOR RELIEF Against CSS, Rouhana, Newmark and the Other CSS Entities to Avoid and Recover Insider Revenue Transfers as Fraudulent Transfers (11 U.S.C. §§ 544(b) and 550(a); 6 Del. C. § 1305) ..........42

EIGHTH CLAIM FOR RELIEF Against All Defendants for Avoidance of Insider Releases as Fraudulent Transfers (11 U.S.C. §§ 548(a)(1)(B) and 550(a))...........43

NINTH CLAIM FOR RELIEF Against All Defendants for Avoidance of Insider Releases as Fraudulent Transfers (11 U.S.C. §§ 544(b) and 550(a); 6 Del. C. § 1305)...............................................................................................................44

TENTH CLAIM FOR RELIEF Against All Defendants to Recover Preferred Dividends and Insider Revenue Transfers as Illegal Dividends ...........................45

ELEVENTH CLAIM FOR RELIEF Against All Defendants for Non-Payment of Employee Wage, Benefit and Tax Obligations......................................................46

TWELFTH CLAIM FOR RELIEF Objection to Claims of All Defendants – Disallowance Under 11 U.S.C. §§ 502(d) & (j) ......................................................47

THIRTEENTH CLAIM FOR RELIEF Against All Defendants for Equitable Subordination of Claims  Under 11 U.S.C. § 510(c) ..............................................48

PRAYER FOR RELIEF ............................................................................................48

George L. Miller, the duly appointed chapter 7 trustee of the above-captioned Debtors' estates (the "Trustee" or "Plaintiff"), on behalf of Chicken Soup for the Soul, Inc. ("CSSE" or the "Company") and the other Debtors' estates, and as Plaintiff in the above-captioned adversary proceeding, and against the above-captioned defendants (collectively, the "Defendants"), hereby alleges on information and belief:

## **INTRODUCTION**

1.        Prior to seeking bankruptcy protection in June 2024, the Debtors were victim of mismanagement and pillaging by insiders on a scale rarely seen with public companies. The Debtors were at all relevant times dominated and controlled by William J. Rouhana, Jr. ("Rouhana"), who directly and indirectly owned the majority of the Company's voting stock, served as the Chairman of the Company's board of directors, and acted as its Chief Executive Officer. Although the Debtors reported net losses every year beginning in 2018, Rouhana treated the Debtors as his personal piggybank throughout, while neglecting the most basic corporate duties. The Company's other directors and officers were conflicted, beholden to Rouhana, supine and failed to exercise independent judgment or to act in the interests of the Company.

2.        As described more fully herein, the Defendants' misconduct included causing the Company to:

> (1)      pay to its controlling shareholder 10% of its net revenues each quarter, totaling over $55 million since 2020, notwithstanding the Company's insolvency and enormous losses during that period;

> (2)      pay tens of millions of dollars in dividends to its preferred shareholders when the Company was insolvent;

> (3)      assume hundreds of millions of dollars in debt that the Company had no ability to service in connection with the acquisition of an insolvent entity, solely on the basis of management's unreasonable projections (rather than those of the Company's retained financial advisor), and to obligate the Company to pay a portion of the acquired entity's revenues pursuant to insider management and licensing fee arrangements and, upon the

consummation of the transaction, to purportedly release the Defendants from all claims in exchange for no consideration;

(4)    enter into numerous licensing agreements with Rouhana's personal contacts and others for less than fair value; and

(5)    fail to pay millions of dollars in employee wages, medical benefits, and payroll taxes, while transferring millions of dollars to the Company's shareholders.

3.    At each stage, the Defendants were motivated by a desire to maintain control over the Debtors and to protect their own interests, rather than those of the Debtors. The Defendants' misconduct and dereliction of duty caused the Debtors and their creditors significant harm.

4.    By this action, the Trustee seeks redress for that harm, including through claims to (i) recover damages for the Defendants' negligence, gross negligence, bad faith and repeated breaches of fiduciary duties, including the duty of loyalty and duty of care, and for aiding and abetting these breaches of fiduciary duties; (ii) recover transfers made by the Company to its shareholders as fraudulent transfers and as illegal dividends under applicable law; (iii) avoid the agreement to release claims against the Defendants and the prejudicial intellectual property license agreements as fraudulent transfers; (iv) recover damages for the non-payment of employee wages, benefits, and payroll taxes; and (v) disallow and equitably subordinate any claims asserted by or on behalf of the Defendants in the Debtors' bankruptcy cases.

## JURISDICTION AND VENUE

5.    On June 24, 2024 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* ("Bankruptcy Code"). On July 10, 2024, the Bankruptcy Court converted the Debtors' bankruptcy cases to chapter 7 of the Bankruptcy Code. [D.I. 120]

6.      This action arises out of and relates to the Debtors' bankruptcy cases and is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (B), (H) and (O).  The Bankruptcy Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334.

7.      Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

## THE PARTIES

### The Trustee Plaintiff

8.      On July 11, 2024, George L. Miller was appointed as the chapter 7 trustee of the Debtors' estates.  The Trustee is the Plaintiff in this action and brings this action on behalf of the Debtors' estates.  With one exception, each of the Debtors is a corporate entity incorporated, or a limited liability company formed, under Delaware law.[2]

9.      Plaintiff is vested with, among other things, the powers described in section 704 of the Bankruptcy Code, including the power to investigate the financial affairs of the Debtors and to collect and reduce to money property of the estates.

### The Director & Officer Defendants

10.     Defendant William J. Rouhana, Jr. ("Rouhana") is an individual and is the husband of Amy L. Newmark.  At all relevant times since its formation, Rouhana served as the Chairman of the Board of Directors of the Company (the "Board"), the Chief Executive Officer of the Company, controlled the Company and its subsidiaries (including all of the Debtors), and controls each of the CSS Entities (as such term is defined herein).

11.     Defendant Amy L. Newmark ("Newmark") is an individual and is the wife of Rouhana.  At all relevant times since its formation, Newmark served as a member of the Board. Newmark also served as Senior Brand Advisor to the Company pursuant to the CSS

---

[2] Debtor Locomotive Global, Inc. is a Wyoming corporation.

Management Agreement between the Company and CSS and, with Rouhana, owns the CSS Entities (as such terms are defined herein).

12.      Defendant Christopher Mitchell ("Mitchell") is an individual.  At all relevant times, since June 2021, Mitchell served as a member of the Board.  Mitchell also served as the Company's Chief Financial Officer for the period from January 1, 2019 through November 2022 and, since January 1, 2019, has served as the Chief Financial Officer of CSS.

13.      Defendant Cosmo DeNicola ("DeNicola") is an individual.  At all relevant times, since June 2019, DeNicola served as a member of the Board.

14.      Defendant Fred M. Cohen ("Cohen") is an individual.  At all relevant times, since June 2016, Cohen served as a member of the Board.

15.      Defendant Christina Weiss Lurie ("Lurie") is an individual.  At all relevant times, since June 2016, Lurie served as a member of the Board.

16.      Defendant Diana Wilkin ("Wilkin") is an individual.  At all relevant times, since June 2016, Wilkin served as a member of the Board.

17.      Defendant Vikram Somaya ("Somaya") is an individual.  At all relevant times, since October 2021, Somaya served as a member of the Board.

18.      Defendant Martin Pompadur ("Pompadur") is an individual.  At all relevant times, since June 2019, Pompadur served as a member of the Board.

19.      Defendant Jason Meier ("Meier") is an individual.  Since November 2022, Meier has served as the Chief Financial Officer and Principal Accounting Officer of the Company. Prior to this time, commencing September 2021, Meier served as Executive Vice President, Finance and Chief Accounting Officer of the Company.

20.     Defendant Amanda R. Edwards ("Edwards") is an individual.  At all relevant times, since 2017, Edwards served as Chief of Staff for Rouhana.  In addition, for the period May 2022 through December 2023, Edwards served as the Company's Senior Vice President and Chief of Staff and, for the period January 2024 to October 2024, Edwards served as the Company's Executive Vice President of Operations.

21.     Rouhana, Newmark, Mitchell, DeNicola, Cohen, Lurie, Wilkin, Somaya, and Pompadur are referred to herein as the "Board" or "Board Defendants."  Rouhana, Mitchell, Meier, and Edwards are referred to herein as the "Officers" or "Officer Defendants."  Together, the Board Defendants and the Officer Defendants are referred to herein as the "D&Os" or "D&O Defendants."

### The CSS Entity Defendants

22.     Defendant Chicken Soup for the Soul Productions, LLC ("CSSP") is the parent and controlling stockholder of the Company, owning approximately 100% of the Company's Class B common stock (representing an ownership of 36.7% of the total outstanding common stock and 85% control of the voting power of the Company).[3]  CSSP is controlled by Rouhana.  CSSP is a Delaware limited liability company.

23.     Defendant Chicken Soup for the Soul, LLC ("CSS") owns 100% of CSSP.  CSS is controlled by Rouhana.  CSS is a Delaware limited liability company.

24.     Defendant Chicken Soup for the Soul Holdings, LLC ("CSS Holdings") owns 100% of CSS.  CSS Holdings is controlled by Rouhana.  CSS Holdings is a Delaware limited liability company.

---

[3] CSSE's Annual Report (Form 10-K) for the fiscal year ended December 31, 2022 (the "CSSE 2022 Annual Report") at F-37.

25.    CSSP, CSS, and CSS Holdings are referred to herein as the "<u>CSS Entities</u>" or

"<u>CSS Entity Defendants</u>."

<b><u>STATEMENT OF FACTS</u></b>

A.    <u>Rouhana's Unchecked Control Over the Company</u>

26.    The Company formerly operated primarily through its Debtor subsidiaries as a

provider of streaming on-demand video and television services.  Rouhana, as the Company's

CEO, Chairman of the Board, and the person in control of the CSS Entities, effectively

controlled all operational and financial activities of the Company and its subsidiaries.  Rouhana

also exerted significant and unjustifiable control over the other D&Os and their decision making.

