## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| CSS ENTERTAINMENT INC. (f/k/a CHICKEN SOUP FOR THE SOUL ENTERTAINMENT INC.)*, et al.*,[1] | Case No. 24-11442 (MFW) |
| | (Jointly Administered) |
| Debtors. | |
| GEORGE L. MILLER, CHAPTER 7 TRUSTEE, | |
| Plaintiff, | |
| v. | Adv. Pro. No. 25-50399 (MFW) |
| WILLIAM J. ROUHANA, JR., AMY L. NEWMARK, CHRISTOPHER MITCHELL, FRED M. COHEN, COSMO DENICOLA, MARTIN POMPADUR, CHRISTINA WEISS LURIE, DIANA WILKIN, VIKRAM SOMAYA, JASON MEIER, AMANDA R. EDWARDS, CHICKEN SOUP FOR THE SOUL PRODUCTIONS, LLC, CHICKEN SOUP FOR THE SOUL, LLC, CHICKEN SOUP FOR THE SOUL HOLDINGS, LLC, | |
| Defendants. | |

## WILLIAM J. ROUHANA, JR.'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS COMPLAINT

*Counsel Listed on Next Page*

---

[1] The Debtors in these chapter 7 cases, along with the last four digits of each Debtor's federal tax identification number (where applicable), are: 757 Film Acquisition LLC (4300); CSS Entertainment, Inc. (f/k/a Chicken Soup for the Soul Entertainment Inc.) (0811); CSS Studios, LLC (f/k/a Chicken Soup for the Soul Studios, LLC) (9993); CSS Television Group, LLC (f/k/a Chicken Soup for the Soul Television Group, LLC); Crackle Plus, LLC (9379); CSS AVOD Inc. (4038); CSSESIG, LLC (7150); Digital Media Enterprises LLC; Halcyon Studios, LLC (3312); Halcyon Television, LLC (9873); Landmark Studio Group LLC (3671); Locomotive Global, Inc. (2094); Pivotshare, Inc. (2165); RB Second Merger Sub LLC (0754); Redbox Automated Retail, LLC (0436); Redbox Entertainment, LLC (7085); Redbox Holdings, LLC (7338); Redbox Incentives LLC (1123); Redwood Intermediate, LLC (2733); Screen Media Films, LLC; Screen Media Ventures, LLC (2466); and TOFG LLC (0508).

**WOMBLE BOND DICKINSON (US) LLP**

Donald J. Detweiler (DE Bar No. 3087)
1313 N. Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile: (302) 252-4330
Email: don.detweiler@wbd-us.com

Cathy A. Hinger (admitted *pro hac vice*)
2001 K Street NW, Suite 400 South
Washington, D.C. 20006
Telephone: (202) 467-6900
Facsimile: (202) 467-6910
Email: cathy.hinger@wbd-us.com

*Counsel for Defendant William J. Rouhana, Jr.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

NATURE AND STAGE OF THE PROCEEDING................................................................... 3

STATEMENT OF FACTS AND ALLEGATIONS................................................................... 4

   I.   MR. ROUHANA, DEBTORS, AND THE CSS ENTITIES ................................................ 4

   II.   CSSE'S LONGSTANDING AGREEMENTS WITH CSS.................................................. 5

   III.  MARKET CHALLENGES AND THE REDBOX MERGER........................................... 6

   IV.  THE COMPLAINT'S CLAIMS AGAINST MR. ROUHANA.................................... 11

      A.   Redbox Acquisition Theory ........................................................................................ 11

      B.   CSS Agreements Theory.............................................................................................. 13

      C.   Third-Party Licensing And Distribution Agreements Theory............................................ 14

      D.   Dividend Theory........................................................................................................ 15

      E.   The FLSA Employee Wage And Benefit Claim Theory .................................................. 15

      F.   Release Theory .......................................................................................................... 15

LEGAL STANDARD............................................................................................................. 16

ARGUMENT ......................................................................................................................... 17

   I.   THE COMPLAINT'S CLAIM FOR BREACH OF FIDUCIARY DUTY
      (COUNT ONE) FAILS AS A MATTER OF LAW ...................................................... 17

      A.   The Complaint Relies On Generalities And Formulaic Recitations Of Standards
          To Try Substantiating The Claim That Mr. Rouhana Violated Fiduciary Duties........... 18

        1.   Standards For Each Alleged Breach Of Fiduciary Duty ................................................ 18

           a.   Duty Of Care And The Business Judgment Rule .................................................... 18

           b.   Duty Of Loyalty.................................................................................................... 20

           c.   Duty Of Good Faith .............................................................................................. 20

        2.   The Complaint's Impermissible Reliance On Group Pleading ..................................... 21

        3.   None Of The Complaint's Theories State A Claim For Breach Of Fiduciary Duty
           Under The Above Standards.................................................................................. 22

           a.   The Redbox Merger Theory.................................................................................. 22

           b.   The CSS Agreements Theory ................................................................................ 24

           c.   The Third-Party Licensing And Distribution Agreements Theory........................... 26

           d.   The Dividends Theory .......................................................................................... 26

           e.   The Employee Wages And Benefits Theory ........................................................... 28

      B.   The Complaint's Duty Of Care Claims Are Barred By Exculpation Provisions............. 28

      C.   The Complaint's Claims Are Barred By The Release........................................................ 30

II.   THE CLAIM FOR AIDING AND ABETTING ALLEGED BREACHES OF
      FIDUCIARY DUTY (COUNT FIVE) FAILS AS A MATTER OF LAW ......................... 30

III.  THE COMPLAINT'S BANKRUPTCY CODE CLAIMS (COUNTS 6-9 AND 12-13)
      SHOULD BE DISMISSED ............................................................................................. 33

   A.   Count Six Fails To State Section 548(a)(1)(B) Or 550(a) Claims ..................................... 33

      1.   Count Six Fails To Establish A Fraudulent Transfer To CSS ..................... 34

      2.   Count Six Fails To State A Subsequent Transferee Claim ......................... 35

   B.   Like Count Six, Count Seven Fails To State Section 544(b) Or 550(a) Claims ............. 36

   C.   Count Eight Fails To State Section 548(a)(1)(B) Or 550(a) Claims ................................. 37

   D.   Count Nine Fails To State Section 544(b) Or 550(a) Claims ............................................. 40

   E.   Count 12 Fails To State Section 502(d) & (j) Disallowance Claims ................................. 40

   F.   Count 13 Fails To State A Claim Under Section 510(c) ...................................................... 40

IV.  THE COMPLAINT FAILS TO STATE A CLAIM FOR RECOVERY OF
      PREFERRED DIVIDENDS (COUNT 10) ...................................................................... 41

V.   THE COMPLAINT'S FLSA CLAIM (COUNT 11) SHOULD BE DISMISSED ............. 41

   A.   The Trustee Lacks Statutory Authority To Assert A Direct Claim Under
        The FLSA On Behalf Of CSSE's Former Employees ....................................................... 41

   B.   The FLSA Does Not Impose Liability For The Complaint's Claims Based On
        Unpaid "Benefits" Or Unremitted "Tax Obligations" ......................................................... 43

   C.   Mr. Rouhana Has No Personal Liability Under The FLSA ................................................. 44

   D.   The Complaint Fails To Allege Sufficient Facts To State A Claim For Unpaid
        Minimum Or Overtime Wages Under The FLSA ................................................................. 45

CONCLUSION ...................................................................................................................................... 45

## TABLE OF AUTHORITIES

Cases

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................................ 16

*Balascio v. Leitzke (In re Leitzke)*,
  No. 13-12156, Adv. No. 14-500017, 2014 WL 3583706 (Bankr. D. Del. July 18, 2014) .................... 17

*Barba v. New Century Chinese Buffet, Inc.*,
  No. 2:20-CV-01557, 2023 WL 6348825 (W.D. Pa. Sept. 29, 2023) .......................................... 44

*Bartesch v. Cook*,
  941 F. Supp. 2d 501 (D. Del. 2013) ....................................................................... 4

*Bocock v. Innovate Corp.*,
  C.A. No. 2021-0224-PAF, 2022 WL 15800273 (Del. Ch. Oct. 28, 2022) ..................................... 21

*Burtch v. Huston (In re USDigital, Inc.)*,
  443 B.R. 22 (Bankr. D. Del. 2011) .................................................................... 29, 31

*Burtch v. Opus, L.L.C. (In re Opus E., L.L.C.)*,
  480 B.R. 561 (Bankr. D. Del. 2012) ...................................................................... 29

*Burtch v. Zachem (In re TZEW Holdco, LLC)*,
  Adv. No. 22-50255, 2023 WL 6140247 (Bankr. D. Del. Sept. 19, 2023) ................................ 21, 32

*Cede & Co. v. Technicolor, Inc.*,
  634 A.2d 345 (Del. 1993) ............................................................................. 18, 19

*Cherichetti v. PJ Endicott Co.*,
  906 F. Supp. 2d 312 (D. Del. 2012) ...................................................................... 44

*Cohen v. Sikirica*,
  487 B.R. 615 (W.D. Pa. 2013) ............................................................................ 36

*Comm'r of Internal Revenue v. Clark*,
  489 U.S. 726 (1989) ..................................................................................... 38

*Continuing Creditors' Committee of Star Telecom., Inc.*,
  385 F. Supp. 2d 449 (D. Del. 2004) ...................................................................... 29

*Cred Inc. Liquidation Tr. v. Uphold HQ Inc. (In re Cred Inc.)*,
  650 B.R. 803 (Bankr. D. Del. 2023), *aff'd*, 658 B.R. 783 (D. Del. 2024) ............................ 17, 23

*Davis v. Abington Mem'l Hosp.*,
  765 F.3d 236 (3d Cir. 2014) ............................................................................. 43

*Donovan v. Grim Hotel Co.*,
  747 F.2d 966 (5th Cir. 1984) ............................................................................ 44

*Fisk Ventures, LLC v. Segal*,
  C.A. No. 3017-CC, 2008 WL 1961156 (Del. Ch. May 7, 2008) ............................................... 24

*Flannery v. Genomic Health, Inc.*,
  No. CV 2020-0492-JRS, 2021 WL 3615540 (Del. Ch. Aug. 16, 2021) ........................................ 31

*Gagliardi v. TriFoods Int'l, Inc.*,
  683 A.2d 1049 (Del. Ch. 1996) .......................................................................... 19

*Genesis Healthcare Corp. v. Symczk*,
  569 U.S. 66 (2013) ............................................................................................ 43

*Giuliano v. Ferdinand (In re Liquid Holdings Group, Inc.)*,
  Ad. Pro. 17-50662 (Bankr. D. Del. Sept. 18, 2018) ......................................... 37

*Golden v. Community Health Sys. (In re Quorum Health Corp.)*,
  2023 Bankr. LEXIS 1471 (Bankr D. Del Apr. 18, 2023) ................................... 37

*Haybarger v. Lawrence Cnty. Adult Prob. & Parole*,
  667 F.3d 408 (3d Cir. 2012) ............................................................................. 44

*Hirsch v. Arthur Andersen & Co.*,
  72 F.3d 1085 (2d Cir. 1995) ............................................................................. 17

*H-M Wexford LLC v. Encorp, Inc.*,
  832 A.2d 129 (Del. Ch. 2003) .......................................................................... 23

*Hurwitz v. Mahoney (In re Space Case)*,
  No. 22-10657, Adv. No. 23-50748, 2024 WL 1628440
  (Bankr. D. Del. Apr. 15, 2024) ............................................. 19, 20, 22, 25, 26

*In re AgFeed USA, LLC*,
  546 B.R. 318 (Bankr. D. Del. 2016) ............................................................ 34, 35

*In re Chemours Co. Derivative Litig.*,
  C.A. No. 2020-0786-SG, 2021 WL 5050285 (Del. Ch. Nov. 1, 2021) ......... 28, 41

*In re Cornerstone Therapeutics Inc, S'holder Litig.*,
  115 A.3d 1173 (Del. 2015) ................................................................... 24, 28, 29

*In re Crimson Expl. Inc. S'holder Litig.*,
  C.A. No. 8541, 2014 WL 5449419 (Del. Ch. Oct. 24, 2014) ............................ 19

*In re Ctr. City Healthcare, LLC*,
  641 B.R. 793 (Bankr. D. Del. 2022) .................................................. 6, 16, 35, 39

*In re Cyan, Inc. S'holders Litig.*,
  C.A. No. 11027, 2017 WL 1956955 (Del. Ch. May 11, 2017) .......................... 19

*In re DBSI, Inc.*,
  445 B.R. 351 (Bankr. D. Del. 2011) .................................................................. 35

*In re DSI Renal Holdings, LLC*,
  574 B.R. 446 (Bankr. D. Del. 2017) .............................................................. 42, 43

*In re EZCORP Inc. Consulting Agreement Deriv. Litig.*,
  130 A.3d 934 (Del. 2016) ................................................................................. 29

*In re First Guar. Mortg. Corp.*,
  No. 22-10584 (CTG), 2023 WL 8940688 (Bankr. D. Del. Dec. 27, 2023) ......... 43

*In re First Guar. Mortg., Corp.*,
  No. BR 22-10584 (CTG), 2025 WL 963134 (D. Del. Mar. 31, 2025) ........... 41, 42

*In re Generation Res. Holding Co., LLC*,
  964 F.3d 958 (10th Cir. 2020) .......................................................................... 35

*In re KKR Fin. Holdings LLC S'holder Litig.*,
  101 A.3d 980 (Del. Ch. 2014) .......................................................................... 31

iv

*In re Le Café Crème, Ltd.*,
  244 B.R. 221 (Bankr. S.D.N.Y. 2000) ............................................................... 38

*In re Lids Corp.*,
  260 B.R. 680 (Bankr. D. Del. 2001) ................................................................. 40

*In re Managed Storage Int'l, Inc.*,
  No. 09-10368 (MFW), 2012 WL 5921723 (Bankr. D. Del. Nov. 26, 2012) ......... 4, 6

*In re Mervyn's Holdings, LLC*,
  426 B.R. 488 (Bankr. D. Del. 2010) ................................................................. 34

*In re Mindbody, Inc., S'holder Litig.*,
  332 A.3d 349 (Del. 2024) ............................................................................. 32, 33

*In re Novell, Inc. S'holder Litig.*,
  C.A. No. 6032-VCN, 2013 WL 322560 (Del. Ch. Jan. 3, 2013) ........................... 33

*In re Paramount Gold & Silver Corp. S'holders Litig.*,
  2017 WL 1372659 (Del. Ch. Apr. 13, 2017) ..................................................... 24

*In re PennySaver USA Publ'g, LLC*,
  602 B.R. 256 (Bankr. D. Del. 2019) ............................................................. 34, 39

*In re Petters Co., Inc.*,
  495 B.R. 887 (Bankr. D. Minn. 2013), *as amended* (Aug. 30, 2013) ................... 37

*In re Pinktoe Tarantula Ltd.*,
  No. 18-10344 (LSS), 2023 WL 2960894 (Bankr. D. Del. Apr. 14, 2023) ............. 40

*In re Sirius XM S'holder Litig.*,
  C.A. No. 7800-CC, 2013 WL 5411268 (Del. Ch. Sept. 27, 2013) ....................... 25

*In re Syntax-Brillian Corp.*,
  573 F. App'x 154 (3d Cir. 2014) ..................................................................... 32

*In re United Tax Grp., LLC*,
  No. 14-10486 (LSS), 2016 WL 7235622 (Bankr. D. Del. Dec. 13, 2016) ............. 35

*In re USDigital, Inc.*,
  443 B.R. 22 (Bankr. D. Del. 2011) ............................................................. 35, 36, 40

*In re Waterford Wedgewood USA, Inc.*,
  500 B.R. 371 (Bankr. S.D.N.Y. 2013) .......................................................... 38, 39

