# EXHIBIT 10-A

**DISTRIBUTION AGREEMENT**

**Screen Media Ventures, LLC: Screen Media, Sonar & 1091 Libraries**

This Distribution Agreement ("**Agreement**") is made as of June 29, 2022 ("**Date of Agreement**") and confirms the terms and conditions of the agreement reached:

Between:         **SCREEN MEDIA VENTURES, LLC** ("**Licensor**")
                 800 Third Avenue, Third Floor
                 New York, NY 10022
                 Tel: 646.695.3979
                 Licensor Contact: David Fannon (david@screenmedia.net)
                 Licensor Delivery Contact: Pamela Popp (ppoopp@chickensoupforthesoul.com)

And:             **FILMRISE ACQUISITIONS LLC** ("**FR**")
                 220 36th Street, 4th Floor, Unit 4A
                 Brooklyn, NY 11232
                 Tel: 718.369.9090 / Fax: 718.480.0073
                 FR Contacts:
                     Danny Fisher, Danny@FilmRise.com
                     Business Affairs, BusinessAffairs@FilmRise.com
                 FR Invoicing & Royalty Contacts:
                     AP@FilmRise.com
                     FR-RoyaltyReports@FilmRise.com
                 FR Distribution and Delivery Contacts:
                     Bob Jason, Bob@FilmRise.com
                     Racquel Dixon, RDixon@FilmRise.com

Licensor and FR are collectively referred to as the "**Parties**" and individually as a "**Party**." Capitalized terms are defined terms and are used as defined where they appear within quotation marks or in **Schedule A** ("**Definitions**") of this Agreement. For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, FR and Licensor hereby agree to the following:

1. **Acknowledgement of Existing Agreements**.

1.1. The Parties acknowledge and agree that certain rights to certain Programs (as defined below) are currently under license to FR by Licensor pursuant to:

    1.1.1. A Distribution Agreement dated September 5, 2018 and amended January 12, 2022 (for digital rights in certain Programs in the U.S., the U.K., the Republic of Ireland, Australia, New Zealand, Africa, and Scandinavia via Amazon and all Ad-Supported Streaming platforms).

1.2. The Parties acknowledge and agree that certain rights to certain Programs are currently under license to FilmRise, Inc. (f/k/a Fisher Klingenstein Ventures, LLC) ("**FKV**") by Licensor pursuant to:

    1.2.1. an Amazon Distribution Agreement dated March 21, 2014 and amended October 26, 2016 and July 25, 2017 (for digital rights in certain Programs in the U.S., Canada, and U.K. via Amazon and the FilmRise Channels);

    1.2.2. an Amazon License Agreement dated December 15, 2014 and amended November 15, 2015, October 26, 2016, and July 25, 2017 (for digital rights in certain Programs in the U.S. and U.K. via Amazon and the FilmRise Channels); and

1.2.3. a Blu Ray License Agreement dated August 24, 2015 and amended on October 26, 2016 and July 25, 2017 (for Electronic Sell-Through rights in certain Programs in the U.S. and Canada and digital rights in certain Programs in the U.S. and Canada via Amazon and the FilmRise Channels);

1.3. The Parties acknowledge and agree that certain rights to certain Programs are currently under license to FilmRise-Harlan Acquisitions LLC d/b/a FilmRise Acquisition Fund 8, LLC ("**FR Fund 8**") by Licensor pursuant to:

1.3.1. an Amazon License Agreement dated December 15, 2015 and amended April 21, 2016, October 26, 2016, and July 25, 2017 (for Blu-ray rights in certain Programs in the U.S. and digital rights in certain Programs in the U.S. and the U.K. via Amazon and the FilmRise Channels);

1.3.2. a Buy-Out and Amendment dated October 26, 2016 and amended on July 25, 2017 (for digital rights in the U.K. for thirty-six (36) films via Amazon); and

1.3.3. A Second Amendment dated July 25, 2017 (for digital rights in the U.S. for ten (10) Programs via Amazon.

1.4. The Parties acknowledge and agree that certain rights to certain Programs are currently under license to FR by Sonar Entertainment Distribution, LLC ("**Sonar**") pursuant to:

1.4.1. a Distribution Agreement dated November 13, 2017 and amended December 12, 2018 (for digital rights in certain Programs in the U.S. via Amazon Prime SVOD);

1.4.2. an Amended and Restated Distribution Agreement dated November 27, 2017 and amended June 28, 2018 and December 12, 2018 (for digital rights in certain Programs in the U.S. via Amazon and the FilmRise Channels);

1.4.3. a Distribution Agreement dated December 14, 2017 and amended December 12, 2018 (for digital rights in certain Programs via Amazon Prime SVOD); and

1.4.4. a Distribution Agreement dated December 14, 2017 and amended June 28, 2018 and December 12, 2018 (for digital rights in certain Programs in the U.S. via Amazon AVOD and the FilmRise Channels).

1.5. The Agreements listed in subsections 1.1 through 1.3 are collectively referred to as the "**Prior Screen Media Agreements**." The Agreements listed in subsections 1.4 are collectively referred to as the "**Prior Sonar Agreements**." The Prior Sonar Agreements and the Prior Screen Media Agreements are collectively referred to as the "**Prior Agreement(s)**."

1.6. For the purpose of clarity, the Parties agree and acknowledge that in any instance where any of the Prior Agreements granted FR, FKV, or FR Fund 8 (a) the rights to exploit a Program via the "FilmRise Channels," such rights include the right to distribute Ad-Supported Streaming Rights (as defined in Schedule A of this Agreement) on (i) The Roku Channel, Future Today Media, WatchFreeFlix, whether or not streaming on such platforms are on a FilmRise-branded channel or page; and (ii) FAST channels that are owned, operated, programmed, or syndicated by FR or any of its affiliates which may be available on third party platforms, apps, or services, including, without limitation, The Roku Channel and YouTube; and (b) the rights to exploit a Program via "AVOD" rights shall include streaming where the viewer's right to view the Programs at a certain time can be selected by the viewer ("AVOD") or as part of a pre-scheduled linear format ("FAST").

1.7. The Parties agree and acknowledge that nothing in this Agreement amends or modifies in any way the Prior Agreements or FR's, FKV's, or FR Fund 8's rights to such Programs in anyway as provided in the Prior Agreements, except to the extent modified by subsection 1.6 above.