As the Company candidly acknowledged in its annual securities reports:[4]

> *Our chairman and chief executive officer effectively controls our company*.
>
> We have two classes of common stock – Class A Common Stock, each share of which entitles the holder thereof to one vote on any matter submitted to our stockholders, and Class B Common Stock, each share of which entitles the holder thereof to ten votes on any matter submitted to our stockholders. *Our chairman and chief executive officer, William J. Rouhana, Jr., has control over the vast majority of all the outstanding voting power as represented by our outstanding Class B and Class A Common Stock and effectively controls CSS Holdings and CSS, which controls CSS Productions, and, in turn, our company. Further, our bylaws provide that any member of our board may be removed with or without cause by the majority of our outstanding voting power, thus Mr. Rouhana exerts significant control over our board. This concentration of ownership and decision making may make it more difficult for other stockholders to effect substantial changes in our company and may also have the effect of delaying, preventing or expediting, as the case may be, a change in control of our company.*

---

[4]    *Id.* at 28 (emphasis added).  *See also* CSSE's Annual Report (Form 10-K) for the fiscal year ended December 31, 2021 (the "<u>CSSE 2021 Annual Report</u>") at 22, and CSSE's Annual Report (Form 10-K) for the fiscal year ended December 31, 2023 (the "<u>CSSE 2023 Annual Report</u>") at 26.

27.     Due to Rouhana's unilateral control of the Company and its subsidiaries, and his ability to remove the other D&Os without cause, the other D&Os were beholden to Rouhana, did not act contrary to his wishes, and did not function as proper directors and officers of a Delaware publicly traded company.

28.     As set forth in the Company's annual reports:[5]

> Our shares of Class A Common Stock and Class B Common Stock vote together as a single class and are the only class of our securities that carry full voting rights. ***Mr. Rouhana, our chairman of the board and chief executive officer, beneficially owns the vast majority of the voting power of our outstanding common stock. As a result, Mr. Rouhana exercises a significant level of control over all matters requiring stockholder approval, including the election of directors, amendment of our certificate of incorporation, and approval of significant corporate transactions. This control could have the effect of delaying or preventing a change of control of our company or changes in management and will make the approval of certain transactions difficult or impossible without his support***, …

29.     As described below, Rouhana breached his fiduciary duties to the Debtors, based on his undue control and influence over the Debtors, the other D&Os and the CSS Entities. Through deception and manipulation, Rouhana ran the Company with a focus first and foremost on maintaining his control and influence, and on maximizing shareholder gain for his benefit, even while the Company was insolvent.   Rouhana (aided by the Officers on his financial management and executive teams, including Mitchell and Meier, and his right-hand person Edwards), adopted wildly unrealistic business projections and plans – which the other D&Os blindly accepted – leading the Company to a dire position: zero liquidity, deteriorating assets, entry into insider and unfavorable transactions that drained the Company's coffers, the non-

---

[5] CSSE 2022 Annual Report at 31 (emphasis added).  *See also* CSSE 2021 Annual Report at 25 and CSSE 2023 Annual Report at 29.

payment of millions of dollars in employee payroll, medical benefits, and taxes and, ultimately, the Debtors' free-fall bankruptcy filing.

30.      As described below, the other D&Os breached their fiduciary duties to the Debtors by allowing Rouhana to exert undue and unreasonable control and influence over them, the Debtors, and the CSS Entities.  The other D&Os did not act as proper directors and officers of a Delaware corporation.  They were supine and loyal to Rouhana and utterly failed to adequately oversee him and curtail his entry into self-interested and unreasonable transactions. They were negligent and failed to make reasoned and informed decisions; instead, beholden to Rouhana, they abdicated their fiduciary responsibilities and placed Rouhana's and their own interests ahead of those of the Company.  The Company's Board minutes reflect that the other D&Os unreasonably relied on, did not question, and/or rubber-stamped Rouhana's determinations and dictates.  The other D&Os consistently failed to obtain and/or ignored pertinent information that would have allowed them to make reasoned and informed decisions and act for the benefit of the Company, as they were required by law to do.  Instead, the D&Os' loyalties lay with Rouhana at the expense of the Company.  The other D&Os' failure to oversee and check Rouhana's self-interested, deceptive, and manipulative actions led to the demise of the Debtors.

**B.      The Failure of Internal Controls and the Debtors' Demise**

31.      The Company began to report annual net losses no later than 2020.  The Company reported net losses of approximately $44.6 million in 2020,[6] $59.4 million in 2021,[7] $111.3 million in 2022,[8] $636.6 million in 2023,[9] and $52.9 million in the first quarter of 2024.[10]

---

[6]  CSSE 2021 Annual Report at 5.

[7]  *Id.*

[8]  CSSE 2022 Annual Report at 6.

Throughout that period, the Company reported negative cash flows from operations.[11]  In most years, the Company had relatively little free cash on hand.  In 2023, the Company's liabilities exceeded the book value of its assets by over $500 million.[12]

32.    The Company's stock price declined in value during this period as a result of its insolvency and, in September 2023, the Company received a determination from NASDAQ to delist its stock.[13]  Beginning with the third quarter of 2023, the Company's financial statements contained a going concern qualification.[14]

33.    As bad as the Company's reported performance was, those public reports did not accurately reflect the Company's true financial condition.  In May 2024, the Company acknowledged that its internal controls over financial reporting and operations were not effective, including in connection with the disastrous merger with Redbox in 2022 (described below), stating that:[15]

> Management concluded that the Company's internal controls over financial reporting were not effective at the reasonable assurance level as of December 31, 2023.  As a result of our evaluation, we identified a material weakness in our controls related to implementation and testing of design and operating effectiveness of controls, including Redbox that was acquired in 2022 . . .

---

[9]  CSSE 2023 Annual Report at 5.

[10]  CSSE Quarterly Report (Form 10-Q filed May 20, 2024) at 35.

[11]  *Id.* at 43 (stating that cash flow was negative $502,728 for the period ended March 31, 2024); CSSE 2023 Annual Report at 49 (showing negative cash flows of approximately $62.9 million for 2023 and $23.3 million for 2022); CSSE 2021 Annual Report at F-7 (showing negative cash flows of approximately $50 million in 2021 and $40.5 million in 2020).

[12]  CSSE 2023 Annual Report at F-6 (showing total assets of approximately $422.3 million and liabilities of approximately $925.8 million).

[13]  CSSE Current Report (Form 8-K filed March 29, 2024).

[14]  *See, e.g.*, CSSE Quarterly Report (Form 10-Q filed December 22, 2023) at 9-10; CSSE Quarterly Report (Form 10-Q filed May 20, 2024) at 8-9.

[15]  CSSE Quarterly Report (Form 10-Q filed May 20, 2024) at 45.

34.    There is no indication in the Company's Board minutes that the D&Os requested, or were provided with, sufficient information to allow them to understand and/or address the Company's dire financial straits, including as to the admitted failure of the Company's internal controls over financial reporting.  Instead of obtaining, analyzing, questioning and considering the information reasonably necessary to act in the best interests of the Company, the D&Os were conflicted, supine and loyal to Rouhana, rubber-stamping his self-interested plans and unreasonably supporting his determinations and dictates to the Company's detriment.

## C.    The Redbox Merger

35.    No later than March 2022, the Company began exploring a potential acquisition of Redbox Entertainment Inc. ("Redbox").  CSSE was floundering at the time; its stock price had tanked from approximately $40/share in May 2021 to approximately $8/share in March 2022, and it reported a net operating loss of approximately $59.4 million in 2021 and would later report a net operating loss of approximately $111.3 million in 2022.  Even these large reported losses were likely underestimated, as the Company subsequently announced that its internal controls over financial reporting were not effective.

36.    Redbox operated a legacy business focused on renting physical DVDs and Blu-ray Discs from a nationwide network of approximately 32,000 self-service kiosks.  While once successful, Redbox's business was in steep decline by 2022.  Customers' rapidly changing preference for on-demand streaming services and the effects of the COVID-19 virus caused Redbox's revenues to drop precipitously from over $1 billion in 2018 to approximately $289 million in 2021.  Redbox's adjusted EBITDA dropped from approximately $292 million in 2018 to *negative* $17 million in 2021.  Redbox's business was in a free-fall.

37.    In March 2022, while the Company was actively negotiating a potential acquisition of Redbox, Redbox failed to timely file its annual form 10-K.  Redbox disclosed

publicly in April 2022 that it was continuing to assess whether substantial doubt existed about its ability to continue as a going concern.  Around the same time, Redbox's board of directors was advised that Redbox would likely need to file for bankruptcy if it could not secure additional liquidity or consummate a transaction with the Company.  Indeed, Redbox's board approved contingency planning for a bankruptcy filing if a transaction was not consummated. Notwithstanding these events, there is no indication in the Company's Board minutes that the D&Os requested or obtained sufficient information to undertake a rational analysis of the reasonableness of the transaction in light of the apparent and publicly disclosed risks, and the Company continued to pursue a transaction with Redbox – a transaction by which the Company would immediately become obligated to transfer a portion of Redbox's revenues to Rouhana's wholly-owned entity, CSS, through insider management and licensing agreements.

38.     The Company engaged Guggenheim Securities, LLC ("Guggenheim") as its financial advisor in connection with the proposed transaction, which would ultimately take the form of a merger (the "Merger").  Guggenheim advised the Company during the period leading up to the consummation of the Merger, including by providing presentations to the Board, with Officers present, summarizing certain financial information, projections, and estimates of synergies that might be realized from the Merger.