*In re Wilton Armetale, Inc.*,
  968 F.3d 273 (3d Cir. 2020) ........................................................................... 42

*Insys Liqid. Tr. v. Quinn Emanuel Urquhart & Sullivan (In re Insys Therapeutics, Inc.)*,
  No. 19-11292, Adv. 21-50359, 2021 WL 5016127 (Bankr. D. Del. Oct. 28, 2021) ....... 16, 35

*Klang v. Smith's Food & Drug Ctrs., Inc.*,
  No. CIV.A. 15012, 1997 WL 257463 (Del. Ch. May 13, 1997) ....................... 28, 41

*Lightsway Litig. Servs., LLC v. Yung (In re Tropicana Ent., LLC)*,
  520 B.R. 455 (Bankr. D. Del. 2014) ............................................................. 17, 31

*Maffei v. Palkon*,
  No. 125, 2024 Term, 2025 WL 384054 (Del. Feb. 4, 2025) ............................... 23

*Malpiede v. Townson*,
 780 A.2d 1075 (Del. 2001) ................................................................................. 32

*Miller v. ANConnect LLC (In re Our Alchemy, LLC) (ANConnect II)*,
 No. 16-11596, Adv. No. 18-50633(KG), 2019 WL 4447519 (Bankr. D. Del. Sept. 16, 2019)........ 31, 32

*Miller v. ANConnect, LLC (In re Our Alchemy)*,
 No. 16-11596, Adv. No. 18-50633, 2019 WL 4447541 (Bankr. D. Del. Sept. 16, 2019) ............... 18, 20

*Miller v. Black Diamond Capital Mgmt., L.L.C. (In re Bayou Steel BD Holdings, L.L.C.)*,
 642 B.R. 371 (Bankr. D. Del. 2022) ......................................................................... 30

*Miller v. Fallas (In re J&M Sales, Inc.)*,
 No. 18-11801 (JTD), 2022 WL 532721 (Bankr. D. Del. Feb. 22, 2022)................................. 37

*Miller v. McCown, Deleeuw & Co., Inc. (In re The Brown Schools)*,
 386 B.R. 37 (Bankr. D. Del. 2008) .......................................................................... 35

*Nguyen v. Barrett*,
 C.A. No. 11511-VCG, 2016 WL 5404095 (Del. Ch. Sept. 28, 2016) .................................... 29

*Off. Comm. Of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners, L.P. (In re Fedders N. Am., Inc.)*,
 405 B.R. 527 (Bankr. D. Del. 2009) ................................................................... 18, 20

*Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*,
 226 F.3d 237 (3d Cir. 2000), *rev'd on other grounds*, 330 F.3d 548 (3d. Cir. 2003) ................. 36

*Official Committee of Unsecured Creditors v. Credit Suisse (In re Champion Enters., Inc.)*,
 No. 09-14014 (KG), 2010 WL 3522132 (Bankr. D. Del. Sept. 1, 2010) ............................ 35, 40

*Pereira v. Farace*,
 413 F.3d 330 (2d Cir. 2005)................................................................................. 29

*Polk 33 Lending, LLC v. Schwartz*,
 555 F. Supp. 3d 38 (D. Del. 2021)........................................................................... 25

*Prod. Res. Grp. v. NCT Grp., Inc.*,
 863 A.2d 772 (Del. Ch. 2004)............................................................................... 29

*Rapoport v. Asia Elecs. Holding Co.*,
 88 F. Supp. 2d 179 (S.D.N.Y. 2000)......................................................................... 17

*Reich v. PTC Career Inst. of Pennsylvania, Inc.*,
 No. CIV. A. 94-647, 1994 WL 283681 (E.D. Pa. June 24, 1994), *aff'd*, 52 F.3d 316 (3d Cir. 1995).... 44

*Sanchez v. AFA Foods, Inc. (In re AFA Inv., Inc.)*,
 No. 12-11127, Adv. No. 12-50710, 2012 WL 6544945 (Bankr. D. Del. Dec. 14, 2012) ...................... 17

*Shabbouei v. Potdevin*,
 C.A. No. 2018-0847-JRS, 2020 WL 1609177 (Del. Ch. Apr. 2, 2020)................................... 23

*Smith v. Weinshanker (In re Draw Another Circle)*,
 602 B.R. 878 (Bankr. D. Del. 2019) ......................................................................... 31

*Stanziale v. CopperCom, Inc. (In re Conex Holdings), LLC*,
 518 B.R. 792 (Bankr. D. Del. 2014) ......................................................................... 30

*Stanziale v. Nachtomi (In re Tower Air, Inc.)*,
 416 F.3d 229 (3d Cir. 2005)................................................................................. 19

*Tabachnik v. New Water Capital GP, LLC (In re Worth Collection, Ltd.)*,
   666 B.R. 726 (Bankr. D. Del. 2024) .................................................................................. 16, 17

*The Liquidation Trust of Hechinger Inv. Co. of Delaware, Inc. v. Fleet Retail Finance Group*
   *(In re Hechinger Inv. Co. of Delaware)*,
   327 B.R. 537 (D. Del. 2005) ............................................................................................... 39

*The Liquidation Trust v. Daimler AG (In re Old Carco LLC)*,
   435 B.R. 169 (Bankr. S.D.N.Y. 2010) ............................................................................... 39

*The Raj and Sonal Abhyanker Tr. ex. rel. UpCounsel, Inc. v. Blake*,
   C.A. No. 2020-0521, 2021 WL 2477025 (Del. Ch. June 17, 2021) ..................................... 21

*Theseus Strategy Grp. LLC v. Barsa (In re Old BPSUSH, Inc.)*,
   No. 16-12373, Adv. No. 19-50726, 2020 WL 6818435 (Bankr. D. Del. June 30, 2020) .............. 17, 20

*Thompson v. Real Est. Mortg. Network*,
   748 F.3d 142 (3d Cir. 2014) ............................................................................................... 44

*Tilton v. MBIA Inc. (In re Zohar III, Corp.)*,
   639 B.R. 73 (Bankr. D. Del.), *aff'd*, 620 F. Supp. 3d 147 (D. Del. 2022) ............................. 17

*Traub v. Stardust389, Inc.*,
   No. CV 22-1582-SRF, 2024 WL 1434789 (D. Del. Apr. 3, 2024) ...................................... 45

*UMB Bank, N.A. v. Sun Capital Partners V, LP (In re LSC Wind Down LLC)*,
   610 B.R. 779 (Bankr. D. Del. 2020) .................................................................................. 37

*United Food & Com. Workers Union v. Zuckerberg*,
   250 A.3d 862 (Del. Ch. 2020) ........................................................................................... 29

*Victorin v. Maynard*,
   No. CV 2012-037, 2014 WL 4812088 (D.V.I. Sept. 29, 2014) ........................................... 44

*Wei v. Levinson*,
   C.A. No. 2023-0521, 2025 WL 1565356 (Del. Ch. June 3, 2025) ...................................... 23

*Wright v. Lehigh Valley Hosp. & Health Network*,
   No. CIV.A. 10-431, 2011 WL 2551026 (E.D. Pa. June 23, 2011) ...................................... 44

*Wu v. E. Ocean Agric. Corp.*,
   No. CV 21-668-RGA, 2022 WL 609619 (D. Del. Feb. 9, 2022) ........................................ 45

*Zas v. Canada Dry Bottling Co. of New York, L.P.*,
   No. 12-1649 (SRC)(CLW), 2013 WL 3285143 (D.N.J. June 27, 2013) .............................. 44

*Zazzali v. Hirschler Fleischer, P.C.*,
   482 B.R. 495 (D. Del. 2012) .............................................................................................. 35

<u>Statutes</u>

11 U.S.C. § 502(d) ................................................................................................................... 40

11 U.S.C. § 502(j) .................................................................................................................... 40

11 U.S.C. § 510(c) ................................................................................................................... 40

11 U.S.C. § 544(b) ................................................................................................................... 36

11 U.S.C. § 548(a)(1)(B) ..................................................................................................... 33, 38

11 U.S.C. § 550(a) .............................................................................................................. 33, 36

29 U.S.C. § 206 ........................................................................................................... 43

29 U.S.C. § 207 ........................................................................................................... 43

29 U.S.C. § 207(e)(4) .................................................................................................. 43

29 U.S.C. § 216(b) ...................................................................................................... 43

6 Del. C. Section 1305 ........................................................................................... 36, 40

Del. Code tit. 10, § 8106 ............................................................................................. 25

Del. Code, tit. 8, § 102(b)(7) ...................................................................................... 28

<u>Rules</u>

Federal Rule of Bankruptcy Procedure 7012(b) ........................................................... 1

Federal Rule of Civil Procedure 12(b)(6) ..................................................................... 1

Pursuant to Federal Rule of Civil Procedure 12(b)(6), made applicable to this adversary proceeding through Federal Rule of Bankruptcy Procedure 7012(b), Defendant William J. Rouhana respectfully submits this Memorandum in support of his Motion to Dismiss all claims pled against him in the Complaint filed by Plaintiff George L. Miller as Chapter 7 Trustee ("Trustee").

## PRELIMINARY STATEMENT

This lawsuit erroneously attempts to blame Debtors' demise on Mr. Rouhana, the former CEO of Debtor Chicken Soup for the Soul Entertainment, Inc. ("CSSE") and Chairman of its Board of Directors ("Board"), based on the Board's *decision* to approve CSSE's 2022 merger with Redbox Entertainment Inc. and related entities ("Redbox") (the "Redbox Merger"), which did not work out as planned. With the benefit of hindsight, the Complaint criticizes the Redbox Merger, including CSSE's assumption of $350 million of Redbox's debt. But the directors and officers did not breach fiduciary duties by making what, in hindsight, the Trustee essentially characterizes in the Complaint as a "bad decision." To challenge this decision, the Trustee must plead around the business judgment rule—plausible facts to show Mr. Rouhana was disloyal, ill-informed, or acted intentionally to harm CSSE – which he does not.

The very SEC filings and Board meeting minutes the Complaint references concerning the Redbox Merger show Trustee has it wrong. Completely wrong. The Complaint relies on threadbare allegations, misleading (if not wildly erroneous) assertions, and impermissible group pleading, but the documents it relies on establish this reality: the Redbox Merger was researched, scrutinized, analyzed, and critically considered by all of CSSE's fiduciaries for months, in consultation with counsel and reputable investment advisors. Yet astonishingly, the Trustee

1

contends Mr. Rouhana "pillaged" CSSE and was cramming this Merger down the directors' throats based on foolish assumptions. (Compl. ¶ 1.)[2]

Trustee claims he did this: (1) because Mr. Rouhana wanted to "maximize[e] shareholder gain for his benefit," (Compl. ¶ 29); and (2) so he could add Redbox revenue to the calculation of fees CSSE made to a company he "controlled," Chicken Soup for the Soul, LLC ("CSS"), under two agreements. Neither supposed motivation makes any sense. First, Chicken Soup for the Soul Productions, LLC ("CSSP"), which Mr. Rouhana controls, is the "parent and controlling stockholder of [CSSE], owning approximately 100% of the Company's Class B common stock (representing an ownership of 36.7% of the total outstanding common stock and 85% control of the voting power of [CSSE]." (Compl. ¶ 22.) While CSSP, and ultimately Mr. Rouhana, certainly stood to gain, along with all other shareholders, if the Redbox Merger was a success, CSSP as a significant shareholder, also had the most to lose if the Redbox Merger caused CSSE to fail. The economic incentives for CSSP and its parent CSS to do all they could to help, not hurt, CSSE render Trustee's first interestedness theory patently absurd. Second, Trustee imprudently overlooks that the vast majority of Redbox revenue was expressly *excluded* from payments CSSE would make to CSS. The Complaint also conceals that after the Redbox Merger, CSS modified its agreements with CSSE to reduce its service fee obligations to CSS, freeing up additional working capital for CSSE, all for the benefit of CSSE, not Mr. Rouhana. Given these facts, there is no rational theory on which Mr. Rouhana could expect to benefit personally from CSSE failing.

While, in hindsight, the $350 million in debt assumed as part of the merger is characterized by the Trustee as a "bad decision" it simply does not give rise to a cognizable claim. Rather, the Complaint conspicuously ignores that HPS Investment Partners, LLC's ("HPS"), which controlled

---

[2] "Adv. Pro. D.I." refers to the docket index entries in this Adversary Proceeding, and "D.I." refers to the docket index entries in the related bankruptcy cases, Case No. 24-11442 (MFW). "Compl." refers to Adv. Pro. D.I. 1.

the assumed Redbox debt, failed to honor its obligations under an August 11, 2022 Amended and Restated Credit Agreement (the "Credit Agreement") with the CSSE and others. (D.I. 7 ¶¶ 19, 24-32; *see also* Compl. ¶¶ 46-48, 51, 53-54.) Under the Credit Agreement, CSSE was supposed to obtain another $40 million in financing post-closing, but HPS blocked CSSE from doing so in violation of its promises. (D.I. 7 ¶ 20.) This misconduct directly caused Debtors' bankruptcy. In fact, Mr. Rouhana arranged for up to $20 million in Debtor in Possession ("DIP") financing before he stepped down as CEO. (*See* D.I. 7 ¶¶ 3, 33; D.I. 8 at 9, 11; D.I. 8-1 at 43.) But HPS blocked this too, insisting that it provide only $8.0 million of *interim* DIP financing (the "Interim DIP Financing"), in exchange for questionable broad releases (on an Interim DIP Financing Order) and immediate reinstatement of CSSE's "Strategic Review Committee" (the "SRC") to assume control over the Debtors. (*See generally* D.I. 7 ¶¶ 30-40; *see also* D.I. 28, 29, 85.) Judge Horan approved the Interim DIP Financing on July 4, 2024, without a hearing, and on July 10, 2024, the SRC directed the very lawyers now representing the Trustee in this suit to make an oral motion for chapter 7 conversion. (D.I. 120.) HPS then used the conversion as an excuse to cease funding the Interim DIP Financing, directly causing the employees' losses and needless, avoidable destruction of Debtors' assets. Yet the Trustee seeks to foist the blame on the Defendants, rather than HPS.

In sum, the SEC filings and Board minutes show neither Mr. Rouhana, nor the Debtors' sophisticated Board, were ill-informed, acted with disloyalty or acted with an attempt to harm the Debtors. Their decision is protected by the business judgment rule, which the Complaint fails to plead around. None of the Trustee's other claims have any merit, and all should be dismissed.

## NATURE AND STAGE OF THE PROCEEDING

On June 28, 2024 ("Petition Date"), Debtors filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code in this Court. (D.I. 1.) On July 10, 2024, the chapter 11 bankruptcy cases were converted to chapter 7 cases. (D.I. 120.) George L. Miller has

been duly appointed as Trustee of the chapter 7 Debtors.  (D.I. 130.)  On March 12, 2025, the Trustee filed this Adversary Proceeding.  (Adv. Pro. D.I. 1.)  The 49-page Complaint asserts 13 claims against 14 Defendants,[3] including 10 claims against Mr. Rouhana seeking monetary damages, avoidance of a release that bars most of the claims, avoidance and recovery of alleged pre-petition payments as supposed fraudulent transfers, and disallowance or equitable subordination of his claim.  Mr. Rouhana moves to dismiss all counts pursuant to Rule 12(b)(6).