DocuSign Envelope ID: 3A43DD1C-2BCF-465E-8BDD-3698096D2521

1.8.  To the extent that any of the Rights in any of the Programs (as both terms are defined below) granted pursuant to this Agreement are already controlled by or under license to FR, FKV, or Fund 8 pursuant to the Prior Agreements, such Rights (including without limitations the rights in subsection 1.6 above) in the specific Programs shall be excluded from the terms of this Agreement and remain subject to the Prior Agreements (except to the extent modified by subsection 1.6 above) until the expiration of the appliable Prior Agreement. Upon the occurrence of such expiration of a Prior Agreement, the applicable Programs licensed in such Prior Agreement shall become subject to the terms of this Agreement for the balance of the remaining Term (as defined below).

2.  **Programs**. The feature length motion pictures and episodic series as set forth in **Schedule C**, in all versions and languages (collectively, the "**Program(s)**"). The Programs consist of three (3) slates of programs from the Screen Media Library ("**SM Program(s)**"), Sonar Library ("**Sonar Program(s)**"), and 1091 Library ("**1091 Program(s)**") as designated in Schedule C ("**Programs & Availability Schedule**"). Use of the defined term "Program(s)" includes the SM Programs, Sonar Programs, and 1091 Programs. Licensor will exercise commercially reasonable efforts to remove any watermarks, URLs, or website address on the Programs, and FR will have the right to remove, blur, or edit out any such instances still appearing on the Programs.

    2.1.  FR hereby acknowledges and confirms that the Programs are subject to "Outstanding Licenses" that may limit the availability of some of the Programs. The availability of each Program is set forth in Schedule C and FR acknowledges and confirms that the "Rights" (defined hereafter) granted to FR (including but not limited to "Term" and "Territory" (defined hereafter) are subject to the Programs & Availability Schedule in Schedule C.

    2.2.  <u>Future SM Programs</u>. In each year of the first five (5) years of the Term (as defined below) Licensor shall avail no fewer than fifteen (15) additional new release feature films that are of comparable value and quality (as mutually agreed between the Parties) to the SM Programs listed in Schedule C as of the Date of Agreement ("**Future SM Programs**"). On a quarterly basis such Future SM Programs shall be added to the SM Programs list in Schedule C. Every quarter during such five year period, Licensor shall deliver written notice to FR setting forth the titles of the proposed Future SM Programs (and synopses, cast, running time, genre, and director information) for FR to select, and the availability dates ("**Availability Date**") for FR's exploitation of such proposed Future SM Programs, which Availability Date shall be no later than forty-two (42) months after Screen Media's initial exploitation of a Future SM Program. Notwithstanding the foregoing, if Licensor exhibits the Future SM Program on the "Crackle Plus Networks" (defined hereafter) prior to the foregoing dates, then the Availability Date for such program shall be the date of exhibition on the Crackle Plus Networks. In the event that Licensor fails to make available the Future Programs as required by this subsection, then the Term of the Rights for the SM Programs shall be extended pursuant to good faith negotiations between the Parties.

3.  **Territory**. The territory for the Rights (as defined below) granted in the Programs is as follows (subject to Schedule C):

    3.1.  for the **SM Programs** and the **1091 Programs**, the United States (in all languages), and its territories, possessions, and commonwealths; and

    3.2.  for the **Sonar Programs**, throughout the world excluding the United Kingdom and the Republic of Ireland, and their respective territories and possessions.

    3.3.  The foregoing is collectively referred to as the "**Territory**" or the "**Territories**." The Territory also includes all diplomatic posts, and military and government installations of the countries comprising the individual Territories, wherever located, all ships principally operating in or serviced from the

countries comprising the Territory, and all aircraft and oil rigs flying the flag of the countries comprising the Territory wherever they may be situated worldwide.

**4. Term.** Subject to Schedule C.

4.1. Future SM Programs Term. The term for the Future SM Programs shall be the lesser of fifteen (15) years from each Future Program's Availability Date or the Program expiration date as set out in Schedule C

4.2. Other SM Programs, & U.S. Sonar Programs Term. The term for the Rights (as defined below) granted in the SM Programs (other than the Future SM Programs) and the Sonar Programs available in U.S. (and its territories, possessions, and commonwealths) commences on the Date of Agreement and continues for fifteen (15) years and three (3) months until September 28, 2037, unless a different term for specific Programs are identified in the Programs & Availability Schedule in Schedule C. For the avoidance of doubt, Licensor represents and warrants that Licensor will attempt to renew (or auto-renew, as the case may be) the SM Programs and Sonar Programs in order that FR can exercise the SM Rights and Sonar Rights throughout the Term. Licensor shall provide periodic written notice of the renewal of any Programs during the term when applicable.

4.3. International Sonar Programs Term. The term for the Rights granted in the Sonar Programs that are available anywhere in the Territory outside of the U.S. (and its territories, possessions, and commonwealths), the United Kingdom, and the Republic of Ireland ("**Sonar International Territory**") commences on January 1, 2027 and continues for ten (10) years until December 31, 2036, unless a different term for specific Sonar Programs are identified in the Programs & Availability Schedule in Schedule C.

4.3.1. FR acknowledges that the current license holder for the Sonar Programs in the Sonar International Territory ("**Current Sonar International License**") has the right to enter into licenses for the Sonar Programs in the Sonar International Territory that grant rights through November 30, 2031, provided that such license agreements are fully executed by December 31, 2026. Licensor shall provide FR written notice of licenses entered into by the Current Sonar International License that impacts FR's term. Licensor shall provide prompt written notice to FR setting forth the deal terms made by the Current Sonar Internal License.

4.4. 1091 Programs Term. The term for 1091 Programs shall be the lesser of fifteen (15) years and three (3) months commencing on the Date of Agreement or the Program expiration date as set forth in Schedule C. For the avoidance of doubt, Licensor represents and warrants that Licensor will attempt to renew (or auto-renew, as the case may be) the 1091 Programs in order that FR can exercise the 1091 Rights throughout the 1091 Programs Term. Licensor shall provide periodic written notice of the renewal of any Programs during the term when applicable.

4.5. The foregoing is collectively referred to as the "**Term.**"

4.6. Crackle Plus Networks Exclusives. Licensor shall have the right, by providing written notice to FR no later than October 1st of each year during the Term, to designate up to twenty-four (24) of the SM Programs as "Crackle Plus Networks Exclusives" and withhold from FR's distribution of such designated SM Programs for a maximum period of sixty (60) consecutive days during the following calendar year, provided that Licensor shall not designate a Program title as a "Crackle Plus Networks Exclusive" more than once every four (4) years during the Term.

**5. Rights.** Licensor hereby grants and assigns to FR the Rights (as defined below) in the Programs throughout the Territory during the Term.