39.     In a slide deck titled "Project Emerald Board Discussion Materials" dated May 2022 (the "May 2022 Deck"), Guggenheim summarized certain terms, strategic rationales, and financial information relevant to the proposed Merger.  A critical slide in the May 2022 Deck that compared Redbox's actual historical performance to its projected future performance was identified as the "Redbox Stand-alone: CSSE Management Case."[16]  This slide was intended to

---

[16] May 2022 Deck at 13.

present an accurate projection of Redbox's stand-alone revenues and earnings following a Merger.  Redbox's revenues are shown as having dropped steadily from over $1 billion in 2018 to approximately $289 million in 2021 and its adjusted EBITDA is shown as having dropped from approximately $292 million in 2018 to negative $17 million in 2021.  Notwithstanding Redbox's steady and steep decline over the previous four years, the "Redbox Stand-alone: CSSE Management Case" envisioned Redbox having explosive growth following the Redbox Merger; *beginning in 2023, Redbox's revenues were shown as exceeding $500 million annually and its Adjusted EBITDA was projected to grow to over $64 million annually*.  As reported by the Company in its public filings, Redbox's actual revenues for the year ending December 31, 2023 were approximately $151 million, with a net loss of approximately $454 million.[17]

40.     Notably, although Guggenheim prepared the May 2022 Deck, the rosy projections described in the "Redbox Stand-alone: CSSE Management Case" were attributed exclusively to CSSE's own management.  As Guggenheim noted in the May 2022 Deck, the "CSSE Management Case reflects adjustments made to the Redbox stand-alone case by CSSE management, *which we have been directed to use for the purposes of our financial analysis*."[18]

41.     Similarly, a slide in the May 2022 Deck summarizing the Company's stand-alone projections shows extraordinary projected growth in revenues and EBITDA.[19]  The Company's stand-alone revenue was approximately $110 million in 2021 and its adjusted EBITDA was approximately $22 million.  Yet, the May 2022 Deck forecast that, following the Merger, the Company's stand-alone revenue would grow consistently at *over 30% each year* and that its adjusted EBITDA would grow evenly at *nearly 50% each year*.  Here too, the May 2022 Deck

---

[17] CSSE 2023 Annual Report at F-23.

[18] May 2022 Deck at 13 (emphasis added).

[19] *Id.* at 14.

states that the Company's management was the source of the projections and notes that Guggenheim was "directed" by management to make certain assumptions.

42.     The May 2022 Deck further projected that the combined entity's revenues would grow at a constant rate, from under $400 million in 2021 to well over $1 billion by 2026.[20]   The combined entity's Adjusted EBITDA was projected to grow from approximately $5 million in 2021 to $50 million in 2022, to $156 million in 2023, and to $258 million in 2026.   Again, the Company's management was the source of these unrealistic projections.   As reported by the Company in its public filings, the combined entity's actual revenues for the year ending December 31, 2023 were approximately $409 million, with a net loss of over $287 million.[21]

43.     There is no indication in the Company's Board minutes that the Board requested or obtained sufficient information to undertake a reasoned analysis of the reasonableness of the assumptions being utilized in the projections prepared by management – spearheaded by Rouhana and his financial and executive management team (including, without limitation, Mitchell, Meier, and Edwards, who were themselves under Rouhana's influence and control) – that provided the basis for the Merger.   Nor did the Board request that Guggenheim provide an opinion as to the reasonableness of management's projections or that Guggenheim provide its own projections.

44.     Thus, while the Company retained Guggenheim to advise it on the financial implications of a potential transaction involving Redbox, the Company "directed" its financial advisor to conclude that the Merger would be wildly successful by assuming that each of the Company and Redbox – two independently dying businesses – would become exceedingly profitable immediately following the Merger.   The Board relied on the May 2022 Deck in

---

[20] *Id.* at 16.

[21] CSSE 2023 Annual Report at F-24.

approving and in seeking shareholder approval for the Merger.  In light of Redbox's negative historical performance, the appeal to the Company of a Merger rested entirely on unreasonably optimistic projections of future performance of the combined company, which were supplied by the Company's own management, rather than its financial advisor.  These unreasonably optimistic projections were neither questioned nor tested by the D&Os, nor did the D&Os question Rouhana's motivation for pushing the Company towards a transaction from which his wholly-owned entity, CSS, would obtain the benefit of a portion of Redbox's revenues through insider management and licensing agreements.  Rather, the projections were blindly accepted notwithstanding that they formed the very basis for the Board's determination to seek shareholder approval of the Merger.

45.     On May 10, 2022, the Company entered into a Merger Agreement with Redbox, pursuant to which the Company agreed to transfer stock to Redbox's shareholders and to assume hundreds of millions of dollars in Redbox's liabilities.  The Merger was consummated in August 2022.  An aggregate of approximately 4.6 million shares of the Company's Class A common stock was issued to Redbox's shareholders in connection with the Merger.[22]  Based on a trading price of the stock of approximately $14 per share as of the closing of the Merger on August 11, 2022, the total value of the stock issuance portion of the transaction was approximately $64.4 million.

46.     On August 11, 2022, concurrently with the consummation of the Merger, the Company entered into an Amended and Restated Credit Agreement ("HPS Credit Agreement") with HPS Investment Partners LLC, as administrative agent and collateral agent ("HPS").  Pursuant to the terms of the HPS Credit Agreement, the Company assumed (i) all of Redbox's

---

[22] *See e.g.*, Redbox Entertainment, Inc.'s Definitive Proxy Statement filed July 15, 2022 at 23.

obligations under an outstanding credit agreement between Redbox and HPS originally dated as of October 20, 2017, and (ii) an $80 million revolving credit facility (together, the "HPS Facilities").  Interest was payable on the HPS Facilities in cash or, for a period of up to 18 months, could be paid (in whole or in part) by increasing the principal amount of the HPS Facilities ("PIK Interest").  The revolving facility matured in February 2025 and the term loan matured in August 2027.

47.    At the closing of the Merger, the Company assumed approximately $360 million of debt under the HPS Credit Agreement and drew down an additional approximately $25.9 million on the revolving credit facility, all at an interest rate of 10.3% per annum. Approximately one month later, on September 19, 2022, the Company made an additional draw under the revolving facility of approximately $22.3 million at an interest rate of 10.85%. Between August 2022 and February 2024, the Company elected to add PIK Interest accrued on the outstanding debt, resulting in a total outstanding debt owed under the HPS Credit Agreement of approximately $500 million as of the Petition Date.

48.    All obligations under the HPS Facilities were unconditionally guaranteed by each of the Company's existing and future direct and indirect material, wholly-owned domestic subsidiaries, subject to certain exceptions.  The obligations of the Company and its subsidiary guarantors under the HPS Credit Agreement were secured by a first priority lien on substantially all of the assets of the Company and its subsidiaries, subject to certain exceptions.

49.    Prior to the Merger, the Company had relatively little debt and interest expense. As of year-end 2021, the Company had total gross debt of approximately $56.7 million and annual interest expense of $4.8 million.  Pursuant to the Merger, however, the Company assumed additional liabilities that totaled approximately $528 million.  By the end of 2023, the first full

year following the Merger, the Company's total gross debt had exploded to approximately $562.4 million (nearly 10 times the amount of the Company's debt prior to the Merger) and its annual interest expense had ballooned to over $76 million (nearly 16 times the amount of the Company's interest expense prior to the Merger).

50.     The Company never had the ability to service these liabilities.  The Company ended 2021 with approximately $43 million in unrestricted cash.  It paid transaction costs of approximately $17.5 million and loan closing costs of approximately $1.2 million in connection with the Merger.  As of December 31, 2022, the Company had unrestricted cash and cash equivalents of approximately $15 million, while its total gross debt outstanding was approximately $500.2 million.  As of December 31, 2023, the Company had *no* unrestricted cash, while its total gross debt outstanding was approximately $562.4 million.

51.     As it acknowledged in its public securities filings, the Company's ability to service the HPS Facilities was predicated entirely on the hope that Redbox's business would experience a dramatic turnaround:[23]

> CSSE's merger with Redbox occurred in August 2022. The merger included the assumption of $359.9 million of debt.  The ability to service this debt and operate our combined business operations was predicated on a partial return to pre-COVID levels in the number and cadence of theatrical releases that were available to the company for its kiosk network, cost synergies between the companies, and the ability to consummate certain accounts receivable financing.  The corresponding rebound in demand for physical kiosk rentals was expected to return to approximately a third of 2019 levels, along with expected synergies from the acquisition, and accounts receivable financing, which would generate sufficient cash flows to cover the cash needs of the combined businesses.

52.     That recovery did not happen and it never could have reasonably been expected to happen.  Redbox operated an antiquated business focused on renting a product that, by 2022, was

---

[23] CSSE 2023 Annual Report at F-11.

no longer in demand. Redbox's own financial distress was no secret and it was preparing for

bankruptcy at the same time that the Company was negotiating to acquire it.  But even if Redbox

had not been a massive liability at the time, it was obvious that the Company could not support

its operations.  Notwithstanding these apparent risks, the D&Os failed to reasonably test or

question the viability of the Merger from a financial or operational standpoint.

53.     At its core, the Company (including Redbox) was a content supplier.  The

Company required significant amounts of cash to procure film licenses to supply a product to the

Redbox kiosks and its on-demand services.  Following the Merger, however, the Company

lacked the cash necessary to operate or the ability to borrow it, which left the Company unable to

procure content to support its operations.  As the Company stated in the CSSE 2023 Annual

Report:[24]

> Redbox's business . . . depends on our ability to obtain adequate content
> from movie studios. We have entered into licensing agreements with
> certain studios to provide delivery of their DVDs. These movie studios
> have terminated our relationship due to our inability to pay their licenses
> [*sic*] fees . . .

54.     Without a product to offer, customer interest and the Company's revenues fell

dramatically, leaving the Company further constrained and resulting in irreparable harm to the

Company's operations.  Between the closing of the Merger in August 2022 and the end of that

calendar year, the Company recorded a nearly $36 million net loss related to Redbox.   In

calendar year 2023 – the first full year following the Merger – ***the Company recorded an

approximate $454 million net loss related to Redbox***.

55.     In its accounting of the Merger, the Company claimed that it acquired assets

worth approximately $598 million.  Over $506 million of that amount was in the form of

---

[24] *Id.* at 17.