## STATEMENT OF FACTS AND ALLEGATIONS

### I.    MR. ROUHANA, DEBTORS, AND THE CSS ENTITIES.

Mr. Rouhana was the CEO of CSSE and Chairman of its Board.  (Compl. ¶ 10.)  He resigned as CEO pre-petition on June 28, 2024 and was no longer a member of CSSE's Board as of July 4, 2024.  (D.I. 7 ¶¶ 1, 10; *see also* D.I. 1 at 6.)  CSSE is a Delaware corporation.  It "operated primarily through its . . . subsidiaries [including other Debtors] as a provider of streaming on-demand video and television services."  (Compl. ¶ 26.)  CSSE and its affiliates worked together "to acquire, produce, co-produce and distribute content, including . . . original and exclusive content, all in support of [their] streaming services."  (CSSE 2021 10-K at 4.)[4]  Debtor Screen Media Ventures, LLC ("Screen Media") managed "one of the industry's largest independently owned television and film libraries consisting of approximately 20,000 films and television episodes."  (*Id.* at 5.)  Debtor Crackle Plus, LLC monetized the value of the Screen Media library and other content by operating streaming services that were "among the most watched ad-

---

[3] The Complaint asserts parallel claims against nine former officers and/or directors of CSSE, three direct or indirect corporate parents of CSSE—CSS", and Chicken Soup for the Soul Holdings, LLC ("CSS Holdings" (collectively, "CSS Entities")—and one former employee of CSS the complaint inaccurately alleges was a CSSE officer.

[4]  https://www.sec.gov/ix?doc=/Archives/edgar/data/1679063/000155837022004926/csse-20211231x10k.htm.  The Complaint relies on this and other Annual Reports filed with the SEC.  (*See* Compl. ¶¶ 26, 31, 73.)  The Court may consider CSSE's SEC filings because the Complaint references and relies on them, and it may take judicial notice of them.  *See In re Managed Storage Int'l, Inc.*, No. 09-10368 (MFW), 2012 WL 5921723, at *2 (Bankr. D. Del. Nov. 26, 2012) (Walrath, J.), *rev'd and remanded on other grounds sub nom. Burtch v. Avnet, Inc.*, 527 B.R. 150 (D. Del. 2015); *Bartesch v. Cook*, 941 F. Supp. 2d 501, 505 n.1 (D. Del. 2013).

supported independent VOD streaming services," serving "more than 40 million monthly active visitors" as of December 31, 2021.  (*Id.* at 4.)  Collectively, CSSE and its affiliates had access to over 50,000 content assets.  (CSSE 2023 10-K at 4.)[5]  The Complaint alleges Mr. Rouhana owns or controls CSSP, a Delaware limited liability company ("LLC") that has a controlling interest in CSSE's Class B common stock and 85% control of the voting power for CSSE.  (Compl. ¶¶ 22-23.)  The Complaint also alleges he owns or controls CSS, a Connecticut LLC that owns CSSP, and CSS Holdings, a Delaware LLC that in turn owns CSS.  (*See id.* ¶¶ 10, 22-24, 26.)

## II.    CSSE'S LONGSTANDING AGREEMENTS WITH CSS.

CSS and CSSE were parties to a May 12, 2016 License Agreement ("CSS License Agreement" or "License"), pursuant to which CSSE agreed to pay 5% of net revenues to CSS "in exchange for a license to utilize the Chicken Soup for the Soul brand and related content, and for certain marketing support."[6]  (Compl. ¶ 63; Ex. 1, CSS License Agreement at 2.)[7]  The "Chicken Soup for the Soul" brand "provide[d] a competitive advantage in attracting advertisers and entertainment talent."  (CSSE 2021 10-K, at 8.)  CSS and CSSE were also parties to a May 12, 2016 Management Services Agreement ("CSS MSA") (together with the CSS License Agreement, "CSS Agreements"), pursuant to which CSSE agreed to pay 5% of net revenues to CSS for services, including "back-office services, office space, and equipment."[8]  (Compl. ¶ 62; Ex. 2, CSS MSA at 2.)  The parties modified the CSS Agreements on March 29, 2023 to provide CSSE and its affiliates with an additional $16.2 million in additional working capital and flexibility.  (Ex. 3,

---

[5] https://www.sec.gov/ix?doc=/Archives/edgar/data/0001679063/000155837024005371/csse-20231231x10k.htm.
[6] CSS holds the intellectual property rights to the Chicken Soup for the Soul brand, mark, and name.  CSS terminated the CSS License Agreement (*see* D.I. 619), so nobody can use these rights without CSS's permission.
[7] This Memorandum relies on Exhibits in the Joint Appendix being filed contemporaneously with the Memorandum.
[8] These services were substantial, including financial, treasury, and accounting services, such as budgeting, investment services, invoice processing, collections, and regular financial reporting; tax services, including tax reporting and planning; legal support services, including trademark maintenance; property management; public relations support; human resources services, including payroll administration, accounting, and employee benefits; procurement services; sales and marketing services; and technical services.  (Ex. 2 at Schedules B and C.)

Modification to CSS Agreements, Mar. 29, 2023.)  CSS agreed to receive shares of CSSE common stock in lieu of cash for: (1) $3.45 million of the fees earned by CSS under the CSS Agreements in the first quarter of 2023; and (2) 25% of the next $51 million of fees earned by CSS under the CSS Agreements after April 1, 2023.  (*Id.*)  This reduced CSSE's payment of fees significantly.

## III.    MARKET CHALLENGES AND THE REDBOX MERGER.

As of March 2022, CSSE was exploring a potential acquisition of Redbox.  (Compl. ¶ 35.) Redbox was perhaps best known for its physical, self-service DVD rental kiosks.  (*Id.* ¶¶ 35-36.) It had established a dominant market niche with approximately 32,000 kiosks nationwide (*id.* ¶ 36), and strong distribution relationships with major film studios.  Redbox faced competition from increased video streaming services and a dearth of theatrical releases during the COVID-19 pandemic (*id.* ¶ 36), as did CSSE.  But by combining, Redbox could mitigate operational costs by joining CSSE's platform, the combined customer bases could expand both companies' subscribers, and post-pandemic new releases would rebound Redbox kiosk revenue.  (*See infra* at 12.)

Despite the Complaint's insinuation otherwise (*id.* ¶¶ 37, 43), the CSSE Board met numerous times to discuss the potential Redbox Merger.  CSSE's February 8, 2022 Board meeting minutes show that the Board discussed CSSE's "potential acquisition of . . . Redbox" and CSSE's engagement of a third-party "financial advisor, Guggenheim [Securities, LLC ("Guggenheim")]," which "was putting together models for various potential acquisitions."  (Ex. 4, CSSE Board Meeting Minutes, Feb. 8, 2022 (noting the presence of CSSE's outside general counsel at the Board meeting).)[9]  On April 21, 2022, the Board met again and considered "the potential acquisition of

---

[9] The Complaint relies on CSSE Board meeting minutes and what the Trustee contends "there is no indication" of in them.  (Compl. ¶¶ 30, 34, 37, 43.)  The Court may therefore consider CSSE's Board meeting minutes without converting this to a Motion for summary judgment.  *See In re Managed Storage Int'l, Inc.*, 2012 WL 5921723, at *2; *In re Ctr. City Healthcare, LLC*, 641 B.R. 793, 802 (Bankr. D. Del. 2022) (Walrath, J.).  The same is true for other documents the Complaint relies on, including: the CSS License Agreement (Compl. ¶¶ 63-64, 66-67, 89, 92, 136, 144, 176), the CSS MSA (*id.*; *see also id.* ¶ 62), the Redbox Merger Agreement (*see id.* ¶¶ 45, 58-59, 151, 159); the Release (*see id.* ¶¶ 2(3), 4, 58-61, 87-88, 152-162); and the Credit Agreement.  (*See, e.g.*, *id.* ¶¶ 46-48.)

Redbox," including the "potential benefit of such an acquisition, as well as the complexities relating to Redbox's debt, operations, and legacy business." (Ex. 5, CSSE Board Meeting Minutes, Apr. 21, 2022, at 2 (stating "***Discussion was had thereon*** . . . .") (emphasis added).)

On May 4, 2022, the Board (with outside general counsel present) received presentations from CSSE officers on "Redbox and its business, the operational synergies with [CSSE] and the complementary lines of business that Redbox would bring in a merger," the "proposed current terms," the need for "working capital and cash flow," and "key performance drivers . . . ." (Ex. 6, CSSE Board Meeting Minutes, May 4, 2022, at 1-2.) CSSE's Senior VP of Finance also discussed ongoing work with financial advisor "Guggenheim on building the financial cases and us[ing] industry reports, upcoming theatrical slates, industry box office performance, Redbox rentals and sessions to develop the assumptions." (*Id.* at 2.) The CSSE "Board then outlined a series of issues relating to the possible transaction" ***and discussed them***, including "Redbox revenue breakdown;" "Costs relating to managing the business;" "Margin proceeds;" "Cash flow needs;" "Potential operational synergies including content spend, public entity costs, [and] tech investments;" "Credit agreement benefits and risks;" and Redbox's "Kiosk service business." (*Id.* at 2.) The Board also received materials including "an overview of the potential transaction, the related terms, financial models, potential risks, and a proposed presentation that would accompany a transaction announcement," as well as the "proposed current terms" of the merger and materials regarding CSSE's need for "working capital and cash flow." (*Id.*)

Importantly, the Board considered "the risks associated with the potential transaction," including risks relating to: "the DVD market not continuing to rebound . . . .;" declining DVD sales "accelerat[ing] in the future, which would negatively impact the business of Redbox and the

combined companies post-merger;" a potential "Hollywood dec[ision] not to increase theatrical releases due to COVID;" "the investment community not understanding the deal;" "a potential recession;" and working capital needs.  (*Id.*)  ***Discussion was had around these topics*** " as well, contrary to the Complaint's conclusory allegations that "[t]here is no indication in the Company's Board minutes that the Board requested or obtained sufficient information to undertake a reasoned analysis" and that the directors and officers "blindly accepted" the projections and "utterly failed to properly assess" the transaction.  (*Id.*; *see, also*, Compl. ¶¶ 43-44, 57, 99 (emphasis added).)

On May 9, 2022, the CSSE Board convened yet again to discuss the potential Redbox Merger, with the benefit of a presentation prepared by Guggenheim that included "a summary of key terms and deal rationale, public trading perspectives, financial overviews of Redbox and [CSSE], synergies and pro forma combination data relating to the combined companies, valuation analyses, and pro forma financial effects."  (Ex. 7, CSSE Board Meeting Minutes, May 9, 2022, at 1.)  Four Guggenheim representatives attended this meeting and presented on "the due diligence work and analysis that the combined Guggenheim and [CSSE] teams undertook to evaluate the Redbox business," a "summary of the key terms and deal rationale," the terms of the proposed "new debt facility that would be provided through HPS," other transactions "that Guggenheim advised on as a basis for this [Redbox] analysis," and Guggenheim's "share analysis and calculations."  (*Id.* at 1-2.)  "The Board then asked a series of questions of the Guggenheim team, which they answered."  (*Id.* at 2.)  Once Guggenheim left the meeting, the Board again "reviewed a series of issues related to the possible transaction."  (*Id.*)  Among other things, the Board discussed "Market and industry reception of the transaction;" "streaming growth" for advertising-based video on demand; "Access to customers;" "Cash flow pacing and correlation to [Redbox's] legacy DVD rental business;" "Demographics of physical kiosk locations and customers;"

"Subscriber acquisition expenses;" "Retailer agreements;" and the "Due diligence process." (*Id.*)

The Board met again the next day on May 10, 2022 to review the proposed "Merger Agreement and the material terms thereof" and to discuss "the benefits and potential risks of the merger," "debt obligations of Redbox," "the new credit agreement that the combined companies would enter into at the closing of the mergers," and the proposed merger's impact on existing CSSE agreements. (Ex. 8, CSSE Board Meeting Minutes, May 10, 2022, at 1.) The Complaint fails to acknowledge any of these Board discussions.

CSSE's Board also received an opinion from Guggenheim that "the Exchange Ratio is fair, from a financial point of view, to the holders of shares of [CSSE] Common Stock." (CSSE S-4A, July 11, 2022, at A-33;[10] *see also id.* at D-5 (fairness opinion from Redbox's financial advisor).) During the May 10, 2022 Board meeting, the Board unanimously passed a series of resolutions to approve and facilitate the Redbox merger. (Ex. 8)

CSSE initially began evaluating "various commercial and strategic opportunities" between it and Redbox's predecessor as early as 2020. (CSSE S-4A, July 11, 2022, at 47.) Discussions resumed in February 2022 when Redbox, through "Apollo Global Management, LLC ("Apollo"), an affiliate of Redbox's majority stockholder, . . . reached out to CSSE to gauge CSSE's interest in exploring a potential strategic transaction with Redbox." (*Id.*) Consistent with the CSSE Board meeting minutes discussed above, the 181-page proxy statement filed with the SEC regarding the Redbox merger details the parties' extensive due diligence over the course of months. For example, "Redbox engaged with CSSE regarding CSSE's due diligence requests" submitted through Guggenheim (*id.* at 50-51); "CSSE, together with Guggenheim, engaged in extensive due diligence regarding Redbox . . . ," including "videoconferences with Redbox, its Strategic Review

---

[10] *See* https://www.sec.gov/Archives/edgar/data/1679063/000110465922078845/0001104659-22-078845-index.htm.

Committee, and HPS" and due diligence "on [a] synergy analysis conducted with Guggenheim and Redbox" (*id.* at 51, 54); CSSE provided Redbox's counsel (Weil, Gotshal & Manges LLP) access to a data room "to review diligence materials requested by Redbox . . . ." (*id.* at 53); CSSE and Redbox exchanged various term sheets and proposals (*id.* at 49-50, 53, 56); "Redbox and CSSE, together with their respective advisors, discussed certain issues regarding the structure of the proposed transaction . . . ." (*id.* at 57); and the CSSE Board met several times to discuss the potential merger, including "various risks related to the transactions," "management's evaluation of the synergies between CSSE and Redbox," and "the key business-related due diligence findings on Redbox." (*Id.* at 57-60.)  Guggenheim was paid $15.0 million for its work.  (*Id.* at 83.)  Thus, the Complaint's insinuation that Guggenheim, and then the Board, rubber-stamped whatever Mr. Rouhana wanted is nonsense—the Board Minutes clearly reflect that there was robust, collaborative due diligence by and among Apollo, HPS, Redbox, and CSSE, together with each company's respective advisors, attorneys, and Boards.

On August 11, 2022, CSSE acquired Redbox and entered into the Credit Agreement. (Compl. ¶¶ 45-46.)  The viability of the Redbox Merger expressly depended on CSSE's "ability to consummate certain accounts receivable financing."  (*Id.* ¶ 51.)  Rather than roll additional financing into the HPS indebtedness at closing on the Redbox transaction, the Credit Agreement called for CSSE to obtain working capital of up to $40 million pursuant to an ABL structure with a non-HPS lender, which funds were necessary to obtain new release content to revive the Redbox kiosk business.  (Ex. 9, Credit Agreement, at 99-100 § 6.01(j), 104 § 6.02(q); *see also id.* at 30, 38, § 1.01; CSSE 2022 10-K, at 11-12[11] (discussing ability to secure "asset-based lending financing" and an "asset-based accounts receivable lending facility" to secure film financing).)

---

[11] https://www.sec.gov/ix?doc=/Archives/edgar/data/1679063/000155837023005316/csse-20221231x10k.htm.

Once the Merger closed and HPS had upgraded its Redbox collateral to CSSE's valuable library and assets, it refused to approve an ABL facility.  (D.I. 7 ¶ 7.)  As a result, CSSE lacked the working capital necessary "to procure content to support its operations," leading to movie studios terminating their relationship with Redbox due to the inability to pay license fees.  (Compl. ¶ 53.)  Without new content to offer customers, Redbox's revenues fell, and CSSE and Redbox were unable to service the HPS debt.  (*Id.* ¶ 54.)