5.1. SM Program and Sonar Program Rights. "**SM Rights**" and "**Sonar Rights**" means the right under copyright to exhibit, distribute, market, display, project, transmit, broadcast, rebroadcast, perform,

DocuSign Envelope ID: 3A43DD1C-2BCF-465E-8BDD-3698096D2521

advertise, publicize, license, sublicense, exploit, and otherwise communicate the SM Programs and Sonar Programs in all languages:

5.1.1. **exclusively** via **AVOD Ad-Supported Streaming Rights** (as defined in Schedule A) on any and all platforms, services or devices, now existing or created in the future;

5.1.2. **exclusively** via **FAST** (as defined in Schedule A) **Ad-Supported Streaming Rights** on **The Roku Channel** and **Amazon FreeVee** platforms, now existing or created in the future, and any updated, rebranded, or successor platforms (subject to subsection 5.1.7 below);

5.1.3. **nonexclusively** via **FAST Ad-Supported Streaming Rights** on any and all other platforms, now existing or created in the future, subject to FR's exclusive rights per 5.1.2;

5.1.4. **exclusively** on and via **YouTube** channels, YouTube FAST channels, and **YouTube Movies & Shows**, regardless of whether such exploitation by FR is on a FilmRise-branded channel/page or on a non-branded channel/page. FR's rights with respect to YouTube shall be via any means of distribution, whether AVOD, FAST, SVOD and/or a combination thereof but excluding TVOD and EST (the foregoing rights are collectively referred to as the "**YouTube Rights**"); and

5.1.5. via **Peacock**, FR shall have the right to grant Peacock non-exclusive **SVOD Rights** (as defined in Schedule A) as part of granting Peacock **Ad-Supported Streaming Rights** on Peacock ("**Peacock Rights**"). FR acknowledges that Licensor has the right to grant Peacock SVOD rights, provided such grant by Licensor to Peacock does not include any Ad-Supported Streaming Rights.

5.1.6. The SM Rights and Sonar Rights also include the non-exclusive **Allied and Incidental Rights** (defined in Schedule A) via any means, technology, or platform.

5.1.7. Notwithstanding the foregoing, Licensor shall have the right to exhibit all Programs via "**Crackle Plus Networks**." "**Crackle Plus Networks**" means apps, pages, and linear streaming channels (also known as FAST channels) existing or to be created during the Term that are owned, operated, acquired, or branded by, or syndicated through Chicken Soup for the Soul Entertainment or any of its affiliates, now or in the future, and that are transmitted via any and all digital media or hybrid digital media now known or created in the future. The Crackle Plus Networks include without limitations apps that are available on mobile phones, Roku, Amazon Fire, Apple TV, smart TVs and other devices and platforms. The Crackle Plus Network also includes without limitations sites within third party platforms and FAST channels that are operated, programmed, or syndicated by CSSE or any of its affiliates, which may be available on third party platforms, apps, or services, including without limitations Hisense, Pluto, Redbox, Samsung TV Plus, TCL, Tubi, Vizio, Vudu, Xumo. **Notwithstanding the foregoing, The Crackle Plus Networks excludes distribution of the Programs on The Roku Channel and/or Amazon Freevee, and any updated, rebranded, or successor channel and platforms, or any ad-supported services owned or operated by Amazon or Roku (or their successors), except Licensor shall have the right to keep the Programs listed in Schedule D on the existing Blackpix Channel. This prohibition only applies to platforms and services that are currently known as Freevee and The Roku Channel; it does not prohibit the Crackle Plus Networks from creating or placing additional Licensor-owned and operated, or Licensor's affiliate's owned and operated, AVOD apps on Roku devices and Amazon Fire devices.**

5.2. 1091 Program Rights. "**1091 Rights**" means the **FilmRise Streaming Network**. The 1091 Rights also include non-exclusive **Allied and Incidental Rights** via any means, technology, or platform. Notwithstanding the foregoing, FR's FAST rights on the Film Rise Streaming Network for the 1091

Programs shall consist of no more than twenty-five (25%) of 1091 Programs on an individual FAST channel during a programming cycle.

5.3. The SM Rights, Sonar Rights, and 1091 Rights are collectively referred to as the "**Rights**."

5.4. Notwithstanding the foregoing, all rights not granted to FR in this Agreement are hereby expressly reserved to Licensor, including, but not limited to, TVOD, EST, SVOD (other than for the SM Rights and Sonar Rights exhibited via YouTube and Peacock), Free Television, Pay Television, and Home Video.

**6. License Fee: FilmRise Streaming Network & YouTube Rights Excluding YouTube Movies & Shows**. In consideration of the Rights granted by Licensor for exploitation of the Programs via the FilmRise Streaming Network and the YouTube Rights excluding via YouTube Movies & Shows and Third Party Owned YouTube Channels, and the representations and warranties made by Licensor in this Agreement, and expressly conditioned upon Licensor complying with all of its obligations under this Agreement, FR agrees to pay Licensor a flat license fee of ███████ The Parties acknowledge that ████████████████████████████████████████████ ██████ The License Fee shall be payable as follows:

6.1. ████████████████████████████████████████████████ ███████████████████████████

6.2. ████████████████████████████████████████████████ ████████████████████████████ ████████████████████████████████████

6.3. ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████

**7. Advance: YouTube Movies & Shows and Exhibitions Outside the FilmRise Streaming Network**. In consideration of the Rights granted by Licensor for exploitation of the Programs via YouTube Movies & Shows, Third Party Owned YouTube Channels, and outside the FilmRise Streaming Network, and the representations and warranties made by Licensor in this Agreement, and expressly conditioned upon Licensor complying with all of its obligations under this Agreement, FR agrees to pay Licensor an advance of ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████ The Advance shall be payable as follows:

████████████████████████████████████████████████ █████████████████████

███

████████████████████████████████████████████████ ██████████████████████████████████ █████████████████████████████████████

**8. Royalties; Gross Receipts.**

FR agrees to pay Licensor a royalty of

8.2. **"Gross Receipts"** means

**9. Cross-Collateralization.**

**10. Reports and Payments.** Solely with respect to the distribution, exhibition, or sublicenses of Rights outside the FilmRise Streaming Network and YouTube, FR shall provide reports within sixty (60) days of the end of each calendar quarter during the Term, commencing the first calendar quarter in which FR has collected any Gross Receipts. FR shall issue payment to Licensor within fourteen (14) days after receipt of an invoice from Licensor for the amount due. After the fifth year of this Agreement SM Programs and Sonar Programs may be reported on a semiannual basis (for the avoidance of doubt all Future SM Programs shall be reported on a quarterly basis for the first five (5) years after such Future SM Programs start dates, and semiannually thereafter). During the Term and for a period of two (2) year after the expiration thereof, Licensor will have the right to audit FR's books and records insofar as they relate to the Programs' exploitation and monies owed to Licensor by FR under this Agreement, at Licensor's own expense and through an independent Certified Public Accountant experienced in motion picture audits (who will not be employed on a contingency basis); provided that such audit be no more frequent than once per year, within thirty (30) days of FR's receipt of written notice, subject to auditor's and Licensor's execution of FR's reasonable and customary confidentiality agreement, and during customary business hours. If Licensor has not objected to a report in writing within twenty four (24) months of receipt of such report, the report shall be deemed conclusive, and Licensor may no longer object to such report or request an audit or seek any other remedy.