"intangible assets" and "goodwill."  By contrast, the Company assumed actual liabilities of approximately $528 million in the Merger.  In the third quarter of 2023 – approximately one year following the Closing – the Company recorded an impairment charge related to certain intangibles and goodwill of approximately $380.8 million, principally related to the underperformance of Redbox.  The Company effectively wrote-off its massive investment in Redbox within a year.

56.     As described above, the Company subsequently acknowledged that its internal financial controls had failed, including specifically with respect the Merger.

57.     The financial information provided by management – notably, Rouhana, and other Officers on the financial and executive management teams, including Mitchell, Meier, and Edwards – to support the Redbox Merger was wildly optimistic, unrealistic and not based on reasonable assumptions, and its use and presentation to the Board to support the Merger was negligent, grossly negligent, misleading, in bad faith, and constituted a breach of fiduciary duty of care and duty of loyalty by Rouhana and the other Officers on the financial and executive management teams.  When presented with this unreliable information and Guggenheim's specific disclaimers as to its source, and the Company's obligation to pay CSS a portion of Redbox's revenue, the other D&Os utterly failed to properly assess or question the reasonableness of the projections, underlying assumptions, or self-interested nature of the transaction.  Instead of obtaining sufficient information and providing appropriate monitoring and oversight, the D&Os were conflicted, supine and beholden to Rouhana – who served to gain from the transaction through the payment of management and licensing fees to CSS – and simply did his bidding.  Relying solely on the information provided to them by Rouhana and those

members of the management team under his control was negligent, grossly negligent, in bad faith and constituted a breach of the other D&Os' fiduciary duty of care and duty of loyalty.

## D.    The Insider Release Agreement

58.    While the Company was finalizing the Merger, the D&Os took the opportunity to procure broad releases for themselves by causing the Company to enter into a Release Agreement dated as of May 10, 2022, on behalf of itself and several merger subsidiaries (collectively defined therein as the "CSSE Parties"), together with certain "Apollo Parties," HPS Investment Partners, LLC, certain "RDBX Parties," and Seaport Global SPAC, LLC.  Pursuant to the Release Agreement, each of the "Mutual Release Parties" – *i.e.,* the Apollo Group Parties, the CSSE Group Parties,[25] the HPS Group Parties, the RDBX Group Parties and the Seaport Group Parties – agreed to release claims against (i) each of the other Mutual Release Parties, and (ii) the directors, officers, and managers of each of the RDBX Parties and CSSE.  These releases are made effective "as of the consummation of the transactions contemplated by the Merger Agreement."

59.    Section 2.1 of the Release Agreement provides, in relevant part:

> Mutual Releases and Waivers. *Effective as of the consummation of the transactions contemplated by the Merger Agreement (the "Effective Time"), each of* the Apollo Parties, *the CSSE Parties,* HPS, the RDBX Parties and Seaport, severally and not jointly, on behalf of itself and its respective Mutual Release Parties and its and their respective Subsidiaries, Affiliates, or any other Person claiming by, through or for the benefit of any of them, and each of their respective successors and assigns, *hereby unconditionally, irrevocably and forever releases and discharges each of the other Mutual Release Parties*, **and each Party** on behalf of itself and its respective Mutual Release Parties and its and their respective Subsidiaries, Affiliates, or any other Person claiming by, through or for the

---

[25] The term "CSSE Group Parties" is defined in the Release Agreement to mean "the CSSE Parties and each of their former, current and future direct or indirect Subsidiaries and Affiliates and their respective former, current and future officers, directors, managers, employees, representatives, agents, attorneys, successors and assigns."

benefit of any of them, and each of their respective successors and assigns (including the RDBX Group Parties) ***hereby unconditionally, irrevocably and forever releases and discharges each of the former, current and future directors, officers, and managers of*** the RDBX Parties and ***CSSE, to the fullest extent permitted by applicable law, from all past and present Claims*** (other than any Excluded Claims) *that such Party and its respective Mutual Release Parties ever had, now has or hereafter can, shall or may have, for, upon or by reason of any matter, action, inaction cause or thing whatsoever from the beginning of the world to the Effective Time arising out of or related to events, transactions, activity, circumstances or actions occurring or failing to occur, in each case, at or prior to the Effective Time, in each case that arise from or otherwise relate in any way to, in whole or in part, (i) the RDBX Group Parties* (including the management, ownership, activities, failure to act or operation or activities thereof), *(ii) the CSSE Group Parties (including the management, ownership, activities, failure to act or operation or activities thereof), (iii) indebtedness incurred by, or equity interests in, any of the RDBX Group Parties, or any merger, asset sale, equity issuance or other transaction involving any of the RDBX Group Parties, (iv) indebtedness incurred by, or equity interests in, any of the CSSE Group Parties, or any merger, asset sale, equity issuance or other transaction involving any of the CSSE Group Parties, (v) the Merger Agreement, including the formulation, preparation, negotiation or execution of any of the agreements or documents contemplated thereby or related thereto, or (vi) any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Time that relates to any of the foregoing. Each of the Parties* on behalf of itself and its respective Mutual Release Parties *agrees that it shall not make*, and each shall not permit any of its Affiliates to make, and each covenants never to, and to cause its Affiliates not to, assert or voluntarily assist any Person in asserting *any Claim* (other than any Excluded Claim) *against any of the other Parties or the other Mutual Release Parties with respect to any liabilities or obligations released pursuant to the above. . . .*[26]

60.     Since the broad releases to be granted by each of the releasing parties named in the Release Agreement (the "Insider Releases") would take effect only upon the consummation of the Merger, each of the D&Os had a personal interest in ensuring that the Company would consummate the Merger.  Although none of the Defendants provided any consideration to the

---

[26] Release Agreement, § 2.1 (emphasis added).

Company in exchange for causing the Company to enter into the Release Agreement, each of the Defendants stood to benefit personally – through the release of any and all claims against them that may have been held by numerous parties – by causing the Company to enter into the Merger.

61.     By causing the Company to enter into the Release Agreement – which was an interested-party transaction – and to proceed with the Merger to guarantee their Insider Releases, the Defendants placed their own interests ahead of those of the Company in violation of their fiduciary duties.

**E.     The Company Transferred 10% of Its Net Revenues to Its Controlling Shareholder Each Quarter**

62.     The Company is a party to a Management Services Agreement with CSS (the "CSS Management Agreement").  Under the terms of the CSS Management Agreement, the Company was obligated to pay CSS 5% of its net revenues for each fiscal quarter in exchange for services provided by certain insider Defendants (including Rouhana, Newmark, and Mitchell), certain back-office services, office space, and equipment.  Thus, under the CSS Management Agreement, the Company was subject to a continuing requirement to pay its controlling parent 5% of its net revenues, regardless of the Company's financial condition, allegedly to compensate its parent in large part for services provided by insiders, including Rouhana.[27]

63.     The Company is also a party to a trademark and intellectual property license agreement with CSS (the "CSS License Agreement" and, together with the CSS Management Agreement, the "Insider Agreements").  Under the terms of the CSS License Agreement, the Company was obligated to pay to CSS 5% of its net revenues in the aggregate each quarter in exchange for a license to utilize the Chicken Soup for the Soul brand and related content, and for

---

[27] CSSE 2022 Annual Report at 43.

certain marketing support.[28]   Again, the Company was obligated to make these payments to its

corporate parent (owned and controlled by Rouhana and Newmark) regardless of its financial

condition.

64.      Taken together, the Company was obligated to pay 10% of its net revenues to

CSS under the Insider Agreements (collectively, the "Insider Revenue Transfers").  The Insider

Revenue Transfers totaled over $55 million between 2020 and the first quarter of 2024, as

summarized in the table below:[29]

|  | 2020 | 2021 | 2022 | 2023 | Q1 2024 | Total |
|---|---|---|---|---|---|---|
| Management Fees | $3.3M | $5.5M | $9.2M | $9.2M | $600,000 | $27.8M |
| License Fees | $3.3M | $5.5M | $9.2M | $9.2M | $600,000 | $27.8M |
| **Totals** | **$6.6M** | **$11M** | **$18.4M** | **$18.4M** | **$1.2M** | **$55.6M** |

65.      As described above, the Company reported significant net losses during this

period and was insolvent, undercapitalized, and/or generally unable to pay its debts as they came

due.  Moreover, the Company lacked either sufficient surplus or sufficient net profits to lawfully

declare the Insider Revenue Transfers.

66.      Each of the Insider Agreements was originally entered into in 2016.  The CSS

Management Agreement had an original term of five years and thereafter the term was amended

to provide for successive one-year terms unless terminated upon advance notice provided by the

Company.[30]   The terms of the Insider Agreements were not characterized by fair dealing or a fair

price.  Rouhana acted in his own self-interest, deceived and manipulated the Debtors, and did not

act in the best interests of the Debtors in causing them to enter into the Insider Agreements.  CSS

---

[28] *Id.* at 42-43.

[29] Additional Insider Revenue Transfers might have been paid after the first quarter of 2024.

[30] *See* CSSE 2022 Annual Report, Ex. 10.2.3 (Amendment to Management Agreement dated March 15, 2021).  The
   Insider Agreements, and the amendments thereto, were related party transactions that were executed and approved
   by Rouhana on behalf of both the Company and CSS.

and the other CSS Entities, and Rouhana and Newmark personally, profited and derived personal financial benefit at the expense of the Company by virtue of the Insider Agreements.

67.    The other D&Os were not provided with, nor did they request, information sufficient to allow them to make an informed and reasoned determination with respect to the terms of the Insider Agreements, but were conflicted, beholden to, and blindly followed the directions of, Rouhana.  Although the Company could have terminated one or both of the Insider Agreements, the D&Os made no reasonable effort to analyze or question the necessity of the Insider Agreements to the Company, to terminate the Insider Agreements, to seek reasonable alternatives for the Company to procure any necessary services from non-insiders, or to renegotiate the terms of the Insider Agreements in any meaningful way.[31]  Instead, the D&Os permitted the Company to continue operating under the Insider Agreements, notwithstanding its financial distress.  By allowing the payment of management and licensing fees to Rouhana and his controlled entities, the D&Os were supine, conflicted, beholden to Rouhana, and failed to act in the best interests of the Company.