## IV.    THE COMPLAINT'S CLAIMS AGAINST MR. ROUHANA.

The Complaint's claims are premised on allegations that the Redbox Merger was a foolish endeavor, and that Mr. Rouhana took various self-serving actions, while the directors and officers were "supine and loyal" to him and "unreasonably relied on, did not question, and/or rubber-stamped Rouhana's determinations and dictates."  (Compl. ¶¶ 29-30; *see also id.* ¶¶ 1, 10, 26-27, 98-100, 110-112.)  The Complaint bases its claims on six theories, which are described below.

### A.    Redbox Acquisition Theory.

The Complaint seeks to pin the economic consequences of the Redbox Merger on Mr. Rouhana.  (*See, e.g.*, *id.* ¶¶ 2(3), 29, 30, 35-57, 87-88.)  Setting aside the infeasibility of a single individual being able to mastermind and close a multi-party merger of this magnitude, the Complaint alleges that Mr. Rouhana was motivated to pursue the Redbox Merger and that "there is ***no indication in the Company's Board minutes*** that the D&Os requested or obtained sufficient information to undertake a rational analysis of the reasonableness of the transaction in light of the apparent and publicly disclosed risks . . . ."  (*Id.* ¶ 37 (emphasis added).)

To the contrary, the parties engaged in extensive due diligence (lasting months), while the Board received and considered an abundance of materials relating to the merger and its attendant risks.  (*See supra* at 6-10.)  And the Complaint concedes CSSE engaged third-party Guggenheim as CSSE's "financial advisor in connection with the proposed [Redbox] transaction," with that

engagement including "presentations to the Board, with Officers present, summarizing certain financial information, projections and estimates of synergies that might be realized from the Merger," as well as preparation of materials that "summarized certain terms, strategic rationales, and financial information relevant to the proposed Merger." (Compl. ¶¶ 38-39.)

The Complaint insinuates that the Redbox Merger was a bad idea because Redbox experienced pandemic-related financial difficulties. (*See, e.g.*, *id.* ¶¶ 31, 35, 37, 39); *see also* CSSE 2021 10-K at 8, 10, 12.) But CSSE's projected revenues and adjusted EBITA increased considerably between Q4 2020 and Q4 2021, and the Board wanted to "get bigger to effectively compete," noting CSSE's evaluation of a "dozen opportunities . . . all focused on increasing content, operating efficiency and viewership experience." (Ex. 4)

Despite all of this, the Complaint is premised predominantly on second-guessing the Board's consideration of "business projections and plans." (Compl. ¶ 29; *see also id.* ¶¶ 39-44.) In particular, the Complaint concludes key assumptions for the Merger's success—namely, "a partial return to pre-COVID levels in the number and cadence of theatrical releases" and a rebound in demand for physical kiosk rentals to roughly one-third of 2019 levels—"never could have reasonably been expected to happen" because "Redbox operated an antiquated business focused on renting a product that, by 2022, was no longer in demand." (*Id.* ¶¶ 51-52.) The Board's meeting minutes make clear, however, that Mr. Rouhana raised—and the Board fully considered and discussed—these risks. (Ex. 6) The Complaint does not (and cannot) allege any facts supporting the conclusion that Mr. Rouhana knew in May 2022 that CSSE's projections for the Redbox Merger would not materialize years later. Nor does the Complaint adequately acknowledge that the success of the Merger was dependent on CSSE's "ability to consummate certain accounts receivable financing" (Compl. ¶ 51), which HPS blocked.

B.    **CSS Agreements Theory.**

The Complaint also bases its claims on the CSS Agreements, asserting they required payments to CSS that were unfair to CSSE.  (*See* Compl. ¶ 2(1), 62-67, 89, 92.)  Yet the Trustee offers no factual allegations regarding the fair value of the CSS License or the services CSS provided under the CSS Agreements.  Nor does the Complaint allege CSS failed to provide the License or services, or offer any explanation as to how Debtors would have operated without them.  Also, CSSE's officers and directors determined annually that the CSS Agreements were "more favorable" than seeking comparable terms from third parties or adding CSSE staff to provide the services.  (*See, e.g.*, CSSE 2021 10-K at 37; CSSE 2022 10-K at 43; CSSE 2023 10-K at 45.)

The CSS Agreements were first executed in 2016 and amended in 2021 (*id.* ¶ 66), well before the Redbox Merger.  And perhaps the greatest flaw with the CSS Agreements Theory are allegations that Mr. Rouhana was motivated to push the Redbox Merger to increase CSSE's payments to CSS for his personal benefit.  (*Id.* ¶¶ 29, 44, 57, 87.)  This assertion is pulled out of thin air and belies reality because the legacy kiosk business of Redbox (which accounted for over 90% of Redbox's revenue) was specifically ***excluded*** from the revenue calculations under the CSS Agreements.  (Ex. 8 at 1; *see also* Ex. 3 at 6 (providing that "the MSA and [License] fees shall be based on the net revenue of [CSSE] and its subsidiaries ***excluding the Redbox Traditional Business (as defined in the Credit Agreement) unless and until certain prescribed conditions have occurred***" and also providing CSSE an additional $16.2 million in liquidity) (emphasis added).)  The Credit Agreement also previously recognized that the fees payable to CSS under the CSS Agreements "shall be based solely on the net revenue of the Borrower and its Subsidiaries ***excluding the Redbox Traditional Business*** unless or until" enumerated financial and other conditions were satisfied.  (Ex. 9 at 115 §§ 6.07(b)(ix), (xiv) (emphasis added).)

13

C.    **Third-Party Licensing And Distribution Agreements Theory.**

The Complaint also bases its claims on Mr. Rouhana's execution or approval of various license and distribution agreements with third parties. (Compl. ¶¶ 2(4), 68-72, 91.) The Complaint alleges in conclusory fashion that these agreements "were not characterized by fair dealing or a fair price," but offers no factual allegations to support the conclusory lack-of-fairness allegations. (*See id.* ¶¶ 66, 70.) The Complaint claims Debtors were "undercapitalized" when the agreements were executed (*id.*), yet this criticism ignores that these agreements required third parties to pay certain Debtors significant amounts in exchange for license and distribution rights. (*See generally* Ex. 10A – 10I.) These agreements were revenue generators, not cost centers.

The Complaint provides no explanation for why Mr. Rouhana arranging these agreements was unfair, but alleges in conclusory fashion that he "acted in his own self-interest" regarding them. (Compl. ¶ 71.) But the agreements show that neither Mr. Rouhana nor any company allegedly controlled by him was a counterparty to the agreements. (*Id.* ¶ 68.) The Complaint's allegation that one of the licensees was allegedly Mr. Rouhana's "personal friend" (*id.* ¶ 69) is meaningless. In reality, the handful of agreements with this licensee generated payments to Screen Media of $6.4 million for a few years of SVOD rights for just 14 films in CSSE and its affiliates' library of more than 50,000 content assets. (*See* Ex. 10E, Letter Agreement with David S. Nagelberg 2003 Revocable Trust ("Nagelberg Trust"), Mar. 13, 2024; Ex. 10F, Letter Agreement with Nagelberg Trust, Mar. 22, 2024; Ex. 10G, Letter Agreement with Nagelberg Trust, Mar. 27, 2024; Ex. 10H, Letter Agreement with Nagelberg Trust, Apr. 24, 2024; Ex. 10-I, Am. and Restated Letter Agreement with Nagelberg Trust, May 13, 2024.) The Complaint does not allege any facts explaining why or how Mr. Rouhana's involvement in securing licensing and distribution agreements generating millions of dollars in cash for CSSE was commercially unfair.

### D.    Dividend Theory.

The Complaint's claims are also based on the payment of dividends to CSSE's preferred shareholders while CSSE was allegedly insolvent.  (Compl. ¶ 2(2), 73-77, 90, 92.)  The Complaint does not plead CSSE lacked a surplus, however, and CSSE's financial statements (on which the Trustee relies for his arguments) demonstrate CSSE had a surplus between at least January 2020 and June 30, 2023.  (*See infra* at 41.)  The Complaint also concedes CSSE's Board suspended dividend payments in January 2024.  (Compl. ¶ 74.)

### E.    The FLSA Employee Wage And Benefit Claim Theory.

The Complaint alleges CSSE failed to pay unspecified employee wages and medical benefits and remit certain employee income tax withholdings, in violation of the Fair Labor Standards Act ("FLSA").  (*See* Compl. ¶¶ 4, 78-81, 175-178).)  The Complaint further alleges that the CSS Entities were "responsible for the administration and payment of [CSSE's] payroll and benefits, including payroll taxes," pursuant to the CSS MSA.  (*Id.* ¶ 78.)  The Complaint does not explain Mr. Rouhana's alleged involvement in payment of employee wages, benefits, and income tax withholdings.  The Complaint merely alleges CSS was under his "ownership and control" (*id.*), and Mr. Rouhana "fail[ed] to cause [CSSE] to pay [them] . . . ."  (*Id.* ¶ 92.)

### F.    Release Theory.

Finally, the Complaint criticizes a May 2022 Release Agreement between CSSE (and its merger subsidiaries), HPS, Redbox, and others that was executed in connection with the Redbox Merger Agreement ("Release").  (*Id.* ¶¶ 45, 58-61, 87-88.)  In April 2022, Apollo "indicated that it would consent to a sale transaction" subject to certain conditions, including a "customary mutual release among the parties."  (CSSE S-4A, July 11, 2022, at 53, 56.)  CSSE executed the mutual Release, which provides that each party (including CSSE and its subsidiaries and affiliates):

. . . unconditionally, irrevocably and forever releases and discharges . . . each of the

15

former, current and future directors, officers, and managers of . . . CSSE, to the fullest extent permitted by applicable law, from all past and present Claims (other than any Excluded Claims) that such Party and its respective Mutual Release Parties ever had, now has or hereafter can, shall or may have, for, upon or by reason of any matter, action, inaction cause or thing whatsoever from the beginning of the world to the Effective Time [i.e., consummation of the transactions contemplated by the Merger Agreement] arising out of or related to events, transactions, activity, circumstances or actions occurring or failing to occur, in each case, at or prior to the Effective Time . . . .

(Ex. 11, Release, at § 2.1.)  The Release also includes an affirmative covenant not to sue.  (*Id.*)  Realizing that the Release applies to the Trustee's claims, he seeks to avoid the Release, arguing it lacked consideration and was not in CSSE's best interest.  (*See* Compl. ¶¶ 2(3), 60, 123.)

## **LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation omitted).  "A complaint should be dismissed where its factual content does not allow a court 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Tabachnik v. New Water Capital GP, LLC (In re Worth Collection, Ltd.)*, 666 B.R. 726, 735 (Bankr. D. Del. 2024) (quoting *Iqbal*, 556 U.S. at 678).  In deciding a motion to dismiss, the Third Circuit employs a three-step analysis.  *Id.* at 735-36.

First, the pleading party "must allege facts with sufficient particularity to establish its claim" and "cannot rely on reciting statutory elements."  *Ctr. City Healthcare, LLC*, 641 B.R. at 803 (dismissing Section 548 claim that merely recited the statutory language); *Insys Liqid. Tr. v. Quinn Emanuel Urquhart & Sullivan (In re Insys Therapeutics, Inc.)*, No. 19-11292, Adv. 21-50359, 2021 WL 5016127, at *5 (Bankr. D. Del. Oct. 28, 2021) (same).  Second, the "court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Tabachnik*, 666 B.R. at 736 (quotations omitted).  Such "conclusory factual statements may be struck from consideration" when evaluating the sufficiency of a claim on a

motion to dismiss.  *See Cred Inc. Liquidation Tr. v. Uphold HQ Inc. (In re Cred Inc.)*, 650 B.R. 803, 813 (Bankr. D. Del. 2023), *aff'd*, 658 B.R. 783 (D. Del. 2024).  A complaint that merely relies on unsupported platitudes, bald assertions, or conclusory statements cannot state a plausible claim. *See Tabachnik*, 666 B.R. at 742; *Cred Inc. Liquidation Tr.*, 650 B.R. at 829.  Moreover, "broad and general statements" that "lack specific fact[s]" or "examples of such actions" cannot state a claim.  *Tabachnik*, 666 B.R. at 737-738.[12]  Third, only "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Tabachnik*, 666 B.R. at 736.[13]  The Court need not accept "conflicting pleadings that make no sense," nor draw inferences that are contradicted "by statements in the complaint itself[,] by documents upon which its pleadings rely, or by facts of which the court may take judicial notice."  *Id.* at 738 n.42.[14]

## ARGUMENT

### I.    THE COMPLAINT'S CLAIM FOR BREACH OF FIDUCIARY DUTY (COUNT ONE) FAILS AS A MATTER OF LAW.

The Complaint alleges Mr. Rouhana breached his fiduciary duties of care, loyalty, and good faith in numerous ways.  (Compl. ¶ 21.)  Each of the Complaint's theories fails as a matter of law because: (A) the Complaint fails to plead specific acts by Mr. Rouhana giving rise to a breach of the standard for each duty sufficient to state a claim for relief; (B) Mr. Rouhana is exculpated from all duty of care claims; and (C) Mr. Rouhana was released from all conduct and

---

[12] *Cf. Cred. Inc. Liquidation Tr.*, 650 B.R. at 838; *Lightsway Litig. Servs., LLC v. Yung (In re Tropicana Ent., LLC)*, 520 B.R. 455, 472 (Bankr. D. Del. 2014); *Sanchez v. AFA Foods, Inc. (In re AFA Inv., Inc.)*, No. 12-11127, Adv. No. 12-50710, 2012 WL 6544945, at *4 (Bankr. D. Del. Dec. 14, 2012).

[13] *See also Theseus Strategy Grp. LLC v. Barsa (In re Old BPSUSH, Inc.)*, No. 16-12373, Adv. No. 19-50726, 2020 WL 6818435, at *11 (Bankr. D. Del. June 30, 2020), *aff'd sub nom. Theseus Strategy Grp. LLC v. Barsa (In re Old BPSUSH, Inc.) (Theseus II)*, No. 16-12373, Adv. No. 19-50726, 2021 WL 4453595, *4 (D. Del. Sept. 29, 2021).

[14] *See also Tilton v. MBIA Inc. (In re Zohar III, Corp.)*, 639 B.R. 73, 90 (Bankr. D. Del.), *aff'd*, 620 F. Supp. 3d 147 (D. Del. 2022); *cf. Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995); *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000); *Balascio v. Leitzke (In re Leitzke)*, No. 13-12156, Adv. No. 14-500017, 2014 WL 3583706, at *4 (Bankr. D. Del. July 18, 2014).

claims arising from or predating the Redbox Merger.

A.    **The Complaint Relies On Generalities And Formulaic Recitations Of Standards To Try Substantiating The Claim That Mr. Rouhana Violated Fiduciary Duties.**

The Complaint alleges that the first 84 paragraphs provide the factual bases for claims of breaches of fiduciary duties of care, loyalty, and good faith in Mr. Rouhana's capacity as an officer and director.  (Compl. ¶ 85.)  Rather than identify specific factual allegations supporting each of the elements of each of the formulations of such a breach, however, the Complaint paints with a broad brush, loaded with platitudes rather than specific acts.  This is not sufficient.

1.    **Standards For Each Alleged Breach Of Fiduciary Duty.**

a.    *Duty Of Care And The Business Judgment Rule.*

The duty of care is the duty to act on an informed basis.  *See Miller v. ANConnect, LLC (In re Our Alchemy)*, No. 16-11596, Adv. No. 18-50633, 2019 WL 4447541, at *11 (Bankr. D. Del. Sept. 16, 2019) (citing *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)).  This duty requires that officers and directors "use that amount of care which ordinarily careful and prudent men would use in similar circumstances" and "consider all material information reasonably available." *Id.*  A breach of the duty of care requires pleading, and ultimately proving, gross negligence.  *See Off. Comm. Of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners, L.P. (In re Fedders N. Am.*, Inc.), 405 B.R. 527, 539 (Bankr. D. Del. 2009). Gross negligence "generally requires that officers, directors, and managers fail to inform themselves fully and in a deliberate manner." *Id.* (citing *Cede & Co.*, 634 A.2d at 368).