████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████

## 11. **Access to Materials**.

11.1. Licensor will provide FR with access to any marketing materials owned or controlled by Licensor at no cost to FR other than the cost of duplication, if required, fully cleared for use in the exploitation of the Rights granted in this Agreement.

11.2. Licensor will provide FR with free access to any foreign-language versions of the Programs that are available, and the marketing materials relating to them.

**12. Pre-Approval of Images**. Notwithstanding anything in this Agreement to the contrary, all images and likenesses of talent delivered by Licensor to FR pursuant to this Agreement shall be fully cleared, pre-approved, and available for use by FR in the marketing materials.

**13. Closed Captions**. Licensor shall make available pop-up, case-sensitive closed caption (.scc) files for all Programs licensed under this Agreement in all languages delivered to FR. Notwithstanding the foregoing, if Licensor does not deliver such closed caption files to FR, ████████████████████████████
████████████████████████████████████████

**14. Delivery**. The Delivery Materials (as set forth in **Schedule B**), including, but not limited to, digital video files of the highest available quality, including broadcast-safe edits (as available), closed caption files, synopses, key art, etc., as available, and, as available, language assets including M&E tracks and textless materials, and English subtitles shall be delivered to and in accordance with the terms of the attached delivery schedule in Schedule B. Delivery shall be made at Licensor's sole cost and expense.

14.1. FR acknowledges and agrees as of the Date of Agreement Licensor has satisfied its delivery requirements by providing FR with full access to Licensor's storage facility containing the Delivery Materials via the fully executed Lab Access Letter attached here as **Exhibit 1**. Notwithstanding the foregoing, if FR later discovers any defects or deficiencies in the Delivery Materials, FR shall provide written notice to Licensor (email suffices) of such defect or deficiency, and Licensor will have thirty (30) days from receipt of such notice to rectify such defect of deficiency. FR will have the right to edit and/or create broadcast safe versions of the Programs (including, but not limited to, versions less restrictive than "R" rated) if they are unavailable or not delivered by Licensor. Licensor shall have free access (excluding Delivery Costs) to any materials created by FR, such access shall be provided to Screen Media promptly upon SM's written request (a general written request by Screen Media shall satisfy this requirement).

**15. Withdrawal**. If Licensor withdraws one or more of the Programs due to an infringement issue, then at FR's option: (i) the Parties shall mutually agree upon a substitute title; or (ii) the Parties shall mutually agree upon an extension of the Term for Agreement or for individual Programs, as applicable.

**16. FR's Distribution**. Subject to third party requirements of which FR is made aware in writing, FR will have sole charge and control concerning its advertising, marketing, distribution, and exploitation of its Rights in the Programs, in the Territory, in any manner and media as FR may determine. For the avoidance of doubt, the parties agree that FR shall not have the obligation to release or distribute all Programs and Screen Media shall have the right to freely advertise and promote its own reserved rights to the Programs.

For the avoidance of doubt, customary Program marketing shall not require prior written approval from Licensor.

**17. E&O Insurance.** ███████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████

**18.  Representations and Warranties.** Licensor represents and warrants the following:

18.1.  All of the Delivery Materials set forth in Schedule B are and will be accessible to FR pursuant to the lab access letter in Exhibit 1, and will satisfy the requirements and specifications set forth in this Agreement and Schedule B.

18.2.  Licensor is an entity validly existing and in good standing under the laws of the jurisdiction in which it is located, and Licensor has, and will continue to have throughout the Term, the full right, power, legal capacity, and authority to enter into this Agreement and to grant all rights purported to be granted herein without any limitations or encumbrances of any kind. Licensor has secured and obtained, and Licensor will maintain throughout the Term, all necessary licenses, permissions, and releases as may be required for the full and unlimited exercise and enjoyment by FR of the Rights granted herein.

18.3.  All advertising, marketing, packaging, and promotional materials supplied by Licensor to FR including, without limitation, material supplied by Licensor to FR for FR's creation of bonus materials, as well as bonus materials which are created by Licensor and supplied to FR, are clear and free of any charges or claims and will not violate or infringe any rights of any kind or nature of any person or entity.

18.4.  Every musical composition contained in the Programs and every performance of a musical composition contained in the Programs has been licensed for use in and in connection with the Programs for the entire Term and (with the sole exception of non-dramatic performance royalties, which shall be FR's responsibility) no payments of any kind will be required of FR, including without limitation residuals, royalties, reuse fees, mechanical rights fees or any other fees or costs of any kind will be required for use of any such performance or composition as contemplated herein. With respect to each musical composition in the Programs, the non-dramatic public performance rights necessary for exhibition and exploitation of the Programs hereunder are: (i) controlled by American Society of Composers, Authors and Publishers, Broadcast Music, Inc., SESAC or SOCAN or its affiliates and Global Music Rights, (ii) in the public domain, or (iii) owned by or licensed to Licensor, so that no additional clearance of, or payment with respect to, such rights is required for use in the Programs.

18.5.  All costs of production and all obligations and amounts payable with respect to the production of the Programs, including, without limitation, all compensation, salaries, royalties, license fees, service charges, laboratory charges, union or guild obligations have been and will be fully paid and satisfied by Licensor prior to delivery of the Programs and throughout the Term, including without limitation all fees, charges, costs and amounts payable to any performing rights society, publisher or owner of master recordings, and any profit participations not yet due, for which Licensor represents and warrants are solely the responsibility of Licensor.

18.6. To the best of Licensor's knowledge there is no action, suit, or proceeding relating to the Programs pending or threatened before any court, or administrative or governmental body which might adversely affect any of FR's rights hereunder. The Programs and the screenplays (including the plot, characters, title, action, dialogue, music, design, and the content thereof) will not violate or infringe, nor will the exploitation of the Rights by FR pursuant to this Agreement violate or infringe, upon the trademark, trade name, copyright, patent or any other similar right, or defame or violate any rights of privacy or publicity, moral rights or any other rights of any kind or nature of any person or entity.