F.    **The Intellectual Property License Agreements**

68.    In the two years prior to the Petition Date, Debtors CSSE, Screen Media Ventures, LLC ("SMV"), TOFG, LLC ("TOFG"), and Halcyon Television, LLC ("Halcyon") entered into a series of intellectual property licensing agreements (the "Intellectual Property License Agreements").  These Intellectual Property License Agreements include the following:

    (a)    Distribution Agreement dated June 29, 2022 between Debtor SMV and FilmRise Acquisitions LLC.

---

[31] Pursuant to an amendment made to each of the Insider Agreements in 2023, certain of the recorded amounts were to be satisfied through the issuance to CSS of shares of the Company's Class A common stock in lieu of cash. These amounts include approximately $6.2 million of combined Insider Revenue Transfers incurred in 2023 and $200,000 in Q1 2024.

(b)     Letter Agreement dated December 1, 2022 between Debtor SMV and Graceling Distribution, LLC.

(c)     IFTA Multiple Rights Distribution Agreement (Television and Library) dated December 30, 2022 between Debtor SMV and RH Capital, Inc.

(d)     Contract dated April 12, 2023 between CSSE and Tatatu Hungary KFT.

(e)     IFTA Multiple Rights Distribution Agreement (Television and Library) dated September 11, 2023 between Debtor TOFG, and That's the Spirit V.O.F.

(f)     Letter Agreement dated September 29, 2023 between Debtor SMV and Robert B. Becker, Inc.

(g)     Letter Agreement dated March 13, 2024 between Debtor SMV and the Nagelberg Trust.

(h)     Letter Agreement dated March 22, 2024 between Debtor SMV and the Nagelberg Trust.

(i)     Letter Agreement dated March 27, 2024 between Debtor SMV and the Nagelberg Trust.

(j)     License and Distribution Agreement dated April 16, 2024 among (i) Debtors SMV, TOFG, and Halcyon, on the one hand; and (ii) WS Pictures Licensing, LLC, on the other hand.

(k)     Letter Agreement dated April 24, 2024 between Debtor SMV and the Nagelberg Trust.

(l)     Letter Agreement dated May 10, 2024 between Debtor SMV and DJCTM Lending, LLC.

(m)     Letter Agreement dated May 13, 2024 between Debtor SMV and the Nagelberg Trust.

69.     The Nagelberg Trust is a holder of the Company's Series A Preferred Stock and provided $1.75 million to Debtors' chapter 11 counsel as of the Petition Date, Reed Smith LLP, on account of professional fees incurred prior to the Petition Date.  Mr. Nagelberg, the trustee of the Nagelberg Trust, is a personal friend of Rouhana.

70.     The Intellectual Property License Agreements were executed and/or approved by Rouhana on behalf of CSSE and the other Debtors at a time that each of the Debtors was or was

rendered insolvent, undercapitalized, and/or generally unable to pay its debts as they came due. The terms of the Intellectual Property License Agreements were not characterized by fair dealing or a fair price. None of the Debtors received reasonably equivalent value in exchange for entering into the Intellectual Property License Agreements.

71.     Rouhana acted in his own self-interest, deceived, and manipulated the Debtors and the other D&Os, and did not act in the best interests of the Debtors in causing them to enter into the Intellectual Property License Agreements.

72.     The other D&Os were not provided with, nor did they request, information sufficient to allow them to make an informed and reasoned determination with respect to the Intellectual Property License Agreements, but were beholden to, and blindly followed the directions of, Rouhana. By allowing entry into the Intellectual Property Agreements, the D&Os were supine, conflicted, beholden to Rouhana, and failed to act in the best interests of the Debtors.

## G.     The Company Paid Millions in Dividends to Shareholders While It Was Insolvent

73.     The Company has outstanding certain Series A Preferred Stock, on which it declared monthly cash dividends of $0.2031 per share since July 2018. Declared dividends totaled approximately $4.1 million in 2020, $9 million in 2021, $9.7 million in 2022, and $14 million in 2023 (the "Preferred Dividends").[32]

74.     The Company was not required to declare and pay dividends on its Preferred Stock; in fact, under certain circumstances, the declaration of such dividends would have been illegal. As a matter of contract, if the Company were to "fail to declare and pay such dividends for 18 consecutive months, the certificate of designations rights and preferences governing the

---

[32] CSSE 2021 Annual Report at 31, CSSE 2022 Annual Report at 37 and CSSE 2023 Annual Report at 37.

Series A preferred stock provides certain remedies for holders, including, but not limited to the right to appoint at least two directors to [the Board]."[33]   On January 5, 2024, the Board determined to temporarily suspend the payment of monthly cash dividends on the Preferred Stock, beginning with the payment scheduled for on or around January 15, 2024.[34]

75.     As described above, the Company reported significant net losses from at least 2020 and was or was rendered insolvent, undercapitalized, and/or generally unable to pay its debts as they came due during the relevant period.   Moreover, the Company lacked either sufficient surplus or sufficient net profits to lawfully declare the Preferred Dividends. Nevertheless, the Board authorized the declaration and payment of the Preferred Dividends through 2023, when the Company was not legally permitted to do so, the Company was not meeting its obligations to creditors or employees, and when paying the Preferred Dividends was obviously not in the best interest of the Company.

76.     Rouhana acted in his own self-interest, deceived, and manipulated the Company and the other D&Os, and did not act in the best interests of the Company in causing it to pay the Preferred Dividends during a time when the Company was in financial distress, and had no obligation to pay the Preferred Dividends.   Rouhana was motivated by financial gain and the gain of known shareholders, and also by the desire to prevent shareholders from exercising the contractual right to nominate additional directors to the Board (and thereby dilute his control).

77.     The other D&Os were not provided with, nor did they request, information sufficient to allow them to make an informed and reasoned determination with respect to the payment of the Preferred Dividends, but were beholden to, and blindly followed the directions

---

[33] CSSE 2023 Annual Report at 11.

[34] *Id.* at 38.

of, Rouhana.  By allowing the payment of the Preferred Dividends, the D&Os were supine, conflicted, beholden to Rouhana, and failed to act in the best interests of the Company.

**H.     The Company's Insiders Failed to Pay Employee Wages, Medical Benefits and Payroll Taxes**

78.     Pursuant to the CSS Management Agreement, the CSS Entities (under the ownership and control of Rouhana and Newmark) were responsible for the administration and payment of the Company's payroll and benefits, including payroll taxes.  As set forth in the CSSE 2022 Annual Report:[35]

> The Company is part of CSS's central cash management system whereby payroll and benefits are administered by CSS and the related expenses are charged to its subsidiaries and funds are transferred between affiliates to fulfill joint liquidity needs and business initiatives. Settlements fluctuate period over period due to timing of liquidity needs.

79.     Although paying employees is among the most basic corporate functions, the Debtors admitted that they failed to make such payments prior to commencing their chapter 11 cases.[36]  Furthermore, CSS and the Company failed to make approximately $15.5 million in accrued but unpaid withholding taxes during the nine-month period from October 3, 2023 to June 7, 2024 (collectively, the "<u>Employee Wage, Benefit and Tax Obligations</u>").[37]  Around the same time that the Defendants failed to cause the Company to pay and provide medical benefits to its employees and to satisfy its tax obligations, they permitted the Company to continue making payments to its shareholders.

---

[35] CSSE 2022 Annual Report at F-37.

[36] *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and Other Obligations on Account of Compensation and Benefits Programs, Etc.* [D.I. 3, at ¶ 15] ("[T]he Debtors were unable to make payroll for the two-week period ending June 14, 2024.").

[37] *Id.* ¶ 26.

80.     The CSS Entities, Rouhana, Newmark and the other D&Os did not act in the best interests of the Company by failing to pay the Company's obligations to its employees, including over $15.5 million in payroll withholding taxes.

81.     The D&Os knew or should have known that the Company was not paying its obligations to its employees, including over $15.5 million in payroll withholding taxes. Despite knowing that the Employee Wage, Benefit and Tax Obligations were not being paid, the D&Os neither requested, nor were provided with, adequate information or reporting with respect to the non-payment of employee obligations, but were instead concerned about their own liability and were beholden to, and blindly followed and did not question the decisions of Rouhana. By allowing the non-payment of Employee Wage, Benefit and Tax Obligations, the D&Os were supine, conflicted, beholden to Rouhana, and failed to act in the best interests of the Company.

I.      **The CSS and Rouhana Proofs of Claim and Potential
        Claims That May Be Asserted by Other Defendants**

82.     On September 18, 2024, CSS filed Proof of Claim No. 397, asserting a claim against CSSE in the amount of $12,640,273.50 for amounts due under the Insider Agreements.

83.     On September 18, 2024, Rouhana filed Proof of Claim No. 402, asserting a claim against CSSE in the amount of $1,000,000 for contribution and indemnity under the Insider Agreements.

84.     Other Defendants may assert claims against the Debtors' estates.

### CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF

#### Against Rouhana for Breach of Fiduciary Duty

85.     The allegations in the preceding paragraphs of this Complaint are hereby realleged and incorporated by reference as though fully set forth herein.

86.     At all relevant times, Rouhana, in his capacity as Chairman of the Board and CEO of the Company, owed fiduciary duties of due care, loyalty, and good faith to the Company which required him to, among other things, act in good faith and in the best interests of the Company, and exercise such care as an ordinarily prudent person in a like position would use under similar circumstances.

87.     Rouhana breached those duties by causing the Company and its subsidiaries to enter into the numerous transactions described herein that were not in the best interests of the Company, but which were instead intended to elevate Rouhana's own interests above the Company's.  For example, Rouhana caused the Company to engage in the Merger on the basis of his own unsupported and wholly unreasonable financial projections of Redbox's and the Company's future performance, for reasons including that CSS would be entitled to a revenue stream from management and licensing fees, and he understood the consummation of the Merger would cause him to be released from all claims pursuant to the Release Agreement.