The business judgment rule—the strong presumption of honesty and good faith in favor of an officer or director's decisions—protects Mr. Rouhana from any claim for breach of the duty of care, absent gross negligence.  A cardinal precept of Delaware corporate law is that officers and directors manage the business and affairs of the corporation, and the business judgment rule is a

recognition of that statutory instruction.  *See Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1052 (Del. Ch. 1996).  The rule is a presumption that in making a business decision, a corporation's officers and directors acted on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company.  Therefore, courts do not second-guess such judgments absent an abuse of discretion.  *See In re Cyan, Inc. S'holders Litig.*, C.A. No. 11027, 2017 WL 1956955, at *7 (Del. Ch. May 11, 2017) (dismissing breach of fiduciary duty claim because the "Complaint contains no non-conclusory allegation that could support a reasonable inference that the [] board members demonstrated a conscious disregard for [their] duties or that the decision . . . was so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith") (quotation omitted); *In re Crimson Expl. Inc. S'holder Litig.*, C.A. No. 8541, 2014 WL 5449419, at *25 (Del. Ch. Oct. 24, 2014) (dismissing breach of fiduciary duty claim based on allegations that "fairness opinion as flawed and unreliable" and "alleged conflicts as examples of the Board's failed oversight" that were "merely conclusory").  The business judgment rule is a "powerful presumption in favor of actions taken by [officers and] directors in that a decision made by a loyal and informed board will not be overturned by the courts" unless there is no rational business purpose.  *Cede & Co.*, 634 A.2d at 361.  The burden is on the plaintiff to plead facts rebutting this presumption.  *See Hurwitz v. Mahoney (In re Space Case)*, No. 22-10657, Adv. No. 23-50748, 2024 WL 1628440, at *6 (Bankr. D. Del. Apr. 15, 2024) ("[T]he Third Circuit Court of Appeals has determined that a complaint challenging a business decision must plead around the business judgment rule by alleging facts that rebut the presumption.") (citing *Stanziale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 238 (3d Cir. 2005)).  This is a "near-Herculean task" and "uphill battle."  *Id.* (quotations omitted) (dismissing breach of fiduciary duty claims, declining to challenge wisdom of decisions only

through the lens of subsequent collapse, and finding allegations insufficient to overcome business judgment rule).[15]

### b.    *Duty Of Loyalty.*

"The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director . . . ." *ANConnect, LLC*, 2019 WL 4447541, at *15 (quotation marks omitted).  A sufficiently pled duty of loyalty claim requires the plaintiff to "allege facts showing that a self-interested transaction occurred, ***and that the transaction was unfair to the plaintiffs***." *Id.* at *8 (emphasis added; quotation omitted; collecting cases).

### c.    *Duty Of Good Faith.*

The duty to act in good faith is a subsidiary element of the duty of loyalty.  *See Fedders*, 405 B.R. at 540.  To sustain this claim, a plaintiff must plead facts to support a claim that is "qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (i.e., gross negligence)."  *Id*. (quotation omitted).  The Delaware Supreme Court has identified three scenarios in which an officer or director may be found liable for a breach of the duty of good faith under Delaware law, namely one "intentionally acts with a purpose other than that of advancing the best interests of the corporation;" "acts with the intent to violate applicable positive law;" or "intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties."  *Id.* (quotation omitted); *cf. Hurwitz*, 2024 WL 1628440, at *9 (dismissing duty of loyalty and good faith claims because "Delaware courts . . . do not equate a bad outcome with bad faith"); *Theseus Strategy Grp., LLC*, 2020 WL 6818435, at *13

---

[15] The Complaint pleads Mr. Rouhana's conduct was "not grounded in any reasonable business judgment."  (Compl. ¶¶ 93, 105, 117.)  Courts have acknowledged that, even if the business judgment rule has been considered an affirmative defense, courts may consider it at the motion to dismiss phase where the "complaint challeng[es] a business decision[,]" as the Complaint does here, because doing so triggers the plaintiff's duty to "plead around the business judgment rule[.]"  *Hurwitz*, 2024 WL 1628440, at *6.

("A claim for bad faith is not stated by second-guessing the Board's actions").

### 2.    The Complaint's Impermissible Reliance On Group Pleading.

The Complaint cannot state a breach of fiduciary duty claim, under any standard, by alleging undifferentiated conduct by collective groups of directors and officers, yet that is what it does.[16]    None of the Complaint's allegations that the "Defendants," "Director Defendants," "Officer Defendants," or "D&O Defendants" took actions suffice to plead that Mr. Rouhana has the required culpability.  *See The Raj and Sonal Abhyanker Tr. ex. rel. UpCounsel, Inc. v. Blake*, C.A. No. 2020-0521, 2021 WL 2477025, at *4 (Del. Ch. June 17, 2021) ("a plaintiff must adequately plead a breach of fiduciary duty claim against each individual director [or officer]; so-called group pleading will not suffice") (quotation omitted).  The Complaint's heavy reliance on improper group pleading forces "both the Defendants and the Court to guess who did what to whom and when[,]" but "[s]uch speculation is anathema to contemporary pleading standards." *Burtch v. Zachem (In re TZEW Holdco, LLC)*, Adv. No. 22-50255, 2023 WL 6140247, at *3 (Bankr. D. Del. Sept. 19, 2023).  "A claim for breach of fiduciary duties may be dismissed" as an improper group pleading "where a complaint (i) lumps all of the individual Defendants as 'Officers and Directors' . . . without supplying specific facts as to each defendant's wrongdoing; (ii) has not provided any specific facts as to which transactions a particular defendant authorized; and (iii) does not allege what authority any particular defendant had to approve such transactions."  *Id*. (quotations omitted).  The Complaint violates this well-established prohibition.[17]

---

[16] Delaware courts have criticized group pleading as failing to meet the required standards and forcing the court and defendants to parse through allegations with little differentiation amongst the claims and defendants.  *See Bocock v. Innovate Corp.*, C.A. No. 2021-0224-PAF, 2022 WL 15800273, at *19 (Del. Ch. Oct. 28, 2022) (describing group-pled pleadings as "the classic, unappetizing 'pizza on the wall'" and noting "it is more time consuming to clean up the pizza thrown at a wall than it is to throw it.") (quotations omitted).

[17] The Complaint pleads numerous allegations against Mr. Rouhana by using the terms "Board," "Board Defendants," "Officer Defendants," and "D&Os," each of which is defined to include Mr. Rouhana along with numerous other Defendants who were allegedly directors or officers of CSSE.  (Compl. ¶¶ 21, 26-27, 29-30, 34, 37, 44, 52, 57-58, 60, 67, 71-72, 76-77, 80, 81.).  The Complaint is so burdened by these group pleading allegations that it often becomes

### 3. None Of The Complaint's Theories State A Claim For Breach Of Fiduciary Duty Under The Above Standards.

#### a. *The Redbox Merger Theory.*

The Complaint's summary of the Redbox Merger, (Compl. ¶¶ 35-59), admits crucial facts:

- Although Redbox was in financial distress (*id.* ¶ 36), these risks were "apparent and publicly disclosed" (*id.* ¶ 37);

- CSSE (not Rouhana) engaged Guggenheim as its financial advisor,[18] which advised the Board on this transaction, "including by providing presentations to the Board . . . summarizing certain financial information, projections, and estimates of synergies that **might** be realized from the merger." (*id.* ¶ 38) (emphasis added);

- "Guggenheim summarized certain terms, strategic rationales, and financial information relevant to the proposed Merger" in a presentation to the Board (*id.* ¶ 39);

- Some of the projections (termed the CSSE Management Case) in the presentation that Guggenheim provided were specifically disclosed to the Board as having been provided by management (*id.* ¶ 40); and

- The Board discussed the potential Redbox Merger (*id.* ¶ 43), with the Board's meeting minutes making clear the details of the information provided to the Board.[19]

This was an arms-length merger of two unaffiliated companies and the Complaint does not plead otherwise. The Complaint pleads the Board hired professional advisors, sought their input, and received it prior to making its decision. Allegations that the directors (including Mr. Rouhana) were informed by outside advisors and a diligence process, and made a business decision during a turbulent period (navigating the pandemic) that, in hindsight, did not work out, do not state a claim for breach of the duty of care. *See Hurwitz*, 2024 WL 1628440, at *8-9 (dismissing breach of fiduciary duty claim because "the facts alleged merely describe business decisions, some imperfect

---

impossible to parse (compare Compl. ¶ 21 (defining Mr. Rohana as a member of the Board Defendants) with *id.* ¶ 99 (accusing the Board Defendants of permitting Mr. Rouhana to take certain actions).)

[18] *See* https://www.sec.gov/Archives/edgar/data/1679063/000110465922078845/tm2218071-4_s4a.htm. The Court may also take notice of CSSE retaining counsel to assist with the transaction, as well as the fact that Redbox retained its own financial experts and counsel. (CSSE S-4A, July 11, 2022, at A-65, A-66.)

[19] *See also supra* at 6-8. The Trustee had access to the Board meeting minutes and SEC filings discussed *supra* at 11-13 since his appointment. Mr. Rouhana also assisted the Trustee by providing him with more than 9,000 pages of documents relating to the Redbox Merger and HPS's failure to satisfy its obligations under the Credit Agreement.

in hindsight, made by the Officers during a turbulent period of expansion."). The Complaint

simply alleges that since the transaction failed, each named officer and director must have breached

a fiduciary duty; such *ex post* analysis is not enough to state a claim. *See Cred. Inc. Liquidation.*

*Tr.*, 650 B.R. at 829.

The Complaint also fails to plead sufficient facts to show that Mr. Rouhana was actually

interested in the Redbox Merger. First, receipt of the Release in connection with a company

acquisition does not make him interested in the transaction, absent pending litigation or the

significant risk of litigation. *See Shabbouei v. Potdevin*, C.A. No. 2018-0847-JRS, 2020 WL

1609177 (Del. Ch. Apr. 2, 2020); *H-M Wexford LLC v. Encorp, Inc*., 832 A.2d 129, 150 (Del. Ch.

2003) (rejecting argument that directors were interested in transaction based on "releases running

in favor of directors" when threat of personal liability was insubstantial); *see also Wei v. Levinson*,

C.A. No. 2023-0521, 2025 WL 1565356, at *10 (Del. Ch. June 3, 2025) ("The benefit received by

the director and not shared with stockholders must be of a sufficiently material importance . . . , as

to have made it improbable that the director could perform [his] fiduciary duties without being

influenced by [his] overriding personal interest.") (citing *Maffei v. Palkon*, No. 125, 2024 Term,

2025 WL 384054, at *18 (Del. Feb. 4, 2025)). Since the Complaint does not plead the existence

of any pending or threatened litigation, the Release does not make Mr. Rouhana interested.[20]

Second, the Complaint does not adequately plead an economic benefit Mr. Rouhana would

receive sufficient to suggest he was interested in the Merger. Directors are presumed independent,

absent facts showing the decision was based on considerations other than the merits of the

transaction, and there are none. *See In re Cornerstone Therapeutics Inc, S'holder Litig.*, 115 A.3d

---

[20] To the extent the Complaint may be construed as alleging approval of the Release was itself a breach of fiduciary duty, the Complaint fails to allege the necessary elements of such a theory. Rather, it appears the Complaint is alleging the Release is evidence of interestedness for purposes of supporting the Redbox Merger Theory.

1173, 1183 (Del. 2015). The Complaint's theory for why Mr. Rouhana sought approval for the Redbox Merger is that it could lead to increased fees to CSS from the combined companies under the CSS Agreements. (Compl. ¶¶ 29, 44, 57, 87.) But the Board (including Mr. Rouhana) determined that Redbox's traditional business would be excluded from revenue calculations under the CSS Agreements. (*See supra* at 13.) Thus, the Trustee relies on documents that plead him out of any allegation that Mr. Rouhana was interested in the transaction.[21]

Finally, the Complaint does not plead that Mr. Rouhana acted in bad faith in approving the transaction. Reciting the phrase "bad faith" (*id.* ¶¶ 4, 57, 99, 111), without more, is not sufficient to survive a motion to dismiss. *See In re Paramount Gold & Silver Corp. S'holders Litig.*, 2017 WL 1372659, at *15 (Del. Ch. Apr. 13, 2017) (dismissing bad faith claim premised on wholly conclusory allegations of a "rushed process," "significantly undervalued" consideration, and quibbling with the inputs used in the fairness opinion); *Fisk Ventures, LLC v. Segal*, C.A. No. 3017-CC, 2008 WL 1961156, at *11 (Del. Ch. May 7, 2008). The Complaint does not come close to alleging Mr. Rouhana intentionally acted with a purpose other than advancing the best interests of CSSE, sought to violate applicable law, or consciously disregarded his duties. For all of the foregoing reasons, the Complaint fails to state a claim for breach of the duties of care, loyalty, or good faith against Mr. Rouhana under the Redbox Merger Theory.

### b.    *The CSS Agreements Theory.*

The CSS Agreements required CSSE to pay portions of its net revenues to CSS in return for certain licensing rights and provision of services by CSS. (Compl. ¶¶ 62-67; *see also supra* at 13.) The Complaint does not allege CSSE did not receive these rights or services, nor does it allege any facts about the fair market value of these services. Furthermore, the Complaint admits

---

[21] Notably, the Complaint does not allege there was any other party interested in the transaction from whom Mr. Rouhana took instruction or lacked independence. Nor does it plead facts that the Redbox Merger was unfair to CSSE.

CSSE only paid CSS pursuant to the CSS Agreements, with no allegations of overpayment or financial manipulation.  (*Id.* ¶ 101.)

Instead, the Complaint makes factually unsupported allegations that these agreements were not the product of "fair dealing" or agreed to at a "fair price."  (Compl. ¶ 66.)  Such allegations are insufficient.  *See, e.g.*, *Hurwitz*, 2022 WL 1628440 at *8-9 (dismissing breach of fiduciary duty claims predicated on conclusory labels of business decisions as "unreasonable[]").  Furthermore, the Complaint admits that the only obligation to pay CSS arose from a calculated percentage of CSSE's net revenues.  (Compl. ¶ 62.)  If CSSE did not have any net revenues, or had negative net revenues, the Trustee's calculation admits CSSE owed nothing.  Despite the proclamation that this obligation was owed "regardless of the Company's financial condition" (*id.*), the Complaint notably contradicts itself and pleads CSSE only owed money if it had net revenues, and only a small percentage of that net revenue amount was owed.

The CSS Agreements were first executed in 2016, so claims based on that decision are time-barred.[22]  To the extent the Complaint means to allege that conduct with respect to the more recent renewals of the CSS Agreements somehow breached Mr. Rouhana's fiduciary duties, he asserts no fact supporting those claims.  Nor does the Complaint acknowledge that the March 2023 Modification ***alleviated*** CSSE's monetary payment obligations under the CSS Agreements.  (*See supra* at 13.)  Clearly Mr. Rouhana's support for a Modification alleviated CSSE's obligations under these CSS Agreements could not breach his fiduciary duties to CSSE.

Finally, the Complaint's other group allegations suggesting that all the directors and

---

[22] "[A] plaintiff must file a claim for breach of fiduciary duty within three years of the conduct that gives rise to the claim."  *In re Sirius XM S'holder Litig.*, C.A. No. 7800-CC, 2013 WL 5411268, at *4 (Del. Ch. Sept. 27, 2013); *see also Polk 33 Lending, LLC v. Schwartz*, 555 F. Supp. 3d 38, 43 (D. Del. 2021).  All claims for breach of fiduciary duty that arise out of conduct that occurred before June 29, 2021 are barred by the statute of limitations.  *See* Del. Code tit. 10, § 8106 (Actions subject to 3-year limitation).

officers should have terminated, renegotiated, or sought alternatives to the CSS Agreements are mere hypotheticals and *post-hoc* opinions, not factual allegations sufficient to support the claims.