18.7. No actual sexually explicit conduct ("**ASEC**"), lascivious exhibition of genitalia ("**LEG**"), or simulated sexually explicit conduct ("**SSEC**"), as described in 18 USC §§ 2256 et seq. and 28 C.F.R §§75.1 et seq. (popularly known as the "Pence Amendment"), and recorded during the applicable effective dates described therein, is contained in any footage delivered to FR pursuant to this Agreement; provided, however, that if FR determines (in its sole discretion) that such conduct is contained in the footage delivered, then, upon written notification provided to Licensor of such determination, Licensor shall promptly provide to FR (or if applicable, promptly procure from the producer of the Programs and provide to FR): (i) records establishing that the footage in question was recorded before the applicable effective date; (ii) if the footage in question contains LEG or SSEC only, rather than ASEC, a signed copy of the certification to the Attorney General of the United States as provided by 18 U. S.C. § 2257A and 28 C.F.R. § 75.9 (the "**Certification**") in a form acceptable to FR; or (iii) if no Certification for LEG or SSEC is available, or the footage contains ASEC, copies of any and all records required to be kept under the record-keeping and other reporting and labeling obligations set forth in the Pence Amendment, including without limitation the following information for each person who appears in the Programs: (i) all names ever used by each performer (including, but not limited to, maiden name, alias, nickname, stage name or professional name) and each performer's address and (ii) a legible photocopy of each performer's government-issued identification card, such as a driver's license or passport, which contains a recent and recognizable photograph of the performer. In addition, if the delivered footage contains either ASEC, or LEG or SSEC for which no Certification is available, then Licensor shall ensure that each copy of the footage, and the end credits provided to FR, contain the statement required pursuant to U. S.C. § 2257 and 28 C.F.R. § 75.6.

## 19. Indemnification.

19.1. Licensor will at all times, and at its own cost and expense, defend, indemnify and hold FR, its parent, subsidiary and affiliated companies, and their respective successors, licensees, exhibitors, broadcasters, distributors, and assigns and their respective officers, directors, shareholders, employees, attorneys, agents and other representatives harmless from and against any and all claims, actions, suits, judgments, obligations, damages, losses, penalties, liabilities, costs and expenses (including, without limitation, court costs and reasonable outside attorney fees and disbursements) of whatsoever kind and nature imposed on, incurred by, or asserted against FR in any demand, action, suit, claim or proceeding between FR and any third party, arising out of or in connection with the exercise of any of the Rights granted herein or out of any breach or alleged breach by Licensor of any representation, warranty, covenant, or other provision set forth in this Agreement.

19.2. FR will at all times, and at its own cost and expense, defend, indemnify and hold Licensor, its parent, subsidiary and affiliated companies, and their respective successors and assigns and their respective officers, directors, shareholders, employees, attorneys, agents and other representatives harmless from and against any and all third party claims, actions, suits, judgments, obligations, damages, losses, penalties, liabilities, costs and expenses (including, without limitation, court costs and reasonable outside attorney fees and disbursements) of whatsoever kind and nature imposed on, incurred by, or asserted against Licensor in any demand, action, suit, claim or proceeding between

DocuSign Envelope ID: 3A43DD1C-2BCF-465E-8BDD-3698096D2521

Licensor and any third party, arising out of any breach or alleged breach by FR of any representation, warranty, covenant or other provision set forth in this Agreement.

**20. Breach/Cure**. No failure by either Party to fulfill any of its obligations hereunder shall constitute a breach of this Agreement by such Party unless and until the non-breaching Party has provided the breaching Party with written notice specifying such failure(s) and the breaching Party has failed to cure such breach within thirty (30) days after receipt of such notice.

**21. Limitation of Liability**. IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY IN CONNECTION WITH THIS AGREEMENT FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES (INCLUDING LOSS OF PROFITS OR DATA), HOWEVER CAUSED AND REGARDLESS OF THE THEORY OF LIABILITY, EVEN IF A PARTY HAS BEEN ADVISED OR IS AWARE OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING LIMITATION OF LIABILITY SHALL APPLY TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW. LICENSOR AGREES THAT FR'S MAXIMUM LIABILITY SHALL BE EQUAL TO THE ROYALTIES DUE FROM ACTUAL GROSS RECEIPTS RECEIVED BY FR, IF ANY.

**22. Dispute Resolution; Remedies; Governing Law**.

22.1. Dispute Resolution. Subject to Section 20, any controversy, claim, or dispute arising out of or related to this Agreement or the interpretation, performance, or breach hereof, including without limitation alleged violations of state or federal statutory or common law rights or duties, shall be resolved according to the procedures set forth herein, which shall constitute the sole and exclusive dispute resolution mechanism to resolve all disputes.

   22.1.1. Mediation. The Parties agree to try in good faith to settle the dispute by mediation administered by the American Arbitration Association ("**AAA**"). The Parties agree to share the cost of any independent mediator engaged to assist the Parties in resolving their differences. The mediator shall be a person with at least five (5) year experience mediating entertainment disputes, unless the Parties agree otherwise in writing.

   22.1.2. Arbitration. If the Parties are unable to resolve one or more dispute(s) by mediation, pursuant to the rules of and administered by the AAA, either Party may elect to initiate arbitration before the AAA in order to resolve the dispute before a single arbitrator agreed upon by both Parties, who shall be located in New York County and have at least five (5) year experience handling entertainment disputes and who is not affiliated with, and has no pre-existing relationship with, either of the Parties. The decision of the arbitrator will be final, non-appealable, and binding on the Parties for all purposes. The prevailing Party in any arbitration between the Parties shall recover from the other Party its reasonable outside legal fees and expenses.

22.2. Remedies. In the event of any dispute relating to the subject matter of this Agreement, Licensor will be limited to monetary damages, if any, actually sustained by Licensor. Excluding failure of FR to pay either the License Fee or Advance when due, in no event will Licensor be entitled by reason of breach or default to revoke, terminate, rescind, or alter this Agreement or to enjoin or restrain FR's distribution or advertising of the Programs or FR's exploitation of the Rights, or to seek, accept, apply for, or obtain any equitable remedies whatsoever.

22.3. Governing Law. This Agreement will be governed by and interpreted in accordance with the laws of the State of New York, without regard to its conflicts of law principles.