88.     Neither the Merger nor the Release Agreement was in the best interest of the Company and Rouhana failed to act in good faith or on an informed basis.  While the Company retained Guggenheim as its financial advisor in connection with the Merger, Rouhana directed Guggenheim to use his own unreasonable financial projections to support the Merger, instead of seeking an unbiased opinion from the Company's financial professionals.  The Merger was disastrous for the Company, including for the easily foreseeable reason that the Company had no ability to support the massive liabilities that it assumed in connection with the Merger.  Moreover, the Company received no consideration from Rouhana in exchange for the Release Agreement pursuant to which he was purportedly released from all claims.

89.     Rouhana further breached his duties to the Company by causing the Company to continue operating under the Insider Agreements – which were related party transactions executed and approved by Rouhana on behalf of both the Company and CSS – and to pay the Insider Revenue Transfers to CSS, notwithstanding the Company's financial distress.  Rouhana benefited personally from the Insider Revenue Transfers – which were effectively dividends paid by the Company to its controlling shareholder – both through his ownership of CSS and also as an individual whose compensation would be paid directly under the Management Agreement. The terms of the Insider Agreements were not characterized by fair dealing or a fair price.  Yet, Rouhana made no attempt to seek out alternatives to the Insider Agreements that would have been favorable to the Company, preferring instead to place his own interests ahead of the Company's, including during periods that the Company experienced severe financial distress.

90.     In addition, Rouhana authorized the Company to pay out millions of dollars in dividends to preferred shareholders while the Company was in financial distress, and when the Company had no legal ability or contractual obligation to do so.  Rouhana was motivated by financial gain and the gain of known shareholders, and the desire to maintain control over the Company.  Rouhana failed to exercise due care or to act in good faith, was disloyal, and he placed his own interests ahead of the Company's.

91.     Similarly, Rouhana breached his duties by causing the Company to enter into numerous Intellectual Property License Agreements, which were not in the Company's interests, but which benefited Rouhana's known acquaintances and others.  The Debtors failed to receive fair value in exchange for the Intellectual Property License Agreements, most of which were entered into shortly before the Debtors filed voluntary chapter 11 cases, and which thereby deprived the Debtors' estates of meaningful value.

92.     Furthermore, Rouhana's failure to cause the Company to pay necessary Employee Wage, Benefit and Tax Obligations is inexcusable, especially during periods when he authorized the Company to continue performing under the Insider Agreements and paying dividends to shareholders.  By placing his own interests ahead of the Company's and by failing to exercise due care or to act in good faith, Rouhana breached his fiduciary duties.

93.     Rouhana's course of conduct was not grounded in any reasonable business judgment and was the result of negligence, gross negligence and a gross abuse of discretion.  In engaging in this conduct, Rouhana did not exercise due care, did not act in good faith, and did not act with an honest or reasonable belief that his course of conduct was in the best interests of the Company.

94.     Moreover, in undertaking his actions, Rouhana furthered his self-interest rather than the interests of the Company.  Rouhana thereby breached his duty of loyalty owed to the Company.

95.     As a direct and/or proximate result of the breaches of fiduciary duties committed by Rouhana, the Company suffered damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

### Against Each Non-Rouhana Board Defendant for Breach of Fiduciary Duty

96.     The allegations in the preceding paragraphs of this Complaint are hereby realleged and incorporated by reference as though fully set forth herein.

97.     At all relevant times, the Board Defendants, in their capacity as members of the Board, owed fiduciary duties of due care, loyalty, and good faith to the Company which required them to, among other things, act in good faith and in the best interests of the Company, and exercise such care as an ordinarily prudent person in a like position would use under similar circumstances.

98.     The Board Defendants breached those duties by causing the Company and its subsidiaries to enter into the numerous transactions described herein that were not in the best interests of the Company, but which were instead intended to elevate their own interests above the Company's.  For example, the Board Defendants caused the Company to engage in, or failed to prevent, the Merger on the basis of Rouhana's and his management team's unsupported and wholly unreasonable financial projections of Redbox's and the Company's future performance, for reasons including that the Board Defendants understood the consummation of the Merger would cause them to be released from all claims pursuant to the Release Agreement.

99.     Neither the Merger nor the Release Agreement was in the best interest of the Company and the Board Defendants failed to act in good faith or on an informed basis.  While the Company retained Guggenheim as its financial advisor in connection with the Merger, the Board Defendants permitted Rouhana and his management team to direct Guggenheim to use their own unreasonable financial projections to support the Merger, instead of seeking an unbiased opinion from the Company's financial professionals.  The Board Defendants' blind reliance on that information – without any attempt to question the reasonableness of the projections or underlying assumptions provided by the Company's management – was negligent, grossly negligent, in bad faith and constituted a breach of their fiduciary duties.

100.     The Merger was disastrous for the Company, including for the easily foreseeable reason that the Company had no ability to support the massive liabilities that it assumed in connection with the Merger.  Moreover, the Company received no consideration from the Board Defendants in exchange for the Release Agreement pursuant to which they were purportedly released from all claims.

101.    The Board Defendants further breached their duties to the Company by causing the Company to continue operating under the Insider Agreements – which were related party transactions – and to pay the Insider Revenue Transfers to CSS, notwithstanding the Company's financial distress.  The terms of the Insider Agreements were not characterized by fair dealing or a fair price.  Yet, the Board Defendants made no attempt to seek out alternatives to the Insider Agreements that would have been favorable to the Company, preferring instead to place Rouhana's interests ahead of the Company's, including during periods that the Company experienced severe financial distress.

102.    In addition, the Board Defendants authorized the Company to pay out millions of dollars in dividends to preferred shareholders, while the Company was in financial distress, and when the Company had no legal ability or contractual obligation to do so.  The Board Defendants were motivated by financial gain and the gain of known shareholders, and a desire to maintain control over the Company.  The Board Defendants failed to exercise due care or to act in good faith, were disloyal, and they placed their own interests ahead of the Company's.

103.    Similarly, the Board Defendants breached their duties by causing the Company to enter into numerous Intellectual Property License Agreements, which were not in the Company's interests, but which benefited Rouhana's known acquaintances and others.  The Debtors failed to receive fair value in exchange for the Intellectual Property License Agreements, most of which were entered into shortly before the Debtors filed voluntary chapter 11 cases, and which thereby deprived the Debtors' estates of meaningful value.

104.    Furthermore, the Board Defendants' failure to cause the Company to pay necessary Employee Wage, Benefit and Tax Obligations is inexcusable, especially during periods when they authorized the Company to continue performing under the Insider Agreements

and paying dividends to shareholders.  By placing their own interests ahead of the Company's and by failing to exercise due care or to act in good faith, the Board Defendants breached their fiduciary duties.

105.    The Board Defendants' course of conduct, including their approval and support of Rouhana's course of conduct, was not grounded in any reasonable business judgment and was the result of negligence, gross negligence and a gross abuse of discretion.  In engaging in this conduct, the Board Defendants did not exercise due care, did not act in good faith, and did not act with an honest or reasonable belief that their course of conduct was in the best interests of the Company.

106.    Moreover, in undertaking these actions, the Board Defendants furthered their own and Rouhana's self-interest rather than the interests of the Company. The Board Defendants thereby breached their duty of loyalty owed to the Company.

107.    As a direct and/or proximate result of the breaches of fiduciary duties committed by the Board Defendants, the Company suffered damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
**Against Each Non-Rouhana Officer Defendant for Breach of Fiduciary Duty**

108.    The allegations in the preceding paragraphs of this Complaint are hereby realleged and incorporated by reference as though fully set forth herein.

109.    At all relevant times, the Officer Defendants, in their capacity as titled or acting senior officers of the Company, owed fiduciary duties of due care, loyalty, and good faith to the Company which required them to, among other things, act in good faith and in the best interests of the Company, and exercise such care as an ordinarily prudent person in a like position would use under similar circumstances.

110.    The Officer Defendants breached those duties by facilitating and failing to prevent the numerous transactions described herein that were not in the best interests of the Company, but which were instead intended to elevate their own interests above the Company's. For example, the Officer Defendants facilitated the Company's entry into the Merger on the basis of unsupported and wholly unreasonable financial projections of Redbox's and the Company's future performance, for reasons including that the Officer Defendants understood the consummation of the Merger would cause them to be released from all claims pursuant to the Release Agreement.

111.    Neither the Merger nor the Release Agreement was in the best interest of the Company and the Officer Defendants failed to act in good faith or on an informed basis. While the Company retained Guggenheim as its financial advisor in connection with the Merger, the Officer Defendants directed Guggenheim to use their own unreasonable financial projections to support the Merger, instead of seeking an unbiased opinion from the Company's financial professionals. The Officer Defendants' conduct in supplying that information was negligent, grossly negligent, in bad faith and constituted a breach of their fiduciary duties.

112.    The Merger was disastrous for the Company, including for the easily foreseeable reason that the Company had no ability to support the massive liabilities that it assumed in connection with the Merger. Moreover, the Company received no consideration from the Officer Defendants in exchange for the Release Agreement pursuant to which they were purportedly released from all claims.

113.    The Officer Defendants further breached their duties to the Company by facilitating the Company's continued operation under the Insider Agreements – which were related party transactions – and to pay the Insider Revenue Transfers to CSS, notwithstanding the

Company's financial distress.  The terms of the Insider Agreements were not characterized by fair dealing or a fair price.  Yet, the Officer Defendants made no attempt to seek out alternatives to the Insider Agreements that would have been favorable to the Company, preferring instead to place Rouhana's interests ahead of the Company's, including during periods that the Company experienced severe financial distress.