### c. *The Third-Party Licensing And Distribution Agreements Theory.*

The Third-Party Licensing and Distribution Agreements Theory is likewise devoid of any factual allegations about Mr. Rouhana that he personally profited from these agreements, lacked independence in connection with them, or otherwise chose to abrogate his duties to the benefit of arms-length third parties.  (*See* Compl. ¶¶ 68-72.)  The Complaint vaguely claims, without any factual support, that the terms of these agreements "were not characterized by fair dealing or a fair price" and that "[n]one of the Debtors received reasonably equivalent value in exchange for entering into the Intellectual Property License Agreements."  (Compl. ¶ 70).[23]

The Complaint again repeats that Mr. Rouhana acted in his own self-interest and did not act in Debtors' best interest, but pleads no facts that support this claim.  The Complaint pleads no facts showing Mr. Rouhana was interested in or received any benefit from these agreements. Likewise, the Complaint fails to allege any facts that Mr. Rouhana intended to violate the law or consciously disregarded his duties.  The mere invocation of elements of a claim do not suffice to state a claim, and none of the Trustee's conclusory statements suffice to state a claim against Mr. Rouhana for any breach of fiduciary duty, whether described as a claim for breach of the duties of care, loyalty, or good faith.  *See, e.g., Hurwitz*, 2022 WL 1628440 at *8-9 (dismissing fiduciary duty claims predicated on conclusory labels of business decisions as "unreasonable[]").

### d. *The Dividends Theory.*

The Complaint fails to plead any facts supporting a claim that Mr. Rouhana breached any

---

[23] This entire theory makes no sense because, as explained above (*see supra* at 13-14), these contracts called for the third parties to make payments *to CSSE*, not Mr. Rouhana, CSS, or anyone else.  The entire Complaint is premised on the observation that more revenue is exactly what CSSE needed—thus, this theory is particularly farfetched and nonsensical in the absence of any facts examining the price of each such contract and explaining why each price, for each set of licensed rights, is supposedly below market or unfair.

duty or received any benefit from the dividend payments and therefore fails entirely to state any claim for breach of his fiduciary duties of care, loyalty, or good faith.

As an initial matter, the Complaint does not plead facts that CSSE lacked a surplus[24] at the time of these dividend payments, and CSSE's financial statements (on which the Trustee relies for his arguments) demonstrate CSSE had a surplus between at least January 2020 and June 30, 2023.[25] The financial statements of CSSE were prepared in accordance with GAAP and with the assistance of outside experts (including auditors). The Complaint does correctly allege that Mr. Rouhana and CSSE's other directors suspended dividend payments in January of 2024. (Compl. ¶ 74.)

The Complaint's only statement about Mr. Rouhana's role in the dividend payments begins with a familiar mantra—he supposedly acted in his own self-interest, manipulated the other D&Os, and did not act in the best interests of CSSE. (*Id.* ¶ 76.) The Complaint does not allege Mr. Rouhana or any other officer or director received any such payments, but claims without any factual support that Mr. Rouhana was motivated by "financial gain." *Id.* The Complaint instead alleges that if CSSE failed to pay dividends for 18 consecutive months, certain unidentified shareholders might be entitled to certain rights to nominate unknown directors. (*Id.* ¶¶ 74-75.) This speculative claim is a far cry from the required pleading of personal profit or a lack of independence by Mr. Rouhana. Among other things, this supposed risk could have easily been avoided by the Board authorizing a single dividend payment every 12 months. This theory—based

---

[24] Defendants are entitled to issue and pay dividends out of the Company's surplus, pursuant to Section 170 of the DGCL, and can rely on the corporation's records in determining that surplus pursuant to Section 172 of the DGCL.

[25] *See* CSSE, Annual Report (Form 10-K) (Mar. 3, 2020); CSSE, Quarterly Report (Form 10-Q) (May 14, 2020); CSSE, Quarterly Report (Form 10-Q) (Aug. 13, 2020); CSSE, Quarterly Report (Form 10-Q) (Nov. 12, 2020); CSSE, Annual Report (Form 10-K) (Mar. 31, 2021); CSSE, Quarterly Report (Form 10-Q) (May 13, 2021); CSSE, Quarterly Report (Form 10-Q) (Aug. 11, 2021); CSSE, Quarterly Report (Form 10-Q) (Nov. 8, 2021); CSSE, Annual Report (Form 10-K) (Mar. 31, 2022); CSSE, Quarterly Report (Form 10-Q) (May 11, 2022); CSSE, Quarterly Report (Form 10-Q) (Aug. 12, 2022); CSSE, Amendment to Quarterly Report (Form 10-Q) (Nov. 14, 2022); CSSE, Annual Report (Form 10-K) (Mar. 31, 2023); CSSE, Quarterly Report (Form 10-Q) (Aug. 14, 2023); CSSE, Amendment to Quarterly Report (Form 10-Q) (Dec. 22, 2023). For a summary of the surplus calculation based on the SEC filings, see also the brief in support of the other directors' motion to dismiss.

on legally permitted dividend payments from a GAAP-measured surplus—does not come close to pleading interestedness or a conscious and willing disregard for duty and the law.  Accordingly, this claim should be dismissed.  *See In re Chemours Co. Derivative Litig.*, C.A. No. 2020-0786-SG, 2021 WL 5050285, at *19 (Del. Ch. Nov. 1, 2021); *Klang v. Smith's Food & Drug Ctrs., Inc.*, No. CIV.A. 15012, 1997 WL 257463, at *4 (Del. Ch. May 13, 1997).

### e.    *The Employee Wages And Benefits Theory.*

As a threshold matter, because the Trustee has no statutory authority to assert FLSA claims on behalf of Debtors' employees (*see infra* at 42-45), he may not dress up a claim he has no authority to assert as a breach of fiduciary duty claim.  This theory also fails on insufficiency of pleading any specific conduct by Mr. Rouhana that breached fiduciary duties of care, loyalty, or good faith.  *See In re Cornerstone Therapeutics Inc., S'holder Litig.*, 115 A.3d at 1180.[26]

### B.    The Complaint's Duty Of Care Claims Are Barred By Exculpation Provisions.

CSSE's formative documents exculpate its directors from breach of the duty of care claims. Section 102(b)(7) of the Delaware General Corporate Law allows a Delaware corporation to place a provision in its certificate of incorporation or other governing documents that exculpates its directors from monetary liability for breaches of the duty of care, whether asserted by the corporation, its shareholders, or any party standing in their shoes.  *See* DEL. CODE, tit. 8, § 102(b)(7).  CSSE exercised this right and exculpated its directors from duty of care claims to the maximum extent allowed by law.  (Ex. 12, CSSE Charter – Certificate of Incorporation (Seventh); Ex. 13, CSSE By-Laws §§ 2.11, 3.12, 7.2; Ex. 14, Amendment to CSSE By-Laws, Apr. 29, 2024.)

Courts routinely dismiss duty of care claims when the corporation has an exculpatory

---

[26] Though not applicable here, the Complaint's fiduciary duty claims and theories also fail to state a claim under the entire fairness standard of review.

provision in its certificate of incorporation or by-laws.[27]  Prior to the Delaware Supreme Court's

decision in *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173 (Del. 2015), some

courts had found that "exculpation operated as an affirmative defense, and director defendants

could avoid personal liability for paying monetary damages only if they ha[d] established their

failure to withstand an entire fairness analysis is exclusively attributable to a violation of the duty

of care." *United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 884-85 (Del. Ch.

2020) (alteration in original).  Relying on this principle, prior to *Cornerstone*, this Court has

previously declined to consider an exculpation clause on a motion to dismiss **unless** an unanswered

affirmative defense appeared on its face.  *See Burch v. Opus, L.L.C. (In re Opus E., L.L.C.)*, 480

B.R. 561, 572 (Bankr. D. Del. 2012).  However, in *Cornerstone*, the Delaware Supreme Court held

that a plaintiff "must plead non-exculpated claims against a director who is protected by an

exculpatory charter provision to survive a motion to dismiss," regardless of whether entire fairness

or the business judgment rule applied.  115 A.3d at 1175.  In doing so, the Delaware Supreme

Court changed the effect of an exculpatory clause to operate "more in the nature of an immunity,

comparable to the extent to which sovereign immunity typically protects government employees

from suit, rather than as an affirmative defense."  *In re EZCORP Inc. Consulting Agreement Deriv.

Litig.*, 130 A.3d 934, 940 (Del. 2016); *cf. Nguyen v. Barrett*, C.A. No. 11511-VCG, 2016 WL

5404095, at *3 n.25 (Del. Ch. Sept. 28, 2016) (rejecting the plaintiff's contention that the Court

could not address the 102(b)(7) exculpatory provision that was not explicitly pled in the complaint

---

[27] *See Burch v. Huston (In re USDigital, Inc.)*, 443 B.R. 22, 43-44 (Bankr. D. Del. 2011) (dismissing duty of care claims against director including because of exculpatory provision in corporate by-laws) (citing *Pereira v. Farace*, 413 F.3d 330, 341 (2d Cir. 2005) (vacating judgment on duty of care claim because trustee lacked standing to pursue such a claim where corporate charter included an exculpatory provision); *Continuing Creditors' Committee of Star Telecom., Inc.*, 385 F. Supp. 2d 449, 464 (D. Del. 2004) (dismissing duty of care claim because plaintiff "does not refute the notion that a proper exculpation clause bars all claims of the breach of the duty of care."); *Prod. Res. Grp. v. NCT Grp., Inc.*, 863 A.2d 772, 798–99 (Del. Ch. 2004) (dismissing duty of care claims barred by an exculpatory charter provision).

because the plaintiff's position would undermine the very purpose of a 102(b)(7) exculpation provision).  As such, members of this Court have considered exculpatory clauses on motions to dismiss and relied upon governance documents that were not attached to the complaint to do so.  *See Miller v. Black Diamond Capital Mgmt., L.L.C. (In re Bayou Steel BD Holdings, L.L.C.)*, 642 B.R. 371, 401 (Bankr. D. Del. 2022); *Stanziale v. CopperCom, Inc. (In re Conex Holdings), LLC*, 518 B.R. 792, 804 (Bankr. D. Del. 2014).

The Complaint further placed Mr. Rouhana's business judgment at issue by specifically pleading that his conduct, both individually and collectively, "was not grounded in any reasonable business judgment . . . ."  (*See* Compl. ¶¶ 93, 105, 117.)  As such, CSSE's corporate governance documents, including its charter and bylaws, are integral to the Complaint, and the Court should consider them because they show all duty of care theories pled against Mr. Rouhana fail and should be dismissed.  *See Miller*, 642 B.R. at 401; *Stanziale*, 518 B.R. at 804.

### C.    <u>The Complaint's Claims Are Barred By The Release.</u>

The Complaint acknowledges Mr. Rouhana is protected by the Release, which was executed and became effective on May 10, 2022.  (Compl. ¶¶ 58-61; *see also infra* at 37 n.35.)  As shown below, the Complaint has not adequately pled any basis to avoid it.  (*See infra* at 37-40 (discussing dismissal of Counts Eight and Nine).)  The Release bars, at a minimum, all claims under the Redbox Merger Theory, and any other aspects or sub-theories of breach of fiduciary duty, or any other claim, that predate the August 11, 2022 Redbox Merger.[28]

## II.    THE CLAIM FOR AIDING AND ABETTING ALLEGED BREACHES OF FIDUCIARY DUTY (COUNT FIVE) FAILS AS A MATTER OF LAW.

To plead and maintain a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, . . .

---

[28] This includes any claims based on fees or dividends paid or agreements entered into prior to August 11, 2022.

(3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Miller v. ANConnect LLC (In re Our Alchemy, LLC) (ANConnect II)*, No. 16-11596, Adv. No. 18-50633(KG), 2019 WL 4447519, at *9 (Bankr. D. Del. Sept. 16, 2019).

The first two elements require an independent breach of fiduciary duty by someone who owed CSSE a fiduciary duty. *Id.*[29] Since "Delaware law generally prohibits aiding and abetting claims against parties that already stand in direct fiduciary relationships," this claim is not applicable to Mr. Rouhana. *Smith v. Weinshanker (In re Draw Another Circle)*, 602 B.R. 878, 905 (Bankr. D. Del. 2019) (dismissing aiding and abetting breach of fiduciary duty claims because of the defendants' direct fiduciary relationships); *Huston*, 443 B.R. at 47 (dismissing breach of fiduciary duty claim against director defendant because "[h]e cannot have aided and abetted the same fiduciary duty he allegedly breached in a previous count.").

This claim is also defective because it alleges, in conclusory fashion, that the "D&Os" (including Mr. Rouhana) failed to: (1) "adequately oversee[,]" "curtail," and "check" Mr. Rouhana's activities; (2) "unreasonably relied on[,]" "blindly accepted[,]" "did not question[,]" and "failed to obtain and/or ignored pertinent information"; and (3) merely "rubber-stamped Rouhana's determinations and dictates[.]" (Compl. ¶¶ 1, 29-30, 34, 37, 44, 52, 57, 67, 72, 77, 81, 98-99.) The Complaint's impermissible group pleading[30] again fails to allege which actions by which Defendants were breaches of fiduciary duty and what actions Mr. Rouhana supposedly took to aid in those actions. Presumably, the Complaint does not mean to allege Mr. Rouhana is liable for aiding and abetting his own alleged breaches of duty. *See Huston*, 443 B.R. at 47 ("He cannot

---

[29] To the extent the Court dismisses the underlying claims for breach of fiduciary duty against the other Defendants, the Complaint would lack a primary breach of fiduciary duty, and thus, the aiding and abetting claim also fails. *See, e.g., In re Tropicana Ent., LLC*, 520 B.R. at 472; *Flannery v. Genomic Health, Inc.*, No. CV 2020-0492-JRS, 2021 WL 3615540, at *29 (Del. Ch. Aug. 16, 2021); *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 1003 (Del. Ch. 2014), *aff'd sub nom. Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304 (Del. 2015).

[30] Notably, Count Five incorporates by reference each and every preceding paragraph, including those supporting Count One, which alleges the primary breaches of fiduciary duty claim against Mr. Rouhana. (*See* Compl. ¶ 132.)

have aided and abetted the same fiduciary duty he allegedly breached in a previous count.").

To plead the third element, the Complaint must identify specific factual allegations regarding the underlying breaches from which Mr. Rouhana's knowing participation in another Defendant's breach can be reasonably inferred.  *See Zachem*, 2023 WL 6140247, at *3.[31] Specifically, the Complaint must plead "two types of knowledge." *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 390 (Del. 2024).  First, "[k]nowing participation in a board's fiduciary breach requires that the [nonfiduciary] act with the knowledge that the conduct advocated or assisted constitutes such a breach." *ANConnect II*, 2019 WL 4447519, at *9 (alteration in original). Second, the Complaint "must also demonstrate that the aider and abettor had actual [or constructive] knowledge that their conduct was legally improper" such that they "act[ed] knowingly, intentionally, or with reckless indifference that is, with an illicit state of mind." *Id.*; *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d at 391 (internal quotations omitted and alterations in original).  The Complaint does not plead either type of knowledge, nor does it allege facts that support an inference of such knowledge by Mr. Rouhana in some unknown other Defendant's breach.  "Purportedly suspicious circumstances . . . coupled with bald assertions of knowledge" are insufficient.  *In re Syntax-Brillian Corp.*, 573 F. App'x 154, 163 (3d Cir. 2014); *see also Malpiede v. Townson*, 780 A.2d 1075, 1098 (Del. 2001) (affirming dismissal of aiding and abetting breach of fiduciary duty claim where the allegations did not support an inference that the defendant knowingly participated in a fiduciary breach).