**23. Morals; Sexual Harassment; Discrimination; Offensive Content.** Notwithstanding anything herein to the contrary: (a) in the event that Licensor or any of the principal talent connected to the Programs, including, without limitation, the producer, director, lead actors, etc. (collectively, "**Key Elements**"): (i) commits or has committed or is charged with committing a misdemeanor or felony of moral turpitude; (ii) commits or has committed or is accused of committing an act involving moral turpitude under federal, state, or local law (regardless of whether such conduct is a misdemeanor or felony); (iii) violates the terms of any parole or probation to which the Key Element is or may become subject; or (iv) commits or has committed an act of significant public disrepute or becomes the subject of a scandal such that FR believes, in its sole discretion, that the marketability of the Programs or FilmRise's corporate image has been or will be negatively affected; or (b) In the event that any element of the Programs contains images, scenes, words, dialogue or audio that is offensive or discriminatory in nature; then, in any such event, FR shall have the right to: (i) cease or suspend distribution of the Program(s); or (ii) modify or edit the Programs to the extent necessary to remove the Key Element or offending content from the Programs.

**24. Notices.** Any and all notices which either Party will desire or be required to give to the other hereunder will be in writing and must be personally delivered or be sent by registered or certified mail, postage prepaid, or by courier at the addresses set out in the Agreement, or to such other address as any Party may designate by written notice to the other during the Term. Any such notice will be deemed to have been delivered: (a) immediately in the case of personal delivery; or (b) in the case of postal delivery on the second business day following the date of posting (the fifth business day if posted to another country) or on acknowledgement of receipt if earlier.

**25. Assignment.** This Agreement will inure to the benefit of and be binding upon Licensor and its successors and assigns and upon FR and its successors and assigns. Notwithstanding the foregoing, Licensor may not make any assignment of any of its rights or obligations under this Agreement, unless it has obtained the prior written consent of FR. FR may assign this Agreement or any or all of its rights hereunder to any person or entity at any time.

**26. Residuals.** Licensor will be solely responsible for payment of any union or guild residuals required to be paid based on FR's exploitation of the Rights pursuant to this Agreement. If any residuals are due, Licensor shall deliver to FR written documentation evidencing the timely payment of residuals to a payroll company administering residuals in connection with the Programs, or directly to the guild(s) or to the relevant individual(s), failing which FR may, at FR's sole discretion, deduct from monies otherwise payable to Licensor the amount of the residual payment amounts plus any direct, actual, out-of-pocket costs or expenses associated with the payment or calculation of the residual payments, including but not limited to the cost of any payroll processing service. In such event, FR will calculate the residual payments based upon the accounting statements rendered by FR to Licensor pursuant to this Agreement and based upon the information given to FR as part of delivery.

**27. Cutting/Editing.** Subject to any restrictions that Licensor provides to FR within ninety (90) from the Date of Agreement or ninety (90) days of FR's receipt of the Future SM Programs, FR and/or its licensees shall have the right to perform industry-standard edits to the Programs, such as to superimpose ratings, content advisories, and/or network logos; to comply with any government censorship agency; to insert commercials and other announcements; for broadcaster standards and practices (including, but not limited to, creating broadcast safe versions or versions that less restrictive than "R" rated); for time purposes; and/or as required by any broadcast or network licensee. Notwithstanding the foregoing, FR shall not edit any copyright notices, credits, or production logos contained in the Programs. No casual or inadvertent failure by FR nor any failure by a third party to comply with any such credit obligations shall be deemed a breach of this agreement, provided that FR shall use its reasonable efforts on a prospective basis to cure or to cause the cure of such failure.

**28. Confidentiality**. The financial terms of this Agreement shall be confidential except where required by law, rule, or regulation, and except that this Agreement may be shared with a Party's affiliates, accountants, consultants, agents, banks, investors (including potential investors) and financial partners. Neither party shall issue or authorize the issuance of any press release or public announcement concerning the agreement or the transmission of the Programs hereunder without first obtaining the other's prior written approval thereof.

**29. Complete Agreement**. This Agreement supersedes and cancels all prior negotiations and understandings between the Parties and contains all of the terms, conditions, and agreements of the Parties with respect to the transactions contemplated herein and no warranties, representations, or agreements have been made between the Parties except as herein expressly set forth. This Agreement may not be amended or modified except by a writing signed by both Licensor and FR or their duly authorized representatives. If the terms of any other agreement between the Parties hereto conflict with this Agreement, the terms of this Agreement will prevail.

**30. Counterparts**. This Agreement may be executed in any number of counterparts and each such counterpart hereof shall be deemed an original instrument, but all such counterparts together shall constitute but one agreement. The Parties agree that facsimile, PDF, and electronic copies and signatures shall be treated as originals, fully binding and with full legal force and effect, and hereby waive any rights they may have to object to such treatment.

\* \* \* \* \*

In agreement to the foregoing, and to Schedules A through D and Exhibit 1, which are incorporated here by reference and form a part of this Agreement, the Parties' authorized representatives affix their signatures. This Agreement shall have no legal effect until and unless signed by both Parties in the space provided below.

**ACCEPTED AND AGREED:**

**SCREEN MEDIA VENTURES, LLC**
(**"Licensor"**)

By: _David Fannon_
    David Fannon, Managing Member

Date: 6/29/22

**ACCEPTED AND AGREED:**

**FILMRISE ACQUISITIONS LLC**
(**"FR"**)

By: _Danny Fisher_
    Danny Fisher, CEO, Manager FilmRise

Date: 6/29/2022

## <u>SCHEDULE A – DEFINITIONS</u>

"**Ad-Supported Streaming Rights**" means the communication of the Programs to the public via any means, including without limitation the Internet, online, digital, mobile services, smart TVs, or hybrid transmissions that include digital transmissions, where the viewer's right to view the Programs, whether at a time selected by the viewer ("**AVOD**") or as part of a pre-scheduled linear format ("**FAST**"), and where such communication includes advertising. Ad-Supported Streaming Rights shall include instances where an ad-supported service requires the right to make the Programs available on its service on an ad-free basis for a periodic fee. These Rights include the functionality that would allow a viewer to, during the streaming of a Program, to restart, rewind, fast forward or pause such Program, as well as catch-up rights to allow viewers to elect to view the Program after its linear stream.