114.    Similarly, the Officer Defendants breached their duties by facilitating the Company's entry into numerous Intellectual Property License Agreements, which were not in the Company's interests, but which benefited Rouhana's known acquaintances and others. The Debtors failed to receive fair value in exchange for the Intellectual Property License Agreements, most of which were entered into shortly before the Debtors filed voluntary chapter 11 cases, and which thereby deprived the Debtors' estates of meaningful value.

115.    In addition, the Officer Defendants facilitated the Company paying out millions of dollars in dividends to preferred shareholders, while the Company was in financial distress, and when the Company had no legal ability or contractual obligation to do so.  The Officer Defendants were motivated by financial gain and the gain of known shareholders, and a desire to maintain control over the Company.   The Officer Defendants failed to exercise due care or to act in good faith, were disloyal, and they placed their own interests ahead of the Company's.

116.    Furthermore, the Officer Defendants' failure to cause the Company to pay necessary Employee Wage, Benefit and Tax Obligations is inexcusable, especially during periods when they facilitated the Company's continued performance under the Insider Agreements.  By placing their own interests ahead of the Company's and by failing to exercise due care or to act in good faith, the Officer Defendants breached their fiduciary duties.

117.     The Officer Defendants' course of conduct, including their approval and support of Rouhana's course of conduct, was not grounded in any reasonable business judgment and was the result of negligence, gross negligence and a gross abuse of discretion.  In engaging in this conduct, the Officer Defendants did not exercise due care, did not act in good faith, and did not act with an honest or reasonable belief that their course of conduct was in the best interests of the Company.

118.     Moreover, in undertaking these actions, the Officer Defendants furthered their own and Rouhana's self-interest rather than the interests of the Company.  The Officer Defendants thereby breached their duties of loyalty owed to the Company.

119.     As a direct and/or proximate result of the breaches of fiduciary duties committed by the Officer Defendants, the Company suffered damages in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF

### Against Each CSS Entity Defendant for Breach of Fiduciary Duty

120.     The allegations in the preceding paragraphs of this Complaint are hereby realleged and incorporated by reference as though fully set forth herein.

121.     At all relevant times, the CSS Entity Defendants, in their capacity as controlling shareholders of the Company, owed fiduciary duties of due care, loyalty, and good faith to the Company which required them to, among other things, act in good faith and in the best interests of the Company, and exercise such care as an ordinarily prudent person in a like position would use under similar circumstances.

122.     The CSS Entity Defendants breached those duties by facilitating and failing to prevent the numerous transactions described herein that were not in the best interests of the Company, but which were instead intended to elevate their own interests above the Company's.

For example, the CSS Entity Defendants caused the Company to engage in, or failed to prevent, the Merger on the basis of Rouhana's and his management team's unsupported and wholly unreasonable financial projections of Redbox's and the Company's future performance, for reasons including that CSS would be entitled to a revenue stream from management and licensing fees and that the CSS Entity Defendants understood the consummation of the Merger would cause Rouhana and others affiliated with the CSS Entity Defendants to be released from all claims pursuant to the Release Agreement.

123.    Neither the Merger nor the Release Agreement was in the best interest of the Company and the CSS Entity Defendants failed to act in good faith or on an informed basis. While the Company retained Guggenheim as its financial advisor in connection with the Merger, the CSS Entity Defendants permitted Rouhana and his management team to direct Guggenheim to use their own unreasonable financial projections to support the Merger, instead of seeking an unbiased opinion from the Company's financial professionals.  The CSS Entity Defendants' blind reliance on that information – without any attempt to question the reasonableness of the projections or underlying assumptions provided by the Company's management – was negligent, grossly negligent, in bad faith and constituted a breach of their fiduciary duties.

124.    The Merger was disastrous for the Company, including for the easily foreseeable reason that the Company had no ability to support the massive liabilities that it assumed in connection with the Merger.  Moreover, the Company received no consideration from the CSS Entity Defendants in exchange for the Release Agreement pursuant to which Rouhana and others affiliated with the CSS Entity Defendants were purportedly released from all claims.

125.    The CSS Entity Defendants further breached their duties to the Company by causing the Company to continue operating under the Insider Agreements – which were related

party transactions entered into for the CSS Entity Defendants' benefit – and to pay the Insider Revenue Transfers to CSS, notwithstanding the Company's financial distress.  The terms of the Insider Agreements were not characterized by fair dealing or a fair price.  Yet, the CSS Entity Defendants made no attempt to seek out alternatives to the Insider Agreements that would have been favorable to the Company, preferring instead to place their interests ahead of the Company's, including during periods that the Company experienced severe financial distress.

126.    In addition, the CSS Entity Defendants facilitated the Company paying out millions of dollars in dividends to preferred shareholders, while the Company was in financial distress, and when the Company had no legal ability or contractual obligation to do so.  The CSS Entity Defendants were motivated by financial gain and the gain of known shareholders, and a desire to maintain control over the Company.  The CSS Entity Defendants failed to exercise due care or to act in good faith, were disloyal, and they placed their own interests ahead of the Company's.

127.    Similarly, the CSS Entity Defendants breached their duties by causing the Company to enter into numerous Intellectual Property License Agreements, which were not in the Company's interests, but which benefited Rouhana's known acquaintances and others.  The Debtors failed to receive fair value in exchange for the Intellectual Property License Agreements, most of which were entered into shortly before the Debtors filed voluntary chapter 11 cases, and which thereby deprived the Debtors' estates of meaningful value.

128.    Furthermore, the CSS Entity Defendants' failure to cause the Company to pay necessary Employee Wage, Benefit and Tax Obligations is inexcusable, especially during periods when they authorized the Company to continue performing under the Insider Agreements and paying dividends to shareholders.  By placing their own interests ahead of the Company's

and by failing to exercise due care or to act in good faith, the CSS Entity Defendants breached their fiduciary duties.

129.     The CSS Entity Defendants' course of conduct, including their approval and support of Rouhana's course of conduct, was not grounded in any reasonable business judgment and was the result of negligence, gross negligence and a gross abuse of discretion.  In engaging in this conduct, the CSS Entity Defendants did not exercise due care, did not act in good faith, and did not act with an honest or reasonable belief that their course of conduct was in the best interests of the Company.

130.     Moreover, in undertaking these actions, the CSS Entity Defendants furthered their own and Rouhana's self-interest rather than the interests of the Company. The CSS Entity Defendants thereby breached their duties of loyalty owed to the Company.

131.     As a direct and/or proximate result of the breaches of fiduciary duties committed by the CSS Entity Defendants, the Company suffered damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### Against All Defendants For Aiding & Abetting Breaches of Fiduciary Duties

132.     The allegations in the preceding paragraphs of this Complaint are hereby realleged and incorporated by reference as though fully set forth herein.

133.     As alleged above, each of the Defendants breached his, her, or its respective fiduciary duties of loyalty and care that were owed to the Company and the other Debtors.  Each of the other Defendants aided and abetted the foregoing breaches by knowingly participating in these breaches of fiduciary duties.

134.    As a direct and/or proximate result of the aiding and abetting of the other Defendants' breaches of fiduciary duties, the Company suffered damages in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF

**Against CSS, Rouhana, Newmark and the Other CSS Entities to Avoid and Recover Insider Revenue Transfers as Fraudulent Transfers
(11 U.S.C. §§ 548(a)(1)(B) and 550(a))**

135.    The allegations in the preceding paragraphs of this Complaint are hereby realleged and incorporated by reference as though fully set forth herein.

136.    In the two years leading up to the Petition Date, the Company made Insider Revenue Transfers to CSS pursuant to the Insider Agreements in the approximate amount of $38 million.

137.    The Insider Revenue Transfers were transfers of property of the Company.

138.    The Company did not receive reasonably equivalent value in exchange for the payment of the Insider Revenue Transfers.

139.    At the time the Insider Revenue Transfers were made, the Company (a) was engaged or about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business; (b) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; and/or (c) was insolvent or would be rendered insolvent.

140.    At all relevant times, the Company had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code.

141.    As a result, the Insider Revenue Transfers should be avoided pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

142.    Upon avoidance of the Insider Revenue Transfers, Plaintiff is entitled under section 550(a) of the Bankruptcy Code to recover the value of the avoided transfers from CSS as

the initial transferee of the Insider Revenue Transfers, or from Rouhana, Newmark or the other

CSS Entities as the entity for whose benefit such transfer was made or as subsequent transferees.

## SEVENTH CLAIM FOR RELIEF

**Against CSS, Rouhana, Newmark and the Other CSS Entities to Avoid and Recover
Insider Revenue Transfers as Fraudulent Transfers
(11 U.S.C. §§ 544(b) and 550(a); 6 Del. C. § 1305)**

143.    The allegations in the preceding paragraphs of this Complaint are hereby

realleged and incorporated by reference as though fully set forth herein.

144.    In the four years leading up to the Petition Date, the Company made Insider Revenue

Transfers to CSS pursuant to the Insider Agreements in excess of $55 million.

145.    The Insider Revenue Transfers were transfers of property of the Company.

146.    The Company did not receive reasonably equivalent value in exchange for the

payment of the Insider Revenue Transfers.

147.    At the time the Insider Revenue Transfers were paid, the Company (a) was

engaged or about to engage in a business for which its remaining assets and/or capital were

unreasonably small in relation to the business; (b) intended to incur, or reasonably should have

believed that it would incur, debts beyond its ability to pay as they became due; and/or (c) was

insolvent or would be rendered insolvent.

148.    At all relevant times, the Company had actual creditors holding unsecured claims

allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code.

149.    As a result, the Insider Revenue Transfers should be avoided pursuant to section

544 of the Bankruptcy Code and section 1305 of the Delaware Uniform Fraudulent Transfer Act.

150.    Upon avoidance of the Insider Revenue Transfers, Plaintiff is entitled under

section 550(a) of the Bankruptcy Code to recover the value of the avoided transfers from CSS as

the initial transferee of the Insider Revenue Transfers, or from Rouhana, Newmark, or the other CSS Entities as the entity for whose benefit such transfer was made or as subsequent transferees.