Compounding the Complaint's failure to plead actual or inferable knowledge, the Complaint fails to muster any factual allegations that Mr. Rouhana ***actively*** provided "substantial

---

[31] *Zachem* dismissed the claim because the Complaint alleged the defendants took various actions (or failed to act) without identifying which transactions which defendant may have authorized or the nature of each defendant's authority to approve such transactions, or when such action or inaction may have occurred.  2023 WL 6140247, at *3.

assistance" to some unspecified other officer's or director's breach.  *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d at 393.  Delaware courts have "found liability only where there has been overt participation" rather than "passive awareness."  *Id.; see also In re Novell, Inc. S'holder Litig.*, C.A. No. 6032-VCN, 2013 WL 322560, at *17 (Del. Ch. Jan. 3, 2013).  Here, the Complaint's allegations regarding the purported "assistance" Mr. Rouhana provided are entirely absent. Allegations of inaction by others, which are directly contradicted by the Board meeting minutes and public SEC filings (*see supra* at 6-10), are also not sufficient to establish that Mr. Rouhana provided substantial assistance to some other director or officer's inactive breach.  *See In re Mindbody, Inc., S'holder Litig.*, 332 A.3d at 399.  Count Five should be dismissed.

## III.    THE COMPLAINT'S BANKRUPTCY CODE CLAIMS (COUNTS 6-9 AND 12-13) SHOULD BE DISMISSED.

### A.    <u>Count Six Fails To State Section 548(a)(1)(B) Or 550(a) Claims.</u>

Count Six asserts claims under 11 U.S.C. §§ 548(a)(1)(B) and 550(a) alleging that payments CSSE made to CSS within two years prior to the Petition Date, under the CSS Agreements, were constructive fraudulent conveyances.  (Compl. ¶¶ 136-142.)  The Complaint further claims that, upon establishing avoidance under Section 548(a)(1)(B), he is entitled to a judgment against Mr. Rouhana under Section 550(a).  (*Id.* ¶ 142.)  These claims are premised on the payments CSSE made to CSS under the CSS Agreements Theory.  (*Id.* ¶¶ 62-63; *see also supra* at 13.)  But instead of enumerating each of the allegedly 16 transfers[32] (or in the case of Count Seven, 32 transfers) by date, amount, and the specific reason for the avoidance of each challenged transfer, the Complaint simply lumps them together per year.  The Complaint also provides no factual allegations to show why or how any of these alleged payments were fraudulent.  (Compl.

---

[32] Count Six challenges alleged quarterly payments made "[i]n the two years leading up to the Petition Date" (i.e., June 28, 2022 through June 28, 2024).  (Compl. ¶ 136.)  Thus, under each Agreement, the Complaint is challenging 3 payments in 2022, 4 payments in 2023, and 1 payment in 2024, for a total of 16 supposed transfers.  (*Id.* ¶ 64.)

¶¶ 62-63.)  Nor does he allege which of the 16 (or 32) transfers, or portions thereof, were subsequently transferred by CSS to any of the other Defendants named in this Count to support the Section 550(a) theory.  These pleading failures are fatal to these claims.

### 1.    Count Six Fails To Establish A Fraudulent Transfer To CSS.

To plead a constructive fraudulent conveyance, the Complaint must allege:

> ". . . that there was a transfer for *less than reasonably equivalent value at a time when the Debtors were insolvent*."  *The Trustee must do more than merely recite statutory elements*, but needs only to state facts with sufficient particularity to provide the defendant with fair notice of the charges against him.  Thus, complaints that identify the *dates, amounts, source, and transferee of each of the alleged transfers* successfully support claims of constructive fraudulent transfer under Fed. R. Civ. Pro. 8(a)(2)'s pleading standard.

*See In re PennySaver USA Publ'g, LLC*, 602 B.R. 256, 266 (Bankr. D. Del. 2019) (citing *In re AgFeed USA, LLC*, 546 B.R. 318, 336 (Bankr. D. Del. 2016), and *In re Mervyn's Holdings, LLC*, 426 B.R. 488, 495 (Bankr. D. Del. 2010)) (emphasis added).  Thus, there are two elements to plead: (1) the challenged transfer was for less than reasonably equivalent value, and (2) at the time of each transfer the debtor was insolvent.  The Complaint has not adequately pled either element.

First, the Complaint fails to allege any facts that plausibly suggest any of the 16 (or 32) payments CSSE made to CSS under either of the CSS Agreements were made for less than reasonably equivalent value.  For example, the Complaint does not allege that CSS did not perform the services for which it was paid, nor does it allege the CSS brand name was not made available to or used by any Debtor under the CSS License Agreement.  *Compare with In re PennySaver USA Publ'g, LLC*, 602 B.R. 256, 269 (Bankr. D. Del. 2019) (finding lack of reasonably equivalent value sufficiently pled where trustee alleged that the services to be provided under a management agreement were never provided).  Although the Complaint alleges the CSS Agreements "were not characterized by fair dealing or a fair price" (Compl. ¶ 66), it alleges no facts to support these conclusory allegations.  The failure to allege any facts about the value that CSSE received under

34

the Agreements is fatal.[33]   Here, the Complaint's allegations, that CSSE "did not receive reasonably equivalent value" (*id.* ¶ 138), "simply mirror the language of section 548(a)(1)(B)," which is "insufficient." *In re AgFeed USA, LLC*, 546 B.R. at 336.

Second, the Complaint fails to allege facts that Debtors were insolvent at the time of each one of the 16 (or 32) transfers.  The claim fails for this additional insufficiency.  *In re Ctr. City Healthcare, LLC*, 641 B.R. at 804; *In re Insys Therapeutics, Inc.*, 2021 WL 5016127, at *5.

### 2.    Count Six Fails To State A Subsequent Transferee Claim.

Since the Section 548(a)(1)(B) claim fails, the Section 550(a) claim must also be dismissed. *See In re USDigital, Inc.*, 443 B.R. 22, 40 (Bankr. D. Del. 2011); *Official Committee of Unsecured Creditors v. Credit Suisse (In re Champion Enters., Inc.)*, No. 09-14014 (KG), 2010 WL 3522132, at *22 (Bankr. D. Del. Sept. 1, 2010).  The Section 550(a) claim additionally fails because it fails to plausibly allege that any Defendant received property that was transferred to CSS.  *See In re DBSI, Inc.*, 445 B.R. 351, 354-56 (Bankr. D. Del. 2011).  In other words, the Complaint does not allege any facts establishing which of CSSE's quarterly payments, under which of the CSS Agreements, were supposedly subsequently transferred to which, if any, Defendant.  (*See* Compl. ¶ 64.)  Instead, the Complaint relies on a passive, conclusory allegation that all such Defendants were "subsequent transferees" or that the lumped-together transfers were made for the benefit of all of them.  (*Id.* ¶ 150.)  This is not enough to state a claim under Section 550(a).[34]

---

[33] *See In re United Tax Grp., LLC*, No. 14-10486 (LSS), 2016 WL 7235622, at *4 (Bankr. D. Del. Dec. 13, 2016) ("[T]he Court rejects the argument that the Trustee can skirt the requirement that he present at least some information of the value the Debtor received in exchange for the alleged constructively fraudulent transfers."); *Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 520-21 (D. Del. 2012) (dismissing avoidance claim where "[t]he Complaint fails to adequately allege that DBSI received less than a reasonably equivalent value").

[34] *See Miller v. McCown, Deleeuw & Co., Inc. (In re The Brown Schools)*, 386 B.R. 37, 52 (Bankr. D. Del. 2008) (dismissing Section 550 claims asserted by trustee against several defendants based on the mere fact that they were affiliates of the initial transferee); *see also e.g. In re Generation Res. Holding Co., LLC*, 964 F.3d 958, 967 (10th Cir. 2020) (dismissing Section 550(a) claims where trustee failed to allege the property was transferred to the defendant, and finding generalized allegations that a defendant received funds is not sufficient).

### B.    Like Count Six, Count Seven Fails To State Section 544(b) Or 550(a) Claims.

Count Seven asserts claims under 11 U.S.C. §§ 544(b) and 550(a) alleging that the Court should avoid payments CSSE made to CSS under the CSS Agreements in the four years prior to the Petition Date as constructive fraudulent conveyances under 6 Del. C. Section 1305 ("Section 1305(a)").  (Compl. ¶¶ 142-150.)  Again, neither claim is adequately pled.

Section 544 of the Bankruptcy Code empowers trustees to avoid the transfer of a debtor's property that is avoidable under non-bankruptcy law by an actual, existing creditor holding an allowed unsecured claim who would have had standing to bring the claim had the bankruptcy petition not been filed (the "triggering creditor").  *See Official Comm. of Unsecured Creditors v. Chinery (In re Cybergenics Corp.)*, 226 F.3d 237, 243 (3d Cir. 2000), *rev'd on other grounds*, 330 F.3d 548 (3d. Cir. 2003).  The Complaint invokes Section 1305(a) as the predicate "non-bankruptcy" law for his Section 544 claim.  (Compl. ¶ 149.)  However, to state a claim under Section 1305(a), the plaintiff must allege facts that plausibly show "(1) the debtor made the transfer without receiving reasonably equivalent value, and (2) the debtor was . . . insolvent or became insolvent as a result of the transfer."  *In re USDigital, Inc*., 443 B.R. at 38.  Thus, Count Seven fails for the same reasons as Count Six.

Count Seven should also be dismissed because the Complaint fails to plausibly allege the existence of a triggering creditor.  To satisfy the requirements of Section 544(b), the Complaint must allege that a creditor exists who has an allowable unsecured claim as of the petition date who would have had standing to bring the avoidance action had the bankruptcy petition not been filed.  *See In re Cybergenics Corp.*, 226 F.3d at 243.  The triggering creditor must hold its claim both at the time of the alleged fraudulent transfer and at the time the bankruptcy was filed.  *See Cohen v. Sikirica*, 487 B.R. 615, 628 (W.D. Pa. 2013).  Moreover, the triggering creditor must hold a claim which is allowable under Section 502 of the Bankruptcy Code.  *See Miller v. Fallas (In re J&M*

36

*Sales, Inc.)*, No. 18-11801 (JTD), 2022 WL 532721, at *3 (Bankr. D. Del. Feb. 22, 2022) ("[I]n order to be considered an allowable claim for purposes of Section 544(b) there must be a proof of claim filed as required by Section 502.").

The Complaint's conclusory allegations that "[a]t all relevant times, the Company had actual creditors holding unsecured claims allowable within the meaning of Section 502 and 544(b) of the Bankruptcy Code" are not sufficient.  (Compl. ¶¶ 148, 163); *see Giuliano v. Ferdinand (In re Liquid Holdings Group, Inc.)*, Ad. Pro. 17-50662, at *5 (Bankr. D. Del. Sept. 18, 2018) (dismissing Section 544(b) claim for failure to identify any particular creditor holding an allowable unsecured claim on the petition date that such creditor could have asserted if there were no bankruptcy case).  Because the Complaint fails to identify such a triggering creditor to any of the 32 alleged transfers challenged by this claim, the Section 544(b) claim fails.[35]

And, Count Seven's Section 550(a) claim fails for the same reasons it failed in Count Six.

### C.    Count Eight Fails To State Section 548(a)(1)(B) Or 550(a) Claims.

Substantial portions of the Complaint's claims are doomed by the Release and violate Debtors' covenant not to sue their directors, officers, affiliates, and their respective employees for anything related to, arising out of, or pre-dating the Redbox Merger.  (Ex. 11 at § 2.1.)  In a hollow attempt to confront this fatal dilemma, Count 8 seeks to avoid the Release under Sections 548(a)(1)(B) and 550(a) based on threadbare allegations that Debtors "did not receive reasonably

---

[35] *See, e.g.*, *In re Petters Co., Inc.*, 495 B.R. 887, 900-901 (Bankr. D. Minn. 2013), *as amended* (Aug. 30, 2013) ("To plead his standing to sue to set aside a transfer to any defendant as fraudulent under Minnesota law, the Trustee must identify by name, in his complaint, at least one unsecured creditor with a claim allowable against the estate whose standing he uses to sue that defendant, which creditor would have had the right to sue to avoid that transfer on the date that that Debtor filed for bankruptcy relief.").  In discussing *Petters*, this Court noted that alleging the identity of the triggering creditor allows the defendants "[t]o structure and pursue their opposition to" the trustee's standing to pursue claims under Section 544(b).  *UMB Bank, N.A. v. Sun Capital Partners V, LP (In re LSC Wind Down LLC)*, 610 B.R. 779, 786 (Bankr. D. Del. 2020) (finding that the trustee adequately pled a triggering creditor when numerous creditors were alleged by name).  And, although in at least one case, this Court did not require the plaintiff to specifically identify the triggering creditor.  *Golden v. Community Health Sys. (In re Quorum Health Corp.)*, 2023 Bankr. LEXIS 1471 at *6 (Bankr D. Del Apr. 18, 2023).  The Complaint must, at a minimum, plausibly allege the *existence* of a triggering creditor which holds an allowable claim, which it does not do.

equivalent value" in exchange for the Releases.  (Compl. ¶ 154.)  This Count fails for four reasons.

First, Section 548(a)(1)(B) claims are limited to avoidance of obligations that were "made or incurred" within two years of the Petition Date (i.e. June 28, 2022).  11 U.S.C. § 548(a)(1)(B). The Court should not be misled by the Complaint's deceptive attempt to cram the Release into to the two-year avoidance period by alleging the Release became "effective" at closing on the Redbox Merger (i.e., August 11, 2022).  (*See* Compl. ¶¶ 58, 153.)  The Release was executed by all parties on May 10, 2022, and publicly filed with the SEC on May 12, 2022.  (CSSE Am. 1 to Form 8-K, May 12, 2022, at Ex. 10.1.)[36]  Since the obligation sought to be avoided was "made or incurred" more than two years before the Petition Date, this claim is time-barred.  *In re Le Café Crème, Ltd*., 244 B.R. 221, 238 (Bankr. S.D.N.Y. 2000).

Second, the Integrated Transaction Doctrine bars this claim.  The Release was not executed in a vacuum—it is but one of numerous agreements that comprise the Redbox Merger transaction. (*See* CSSE S-4A, July 11, 2022, at Ex. 2.1, *et seq*.)  Under the Integrated Transaction Doctrine, the Complaint must seek to avoid the entire Merger transaction under Section 548 if the Trustee wants to avoid the Release.  He cannot simply pluck the Release out of the integrated Redbox Merger transaction.  *See In re Waterford Wedgewood USA, Inc.*, 500 B.R. 371, 379 (Bankr. S.D.N.Y. 2013) ("'[I]nterrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction.'") (quoting *Comm'r of Internal Revenue v. Clark*, 489 U.S. 726, 738 (1989)).  "If the various closely related transactions are just means to reach a particular result, the court will view them as a single transaction." *Id.* at 380.  Since the Release was part of the documents required for the closing of the Redbox Merger, the Integrated Transaction Doctrine applies to the Complaint's fraudulent conveyance claims.  *See id.* at 371; *The*

---

[36] *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/0001679063/000110465922059491/tm2215197d3_8ka.htm

*Liquidation Trust v. Daimler AG (In re Old Carco LLC)*, 435 B.R. 169, 187 (Bankr. S.D.N.Y. 2010); *The Liquidation Trust of Hechinger Inv. Co. of Delaware, Inc. v. Fleet Retail Finance Group (In re Hechinger Inv. Co. of Delaware)*, 327 B.R. 537, 546 (D. Del. 2005), *aff'd sub nom. In re Hechinger Inv. Co. of Delaware, Inc.*, 278 F. App'x 125 (3d Cir. 2008).  In each of these cases, the courts dismissed fraudulent conveyance counts because, like the Complaint's impermissible theory here, the plaintiffs failed to show that the debtor received less than reasonably equivalent value for the overall transaction.[37]  Here, the Complaint relies on the Redbox Merger as a primary ground for its claims, and so certainly does not seek to avoid it.  But, electing not to challenge the entire Redbox transaction incurably precludes avoidance of the Release.