"**Allied and Incidental Rights**" Subject to third party restrictions, provided to FR means (i) the right to advertise, market, publicize, and promote the Programs, including the Delivery Materials, by any and all methods and means in any and all media, including without limitation over the Internet and through online media; (ii) the right to use the names, photographs, likenesses, caricatures, biographies, and voices of all talent engaged in connection with the Programs in connection with the advertising, marketing, promotion, and exploitation of the Programs and in commercial tie-ins and cross-promotions in any and all media; (iii) subject to Paragraph 27 of the Agreement, the right to dub and/or subtitle the Programs, subject to any restrictions that Licensor provides to FR within ninety (90) from the Date of Agreement or ninety (90) days of FR's receipt of the Future SM Programs; (iv) the right to cut, edit, time compress and/or alter the Programs, including without limitation by changing the format, inserting commercial trailers, or otherwise; and (v) the right to include FR's (or any affiliate, licensee or sub-distributor) name, logo, and trademarks at the beginning and end of the Programs and in all advertising and promotion materials.

"**Distribution Expenses**" means the aggregate of all verifiable, direct, third party, out-of-pocket costs and expenses paid or incurred or caused to be paid or incurred in connection with creating broadcast versions of the Programs and creating dubbed/subtitled or other language versions of the Programs and closed caption files that are not delivered.  For the avoidance of doubt all costs associated with exploitation solely on the FilmRise Streaming Network and FilmRise owned and operated YouTube Channels are excluded from Distribution Expenses

"**Electronic Sell-Through**" means the communication of the Program or part thereof to a consumer by means of transmission of an electronic copy via the Internet or private or virtual private networks, or by any mobile or wireless technology, for the reception and permanent use and enjoyment of the Program by such consumer, upon payment of a purchase fee by such consumer for the particular Program.

"**FilmRise Streaming Network**" means apps, pages, and linear streaming channels (also known as FAST channels) existing or to be created during the Term that are owned, operated, acquired, or branded by, or syndicated through FR or any of its affiliates, now or in the future, and that are transmitted via any and all digital media or hybrid digital media now known or created in the future. The FilmRise Streaming Network also consists of FilmRise Branded apps that are available on mobile phones, Roku, Amazon Fire, Apple TV, smart TVs and other devices and platforms. The FilmRise Streaming Network also includes without limitations sites within third party platforms and FAST channels that are operated, programmed, or syndicated by FR or any of its affiliates, which may be available on third party platforms, apps, or services, including without limitations Hisense, Freevee, Pluto, Redbox, Samsung TV Plus, TCL, The Roku Channel, Tubi, Vizio, Vudu, Xumo, and YouTube.

"**Free TV**" means the linear over-the-air broadcast of scheduled programs onto a television set without a charge to the viewer. Government television assessments or taxes will not be deemed a charge to the viewer.

DocuSign Envelope ID: 3A43DD1C-2BCF-465E-8BDD-3698096D2521

"**Home Video**" means the distribution and exploitation of the Program on any tangible medium (whether now known or hereafter created) including, but not limited to, videocassette, compact disc, DVD, videodisc, Blu-Ray disc ("Videograms"), whether by sale, rental, lending or otherwise.

"**Pay TV**" means the linear broadcast of scheduled programs via cable network or satellite network onto a television set where a periodic fee is charged to the viewer to access such linear broadcast.

"**Subscription Video on Demand**" or "**SVOD**" means a subscription video-on-demand service, whereby a periodic charge is charged to the viewer in respect of a certain period, during which period the viewer can view the Program along with a bundle of other programs an unlimited number of times and at times selected by the viewer.

"**Third Party Owned YouTube Channel**" means a channel programmed by a third party producer, content creator, or distributor other than Alphabet, Inc., owner of Google.

"**Transactional Video on Demand**" or "**TVOD**" means the communication of the Program or part thereof to the public by means of transmission of an electronic copy of the Program via any Electronic Sell-Through or Electronic Rental service.

*[The remainder of this page is intentionally left blank.]*

**SCHEDULE B**
**DELIVERY MATERIALS**

| Section B – VIDEO Feature Elements | | |
|---|---|---|
| B.1 | **HD (If Available)**<br>  APPLE ProRes 422 HQ 1080p 23.98fps (or **native** frame rate) 16x9 OAR closed blacks<br><br>Audio:<br>**(If Available)**<br>  L,R,C,Lfe,Ls,Rs,Lt,Rt (8 **Mono** Tracks, PCM, 24-bit, 48kHz, Little Endian)<br>**Or**<br>  Stereo (2 Mono Tracks or 1 Stereo Track, PCM, 24-bit, 48kHz, Little Endian)<br><br>**SD**<br>  APPLE ProRes 422 HQ 720x480i 29.97fps (or **native** frame rate)<br><br>Audio:<br>  Stereo (2 Mono Tracks or 1 Stereo Track, PCM, 24-bit, 48kHz, Little Endian) | |
| B.2 | As available, If the film contains any English subtitles, then a secondary master conforming to B.1 above will need to be delivered <u>without subtitles</u>. A separate STL or SRT file for subtitles will also need to be provided. | |
| B.3 | As available, TEXTLESS ELEMENTS: APPLE Pro Res 422 HQ 1080p 23.98 16x9 OAR closed blacks. Audio: MOS (silent) | |
| B.4 | As available 5.1 and stereo DME (Dialogues, Music & Effects) stems conforming to delivered feature frame<br>rate as .wav files | |
| Note: | Open blacks, Field based standards conversions or up conversions to 1080p are NOT acceptable for delivery | |
| Section F – Documentation and Exploitation - All Documentation to be delivered in English | | |
| F.2 | UNDERLYING RIGHTS AND CHAIN OF TITLE | |
| (a) | Music Licenses – To the extent available | |
| (b) | Music Cue Sheets – as available | |
| F.3 | ANCILLARY DOCUMENTS | |
| (a) | A Bound E&O Policy, E&O Certificate and Additional Insured Endorsement following FR E&O protocol. | |
| (b) | IRS Form W-9 or W-8BEN-E | |
| F.4 | As available, Feature & trailer Dialogue/Spotting/Continuity List in a digital format (WORD or EXCEL). If the Programs are in a foreign language, one (1) copy in the foreign language and one (1) copy in English. To the extent available | |
| F.5 | English subtitle file (if applicable and as available) | |
| F.6 | English Language Closed Caption file(s) (.scc) created by an FR approved vendor - case sensitive and 'pop up' format. (NO all uppercase formatted files will be accepted) All music lyrics need to be captioned. | |

| F.7 | As available, Ratings information for each Program | |
|---|---|---|
| F.9 | MARKETING (all as available) | |
| (a) | Credit Statement: Paid Advertisements Credits & Name/Likeness Requirements | |
| (b) | Dubbing/Editing Restrictions - Need letter on letterhead even if "none" to the extent available | |
| (c) | Credit Block in digital form (WORD Doc) with copyright line and list of all required logos and subsequent delivery of all required as a digital file (TIFF, EPA, or J-PEG) logos | |
| (d) | Key Art in PSD or INDD layered files/300 DPI and RGB color space | |
| (e) | Digital Photography - minimum 10 color images depicting key scenes in the Program approved and cleared for all use - including 'unit', 'gallery' and 'behind the scenes'. | |
| (f) | EPK including 4 approved clips from the program to the extent available | |
| (g) | No less than 30 minutes of bonus material / "Making of" Featurette/Promo/ and statement of Clearance to the extent available | |
| (h) | FilmRise metadata form filled out for the Programs. | |