### EIGHTH CLAIM FOR RELIEF

**Against All Defendants for Avoidance of Insider Releases as Fraudulent Transfers**
**(11 U.S.C. §§ 548(a)(1)(B) and 550(a))**

151.    The allegations in the preceding paragraphs of this Complaint are hereby realleged and incorporated by reference as though fully set forth herein.

152.    Plaintiff disputes that the May 2022 Release Agreement provides for a release by the Company of its own directors, officers, and managers from all claims and liabilities arising through the consummation of the transactions contemplated by the Merger Agreement (which occurred in August 2022).

153.    However, to the extent the Release Agreement provided a release to any Defendant of any claim asserted in this action, the Insider Releases were transfers of property of the Debtors within two years of the Petition Date.

154.    The Debtors did not receive reasonably equivalent value in exchange for the granting the Insider Releases.

155.    At the time of the effective date of the Insider Releases, the Company (a) was engaged or about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business; (b) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; and/or (c) was insolvent or would be rendered insolvent by the transactions undertaken in connection with the Insider Releases.

156.    At all relevant times, the Company had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code.

157.     As a result, the Insider Releases should be avoided pursuant to section 548(a)(1)(B) of the Bankruptcy Code, and are no bar to the claims asserted in this Complaint.

## NINTH CLAIM FOR RELIEF

**Against All Defendants for Avoidance of Insider Releases as Fraudulent Transfers (11 U.S.C. §§ 544(b) and 550(a); 6 Del. C. § 1305)**

158.     The allegations in the preceding paragraphs of this Complaint are hereby realleged and incorporated by reference as though fully set forth herein.

159.     Plaintiff disputes that the May 2022 Release Agreement provides for a release by the Company of its own directors, officers, and managers from all claims and liabilities arising through the consummation of the transactions contemplated by the Merger Agreement (which occurred in August 2022).

160.     However, to the extent the Release Agreement provided a release to any Defendant of any claim asserted in this action, the Insider Releases were transfers of property of the Debtors within four years of the Petition Date.

161.     The Debtors did not receive reasonably equivalent value in exchange for the granting the Insider Releases.

162.     At the time of the granting and effectiveness of the Insider Releases, the Company (a) was engaged or about to engage in a business for which its remaining assets and/or capital were unreasonably small in relation to the business; (b) intended to incur, or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due; and/or (c) was insolvent or would be rendered insolvent.

163.     At all relevant times, the Company had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code.

164.     As a result, the Insider Revenue Transfers should be avoided pursuant to section 544 of the Bankruptcy Code and section 1305 of the Delaware Uniform Fraudulent Transfer Act, and are no bar to the claims asserted in this Complaint.

### TENTH CLAIM FOR RELIEF
**Against All Defendants to Recover Preferred Dividends and
Insider Revenue Transfers as Illegal Dividends**

165.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

166.     The Company declared Preferred Dividends totaling approximately $4.1 million in 2020, $9 million in 2021, $9.7 million in 2022, and $14 million in 2023.

167.     The Company was under no obligation to declare the Preferred Dividends.

168.     In the four years leading up to the Petition Date, the Company made Insider Revenue Transfers to CSS in excess of $55 million.

169.     The Insider Revenue Transfers were the equivalent of dividends paid by the Company to its controlling shareholder.

170.     The declaration of the Preferred Dividends and the payment of the Insider Revenue Transfers violated the General Corporation Law of the State of Delaware ("DGCL"), including (without limitation) sections 170, 172, 173 and 174 of the DGCL. At the time the Preferred Dividends and the Insider Revenue Transfers were paid, the Company (i) lacked sufficient surplus as defined in and computed in accordance with sections 154 and 244 of the DGCL; (ii) lacked sufficient net profits for the fiscal year in which the transfers were made and/or the preceding fiscal year; and (iii) was otherwise insolvent or became insolvent as a result of the transfers.

171.     Each of the Defendants knew or should have known that the Preferred Dividends and the Insider Revenue Transfers violated the DGCL.

172.     In causing the Company to declare the Preferred Dividends and to make the Insider Revenue Transfers, the Defendants did not exercise due care, and did not rely reasonably or in good faith on any appropriate records, information, opinions, reports or statements regarding the value or amount of the Company's assets, liabilities and/or net profits, or any other competent facts pertinent to the existence and amount of surplus or other funds from which dividends might properly be declared and paid by the Company.

173.     The declarations of the Preferred Dividends and the Insider Revenue Transfers were not grounded in any reasonable business objective, and were the result of negligence, gross negligence, and a gross abuse of discretion by the Defendants.  As a result, the Defendants are jointly and severally liable for the full amount of the Preferred Dividends and the Insider Revenue Transfers, due to their negligent, grossly negligent or willful declarations of the Preferred Dividends and Insider Revenue Transfers in violation of the DGCL.

### ELEVENTH CLAIM FOR RELIEF

**Against All Defendants for Non-Payment of Employee Wage, Benefit and Tax Obligations**

174.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

175.     The Company failed to pay the Employee Wage, Benefit and Tax Obligations, including over $15.5 million in payroll withholding taxes.

176.     The Defendants' failure to cause the Company to pay necessary Employee Wage, Benefit and Tax Obligations was inexcusable, especially during periods when they authorized the Company to continue performing under the Insider Agreements and paying dividends to shareholders.

177.     The non-payment of the Employee Wage, Benefit and Tax Obligations was willful and violated the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA") subjecting

the Defendants to personal liability for the non-payment of the Employee Wage, Benefit and Tax Obligations.

178.    The willful violations of the FLSA based on the non-payment of the Employee Wage, Benefit and Tax Obligations are attributable to the Defendants as a consequence of their authority over and responsibility for the decisions that resulted in the FLSA violations.  Each Defendant exercised control over significant day-to-day operational aspects of the Company, including holding a position of authority and responsibility for employee compensation and benefits, and ensuring the payment of the Employee Wage, Benefit and Tax Obligations.

179.    As a direct and/or proximate result of the non-payment of the Employee Wage, Benefit and Tax Obligations by the Defendants, the Company suffered damages in an amount to be determined at trial.

## TWELFTH CLAIM FOR RELIEF

### Objection to Claims of All Defendants – Disallowance Under 11 U.S.C. §§ 502(d) & (j)

180.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

181.    All Defendants, including Defendants Rouhana and CSS, are liable to Plaintiff for their breaches of fiduciary duty, receipt of fraudulent transfers and/or payment of illegal dividends.

182.    Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of the Defendants filed or scheduled in the Bankruptcy Cases (the "Defendants' Claims") must be disallowed until such time as the Defendants have paid to Plaintiff the amounts for which they are liable as set forth in the Complaint.

183.    Plaintiff reserves all rights to further object to any Defendants' Claims on any and all additional grounds.

## THIRTEENTH CLAIM FOR RELIEF

**Against All Defendants for Equitable Subordination of Claims Under 11 U.S.C. § 510(c)**

184.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

185.    The conduct of the Defendants, as alleged above, constitutes inequitable conduct.

186.    By reason of the Defendants' conduct, each of the Debtors became insolvent, thereby harming their respective unsecured creditors.

187.    Allowing the Defendants to receive payment on account of any Defendants' Claims prior to payment to the Debtors' general unsecured creditors would be unfair and inequitable.

188.    Equitable subordination of the Defendants' Claims is consistent with the Bankruptcy Code.

189.    Because of the transactions and actions described in the preceding paragraphs of this Complaint, the Defendants' Claims should be equitably subordinated to all of the claims of the Debtors' general unsecured creditors pursuant to section 510(c) of the Bankruptcy Code.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiff requests that the Court enter an order and judgment:

(1)    On the First Claim for Relief, for damages in an amount to be determined at trial for Rouhana's breach of fiduciary duties;

(2)    On the Second Claim for Relief, for damages in an amount to be determined at trial for the Board Defendants' breach of fiduciary duties;

(3)    On the Third Claim for Relief, for damages in an amount to be determined at trial for the Officer Defendants' breach of fiduciary duties;

(4)    On the Fourth Claim for Relief, for damages in an amount to be determined at trial for the CSS Entity Defendants' breach of fiduciary duties;

(5)      On the Fifth Claim for Relief, for damages in an amount to be determined at trial for Defendants' aiding and abetting breach of fiduciary duties;

(6)      On the Sixth Claim for Relief, for avoidance of Insider Revenue Transfers as fraudulent transfers;

(7)      On the Seventh Claim for Relief, for avoidance of Insider Revenue Transfers as fraudulent transfers;

(8)      On the Eighth Claim for Relief, for avoidance of the Insider Releases as fraudulent transfers;

(9)      On the Ninth Claim for Relief, for avoidance of the Insider Releases as fraudulent transfers;

(10)     On the Tenth Claim for Relief, for recovery of Preferred Dividends and the Insider Revenue Transfers as illegal dividends;

(11)     On the Eleventh Claim for Relief, for damages in an amount to be determined at trial for the D&O Defendants' non-payment of the Employee Wage, Benefit and Tax Obligations;

(12)     On the Twelfth Claim for Relief, for disallowance of the Defendants' claims asserted in the Debtors' bankruptcy cases;

(13)     On the Thirteenth Claim for Relief, for equitable subordination of the Defendants' claims asserted in the Debtors' bankruptcy cases;

(14)     For costs of suit incurred herein, including (without limitation) attorneys' fees, to the extent permitted by law; and

(15)     Granting Plaintiff such other and further relief as the Court deems just and proper.

Dated: March 12, 2025          **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Steven W. Golden*

Richard M. Pachulski (admitted *pro hac vice*)
Alan J. Kornfeld (admitted *pro hac vice*)
Steven W. Golden (DE Bar No. 6807)
Tavi C. Flanagan (admitted *pro hac vice*)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile:  (302) 652-4400
Email:  rpachulski@pszjlaw.com
       akornfeld@pszjlaw.com
       sgolden@pszjlaw.com
       tflanagan@pszjlaw.com

*Counsel to George L. Miller, Chapter 7 Trustee*