Third, to adequately plead a claim for constructive fraudulent conveyance under Section 548(a)(1)(B), as in Count Six, the Complaint must do more than merely recite the statutory requirement that Debtors "received less than a reasonably equivalent value in exchange" for such transfer or obligation."  *In re PennySaver USA Publ'g, LLC*, 602 B.R. at 266.  Yet that is all the Complaint does.  (Compl. ¶ 154.)

Fourth, the Complaint lacks specific factual allegations that, if true, would establish that CSSE was insolvent either as of May 10, 2022, when the obligation was made or incurred, or as of August 11, 2022, when the Redbox Merger became effective.  *See In re Ctr. City Healthcare, LLC*, 641 B.R. at 804-805 ("In this case, the Complaint does not allege any facts relative to the Debtors' insolvency at the time of the Transfers but merely recites the language of the statute.")  The Complaint's allegations that CSSE incurred "significant net losses from at least 2020" is not

---

[37] *In re Waterford Wedgwood USA, Inc.*, 500 B.R. at 382 ("In sum, the Trustee has not shown that a genuine issue of fact exists regarding whether the overall purchase price was reasonably equivalent value."); *In re Old CarCo LLC*, 435 B.R. at 187  ("The Court concludes that the Complaint fails to state a claim because it does not include, or even reference, the significant value received by CarCo pursuant to the overall transaction."); *In re Hechinger Inv. Co. of Del.*, 327 B.R. at 552 , *aff'd sub nom. In re Hechinger Inv. Co. of Delaware, Inc.*, 278 F. App'x 125 (3d Cir. 2008) ("In this case, plaintiff has not presented credible evidence to refute the fact that Hechinger received value through the Transaction in the form of expected synergy between Hechinger and Builders Square.").

enough.  (Compl. ¶ 75); *see In re Pinktoe Tarantula Ltd.*, No. 18-10344 (LSS), 2023 WL 2960894, at *10 (Bankr. D. Del. Apr. 14, 2023).

Finally, the Section 550(a) claims fail for the same reasons as in Counts Six and Seven.

### D.     Count Nine Fails To State Section 544(b) Or 550(a) Claims.

Count Nine asserts claims under Sections 544(b) and 550(a) alleging that the Release was a constructive fraudulent conveyance recoverable under 6 Del. C. § 1305.  Both Count Nine theories fail for the same reasons both Count Eight theories fail.  Count Nine also fails for the same reasons Count Seven fails—the Complaint's failure to identify a "triggering creditor."

### E.     Count 12 Fails To State Section 502(d) & (j) Disallowance Claims.

In Count 12, the Complaint seeks to disallow "any and all claims" any Defendant filed or scheduled in the Bankruptcy Cases.  11 U.S.C. §§ 502(d) & (j).  But if the Court dismisses Counts 6, 7, 8 and 9, as it should for the reasons discussed above, then it must likewise dismiss Count 12. *See In re USDigital, Inc.*, 443 B.R. at 49.[38]

### F.     Count 13 Fails To State A Claim Under Section 510(c).

Count 13 seeks to subordinate the claims of Defendants to the claims of Debtors' general unsecured creditors.  *See* 11 U.S.C. § 510(c).  To equitably subordinate a claim under Section 510(c), the Court must find that the claimant engaged in "(i) inequitable conduct; (ii) resulting in injury to creditors or unfair advantage to the claimant; and (iii) [that subordination is] an outcome that is not otherwise inconsistent with the Bankruptcy Code."  *In re Champion Enters., Inc.*, 2010 WL 3522132, at *5.  Once again, the Complaint has lumped all Defendants together with impermissible group pleading.  (*See supra* at 21.)  The Complaint has not done anything to explain

---

[38] Count 12 is also premature because a creditor's claim should only be disallowed if it has failed to pay a judgment for an avoidable transfer.  *See* 11 U.S.C. §§ 502(d); *see also In re Lids Corp.*, 260 B.R. 680, 684 (Bankr. D. Del. 2001).

how or why each and every Defendant supposedly engaged in inequitable conduct that independently caused injury to the creditors or any specific advantage to a Defendant. The Complaint again only supports this claim with conclusory allegations that parrot the statutory language, which is not sufficient.

## IV. THE COMPLAINT FAILS TO STATE A CLAIM FOR RECOVERY OF PREFERRED DIVIDENDS (COUNT 10).

The Complaint's claims arising from the payment of dividends should be dismissed because Defendants are entitled to issue and pay dividends out of CSSE's surplus, pursuant to Section 170 of the DGCL, and can rely on the corporation's records in determining that surplus pursuant to Section 172 of the DCGL. The Complaint's reliance on CSSE's public financials doom this claim, as the financial statements—which were prepared in accordance with GAAP and with assistance of outside experts (including auditors)—demonstrate that, at least for the period of January 1, 2020 through June 30, 2023[39], CSSE had a surplus sufficient to authorize the issuance of the dividends. (*See supra* at 27 n.25.) Accordingly, Count 10 should be dismissed. *See In re Chemours Co. Derivative Litig.*, 2021 WL 5050285, at *19; *Klang*, 1997 WL 257463, at *4.

## V. THE COMPLAINT'S FLSA CLAIM (COUNT 11) SHOULD BE DISMISSED.

### A. The Trustee Lacks Statutory Authority To Assert A Direct Claim Under The FLSA On Behalf Of CSSE's Former Employees.

The Trustee lacks statutory authority to assert the Count 11 FLSA claims on behalf of CSSE's former employees because claims under the FLSA are not derivative of harm to CSSE— such claims belong to the former employees. *See, e.g.*, *In re First Guar. Mortg., Corp.*, No. BR 22-10584 (CTG), 2025 WL 963134, at *4-5 (D. Del. Mar. 31, 2025) ("*First Guaranty I*")

---

[39] CSSE, in reliance on its outside experts, issued dividends only because a permitted calculation determined there was a surplus every quarter they were issued.

(affirming order that relator's False Claims Act claim was not a derivative claim for "injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claim[s] against the debtor," but a direct claim for harm caused by the debtor "unique to a particular creditor," the federal government); *see also In re Wilton Armetale, Inc.*, 968 F.3d 273, 280-81 (3d Cir. 2020) (clarifying that "'standing' to pursue causes of action that become the estate's property means its *statutory* authority under the Bankruptcy Code, not its *constitutional* standing to invoke the federal judicial power") (emphasis in original). "As the Third Circuit has explained, a cause of action is considered property of the [debtor's] estate if the claim existed at the commencement of the bankruptcy filing ***and the debtor could have asserted the claim on its own behalf***." *First Guaranty I*, 2025 WL 963134, at *4 (citations omitted) (emphasis added). "The claim must be a general one, with no particularized injury arising from it." *Id.* (citations omitted). As such, the "property of the bankruptcy estate does not include claims for damages caused to individual creditors." *In re DSI Renal Holdings, LLC*, 574 B.R. 446, 479 (Bankr. D. Del. 2017). To distinguish derivative/general from direct/individual claims, the Third Circuit instructs that courts look to the "theory of liability." *First Guaranty I*, 2025 WL 963134, at *4.

In *DSI Renal*, a chapter 7 trustee brought an adversary proceeding seeking to hold the corporate debtor's officers, directors, and shareholders personally liable for, among other things, breach of fiduciary duty, aiding and abetting, and corporate waste. *See In re DSI Renal Holdings, LLC*, 574 B.R. at 453-54. The court granted the defendants' motion to dismiss the trustee's claim for a declaratory judgment that the debtor was liable for the debts of its pre-merger subsidiary, for which the defendants were alleged to be personally liable on a corporate veil piercing theory. *Id.* at 477-78. The court held that the theory of liability underlying this claim—recovery of assets on behalf of the pre-merger subsidiary's creditors—was "not a derivative claim alleging damages

42

suffered by the Debtor corporations, but a claim seeking a remedy for damages to a particular subset of creditors." *Id.* at 480. Thus, it was a direct, not a derivative, claim that the trustee lacked statutory authority to assert. *Id.*

Count 11's theory of liability is that all Defendants violated CSSE's former employees' protections under the FLSA. (*See* Compl. ¶¶ 78-81, 175-179.) Thus, Count 11 asserts a direct claim to a subset of CSSE's creditors—its former employees—for particularized harm CSSE allegedly caused them. Any recovery would run to the benefit of only these former employees, and not to CSSE's creditors generally. *See In re First Guar. Mortg. Corp.*, No. 22-10584 (CTG), 2023 WL 8940688, at *5 (Bankr. D. Del. Dec. 27, 2023), *aff'd sub nom. In re First Guar. Mortg., Corp.*, No. BR 22-10584 (CTG), 2025 WL 963134 (D. Del. Mar. 31, 2025) (discussing, *in dicta*, claims against director or officers in their personal capacity for unpaid wages to a corporate debtor's employees as an example of a direct claim for which a trustee lacks statutory authority to assert); *see also* 29 U.S.C. § 216(b) ("An action . . . may be maintained against any employer . . . by any one or more ***employees***." (emphasis added)). Therefore, Count 11 should be dismissed because the Trustee does not have statutory authority to assert it.

**B.      The FLSA Does Not Impose Liability For The Complaint's Claims Based On Unpaid "Benefits" Or Unremitted "Tax Obligations."**

Even if the Trustee had statutory authority to assert claims under the FLSA, the FLSA does not permit any plaintiff to recover unpaid medical benefits or unremitted income tax withholdings. (*See* Compl. ¶¶ 2, 79 (alleging FLSA claims are based on non-payment of employee "medical benefits" and "accrued but unpaid withholding taxes").) "The FLSA establishes federal minimum-wage, maximum-hour, and overtime guarantees." *Davis v. Abington Mem'l Hosp.*, 765 F.3d 236, 241 (3d Cir. 2014) (citing *Genesis Healthcare Corp. v. Symczk*, 569 U.S. 66, 69 (2013)); *see also* 29 U.S.C. § 206 (minimum wage requirements); 29 U.S.C. § 207 (overtime requirements). The

FLSA does not extend to claims for unpaid employee medical benefits.  *See* 29 U.S.C. § 207(e)(4).

Nor does it cover claims for unremitted employee income tax withholdings.  *See, e.g.*, *Victorin v.*

*Maynard*, No. CV 2012-037, 2014 WL 4812088, at *3 (D.V.I. Sept. 29, 2014); *Barba v. New*

*Century Chinese Buffet, Inc.*, No. 2:20-CV-01557, 2023 WL 6348825, at *10 (W.D. Pa. Sept. 29,

2023); *accord Cherichetti v. PJ Endicott Co.*, 906 F. Supp. 2d 312, 314 n.2 (D. Del. 2012).

### C.    Mr. Rouhana Has No Personal Liability Under The FLSA.

The Complaint also contains no factual allegations showing that Mr. Rouhana qualifies as

an "employer" subject to potential liability under the FLSA.  FLSA liability extends to an

individual only "when he or she exercises 'supervisory authority over the complaining employee

and was responsible in whole or part for the alleged violation' while acting in the employer's

interest."  *Thompson v. Real Est. Mortg. Network*, 748 F.3d 142, 153-54 (3d Cir. 2014) (quoting

*Haybarger v. Lawrence Cnty. Adult Prob. & Parole*, 667 F.3d 408, 417 (3d Cir. 2012)).  An

individual has the required authority to be held personally liable "when the supervisor

'independently exercise[s] control over the work situation.'"  *Id.* (quoting *Donovan v. Grim Hotel*

*Co.*, 747 F.2d 966, 972 (5th Cir. 1984)).

The Complaint does not allege which, if any, employees Mr. Rouhana had supervisory

authority over, nor does it allege any particular role he played in any wage payment decisions

beyond the fact that he was Chairman of CSSE's Board and CEO.[40]  Mere director or officer status

alone is not sufficient to qualify as an "employer" personally liable under the FLSA.[41]  And the

---

[40] *See Wright v. Lehigh Valley Hosp. & Health Network*, No. CIV.A. 10-431, 2011 WL 2551026, at *9-10 (E.D. Pa. June 23, 2011) (denying motion to amend FLSA claim where plaintiff failed to allege whether the defendants had specific roles in determining personnel, financial, and compensation practices); *Zas v. Canada Dry Bottling Co. of New York, L.P.*, No. 12-1649 (SRC)(CLW), 2013 WL 3285143, at *4 (D.N.J. June 27, 2013) (dismissing FLSA claims for lack of allegations that defendant played a role in failing to pay plaintiffs wages or overtime or making impermissible deductions from wages).

[41] *See, e.g.*, *Reich v. PTC Career Inst. of Pennsylvania, Inc.*, No. CIV. A. 94-647, 1994 WL 283681, at *4 (E.D. Pa. June 24, 1994 (merely attending board meetings, or holding a corporate office and receiving a salary, is insufficient to establish "employer" status under the FLSA)), *aff'd*, 52 F.3d 316 (3d Cir. 1995).

Complaint does not bother to specify what Mr. Rouhana's alleged role was with respect to the allegations that "**Debtors** were unable to make payroll for the two-week period ending June 14, 2024 (Compl. ¶ 79 n.36 (emphasis added)), and other losses employees may have experienced as a result of their July 10, 2024 terminations, which occurred **after** Mr. Rouhana had resigned as CEO and had been removed from the Board as of July 4, 2024.  (*See supra* at 4.)  In sum, the Complaint alleges no basis to hold Mr. Rouhana personally liable as an employer under the FLSA.

### D.       The Complaint Fails To Allege Sufficient Facts To State A Claim For Unpaid Minimum Or Overtime Wages Under The FLSA.

To state minimum or overtime wage claims under the FLSA, a complaint must identify at least one workweek when non-exempt employees worked in excess of 40 hours and were not paid for the excess hours in that workweek, or were not paid minimum wages.  *See Wu v. E. Ocean Agric. Corp.*, No. CV 21-668-RGA, 2022 WL 609619, at *2-3, *6 (D. Del. Feb. 9, 2022).  The Complaint contains none of these required allegations, and this claim should thus be dismissed.[42]

## CONCLUSION

For the foregoing reasons, Mr. Rouhana respectfully requests the entry of an order dismissing the claims against him with prejudice.

---

[42] To the extent paragraph 79 intends to allege a claim for gap time (uncompensated hours worked that fall between the FLSA's minimum wage and overtime provisions), such claims fail "because the FLSA provides remedies only for minimum wage or maximum hour violations, and it does not cover claims for unpaid straight time."  *Traub v. Stardust389, Inc.*, No. CV 22-1582-SRF, 2024 WL 1434789, at *3 (D. Del. Apr. 3, 2024).

Dated: July 11, 2025
Wilmington, Delaware

**WOMBLE BOND DICKINSON (US) LLP**

*/s/ Donald J. Detweiler*
Donald J. Detweiler (DE Bar No. 3087)
1313 N. Market Street, Suite 1200
Wilmington, Delaware 19801
Telephone: (302) 252-4320
Facsimile:  (302) 252-4330
Email: don.detweiler@wbd-us.com

-and-

Cathy A. Hinger
(admitted *pro hac vice*)
2001 K. Street NW, Suite 400 South
Washington, D.C. 20006
Telephone: (202) 467-6900
Facsimile:  (202) 467-6910
Email: cathy.hinger@wbd-us.com

-and-

James S. Derrick
(admitted *pro hac vice*)
301 South College Street, Suite 3500
Charlotte, North Carolina 28202
Telephone: (704) 331-4913
Facsimile:  (704) 338-7819
Email: james.derrick@wbd-us.com

*Counsel for William J. Rouhana*