**PLEASE NOTE: WATERMARKS AND URL'S OR WEBSITE ADDRESSES MAY NOT APPEAR ON ANY OF THE CONTENT, INCLUDING ON THE CREDITS.**

## Technical Specifications

1. All drives delivered will be the property of FR

2. M&E's must be fully filled

3. Closed caption files need to be "pop-on" not "roll-up." They must be case sensitive. No all uppercase allowed

4. There are to be no commercial blacks. All blacks are required to be closed.

5. Field based standards conversions or up conversions to 1080p are NOT acceptable for delivery

6. All broadcast deliverables must adhere to standard broadcast practices and standards

All Delivery Materials are to be provided to FilmRise at Licensor's expense and sent to:

    FilmRise
    220 36th Street, 4th Floor, Unit 4A
    Brooklyn NY 11232
    Attention: Gibson Merrick & Racquel Dixon

    Email: Gibson@FilmRise.com & RDixon@FilmRise.com

DocuSign Envelope ID: 3A43DD1C-2BCF-465E-8BDD-3698096D2521

# SCHEDULE C
# PROGRAMS & AVAILIBILITY SCHEDULE

**SCHEDULE D**
**BLACKPIX PROGRAMS**

| LIBRARY | PROGRAM TITLE |
|---|---|
| Screen Media | One Last Thing |
| Screen Media | Ripped |
| Screen Media | Shelter |
| Screen Media | Vince Carter: Legacy |
| Screen Media | Courage to Love |
| Screen Media | Teacher of the Year |
| Screen Media | Honeydripper |
| Sonar | Captive Heart: The James Mink Story |
| Sonar | Crown Heights |
| Sonar | Finding Buck McHenry |
| Sonar | For One Night |
| Sonar | Free of Eden |
| Sonar | In His Father's Shoes |
| Sonar | Inspectors 2, The |
| Sonar | Inspectors, The |
| Sonar | Just a Dream |
| Sonar | Kickasso |
| Sonar | Member of the Wedding, The |
| Sonar | Riot |
| Sonar | Ruby's Bucket of Blood |
| Sonar | Run for the Dream |
| Sonar | Sally Hemings: An American Scandal |
| Sonar | The Red Sneakers |
| Sonar | To Dance with Olivia |
| Sonar | Zooman |

DocuSign Envelope ID: 3A43DD1C-2BCF-465E-8BDD-3698096D2521

# EXHIBIT 1
# LAB ACCESS LETTER

DocuSign Envelope ID: 3A43DD1C-2BCF-465E-8BDD-3698096D2521

Screen Media Ventures, Lab ("**Laboratory**")
800 Third Avenue,
New York NY 10022
Attn: Alex Girard
Email:alex@screenmedia.net

### Re: *Laboratory Access Letter*

Dear Sir or Madam:

You hereby acknowledge that you are holding on deposit in the name of the undersigned ("**Licensor**") at the laboratory certain negative and pre-print materials, for the motion pictures and television programs set forth on **Exhibit 1** attached hereto ("**Materials**"). You further acknowledge that the Materials are of standard commercial quality and suitable for making duplicating materials from which commercially acceptable release prints of the Picture can be manufactured, including dubbed and subtitled versions thereof.

Licensor has granted to FilmRise ("**FR**") certain distribution and other rights in the Pictures. Accordingly, you are hereby instructed, authorized, and directed to provide access to the Materials to FR and to honor all orders for Materials of FR's and its successors, assigns and licensees with respect to such Materials.

All laboratory services and materials ordered by FR or its successors, assigns and licensees with respect to the Picture shall be at the sole cost and expense of Licensor. FR has agreed to take all materials on an as is basis.

You agree not to assert any claim or any lien at common law or under any statute or otherwise against FR or its successors, assigns or licensees or against any materials relating to the Materials by reason of any unpaid charges incurred by any other party.

You will not refuse to honor any of the orders of FR or its successors, assigns or licensees by reason of any unpaid charges incurred by any other party.

The instructions, authorizations, and directions herein in favor of FR are being relied on by FR and are coupled with an interest and may not be revoked, rescinded or in any way modified without the written consent of FR.

Please confirm by signing in the space provided below that you agree to fill all orders from FR or Licensor, as the case may be, in accordance with the terms and provisions set forth herein.

**ACKNOWLEDGED AND AGREED TO:**               **ACKNOWLEDGED AND AGREED TO:**

**Screen Media Ventures, LLC ("licensor")**      **Screen Media Ventures, Lab ("Laboratory")**


By: *David Fannon*                              By: *David Fannon*
Its: President                                  Its: President


**CONFIRMED:**
**FilmRise**

By: _____
    CEO, Manager, FilmRise

DocuSign Envelope ID: 3A43DD1C-2BCF-465E-8BDD-3698096D2521

# Laboratory Access Letter – Exhibit 1

# Screen Media DSTBN (SM Sonar 1091) 20220629 Execution[42]

**Final Audit Report** 2022-06-29

| | |
|---|---|
| Created: | 2022-06-29 |
| By: | Matthew Warshay (matthew.warshay@screenmedia.net) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAhL-Epc4It59lEF88ROrVemhvCH0cxPWP |

## "Screen Media DSTBN (SM Sonar 1091) 20220629 Execution[42]" History

📄 Document created by Matthew Warshay (matthew.warshay@screenmedia.net)
2022-06-29 - 7:09:03 PM GMT

📧 Document emailed to David Fannon (david@screenmedia.net) for signature
2022-06-29 - 7:09:55 PM GMT

📄 Email viewed by David Fannon (david@screenmedia.net)
2022-06-29 - 7:12:34 PM GMT

✍️ Document e-signed by David Fannon (david@screenmedia.net)
Signature Date: 2022-06-29 - 7:13:08 PM GMT - Time Source: server

✅ Agreement completed.
2022-06-29 - 7:13:08 PM GMT

**Adobe Acrobat Sign**