# EXHIBIT 10-C

## IFTA® MULTIPLE RIGHTS DISTRIBUTION AGREEMENT (TELEVISION AND LIBRARY)

This Multiple Rights Distribution Agreement (Agreement) is made as of December 30, 2022 (Effective Date) between the following Licensor and Licensee:

**Licensor**: Screen Media Ventures, LLC

    Address: 800 Third Avenue, 3rd Floor, New York, NY, USA

    Tel: USA (212) 308-1790

    Attn: William Rouhana        E-Mail: wrouhana@chickensoupforthesoul.com

**Licensee**:

    RH Capital, Inc.

    Address: 1349 Old Post Road, Pound Ridge, NY 10576

    Tel: (203) 515-5763

    Attn: Robert Halmi        E-Mail: RH@thestudiofund.com

Subject to timely payment of the License Fee, Licensor licenses to Licensee, and Licensee accepts from Licensor, the Licensed Rights in the Programs throughout the Territory for the Term in the Authorized Languages on the terms and conditions of this Agreement.

This Agreement has been prepared using the International Multiple Rights Distribution Agreement, Version 2018 Form, promulgated by the Independent Film & Television Alliance® (IFTA®). This Agreement may also include additional IFTA® Forms and in which case the IFTA® Forms are those current as of the Effective Date of this Agreement. The Parties acknowledge that IFTA® has only authorized use of the IFTA® trademark in this Agreement where no change has been made to the applicable IFTA® Form except to insert information in the Deal Terms or where mutually agreed by the Parties and reasonably identified as such.

This Agreement consists of the following parts: this Cover Page; IFTA® International Deal Terms; IFTA® International Standard Terms; IFTA® International Schedule of Definitions; IFTA® International Schedule of Territory Definitions. Any IFTA® Form referenced in the Deal Terms or the Standard Terms which is not attached to this Agreement is incorporated by reference. Current versions of the IFTA® International Standard Terms and IFTA® International Schedule of Definitions are accessible at www.ifta-online.org. All parts of this Agreement should be interpreted together to form one Agreement, but, in case of conflict of terms, those terms inserted in the Deal Terms to complete the Agreement and specific terms mutually agreed by the Parties will prevail over pre-existing terms in any IFTA® Form.

*In Witness Whereof,* Licensor and Licensee through their authorized signatories have executed this Agreement as of the Effective Date above to be a binding contract between them.

LICENSOR:                    LICENSEE:

*David FaNNON*                     *Robert Halmi*

By: _____        By: _____

Title: _____President_____      Title: _____President_____

Copyright 2018 IFTA®. All Rights Reserved.                     V: 2018

# TABLE OF CONTENTS

*Section*                                                                                    *Paragraph*

**Deal Terms**
    Basic License Terms...................................................................................I.
    Licensed Rights Terms ............................................................................II.
    Financial Terms.......................................................................................III.
    Delivery Terms ........................................................................................ IV.
    Additional Terms ..................................................................................... V.


**Standard Terms**                                                                            *Page*
1. Definitions And Usage ............................................................................ 1
2. Program And Version .............................................................................. 1
3. Licensed Rights And Reserved Rights ................................................... 2
4. Allied Rights............................................................................................ 2
5. Territory .................................................................................................. 3
6. Term, License Period and Holdbacks ................................................... 4
7. Use Provisions ........................................................................................ 4
8. Gross Receipts Provisions ...................................................................... 5
9. Recoupable Costs Provisions ................................................................. 6
10. Payment Requirements .......................................................................... 7
11. Accountings............................................................................................ 9
12. Delivery, Acceptance And Return ......................................................... 11
13. Exploitation Obligations ....................................................................... 14
14. Music...................................................................................................... 12
15. Suspension And Withdrawal .................................................................. 16
16. Default, Breach, Remedies and Termination ........................................ 16
17. Intellectual Property Protection Provisions........................................... 15
18. Licensor's Representations and Warranties ........................................... 19
19. Licensee's Representations and Warranties ........................................... 20
20. Indemnities ............................................................................................ 17
21. Assignment And Sublicensing ............................................................... 17
22. Notice Provisions................................................................................... 18
23. Miscellaneous Provisions....................................................................... 18


**Schedule of Definitions**
    Cinematic Rights ..................................................................................... A.
    Ancillary Rights........................................................................................B.
    PayPerView Rights....................................................................................C.
    Pay TV Rights ......................................................................................... D.
    Free TV Rights .........................................................................................E.
    Video Rights.............................................................................................F.
    VOD Rights .............................................................................................. G.
    EST Rights…………………………………………………………...H.
    Additional Definitions ..............................................................................I.

**IFTA® INTERNATIONAL DEAL TERMS**
*All Licensed Rights are defined in the IFTA® International Schedule of Definitions.  Any Right not specifically licensed to Licensee in the Licensed Rights Terms is reserved by Licensor.*

**I.**
**BASIC LICENSE TERMS**

**A. Programs**:
As set forth in Schedule A attached hereto and incorporated herein by reference. Each a "Program" and, collectively, the "Programs".

**B. Territory**: All.

**C. Term and License Period**:
**Term**:  The Term of this Agreement starts on the Effective Date indicated on the Cover Page and continues until the end of the License Period for all Licensed Rights.
**License Period**: Subject to Licensor's underlying rights as set forth on Schedule A, the License Period for all Licensed Rights commences on the date hereof and continues until December 31, 2027. Licensee shall have the right to enter into license agreements that extend 3 years beyond the end of the License Period.

**D. Language**:
Authorized Language(s): Original Language / Local Language(s)

# II.
# LICENSED RIGHTS TERMS

**A. Licensed Rights**:

   Licensor grants to Licensee non-exclusive *SVOD* (or *Subscription VOD*) Rights only. SVOD means making available a digital Motion Picture Copy by Internet Streaming to a user who is required to pay a set fee for a specified period to view the Motion Picture Copy along with other Motion Pictures available on the licensed service making available such Motion Pictures.

**B. Reservations and Exceptions**:

The following are exceptions to the grant of the Licensed Right(s) in the Programs:

Licensee shall license Licensor the SVOD rights on a non-exclusive basis.

**C. Uses**:

All SVOD on a non-exclusive basis.

**D. Holdbacks**:

The Programs are available immediately, there are no holdbacks.

# III.
# FINANCIAL TERMS

**A. License Fee**: License Fee shall be Twelve Million US Dollars ($12,000,000).

The License Fee is non-refundable and no deductions of any kind may be made from it. The Base Currency is the currency in which the License Fee is denominated and applies to all payments and recoupments under this Agreement. If not otherwise indicated the Base Currency is United States Dollars.

**B. License Fee Payments**: Licensee will pay Licensor the License Fee in the following installments based on occurrence of the following events:

1. No later than March 1, 2023: $6,000,000; and
2. No later than June 1, 2023: $6,000,000.

**C. Payment Requirements**:

1. **Payment Notice**: For each Installment of the License Fee, Licensor will provide Licensee with a Payment Notice when the payment is due consisting of an Invoice designating the amount due and, if necessary, any document indicating occurrence of the payment triggering event within Licensor's control (*e.g.* a Notice of Initial Delivery). Licensee's payment of the invoiced amount will be due immediately upon Licensee's receipt of such Payment Notice.

2. **Payment Account**: For each Payment, Notice Licensee will pay the amount indicated in the Invoice by wire transfer of unencumbered funds, free of any transmission charges, to the following account(s):

[X] The payment account designated in each applicable Invoice.

3. **Payment Security / Letter of Credit**: **NONE**

# IV.
# DELIVERY TERMS

**A.  Delivery Materials**:

Licensee acknowledges and agrees that upon execution of this Agreement Licensor has satisfied its delivery requirements by providing Licensee with a fully executed Lab Access Letter as set forth in Schedule B, and Licensee further acknowledges that it is accepting delivery on an as is basis.

# V.
# ADDITIONAL TERMS

**A. Governing Law**: New York.
   This Agreement will be governed by and interpreted under the Governing Law set forth above.

**B. Dispute Resolution**:
   Any dispute arising under this Agreement, including with respect to any right or obligation that survives termination of this Agreement, will be administered and resolved by binding arbitration under the IFTA® Rules for International Arbitration ("IFTA® Rules") in effect as of the Effective Date and in accordance with Paragraph 16.7. of the IFTA® International Standard Terms.  The IFTA® Rules are available at www.ifta-online.org.

**C. Forum**: New York, New York.
   The exclusive location for resolving disputes under this Agreement is the Forum set forth above.  To the extent allowed by the Governing Law, venue will be proper in any court in the Forum.

**D. Bankability:**
   If Licensee's contract is not considered bankable, then Licensee agrees to provide satisfying financial information to the bank, or the Licensor shall have the right to cancel this Agreement at its sole discretion.

**E. Refund:**
   It is herewith understood and agreed that in case Licensee is entitled to make a certain claim or receive payment or a refund of any monies paid under this Agreement, such claims or refund are subject to Licensor claiming and receiving such refund from the company from which Licensor acquired the rights.  It is understood that the acceptance of the above does not waive any right or remedy Licensee may have against Licensor's predecessor-in-interest, and Licensee may proceed directly against Licensor's predecessor-in-interest before any breach of this Agreement (including, without limitation, refunds or rebates and claims of other amounts with respect to the Programs) without first proceeding against Licensor or exhausting ay right or remedies against Licensor.

**F. Cutting/Editing:**
   Licensee (and Licensee's subsidiaries, parent, affiliate, sub-Licensee and sub-licensees) will not cut or edit the Programs and must comply with all editing restrictions supplied by Licensor on Delivery. Licensee, at its costs, may edit the Programs as reasonably necessary to meet censorship requirements in the Territory or as required for broadcast standards and practices or to format the Programs for television broadcast time periods, provided that all such editing is subject to the rights of the producer and/or director.  Notwithstanding the above, all editing must be approved by Licensor.

**G. Marketing Materials:**
   1. In the event that Licensee wishes to use any other material other than the approved marketing materials supplied by Licensor, Licensee must obtain Licensor's prior written approval prior to the use of such materials and Licensee shall indemnify Licensor (and all of its officers, directors, members, subsidiaries, and any party or entity from whom Licensor obtained rights relating to the Programs) for all costs, claims and damages which may be incurred by them as a result of Licensee's creation and use of such Licensee created materials.

2. Licensee is prohibited from contacting any producer, director, actor, writer, and/or any other party related to the production of the Programs (including such party's agent, lawyer, or other representatives) other than Licensor, without Licensor's prior written approval.

3. Licensee will not enter into any sponsorship or commercial tie-in arrangement with respect to the Programs without Licensor's prior written approval, and in no event will Licensee use the names and likenesses of any individual associated with the Programs as an endorsement of any kind of product or service.

4. For the purposes of this Paragraph G, Licensee shall include Licensee's subsidiaries, parent, affiliate, sub-Licensee and sub-licensees.

**H. Default / Dispute**:

The Prevailing Party in any dispute under this Agreement will be entitled to collect all costs of suit, including reasonable outside attorneys' fees.

Licensee will be in material default under this Agreement if Licensee or any Licensee Affiliate is in uncured material breach of any other distribution agreement with Licensor executed within eighteen (18) months before or after the Effective Date of this Agreement, which default will be subject to the notice and cure provisions in Paragraph 16.2. of the Standard Terms. If Cover Page indicates Licensor is defined as Sales Agent acting on behalf of Producer, Licensor may exercise cross default to any other distribution agreement on behalf of any other producer.

**I. Notices**:

All notices from Licensee to Licensor regarding payments and invoicing will be made to:
Gary Sakalian gary@screenmedia.net     Cc: Susie Lee susie@screenmedia.net

All notices and requests from Licensee to Licensor regarding delivery will be made to:
Pamela Popp ppopp@chickensoupforthesoul.com
Cc: Alex Girard Alex@screenmedia.net
Cc: Rene Cabrera Rene.Cabrera@screenmedia.net

All notices from Licensor to Licensee will be made to:
Robert Halmi:  RH@thestudiofund.com

<u>SCHEDULE A</u>

List of Non-Exclusive SVOD Programs – Provided by email

SCHEDULE B

LABORATORY ACCESS LETTER


December 30, 2022


Screen Media Ventures, Lab ("Laboratory")

800 Third Avenue,

New York NY 10022


Attn: Alex Girard


Email:alex@screenmedia.net

**Re: Laboratory Access Letter**

Dear Sir or Madam:


You hereby acknowledge that you are holding on deposit in the name of the undersigned ("**Licensor**") at the laboratory certain negative and pre-print materials ("**Materials**"), for the motion pictures and television programs set forth on Exhibit 1 attached hereto ("**Pictures**"). You further acknowledge that the Materials are of standard commercial quality and suitable for making duplicating materials from which commercially acceptable release prints of the Pictures can be manufactured, including dubbed and subtitled versions thereof.


Licensor has granted to RH Capital, Inc. ("RHC") certain distribution and other rights in the Pictures. Accordingly, you are hereby instructed, authorized, and directed to provide access to the Materials to RHC and to honor all orders for Materials of RHC and its successors, assigns and licensees with respect to such Materials.


All laboratory services and materials ordered by RHC or its successors, assigns and licensees with respect to the Pictures shall be at the sole cost and expense of the party ordering same. RHC has agreed to take all materials on an as is basis. You agree to look solely to such party for payment of such charges.


You agree not to assert any claim or any lien at common law or under any statute or otherwise against RHC or its successors, assigns or licensees or against any materials relating to the Materials by reason of any unpaid charges incurred by any other party.


You will not refuse to honor any of the orders of RHC or its successors, assigns or licensees by reason of any unpaid charges incurred by any other party.


None of the Materials shall be removed from your possession without the written consent of RHC and Licensor.


The instructions, authorizations and directions herein in favor of RHC are being relied on by RHC and are coupled with an interest and may not be revoked, rescinded or in any way modified without the written consent of RHC.

Please confirm by signing in the space provided below that you agree to fill all orders from RHC or Licensor, as the case may be, in accordance with the terms and provisions set forth herein.

**Screen Media Ventures, LLC ("Licensor")**

By: *David FaNNON*
_____

Its: President
_____

**ACKNOWLEDGED AND AGREED TO:**

**Screen Media Ventures, Lab**

By: *David FaNNON*
_____

Its: President
_____

**CONFIRMED:**

**RH Capital, Inc.**

By: *Robert Halmi*
_____

Its: President
_____

# IFTA® INTERNATIONAL STANDARD TERMS

## 1. DEFINITIONS AND USAGE

    1.1.   **Definitions**:  Words and phrases with initial letters capitalized are Defined Terms.  If not defined where they first appear, Defined Terms are defined in the IFTA® International Schedule of Definitions current as of the Effective Date.  Territories are defined in the IFTA® International Schedule of Territory Definitions current as of the Effective Date.  Both IFTA® definition schedules are available on-line at http://www.ifta-online.org and are incorporated by reference.  In case of any inconsistency between the IFTA® Standard Terms or other Schedule and the Deal Terms, the Deal Terms prevail.  Terms not otherwise defined where they first appear or in the IFTA® schedules are defined by applicable industry custom and practice.

    1.2.   **References**:  Reference to any Right in this Agreement that is not specifically licensed in the Deal Terms is for convenience only and does not grant Licensee any such Right.

    1.3.   **Multiple Programs**:  If more than one Program is licensed in the Deal Terms, then all provisions of this Agreement apply to each Program individually unless otherwise provided.

## 2. PROGRAM AND VERSION

    2.1.   **Program**:  The Program is the Motion Picture identified by its current titles in the Deal Terms.  Licensor may change the title of the Program in its discretion.

    2.2.   **Key Element**:  A Key Element is a Person who is committed to render services or materials on the Program as indicated in the Deal Terms.  A Person will be deemed to have done so if the Person receives credit for so doing in the main or end titles of the Program.  For a director, this requirement will be satisfied if the director renders directing services through the end of Principal Photography.  If the Program as delivered does not include a Key Element which has not been duly replaced under Paragraph 2.3., then Licensee may declare Licensor in material default under Paragraph 16.3.

    2.3.   **Key Replacement**:  If Licensor elects to replace a Key Element, Licensor will give Licensee prompt Notice to such effect.  If the Deal Terms permit Key Replacement, Licensor's Notice will also indicate the replacement for the Key Element who has been accepted by the Person indicated in the Deal Terms, in which case Licensee may not refuse to accept Delivery of the Program or reduce the License Fee or Other Payments because of such replacement.  If the Deal Terms indicate replacement is subject to Licensee's approval, then Licensor's Notice will also indicate any available replacements and provide a reasonable time for Licensee to respond, which time may be reduced to not less than five (5) days from receipt of Licensor's Notice due to exigencies of production.  If Licensee does not give Licensor a Notice disapproving a proposed replacement within the time provided, the replacement will be deemed approved and Licensee may not refuse to accept Delivery of the Program or reduce the License Fee or Other Payments due to such replacement.  If Licensee does give timely Notice of permitted disapproval but Licensor nonetheless commits to use the proposed replacement in the Program, then Licensee may declare Licensor in material default under Paragraph 16.3.

    2.4.   **Version**: The Program is only licensed for viewing from beginning to end in substantially linear form and in authorized Dubbed, Subtitled, Parallel-Tracked or edited versions.  Licensee may also create and exploit, in conjunction with the applicable Licensed Right, enhanced Versions of the Program which include commentaries, EPKs, "making of" footage outtakes, the director's cut and the like, provided that applicable Delivery Materials to do so are delivered and subject to Licensor's Requirements in Paragraph 4.2.  However, this does not authorize any use of the Program in or as the basis for any interactive or video game.  Except as provided in this Agreement, the Program and its trailers must be exhibited at all times substantially in their original continuity, without alteration, interpolation, cut, or elimination.

**3. L<small>ICENSED</small> R<small>IGHTS</small> A<small>ND</small> R<small>ESERVED</small> R<small>IGHTS</small>**

    3.1.    **License Grant**:  Subject to the terms of this Agreement, Licensor licenses to Licensee, exclusively, except as set forth in the Deal Terms, the Licensed Rights in the Program, throughout the Territory for the Term in the Authorized Languages subject to the Exceptions, Uses, and Holdbacks as set forth in the Deal Terms and the Reservation of Rights.

    3.2.    **Reservation of Rights**:  All rights not expressly licensed to Licensee are Reserved Rights which Licensor may exploit without restriction except as provided in this Agreement.  Licensor's Reserved Rights include the exclusive right to grant, exploit or authorize any Secondary Rights for the Program, and to claim, collect, and administer any resulting Secondary Royalty Income.

    3.3.    **Reversion of Rights**:  All Licensed Rights will immediately revert to Licensor free of any claim by Licensee or other Person on the end of the applicable License Period for the Licensed Rights, but no later than the end of the Term as provided in Paragraph 6.1.

    3.4.    **Exclusive Grant**:  If any Licensed Right is granted exclusively to Licensee, then Licensor may not exploit or authorize exploitation of such Licensed Right in the Authorized Language(s) in the Territory during any License Period when Licensee may exploit the exclusive Licensed Right.

    3.5.    **Non-Exclusive Grant**:  If any Licensed Right is granted non-exclusively to Licensee then Licensor may exploit and authorize exploitation of such Licensed Right in any languages including the Authorized Language(s) in the Territory at any time but subject to any Licensor Holdbacks or Use requirements.

**4. A<small>LLIED</small> R<small>IGHTS</small>**

    4.1.    **License**:  Subject to the terms of this Agreement and Licensor's Requirements, Licensor grants to Licensee in addition to the Licensed Rights the non-exclusive license to use the following Allied Rights in the Program within the Territory during the Term:

        4.1.1.    To advertise, publicize and promote exploitation of the Licensed Rights in the Program in the Territory, and in so doing to use the title of the Program, the advertising and promotional materials supplied by Licensor or created by Licensee under this Agreement, and the name, voice and likeness of any Person rendering materials or services on the Program but not as an endorsement for any product or service other than the Program;

        4.1.2.    To include before the beginning or after the end of the Program the credit or logo of Licensee;

        4.1.3.    To change the title of the Program after first obtaining Notice of Licensor's approval;

        4.1.4.    To dub, subtitle, or parallel track the Program in accordance with the Authorized Language Uses in the Deal Terms but only in the Authorized Language(s);

        4.1.5.    To edit the Program to meet exhibition requirements after first obtaining Notice of Licensor's approval;

        4.1.6.    To allow insertion of commercial announcements before the start or after the end of the Program and during the continuity of the Program as commercially reasonable;

        4.1.7.    To use the name, logo, banner, and other identified trademarks of Licensor solely in connection with exploitation the Program and in compliance with Paragraph 4.6; and

        4.1.8.    To use clips from the Program for allowed advertising, marketing, and promotion either as supplied by the Licensor, or as otherwise approved by Licensor, to the extent that they are no more than three (3) minutes individually or five (5) minutes total.

    4.2.    **Licensor's Requirements**:  Licensor's Requirements mean the following requirements and conditions for exploiting any Allied Rights: credit obligations including for use on-screen and on packaging; dubbing, subtitling, and parallel tracking requirements; editing restrictions; paid advertising, publicity and promotional requirements; provisions for use of any name, voice, or likeness; limitations on use of commercial announcements; requirements for use of any trademark or logo; obligations for use of meta-data, DRM, RMI, and digital identifiers, including ISAN or EIDR.

4.3.    **Compliance with Licensor's Requirements**: Licensor will give Licensee timely Notice of Licensor's Requirements promptly to the extent reasonably available for each Requirement. Licensee will abide by all of Licensor's Requirements after receipt of such Notice in exercising any applicable Allied Rights. Upon Licensor's reasonable request, Licensee will promptly submit to Licensor any materials created or used by Licensee in exploiting any Allied Rights so that Licensor can determine whether Licensor's Requirements are satisfied.

4.4.    **Limitations**: In exercising any Allied Rights, Licensee may not: (i) alter or delete any credit, logo, copyright notice, trademark notice, or RMI on the Program; (ii) include any advertisements or other materials before, during, or after the Program other than the credit or logo of Licensee, an approved anti-piracy warning, or commercials as authorized in this Agreement; or (iii) alter, substitute, dub, or delete any music or lyrics without prior Notice of Licensor's approval.

4.5.    **Inadvertent Failure**: No inadvertent failure by Licensee to comply with any of Licensor's Requirements will be a material breach of this Agreement provided Licensee takes reasonable efforts to cure prospectively such failure after Notice of such failure from Licensor.

4.6.    **Use of Licensor Marks**: In using the title of the Program or Licensor's name, logo, banner, or other identified trademark on the Program ("Licensor Marks"), Licensee will at all times follow good trademark practices subject to Licensor's Requirements. Licensee will not at any time adopt any symbol confusingly similar to any of the Licensor Marks or attempt to register any of the Licensor Marks or claim any goodwill deriving from them. All goodwill arising from use of the Licensor Marks will inure to the benefit of Licensor. Upon reasonable request, Licensee will give Licensor representative samples of each use of all Licensor Marks for quality assurance purposes. If Licensor determines Licensee is using any of its Marks improperly, Licensor may give Notice to Licensee of the improper use and required remedial action. If Licensor fails to give Licensee such Notice within ten (10) days of receipt of the sample, reducible to not less than twenty-four (24) hours due to exigencies of release, then the use indicated in the sample will be deemed approved. If Licensee fails to timely remedy the improper use, Licensor, upon Notice to Licensee may immediately end Licensee's right to use such Licensor Marks.

4.7.    **Use of Licensee Marks**: Licensee may use its name, logo, banner or other identified trademark ("Licensee Marks") on the Program in accordance with Paragraph 4.1.2. and in advertising and marketing material for the Program designating Licensee's services in distributing the Program and exploiting the Licensed Rights. Licensor will not adopt any symbol confusingly similar to any of the Licensee Marks with respect to such services or attempt to register any of the Licensee Marks or claim any goodwill deriving from them. All good will arising from Licensee's use of the Licensee Marks will inure to the benefit of Licensee. If any Licensee Marks are contained on any Licensee Created Materials obtained by Licensor under Paragraph 12.5., then Licensor will only use the Licensee Marks on such materials subject to good trademark practices and Licensee's requirements reasonably communicated to Licensor. If Licensee determines that Licensor is using any of its Licensee Marks improperly, the Licensee may give Notice to Licensor of the improper use and required remedial action. If Licensor fails to timely remedy the improper use, Licensor will cease using all Licensee Marks on the offending material upon receipt of Notice from Licensee to do so.

## 5.    TERRITORY

5.1.    **Territory**: The Territory means the countries or territories listed in the Deal Terms as they may be further defined in the IFTA® International Schedule of Territory Definitions current as of the Effective Date. In case of any inconsistency between the Territory definition in the Deal Terms and IFTA® International Schedule of Territories Definitions, the Deal Terms prevail.

5.2.    **Non-Contiguous Areas**: "Non-Contiguous Areas" mean embassies, military and government installations, oil rigs and marine drilling sites, airlines-in-flight, and ships-at-sea flying the flag of a country but not located within its contiguous geographic borders. The Territory does not include the Non-Contiguous Areas of foreign countries located within the Territory. However, for

exploiting any NonTheatrical or Ancillary Licensed Rights, the Territory includes Non-Contiguous Areas of each country in the Territory as necessary for exploiting such Rights.

5.3. **Changes in Borders**: If during the Term an area separates from a country in the Territory, then the Territory will still include the entire area which formed one political entity as of the Effective Date. If during the Term an area is annexed to a country in the Territory, then Licensor grants Licensee a First Negotiation Right to acquire the Licensed Rights in the Program until the end of the Term in the newly annexed area to the extent those Licensed Rights are then or later available.

5.4. **Regionalization**: The Program is only licensed for exploitation using the technological methods in customary commercial use in the Territory during the Term. If Disc is an Authorized Format for Video Licensed Rights, then Licensee may exploit solely in the regional format for the Territory.

## 6. TERM, LICENSE PERIOD AND HOLDBACKS

6.1. **Term**: The Term of this Agreement starts and ends on the dates set forth in the Deal Terms *except* in case of Term extension per Paragraph 15.2. or termination per Paragraph 16.6.

6.2. **License Period**: The License Period is the maximum time period indicated in the Deal Terms during which Licensee may exploit or authorize exploitation of each Licensed Right. If the Deal Terms only authorize a limited number of Authorized Telecasts for the PayPerView, Pay TV or Free TV Licensed Rights, then the applicable License Period for such Licensed Rights ends on the *earlier* of the end of the applicable License Period or the conclusion of the last Authorized Telecast. Failure to use all Authorized Telecasts will not extend the License Period. In no case may Licensee exploit or authorize exploitation of any Licensed Right after the end of the Term of this Agreement.

6.3. **Licensee Holdbacks**: N/A

6.4. **Additional Licensee Holdbacks**: N/A

6.5. **Licensor Holdbacks**: N/A

6.6. **Additional Licensor Holdbacks**: N/A

## 7. USE PROVISIONS

7.1. **Authorized Use(s)**: A Use authorized in the Deal Terms is an Authorized Use of the specific type, *e.g.* an Authorized Format or Authorized Telecasts. Licensee may only exploit each Licensed Right according to the Authorized Uses for the Licensed Right and the provisions of this Agreement.

7.2. **Authorized Format(s)**: If Disc is an Authorized Use, then Licensee may not, to the extent permitted by Law, sell or authorize sale of Discs incorporating the Original Language of the Program parallel tracked with any Authorized Language Version until after Original Language Disc Versions are made available for sale to the public in any country with the same Disc region code as that primarily utilized in the Territory.

7.3. **Authorized Telecast(s)**: Licensee may not telecast or authorize telecast of the Program for more than the Authorized Telecast(s) in the Deal Terms or, if none, a commercially reasonable number. Authorized Telecast(s) may only be used in Authorized Runs or Authorized Playdates indicated in the Deal Terms. Licensee may allocate multiple Authorized Runs or Authorized Playdates among applicable Licensed Rights in a commercially reasonable manner unless otherwise indicated in the Deal Terms. Licensee may not telecast or authorize telecast of the Program by any form of PayPerView or Pay TV other than an encrypted form.

7.4. **Authorized Channel & Satellite**: If the Deal Terms limit any telecast of the Program to an Authorized Channel or Authorized Satellite then Licensee may only authorize telecast over their telecasting facilities as they exist on the Effective Date. Otherwise, Licensee may authorize telecast over any existing channel in the Territory but may only authorize satellite telecast that is primarily intended for downlink reception in the Territory. If a physical change in telecasting facilities materially affects the number or kind of television receivers capable of receiving any telecast (*e.g.* signal boost, new transponder, orbital drift), then Licensee will promptly give Licensor Notice of such change. Licensor then grants Licensee a First Negotiation Right to exploit any affected Licensed Rights over the

changed facilities, considering rights previously granted to other Persons. If no agreement is reached in the First Negotiation period and the change materially affects the exploitation of the Licensed Rights then either Party may by Notice to the other Party end the License Period for the affected Licensed Rights.

7.5.    **Simulcasting**: If the Deal Terms allow or a Law requires, Licensee may authorize Simulcasting Use of the unedited, unaltered, and unabridged Authorized Telecast of the Program in the Authorized Language(s). Simulcasting Use does not authorize exploitation of Pay TV Catch-Up or Free TV Catch-Up, VOD or EST Rights. All Simulcasting Use is subject to Paragraph 13.5. During any Simulcasting period, Licensor will not undertake or authorize Simulcasting of the Program in the Territory in the Authorized Language(s) by any other party but this will not prevent Licensor from exploiting any VOD or EST Rights in the Program not granted to Licensee.

7.6.    **Catch-Up TV**: Only the unedited, unaltered, unabridged Authorized Telecast of the Program may be exploited by means of Catch-Up Pay TV or Catch-Up Free TV. Catch-Up Pay TV or Catch-Up Free TV Licensed Rights do not authorize exploitation of VOD or EST Rights. Any Catch-Up Pay TV or Catch-Up Free TV must occur within thirty (30) days of each Authorized Telecast unless a different period is indicated in the Deal Terms. Any grant of Catch-Up Pay TV or Catch-Up Free TV Licensed Rights will not prevent Licensor from exploiting any VOD or EST Rights in the Program not granted to Licensee.

## 8.    GROSS RECEIPTS PROVISIONS

8.1.    **Gross Receipts**: Gross Receipts means the sum on a continuous basis of the following amounts received by, used by or credited to Licensee, any Licensee Affiliate or any approved subLicensee or agent for each and every Licensed Right calculated as provided in Paragraph 8.2:

8.1.1.    All monies or other consideration of any kind including all advances, License Fees, security deposits, awards, subsidies (other than those described in Paragraph 8.4), and other allowances from the license, sale, lease, rental, lending, barter, distribution, diffusion, exhibition, performance, exploitation, making available, or other exploitation of each Licensed Right in the Program, all without any deductions; and

8.1.2.    All recoveries of any kind arising from any claims for infringement or misappropriation of any Licensed Right after first deducting all costs of suit including attorneys' fees; and

8.1.3.    All monies or other consideration of any kind from any authorized dealing in trailers, posters, copies, stills, excerpts, advertising accessories or other materials used in connection with the exploitation of any Licensed Right; and

8.1.4.    All monies or other consideration of any kind from making available the Program or any of its elements on a Website including from: (i) payments received from users or Authorized Subscribers attributable to accessing the Program or to using the Website and allocated to the Program on a non-discriminatory basis consistently applied; (ii) income derived from advertising and promotions attributable to the Program or from using the Website and allocated to the Program on a non-discriminatory basis consistently applied; and (iii) payments from affiliates or third parties derived from accessing the Program due to links or other information included on the Website in an affiliate or networking program.

8.2.    **Gross Receipts Calculated At Source**: For the purpose of determining Licensor's share of Gross Receipts, all Gross Receipts must be calculated at "source" determined as follows:

8.2.1.    For any Theatrical Licensed Right, "source" means the levels at which payments are remitted directly by cinema theaters making the Program available to the paying public.

8.2.2.    For any NonTheatrical or Ancillary Licensed Right, "source" means the level at which payments are remitted directly by airlines, bus, vehicles, shipping companies, hotels, or other entities that exhibit or make the Program available directly to their patrons or customers.

8.2.3.    For any Video Licensed Right, "source" means the level at which (i) payments are remitted by wholesalers shipping Videograms directly to retailers for ultimate sale or rental to the

paying public, including intermediate distribution levels such as rack jobbers if and to the extent Licensee or a Licensee Affiliate participates in income from such intermediate distribution; and (ii) payments are made for making Videograms available directly to the paying public by Licensee or a Licensee Affiliate through mail order, video clubs, or kiosks.

    8.2.4.    For any Public Video Licensed Right, "source" means at the level at which payments are remitted directly by exhibitors of the Program.

    8.2.5.    For any Pay-Per-View, Pay TV or Free TV Licensed Right, "source" means the level at which payments are remitted directly by broadcast stations, cable systems, satellite telecasters, or like entities that broadcast, cablecast, transmit, or otherwise making the Program available to the viewing public.

    8.2.6.    For any VOD or EST Licensed Right, "source" means the level at which payments are remitted directly by parties operating or controlling any Website from which content is made available to the general public, or to Authorized Subscribers, or from which content of multiple Websites are aggregated for access by the general public or by Authorized Subscribers.

    8.2.7.    For any Licensed Right, if Licensee or any Licensee Affiliate owns or operates the "source" from which payments are made, then any payment attributable to the source must be no less than comparable payments remitted from that source to unaffiliated third parties in arm's length transactions.

    8.3.    **Royalty Income**: All Royalty Income derived from exploitation of any Secondary Rights in the Program or any Licensee Created Materials (per Paragraph 12.5) will be the sole property of Licensor, will not be included in Gross Receipts, and Licensor will have the sole right to apply for and collect all such "Secondary Royalty Income". For this purpose, as between the parties, Licensor will be deemed the "author" or "producer" of the Program, any Version of the Program including dubbed or subtitled, and any Licensee Created Materials. Licensee will not make any claim either directly or through a third-party for any such Secondary Royalty Income. If Licensee receives any such Secondary Royalty Income, Licensee will immediately remit such sums to Licensor with an appropriate statement identifying their source.

    8.4.    **Rebates And Subsidies**: The following amounts, if received by, used by, or credited to Licensee, any Licensee Affiliate, or any approved subLicensee or agent, will first be used to reduce Recoupable Costs to the extent not repayable by Licensee to any third party: (i) print, publicity and similar subsidies for the cost of releasing, advertising or publicizing the Program; (ii) income from publicity tie-ins; (iii) freight, print, trailer, advertising and other cost recoveries, rebates, refunds or discounts, whether obtained from regional or national institutions, exhibitors, approved subLicensees or other Persons; and (iv) income from any use of any clips for advertising, marketing or promoting the Program. All such amounts in excess of Recoupable Costs will be included in Gross Receipts.

## 9. RECOUPABLE COSTS PROVISIONS

    9.1.    **Recoupable Costs**: Recoupable Costs means all direct, verifiable, out-of-pocket, reasonable and necessary costs and expenses, exclusive of salaries and overhead, less any discounts, credits, rebates or similar allowances, actually paid by Licensee for exploiting each Licensed Right in arms-length transactions with third parties for:

    9.1.1.    Customs duties, import taxes, and permit charges necessary to secure entry of the Program into the Territory;

    9.1.2.    Notarization, translation, processing service, and similar costs relating to obtaining or securing registration, importation, exploitation or protection of the Program in the Territory, but only to the extent reasonably pre-approved by Notice from Licensor, and, if Licensor advances any such fees or costs, Licensee will promptly reimburse Licensor for them upon demand;

    9.1.3.    Sales, use, VAT, admission and turnover taxes and related charges assessable against any Gross Receipts realized from the exploitation of any Licensed Right, but not including any

corporate income, franchise or windfall profits taxes, nor any remittance or withholding taxes assessable against amounts payable to Licensor;

9.1.4.    Remittance and withholding taxes on any amounts payable to Licensor, but only as allowed in Paragraph 10.4.;

9.1.5.    Shipping and insurance charges for Delivery of the Materials to Licensee including any amounts for shipping within the Territory, but not for returning the Materials to Licensor;

9.1.6.    Manufacture of pre-print materials, positive prints, digital prints, masters, tapes, trailers, and other copies of the Program in an amount reasonably pre-approved by Notice from Licensor;

9.1.7.    Costs of allowed editing, subtitling, dubbing or parallel tracking in the Authorized Language(s) in an amount reasonably pre-approved by Notice from Licensor;

9.1.8.    Costs of allowed advertising, promotion and publicity in an amount reasonably pre-approved by Notice from Licensor;

9.1.9.    Reasonable checking costs for verifying the accuracy of box office results reported by exhibitors, but not exceeding one percent (1%) of the reported box office receipts from each such exhibitor unless reasonably pre-approved by Notice from Licensor;

9.1.10.  Legal costs and fees paid to obtain recoveries for infringement by a third party of the Licensed Right and the cost of any infringement monitoring service for the Program, in an amount reasonably pre-approved by Notice from Licensor;

9.1.11.  Actual and normal expenses, including reasonable legal costs and fees, incurred in recovering debts from defaulting licensees and exhibitors;

9.1.12.  Costs of packaging for Videograms embodying the Program in an amount reasonably pre-approved by Notice from Licensor;

9.1.13.  Censorship fees and costs of editing to meet censorship requirements in an amount reasonably pre-approved by Notice from Licensor;

9.1.14.  Additional customary and reasonable costs actually paid by Licensee in exploiting the Program in the amount reasonably pre-approved by Notice from Licensor.

9.2.    **Limitations**: No Recoupable Cost may be deducted from Gross Receipts for any Licensed Right except as authorized in the Deal Terms.  Recoupable Costs must be calculated separately for each Licensed Right and may not be recouped from Gross Receipts for any other Licensed Right *except* as authorized in the Deal Terms.  Any cost that does not qualify as a Recoupable Distribution Cost will be Licensee's sole responsibility *unless* Licensor gives Notice approving its recoupment. No item qualifying as a Recoupable Distribution Cost may be deducted more than once.

9.3.    **Third Party Costs**: If a Licensee Affiliate or approved subLicensee or agent pays a cost that would be a Recoupable Cost if paid by Licensee, then such cost may be recouped by Licensee as a Recoupable Cost but may not be recouped or paid more than once.  Otherwise no costs of any third party may be recouped from monies due to Licensor.

## 10. PAYMENT REQUIREMENTS

10.1.    **Timely Payment**:  Licensee will make payments to Licensor and retain recoupments from Gross Receipts only in the manner and sequence specified in the Deal Terms.  Timely payment is of the essence of this Agreement.  Payment will only be considered made when Licensor has immediate and unencumbered use of funds in the required currency in the full amount due.  Licensee will use diligent efforts to obtain promptly all permits necessary to make all payments to Licensor.

10.2.    **Base Currency**:  The Base Currency is the currency specified in the Deal Terms, or if not specified, the Base Currency is United States Dollars.

10.3.    **License Fee**:  The License Fee, consisting of the Minimum License Fee and any Additional License Fee as set forth in the Deal Terms, is the amount payable to Licensor and recoupable from Licensor's share of Gross Receipts for applicable Licensed Rights as indicated in the Deal Terms. The License Fee is payable in the Base Currency.  The License Fee is non-returnable, but fully recoupable in conformity with this Agreement.  The Parties agree the License Fee is a reasonable estimate at the time

of contracting of the minimum share of Gross Receipts that Licensor would receive from Licensee's full performance under this Agreement.

10.4. **Remittance Taxes**: The License Fee is a minimum net sum and no taxes or charges of any sort may be deducted from it, regardless of any remittance or withholding taxes that may be due. However, Licensee may recoup all remittance or withholding taxes on the License Fee and any other payments due Licensor as a Recoupable Cost after providing Licensor with all documentation demonstrating Licensee's payment of the required amount on Licensor's behalf.

10.5. **Limits on Deductions**: There will be no deductions from any payments due Licensor because of any bank charges, conversion costs, sales, use or VAT taxes, "contingents," quotas or any other taxes, levies or charges unless separately agreed in a Notice from Licensor.

10.6. **License Fee Installments**: Licensee will pay each installment of the License Fee to Licensor in the time and manner specified in the Deal Terms. Where an installment is payable on events within Licensor's control, *e.g.,* the start of Principal Photography, Licensor will give Licensee timely Notice of such event. Where an installment is payable on events within Licensee's control, *e.g.,* First Release, Licensee will give Licensor timely Notice of such event. For each Installment of the License Fee, Licensor will provide Licensee with a Notice when the payment is due consisting of an Invoice designating the amount due and if necessary any document indicating occurrence of the event within Licensor's control triggering payment (*e.g.* a Notice of Initial Delivery). Licensee's payment of the invoiced amount will be due within ten (10) days of Licensee's receipt of such payment Notice unless otherwise specified in the Deal Terms. Licensee will pay the amount indicated in the Invoice by wire transfer of unencumbered funds, free of any transmission charges, to the payment account(s) specified in the Deal Terms or if not there specified as specified in the Invoice.

10.7. **Letter of Credit**: If the Deal Terms indicate a payment is secured by a Letter of Credit, then Licensee will open the Letter of Credit at a corresponding bank of Licensor's designated bank. While open, the Letter of Credit will remain valid, negotiable, transferable, confirmed, and irrevocable; it will be automatically renewable for any period stated in the Deal Terms if not negotiated by its first end date. All costs for a Letter of Credit will be borne solely by Licensee.

10.8. **Blocked Funds**: Licensee will give Licensor prompt Notice of any Law that prohibits remittance from the Territory of any sums due Licensor. Licensee will then deposit such sums in Licensor's name in a suitable depository designated by Licensor without any deductions for so doing.

10.9. **Finance Charge**: Any payment not made when due will, in addition to any other right or remedy of Licensor, incur a finance charge at the lesser of three basis points over the 3-month London Inter Bank Offered Rate ("LIBOR+3") on the date payment was due or the highest applicable legal contract rate. This finance charge will accrue from the date the payment was due until it is paid in full.

10.10. **Exchange Rate**: Licensee will recoup the License Fee and all Recoupable Costs in the currency of each country in the Territory. Licensee will convert any sums due Licensor to the Base Currency at the prevailing exchange rate on the date due at a bank timely designated by Licensor. For a late payment, Licensor will be entitled to the most favorable exchange rate between the due date and the payment date. The risk of devaluation of the Base Currency designated by Licensor is Licensor's sole risk; the risk of the devaluation of the currency of the Territory is Licensee's sole risk. Unless specified otherwise in the Deal Terms, the Base Currency means the currency in which the License Fee is payable as designated in the Deal Terms, or, if not so designated, the national currency in the country where Licensor is headquartered.

10.11. **Documentation**: If any Law requires Licensee to obtain a permit or clearance to exploit any Licensed Right, then Licensee will do so at its expense promptly after payment of the License Fee. These may include any dubbing certificate, quota permit, censorship clearance, author's certificate, certificate of origin, music cue sheet, or remittance tax form. Licensee will provide Licensor on request with copies of documents indicating compliance with such Law. If this Agreement is terminated or

cancelled, then upon request Licensee will take all necessary actions to ensure that any such documents are withdrawn or cancelled, failing which Licensee authorizes Licensor to do so.

## 11. ACCOUNTINGS

11.1.   **Cross Collateralization**:  Unless otherwise provided in the Deal Terms, no payment for the Program may be cross collateralized or set-off against any amounts for any other Motion Picture, and amounts due for the Program may not be used to recoup amounts for any other Motion Picture, or *vice versa*.  Gross Receipts and Recoupable Costs for the Motion Picture may only be cross collateralized among the Licensed Rights to the extent, if any, authorized in the Deal Terms, but they may be cross collateralized among any countries in the Territory except as otherwise provided in the Deal Terms.

11.2.   **Allocations**:  If the Program is exploited with other Motion Pictures, then Licensee will only allocate receipts and expenses among the Program and the other Motion Pictures in the manner reasonably approved by Notice from Licensor.

11.3.   **Financial Records**:  Licensee will maintain true and accurate records in local currency of all financial transactions regarding the Program using generally accepted accounting principles on a consistent, uniform and non-discriminatory basis until three (3) years after the Term and during any period while a dispute about payments remains unresolved.  The records will include all Gross Receipts derived, all Recoupable Costs paid, all allowed adjustments or rebates made, all cash collected or credits received, and all other information necessary to render any statement due. Unless Licensor gives Notice approving otherwise, all records will be maintained on a cash basis.  If Licensee permits any off-set, refund or rebate of sums due Licensee, then such sums will nonetheless be included in Gross Receipts. Licensee will also maintain full and accurate copies of every statement, contract, electronic record, audit report, correspondence, and other records for the Program and make available such records for inspection and copying at the Licensee's principal place of business.

11.4.   **Statements - General Contents**:  Starting after Initial Delivery, Licensee will furnish Licensor with a statement in English for the Program that identifies from the time of the immediately prior statement, if any, all Gross Receipts derived, all Recoupable Costs paid (identifying to whom they are paid), and all exchange rates used.  If the Territory contains more than one country, the information will be reported separately for each country and consolidated for the entire Territory.  The information will be provided in reasonable detail on a current and cumulative basis.

11.5.   **Statements - Video**:  For any Video Licensed Rights each statement must also include: (i) all Videograms manufactured, sold, rented, or destroyed; (ii) their wholesale and retail selling prices; and (iii) all deductions taken.  Licensee may not withhold any Gross Receipts as a reserve against returned or defective Videos for more than two (2) consecutive accounting periods after which the reserve must be liquidated.  The reserve may not exceed ten percent (10%) of Video Gross Receipts derived for two (2) accounting periods for which the reserve is retained.

11.6.   **Statements - EST and VOD**:  For EST and VOD Licensed Rights, each statement must also include for each Website on which the Program is made available to the extent reasonably available to Licensee for each reporting period: (i) the total number of access attempts ("raw hits") to the Website; (ii) the total number of subscribers to the Website and the daily average number; (iii) the total number of times the Program was accessed; (iv) the total amount billed and collected including all charges, chargebacks, credits, returns, and refunds; (v) the average length of time or number of bytes when the Program was accessed; (vi) all subscriber fees identifying the method of allocating such fees to the Program; (vii) all advertising revenue indicating the source and method of allocating such revenue to the Program; and (viii) all other reasonable and available financial information necessary or appropriate for calculating Gross Receipts.  Licensee may provide such information by making it available for access by Licensor on a secure portion of the applicable Website.

11.7.   **Statement Periods**:  Licensee will render a statement only when money is due to Licensor or upon reasonable request by Licensor any such statement shall be made available: (i) quarterly for the first three (3) years after the First Release; then (ii) semi-annually through the end of the Term and as

long thereafter as Gross Receipts are derived by Licensee.  Each statement must be delivered to Licensor within sixty (60) days after the end of the period for which it is rendered.  However, no statement need be rendered for any period in which there are no Gross Receipts, but if Licensor has not received a statement for six (6) months, Licensee will provide a current statement within sixty (60) days of Licensor's request.

11.8.   **Audit Right**:  Until three (3) years after the Term and upon at least thirty (30) days' prior Notice, Licensor may examine and copy, on its own or through its auditors, Licensee's financial records regarding the Program. If the examination uncovers an underpayment, uncontested or later determined due, Licensee will pay Licensor the amount of such underpayment on demand.  If such underpayment is more than ten percent (10%) of the amount shown due on the statements audited, Licensee will also pay Licensor upon demand the reasonable costs of examination up to the amount of the underpayment.

## 12. Delivery, Acceptance And Return

12.1.   **Terminology**:  Delivery of a Program means delivery to Licensee of the Delivery Materials by the Delivery Methods as provided in the Deal Terms and this Paragraph.

12.2.   **Initial Delivery**:  Licensee acknowledges and agrees that upon execution of this Agreement Licensor has satisfied its delivery requirements by providing Licensee with a fully executed Lab Access Letter as set forth in Schedule B and Licensor further acknowledges that it is accepting delivery on an as is basis.

12.3.   **Ownership**:  Legal ownership of all Delivery Materials will remain with Licensor subject to Licensee's right to use such Delivery Materials under this Agreement.  Licensee will exercise due care in safeguarding all Delivery Materials and will assume all risks for their theft or damage while they are in Licensee's possession.

12.4.   **Payment for Delivery Materials**:  Licensee will pay for all Delivery Materials as indicated in the Deal Terms or otherwise in Licensor's Delivery Notice.  All costs of Delivery and return of the Delivery Materials (including shipping charges, insurance, import fees, duties, brokerage fees, storage charges and related charges) will be Licensee's sole responsibility unless otherwise specified in the Deal Terms.

12.5.   **Licensee Created Materials**:  Licensee will provide Licensor and its designees with prompt unrestricted free access to all alternate language tracks, subtitled, dubbed and parallel track versions, masters, advertising and promotional materials, artwork and other materials created or authorized by Licensee to exploit the Program ("Licensee Created Materials"). Licensee will promptly give to Licensor a Notice of each Person who prepared any Licensee Created Materials and each laboratory or facility where they are located. Licensor will pay Licensee promptly on request for the actual cost of duplication and shipping to Licensor of any Licensee Created Materials and, if applicable, any reuse fees applicable to their use.  Licensee assigns to Licensor, and Licensor will immediately become the owner of, the worldwide copyright in all Licensee Created Materials, subject to a non-exclusive free license in favor of Licensee and its licensees to use them during the Term solely for exploitation of the Licensed Rights.  If such ownership is not allowed under a Law in the Territory, then Licensee grants Licensor a non-exclusive free license to use all Licensee Created Materials worldwide in perpetuity without restriction.

12.6.   **Return of Materials**:  At the end of the Term, Licensee at its expense, will at Licensor's election, either: (i) return all Delivery Materials and Licensee Created Materials to Licensor; or (ii) destroy all Delivery Materials and Licensee Created Materials and provide to Licensor a customary certificate of their destruction.

## 13. Exploitation Obligations

13.1.   **General Obligations**:  Licensee will release the Program in conformity with any Release Requirements in the Deal Terms, including releasing the Program in any First Release Medium by no later than any Outside Release Date.  Throughout the Term, Licensee will use diligent efforts and skill in

the distribution and exploitation of the Licensed Rights to maximize Gross Receipts and minimize Recoupable Costs consistent with the quality standards of first-class Licensees in the Territory. Licensee will not discriminate against the Program or use the Program to secure more advantageous terms for any other motion Program, product, or service. Licensee will maintain the Program in continuous release throughout the Territory for a period consistent with its reasonable business judgment. Licensee does not License Fee the performance of any authorized agent or subLicensee.

13.2. **Theatrical Exploitation Obligations**: In exploiting any Theatrical Licensed Rights:

13.2.1. <u>Licensor Consultation</u>: Licensee will accord Licensor prior reasonable consultation on an on-going basis of all significant aspects of the plan for the first run theatrical release of the Program in the Territory, including the initial campaign, print order, advertising budget, marketing campaign, and short subject allocations. Licensee will comply in all material respects with any release plan approved by Licensor. Licensee will give Licensor reasonable advance Notice of all premieres of the Program in the Territory. Licensee will not screen the Program in any festival, charitable screening or the like where there is no paying audience without prior Notice of Licensor's approval.

13.2.2. <u>Release Information</u>: Licensee will give Licensor weekly Notice setting forth all information available to Licensee on a weekly and cumulative basis regarding the first run theatrical release of the Program, including exhibition terms, box office receipts, and expenses.

13.2.3. <u>Exhibition Obligations</u>: All exhibition agreements for the Program must be separate from exhibition agreements for any other Motion Picture, product, or service. If the Program is exhibited with any other Motion Picture during its first run, any allocation of box office receipts must be reasonably approved by Notice from Licensor. No more than one percent (1%) of net box office receipts per theater may be allocated to a short subject. Licensee will not license the Program to any theater in which Licensee or a Licensee Affiliate has any interest *except* on terms consistent with arm's-length transactions for like motion pictures. Licensee will use all reasonable efforts to maximize collections from exhibitors as quickly as possible.

13.3. **Video Exploitation Obligations**: In exploiting any Video Licensed Rights:

13.3.1. <u>Licensor Approval</u>: Licensee will accord Licensor prior reasonable approval of all advertising, packaging, artwork, and marketing campaigns for exploiting the Video Licensed Rights. Licensee at its cost will also provide Licensor for its reasonable approval one (1) prototype copy of each authorized type of Video and its packaging promptly after its manufacture and before its sale or disposition. Licensor's approval will be deemed given if Licensor does not give Licensee Notice of an objection within five (5) days of receipt of these items.

13.3.2. <u>Efforts and Quality</u>: Licensee will use diligent efforts and skill in the manufacture, distribution, and exploitation of Videograms of the Program, using quality standards at least comparable to other Videograms commercially available in the Territory. From the end of any Video Holdback until the end of the Term, Licensee will make Videograms of the Program in the Authorized Language(s) and Authorized Formats available in the Territory through its catalogue and will not allow them to leave normal channels of distribution for a commercially unreasonable period of time.

13.3.3. <u>Included Material</u>: Licensee will not make or distribute any Videograms in which the Program is included with another feature length Motion Picture for a single price without prior Notice of Licensor's approval. Licensee may include trailers and advertising material for other Motion Pictures on any Videogram of the Program in a commercially reasonable manner provided that they do not interrupt the running time of the Program and that Licensee also customarily includes trailers and advertising material for the Program on Videograms of other motion pictures.

13.3.4. <u>Pricing</u>: To the extent allowed by Law, for calculating Gross Receipts: (i) Videograms will be deemed sold for not less than any Minimum Wholesale Price or Minimum Retail Price in the

Deal Terms; and (ii) Videograms disposed of without charge above the number of Free Goods in the Deal Terms will be deemed sold at the Minimum Wholesale Price.

13.4. **Television Exploitation Obligations**: In exploiting any PayPerView, Pay TV or Free TV Licensed Rights:

13.4.1. <u>Limitations</u>: Licensee will not telecast or authorize telecast of the Program by any form of Pay TV other than an encrypted form and as allowed by Law, Licensee will not undertake or authorize any sale, rental or export of decoders for such encryption outside the Territory.

13.4.2. <u>Usage Reports</u>: Upon Licensor's request, Licensee will promptly provide Licensor with the following information to the extent reasonably available to Licensee: (i) the title of the Program in each Authorized Language used for each telecast of the Program; (ii) each Person responsible for preparing a dubbed, subtitled, or parallel tracked version of the Program; and (iii) the time and place of each telecast of the Program since the last Usage Report to Licensor.

13.5. **EST and VOD Exploitation Obligations**: In exploiting any EST or VOD Licensed Rights:

13.5.1. <u>Asset Protection</u>: Licensee may only make the Program available on a Website: (i) where access is subject to an enforceable access contract (*e.g.* Terms of Use) that only permits access by Authorized Subscribers and that prohibits circumvention of technological measures against unauthorized access; (ii) that uses current and commercially reasonable DRM that limits access to the Program solely to Authorized Subscribers who have been verified as such using at least 2 methods and solely to reasonably identifiable locations within the Territory.

13.5.2. <u>Protection Verification</u>: Upon reasonable request Licensee will promptly provide Licensor with Notice demonstrating compliance with Paragraph 13.5.1. If Licensee fails to do so Licensor may give Licensee Notice to cease exploiting any affected EST or VOD Licensed Rights. Licensee may not then exploit such rights until Licensee provides Licensor with Notice demonstrating compliance with Paragraph 13.5.1 and Licensee receives a return Notice from Licensor approving compliance. Licensor's good faith decision not to approve any technological measure used by Licensee to demonstrate compliance will not be a breach of this Agreement.

## 14. MUSIC

14.1. **Cue Sheets**: To the extent required and available, Licensor will supply Licensee promptly after Initial Delivery with music cue sheets listing the composer, lyricist and publisher of all music embodied in the Program. Licensee will, as needed, promptly file with the appropriate government agency or music rights society in the Territory the music cue sheets as supplied by Licensor.

14.2. **Synchronization**: Licensor represents and warrants to Licensee that Licensor controls all rights necessary to synchronize the music contained in the Program on all Copies exploited by Licensee throughout the Territory for the Term. Licensor authorizes Licensee to exploit such synchronization rights without charge in exploiting the Licensed Rights in the Program. Licensor will be solely responsible for paying all royalties or charges necessary to obtain and control such synchronization rights for the Term and will hold Licensee harmless from any payments in this regard.

14.3. **Mechanical**: Licensor represents and warrants to Licensee that Licensor controls all rights necessary to make mechanical reproductions of the music contained in the Program on all Copies exploited by Licensee throughout the Territory for the Term. Licensor authorizes Licensee to exploit such mechanical rights without charge in exploiting the Licensed Rights in the Program. Licensor will be solely responsible for paying all royalties or charges necessary to obtain and control such mechanical rights for the Term and will hold Licensee harmless from any payments in this regard, *provided* if a mechanical or authors' rights society in the Territory refuses to honor the authorization obtained by Licensor in the Program's country of origin, then Licensee will be solely responsible for such royalties or charges.

14.4. **Performance**: Licensor represents and warrants to Licensee that the non-dramatic ("small") performing rights in each musical composition embodied in the Program are either: (i) in the public domain in the Territory; or (ii) controlled by Licensor sufficient to allow Licensee to exploit the

Licensed Rights without additional payment for such rights; or (iii) available by license from a performing rights society in the Territory affiliated with the International Confederation of Authors and Composers Societies (CISAC). For music in category (iii), Licensee will be solely responsible for obtaining a license to exploit such performance rights from the local performing rights society.

14.5. **Publishing**: As between Licensor and Licensee, Licensor (or its affiliated publishing company) will be solely entitled to collect and retain the publisher's share of any music royalties arising from Licensee's exploitation of any Licensed Rights in the Program.

## 15. SUSPENSION AND WITHDRAWAL

15.1. **Licensor's Right**: Licensor may suspend Delivery or withdraw the Program by Notice to Licensee: (i) if Licensor determines in good faith that its exploitation might infringe the rights of others or violate any Law; (ii) if Licensor determines in good faith that its Materials are unsuitable for the manufacture of first-class commercial quality exploitation materials; (iii) due to Force Majeure; or (iv) for any reason at Licensor's discretion.

15.2. **Suspension**: The Term will be extended for the length of each suspension. Suspension will not be a material breach of this Agreement and Licensee will only be entitled to incidental damages, but not direct or consequential damages (such as "lost profits"), for any suspension. If any suspension extends Initial Delivery of the Program beyond the Outside Delivery Date, then the Program will be treated as immediately withdrawn on the Outside Delivery Date without the necessity of any Notice. Otherwise, if any suspension lasts more than three (3) consecutive months, then either Party may terminate this Agreement on ten (10) days' Notice and treat the Program as withdrawn.

15.3. **Withdrawal**: If the Program is withdrawn, then Licensor must promptly offer to substitute a Program of like quality mutually satisfactory to Licensor and Licensee without additional charge. If the Parties cannot agree on such a substitute within thirty (30) days of Licensor's Notice of withdrawal, then either Party may terminate this Agreement for the affected Program by Notice to the other Party. If termination occurs before First Release, Licensee will be entitled to a refund from Licensor of the entire License Fee actually paid and all unrecouped Recoupable Costs incurred up to the date of termination. If termination occurs after First Release, Licensee will be entitled to a refund from Licensor of an equitable portion of the unrecouped License Fee actually paid and all unrecouped Recoupable Costs incurred up to the date of termination in consideration of the exploitation of the Licensed Rights in the affected Program. Licensee's sole remedy for any such termination due to withdrawal will be to receive such refund and in no case may Licensee collect any consequential damages (including "lost profits") for any withdrawal. If, within three (3) years after the Program is withdrawn, Licensor elects to again release the Program in the Territory, Licensee will have a First Negotiation Right to acquire any Licensed Rights in the Program.

15.4. **Force Majeure**: Force Majeure means any fire, flood, earthquake, or public disaster; strike, labor dispute or unrest; unavoidable accident; breakdown of electrical or sound equipment; failure to perform or delay by any laboratory or supplier; delay or lack of transportation; embargo, riot, war, insurrection, or civil unrest; any Act of God including severe inclement weather; any act of legally constituted authority; inability to obtain sufficient material, labor, transportation, power, or other essential commodity or service required for the conduct of either Party's business or any other cause beyond the reasonable control of either Party.

## 16. TERMINATION, DEFAULT, BREACH AND REMEDIES

16.1. **Licensee's Default**: Licensee will be in default under this Agreement for failure to perform any of its obligations under this Agreement, including making any payments, as and when due. Licensee will be in material default if: (i) Licensee fails to pay all installments of the License Fee due on or before Initial Release of the Program; (ii) Licensee fails to remit any Statement or any payment relating to a Statement in accordance with Paragraph 11; (iii) Licensee becomes insolvent, seeks relief under any insolvency Law, or allows an insolvency representative to be appointed who is not removed

within thirty (30) days; (iv) Licensee attempts to make any assignment or delegation without first obtaining Licensor's approval under Paragraph 21.1.; or (v) Licensee's default is substantially likely to cause Licensor significant harm or to deprive Licensor of a significant benefit of this Agreement. If this Agreement applies to more than one Program, then at Licensor's election a default for one Program will be a default for any or all Programs.

16.2. **Licensee's Cure and Breach**: Licensor will give Licensee Notice of any claimed default. If the default is capable of cure, then Licensee will have fourteen (14) days after receipt of Licensor's Notice to cure a monetary default, and twenty-one (21) days after its receipt to cure a non-monetary default. If the default is incapable of cure, or if Licensee fails to cure within the allowed time, then Licensee will be in breach of this Agreement. An uncured material default will be a material breach. Licensor may then proceed against Licensee for all available relief for the particular breach, including seeking recoverable damages, terminating this Agreement for a material breach, and declaring all unpaid amounts due Licensor under this Agreement immediately due and payable. If this Agreement covers multiple Programs, Licensor may exercise any available termination right for the affected Program or for any or all other Programs.

16.3. **Licensor's Default**: Licensor will be in default under this Agreement for failure to perform any of its obligations under this Agreement as and when due. Licensor will be a material default if: (i) Licensor fails to give Licensee a Notice of Initial Delivery before the Outside Delivery Date, or otherwise fails to complete Delivery in a timely manner as required in Paragraph 12.2; (ii) the Program as Delivered does not contain a Key Element (or approved Key Replacement) under Paragraph 2.2., or contains an unapproved Key Replacement under Paragraph 2.3.; (iii) Licensor becomes insolvent, seeks relief under any insolvency Law, or allows an insolvency representative to be appointed who is not removed within thirty (30) days; or (iv) Licensor's default is substantially likely to cause Licensee significant harm or to deprive Licensee of a significant benefit of this Agreement. Any default by Licensor is limited to the particular Program affected, and no default by Licensor as to any one Program or agreement with Licensee will be a default as to any other Program or agreement with Licensee.

16.4. **Licensor's Cure and Breach**: Licensee will give Licensor Notice of any claimed default. Licensor will have fourteen (14) days after receipt of Licensee's Notice to cure a monetary default, and twenty-one (21) days after its receipt to cure a non-monetary default. If the default is incapable of cure, or Licensor fails to cure within the allowed time, then Licensor will be in breach of this Agreement. An uncured material default will be a material breach. Licensee may then proceed against Licensor for all available relief for the particular breach, including seeking recoverable damages and terminating this Agreement for a material breach.

16.5. **Recoverable Damages**: Each Party may only seek to recover incidental or direct damages occasioned by any breach. Each Party waives any right to seek special, consequential, or punitive damages, including "lost profits" from any breach. This waiver is an independent covenant that survives the failure of essential purpose of any other remedy, even if limited. Nothing in this Agreement limits Licensor's remedies for infringement claims for any exploitation of the Program by other than the Licensed Rights, outside the Territory, or before or after the Term.

16.6. Termination:

16.6.1. <u>Operation</u>: A Party may terminate this Agreement for a material breach by the other Party. A Party effects such termination by giving Notice of so doing to the other Party. The termination is effective upon the later of receipt of the Notice or date specified in the Notice. A Notice of Termination is required in addition to any Notice of default or breach. Upon termination all applicable unperformed obligations of both Parties for the affected Program(s) are discharged but each Party retains all its remedies, including seeking any available recoverable damages, and remains liable for any breach or failure of any representation or warranty occurring before termination. Upon termination all Licensed Rights in the affected Program(s) revert to Licensor, and Licensor will be free, and if necessary Licensee grants to Licensor the right, to exploit or authorize

exploitation throughout the Territory of any Licensed Rights for the affected Program(s), but Licensor has no obligation to do so. Upon termination, Licensor will have no obligation to make any further Delivery for the affected Program(s) and Licensee will promptly return to Licensor all Delivery Materials received by Licensee for the affected Program(s).

16.6.2. <u>Sublicenses</u>: Upon termination, Licensee will provide Licensor with all documents regarding all subdistribution and agency agreements ("sublicenses") entered into by Licensee for the affected Program(s). Upon the effective date of termination, all such sublicenses will also terminate except as provided in this Paragraph. If allowed in the sublicense and Licensor and Licensee mutually agree, or if Licensor, Licensee and the sublicensee mutually agree, Licensee may continue to service the sublicense including making collections and recoupments from Gross Receipts in accordance with this Agreement, but may not conclude any new sublicenses. Otherwise, if Licensor and the sublicensee mutually agree each in their sole discretion, Licensor may assume the sublicense and retain all Gross Receipts derived from the sublicense itself provided Licensor will hold Licensee harmless from any claim by the sublicensee for any failure of performance by Licensor.

16.7. **Arbitration**: Any dispute arising under this Agreement, including with respect to any right or obligation that survives termination of this Agreement will be administered and resolved by final and binding arbitration under the IFTA® Rules for International Arbitration in effect as of the Effective Date of this Agreement ("IFTA® Rules"). Each Party waives any right to adjudicate any dispute in any other court or forum, *except* that a Party may seek interim relief before the start of arbitration as allowed by the IFTA® Rules. The arbitration will be held in the Forum and under the Governing Law designated in the Deal Terms or, if none, as determined by the IFTA® Rules. The arbitration will be decided in accordance with the Governing Law. The Parties will abide by any decision in the arbitration and any court having jurisdiction may enforce it. The Parties submit to the jurisdiction of the courts in the Forum for interim relief, to compel arbitration, and to confirm or challenge an arbitration award. The Parties agree to accept service of process in accordance with the IFTA® Rules and agree that such service satisfies all requirements to establish personal jurisdiction over the Parties. Both Parties waive application of the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. Both Parties acknowledge that for an unsatisfied arbitration award that is confirmed by a court of competent jurisdiction and is not subject to appeal, the Prevailing Party may request that the other Party be barred from attendance at the American Film Market® solely in accordance with the barring provisions of the current AFM® Guidelines.

## 17. INTELLECTUAL PROPERTY PROTECTION PROVISIONS

17.1. **Requirements**: Licensee will include on each Copy of the Program distributed under its authority any copyright notice, trademark notice, anti-piracy warning and RMI included on any Delivery Materials or otherwise supplied by Licensor.

17.2. **Enforcement**: Licensee will take all reasonable steps to prevent infringement or unauthorized use of the Program in the Territory, including monitoring for infringement. Licensor at its election may independently retain its own intellectual property protection monitoring service. Licensor may participate in any copyright infringement litigation initiated by Licensee using counsel of Licensor's choice, in which case Licensor's expenses will be first reimbursed from any recovery. If Licensee declines to undertake any copyright infringement litigation, Licensor may do so at its own expense, in Licensor's or Licensee's name, with Licensor recovering all of its costs of suit, including reasonable attorney's fees, from first recoveries in such litigation, and the balance remitted to Licensee as Gross Receipts.

17.3. **New Technology**: If during the Term new technology in general commercial use in the Territory inhibits the unauthorized duplication, reception, access, downloading or exploitation of the Program or its Copies, then Licensee will use such technology in a reasonable manner in exploiting the Licensed Rights in the Program. Licensee may deduct the reasonable cost of so doing as a Recoupable Cost with prior Notice of Licensor's approval.

17.4. **No Warranty Against Infringement**: The Parties acknowledge that it is in their mutual interest to prevent infringement and unauthorized distribution of the Program in the Territory. Licensee has also taken all necessary steps to inform itself of any infringement of the Program in the Territory before executing this Agreement. No infringement or unauthorized distribution of the Program, whether before or after the Effective Date, will allow Licensee to terminate this Agreement, reduce any amounts due to Licensor, or alter the terms of exploitation including any Holdbacks. Licensor will cooperate with Licensee to prevent or remedy any such act of infringement or unauthorized distribution of the Program.

## 18. LICENSOR'S REPRESENTATIONS AND WARRANTIES

18.1. **As Principal**: If the Cover Page indicates Licensor is a principal, then Licensor represents and warrants to Licensee that the following are true and correct as of the Effective Date:

18.1.1. Licensor has full authority and capacity to execute this Agreement and full legal and financial ability to perform all of its obligations under this Agreement;

18.1.2. There are no existing or threatened claims, arbitration, or litigation which would adversely affect or impair any of the Licensed Rights in the Territory during the Term;

18.1.3. Licensor has not licensed, encumbered, or assigned any Licensed Right to any other Person in the Territory in a manner that would interfere with Licensee's exclusive exploitation of any Licensed Right granted exclusively, and will not do so during the Term;

18.1.4. Licensor will not exploit or authorize exploitation of any Reserved Right in the Territory before the end of the applicable Licensor Holdback period;

18.1.5. The Program was produced by authors who are nationals of or have their habitual residence in, or was first published or simultaneously first published in, a country which at the time of such production or publication was a signatory to the Berne Convention for the Protection of Literary and Artistic Works and Licensor has not done any act or omitted to do any act which would impair the copyright in the Program within the Territory during the Term;

18.1.6. Neither the Program nor the exploitation of any Licensed Rights does or will during the Term: (i) defame, or hold in a false light, or infringe any privacy or publicity or other personal right of any Person; or (ii) infringe any copyright, trademark, trade secret, right of ideas, or similar property right of any Person. To the best of Licensor's knowledge, as of the Effective Date, no use of any of the Delivery Materials does or will infringe any patent rights of any Person; and

18.1.7. Licensor has undertaken reasonable efforts to ensure that its suppliers of essential special effects and other digital information embodied in the Delivery Materials have not included any electronic self-help instructions that will cause such digital information to cease operation of its own accord in such a manner as to materially impair Licensee's use of such Delivery Materials.

18.2. **As Agent**: If the Cover Page indicates Licensor is acting as an agent, Licensor represents and warrants to Licensee that the following are true and correct throughout the Term:

18.2.1. Licensor has full authority from its principal designated on the Cover Page to enter into this Agreement on behalf of its principal and the principal will be bound by this Agreement including the arbitration provisions in Paragraph 16.7.; and

18.2.2. Licensor's principal has made to Licensor representations and warranties substantially comparable to those in Paragraph 18.1. and has authorized Licensor to make those representations and warranties directly from the principal to Licensee on the principal's behalf, and to the best of Licensor's knowledge they are all true and correct. In case of a breach of any representation or warranty in Paragraph 18.1., Licensee agrees to look directly to the principal and not to Licensor for any remedies Licensee might have.

## 19. LICENSEE'S REPRESENTATIONS AND WARRANTIES

19.1. **As Principal**: Licensee represents and warrants to Licensor that the following are true and correct throughout the Agreement Term:

19.1.1.  Licensee has full authority and capacity to execute this Agreement and full legal and financial ability to perform all of its obligations under this Agreement;

19.1.2.  There are no existing or threatened claims, arbitration, or litigation which would adversely affect or impair Licensee's ability to perform under this Agreement;

19.1.3.  Licensee will honor all restrictions on the exploitation of the Licensed Rights and the Allied Rights under this Agreement and will not exploit any Licensed Right outside the Territory, before the end of its Holdback, or after the Term;

19.1.4.  No authorized exploitation of any Allied Rights by Licensee does or will: (i) defame, or hold in a false light, or infringe any privacy or publicity or other personal right of any Person; or (ii) infringe any copyright, trademark, trade secret, right of ideas, or similar property right of any Person; or (iii) to the best of Licensee's knowledge at the time of its creation, infringe any patent rights of any Person.

19.2.  **As Assignor**:  In case of any authorized transfer of this Agreement under Paragraph 21.1., Licensee makes the following additional representations and warranties to Licensor:

19.2.1.  The assignee can and will make all of the representations and warranties set forth above in Paragraph 19.1. directly to Licensor; and

19.2.2.  If the assignee breaches any of those representations and warranties, then Licensor, in addition to any other right or remedy, may proceed directly against Licensee for such breach without first proceeding against the assignee or exhausting any right or remedy against the assignee.

## 20. INDEMNITIES

20.1.  **By Licensor**:  Licensor will indemnify and hold harmless Licensee, its officers, directors, partners, owners, members, shareholders, employees, attorneys and agents, from all third-party claims, loss, liability, damages or expenses, including, reasonable outside attorneys' fees and costs of suit, but not including lost profits, due to any breach or failure of any of Licensor's representations or warranties. Licensor will honor this indemnity despite any assignment of this Agreement.  If Licensor is acting as an agent, these indemnities are also made directly by Licensor's principal to Licensee, but Licensee will look only to Licensor's principal to honor them.

20.2.  **By Licensee**:  Licensee will indemnify and hold harmless Licensor, its officers, directors, partners, owners, members, shareholders, employees, attorneys and agents, from all third-party claims, loss, liability, damages or expenses, including reasonable outside attorneys' fees and costs of suit, but not including lost profits, due to any breach or failure of any of Licensee's representations or warranties. Licensee will honor this indemnity despite any assignment, transfer, sublicense or appointment of an agent.

## 21. ASSIGNMENT AND SUBLICENSING

21.1.  **Licensee's Limitations**:  Licensee may not assign this Agreement or delegate its duties in whole or in part, whether voluntarily or involuntarily, without prior Notice of Licensor's approval and any attempt to do without such prior Notice will be void. A transfer of a controlling interest in Licensee's capital stock or other evidence of ownership will be deemed an assignment requiring Licensor's approval.  As a condition to giving approval, Licensor may require the assignee or delegate to give Licensor a Notice assuming the obligations under this Agreement.  Licensee may use a customary sublicensee or agent in the Territory to exploit any Licensed Rights provided that so doing does not diminish Licensor's share of Gross Receipts or increase Recoupable Costs and such sublicensee or agent gives Licensor a Notice agreeing to abide by all the terms and conditions of this Agreement.  This Agreement will be binding on any authorized assignee, transferee, sublicensee, or agent but will not release Licensee from its obligations under this Agreement.

21.2.  **Licensor's Rights**:  Licensor may freely assign or transfer this Agreement or any of its rights under this Agreement, but no such assignment or transfer will relieve Licensor of its obligations under

this Agreement, unless it is to a company which acquires all or substantially all of Licensor's assets and fully assumes all of Licensor's obligations under this Agreement.

21.3.    **Licensor's Assignment For Financing Purposes**:  If Licensor grants a security interest in, or assigns its right to receive any payment under this Agreement, to a lender, completion guarantor, or other Person in connection with any loan or financing for the Program, then Licensee will promptly on request negotiate in good faith and execute a customary and mutually agreed Notice of Assignment that does not diminish the rights set forth in this Agreement.  Licensee agrees to abide by consistent instructions contained in a Notice from Licensor and such Person in making any payments otherwise due Licensor directly to such Person.  Licensee agrees not to assert any offset rights to delay, diminish, or excuse the payment of any sums assigned to such Person.  Instead, Licensee will treat such offsets or other rights as a separate and unrelated matter solely between Licensor and Licensee.

## 22. NOTICE PROVISIONS

22.1.    **Notice**:  A Notice means any communication required or allowed under this Agreement.  All Notices must be in a record authenticated by the sender, but a text message or instant message will not qualify as a Notice.  Notice sent by personal delivery or mail will be effective when received or if there is proof of refused delivery by the recipient.  Notice sent by fax or e-mail will be effective when the sender receives an acknowledgement showing receipt by the recipient.  A Notice of Termination or Material Breach sent by fax or e-mail must be accompanied by Notice sent by non-electronic means to be effective.

22.2.    **Place to Send Notice**:  All Notices must be sent to a Party at its address on the Cover Page, except a Party may change its place for notice by Notice duly given.  If a Party is no longer located at its place for Notice, the sender may give Notice by sending Notice to the receiving Party's last known address and providing a copy to a public official, if any, in the jurisdiction where such address is located designated to receive notice for absent parties, such as a Secretary of State, Company Commissioner, or other appropriate authority.

22.3.    **Notice Time Periods**:  All time periods in this Agreement based on Notice run from the date the recipient receives, or is deemed to have received, such Notice.

## 23. MISCELLANEOUS PROVISIONS

23.1.    **Approvals**:  Where either Party may exercise any approval, it will do so promptly and in good faith, but in so doing, a Party need not place the other Party's interests ahead of its own.

23.2.    **No Waiver**:  No waiver of any breach will waive any other breach.  No waiver is effective unless it is contained in a Notice by the Party making the waiver.  The exercise of any right or remedy will not waive any other right or remedy.

23.3.    **Remedies Cumulative**: All remedies are cumulative; resorting to one remedy will not preclude resorting to any other remedy at any time.

23.4.    **Entire Agreement**: This Agreement contains the entire understanding of the Parties regarding its subject matter. It supersedes all previous written or oral negotiations, deal memos, understandings or representations between the Parties, if any.  Each Party expressly waives any right to rely on such negotiations, understandings or representations, if any.

23.5.    **Modification**:  No modification of this Agreement is effective unless contained in a record authenticated by both Parties.

23.6.    **Severability**: If any provision of this Agreement is determined to be invalid or illegal under any applicable Law the remaining provisions of this Agreement will remain in effect unless the invalid or illegal provision was a material part of the consideration for a Party to enter into this Agreement.  In such case, upon request both Parties will negotiate in good faith in an attempt to modify this Agreement to comply with the applicable Law and to maintain the original intent of the Parties as closely as

possible, failing which either Party may seek to rescind this Agreement for a material failure of consideration to the extent allowed by applicable Law.

23.7.   **Counterparts**:  This Agreement may be executed in Counterparts, each of which will be an original but all of which together will form one instrument.

23.8.   **Terminology**: In this Agreement "and" means all possibilities, "or" means any or all possibilities in any combination, and "either...or" means only one possibility. "Including" means "including without limitation"; "must" or "will" means a Party is obligated to act or refrain from acting; "may" means a Party has the right but is not obligated to act or refrain from acting.

23.9.   **Additional Documents**:  Upon reasonable request, each Party will execute and deliver such additional documents or instruments as are necessary to evidence, effectuate or confirm this Agreement.

23.10.  **E-Commerce**:  No record relating to this Agreement, including this Agreement itself or any Notice, may be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was used in its formation or transmission.

# IFTA® INTERNATIONAL SCHEDULE OF DEFINITIONS

The IFTA® Definitions are available on-line at http://www.ifta-online.org.

## A.      Cinematic Rights Definitions:

*Cinematic* means only *Theatrical, NonTheatrical* and *Public Video* exploitation of a Motion Picture.

*Theatrical* means the linear exploitation of a Motion Picture Copy only for direct exhibition in conventional or drive-in theaters, licensed as such in the place where the exhibition occurs, that are open to the general public on a regularly scheduled basis and that charge an admission fee to view the Motion Picture.

*NonTheatrical* means the linear exploitation of a Motion Picture Copy only for direct exhibition before an audience by and at the viewing facilities of either organizations licensed for a primary purpose other than exhibiting Motion Pictures, such as in educational organizations, churches, restaurants, bars, clubs, libraries, Red Cross facilities, oil rigs and oil fields, or governmental bodies such as in embassies, military bases, military vessels and other governmental facilities flying the flag of the Territory.

*Public Video* means exploitation of a Motion Picture Copy embodied in a Videogram only for direct exhibition before an audience in a mini-theater, an "MTV theater", or like establishment that charges an admission to use the viewing facility or to view the Videogram and that is not licensed as a conventional motion picture theater in the place where the viewing occurs.

## B.      Ancillary Rights Definitions:

*Ancillary* means only *Airline, Hotel, Ship, Train* and *Vehicle* exploitation of a Motion Picture.

*Airline* means exploitation of a Motion Picture Copy only for direct exhibition in airplanes either by the airline carrier or by passengers using Mobile Devices that are operated by an airline flying the flag of any country in the Territory for which Airline exploitation is granted but excluding airlines that are customarily licensed from a location outside the Territory or that are only serviced in but do not fly the flag of a country in the Territory.

*Hotel* means exploitation of a Motion Picture Copy only for direct exhibition in temporary or permanent living places, such as hotels, motels, apartment complexes, co-operatives or condominium projects, by means of an internal, closed-circuit television systems where the telecast originates within or in the immediate vicinity of such living places.

*Ship* means exploitation of a Motion Picture Copy only for direct exhibition in sea or ocean-going vessels that are operated by a shipping line flying the flag of any country in the Territory for which Ship exploitation is granted but excluding shipping lines that are customarily licensed from a location outside the Territory or that are only serviced in but do not fly the flag of a country in the Territory.

*Train* means exploitation of a Motion Picture Copy only for direct exhibition in a rail-based transportation system that is operated solely within the Territory.

*Vehicle* means exploitation of a Motion Picture Copy only for direct exhibition in commercially operated motor or electric vehicles, such as buses, taxis, or rideshares, used for transporting individuals solely within the Territory.

## C.      PayPerView Rights Definitions:

*PayPerView* means only *Residential PayPerView* and *NonResidential PayPerView* exploitation of a Motion Picture.

*Residential PayPerView* means the encoded telecast of a Motion Picture Copy by Hertzian waves or over a cable service but not by use of Internet Protocol for television reception in homes or similar permanent living places where a charge is made to the viewer for the right to use a decoding device to

view the Authorized Telecast of the Motion Picture at a time designated by the Authorized Telecaster for each viewing.

*NonResidential PayPerView* means the encoded telecast of a Motion Picture Copy by Hertzian waves or over a cable service but not by use of Internet Protocol for television reception in hotels or similar temporary living places where a charge is made to the viewer for the right to use a decoding device to view the Authorized Telecast of the Motion Picture at a time designated by the Authorized Telecaster for each viewing.

## D.     Pay TV Rights Definitions:

*Pay TV* means only *Terrestrial Pay TV, Cable Pay TV, Satellite Pay TV, Catch-Up Pay TV, Basic Pay TV, and Premium Pay TV* exploitation of a Motion Picture.

*Terrestrial Pay TV* means over-the-air broadcast of a Motion Picture Copy by means of encoded Hertzian waves for television reception where a recurring charge is made: (i) to viewers in private living places for use of a decoding device to view a channel that broadcasts the Motion Picture along with other programming; or (ii) to the operator of a hotel or similar temporary living place located distant from where the broadcast signal originated for use of a decoding device to receive a channel that broadcasts the Motion Picture and other programming and retransmit it throughout the temporary living place for viewing in private rooms.

*Cable Pay TV* means an initial, originating transmission of a Motion Picture Copy by means of an encoded signal over cable for television reception where a recurring charge is made: (i) to viewers in private living places for use of a decoding device to view a channel that transmits the Motion Picture along with other programming; (ii) to viewers in private living places for a right of periodic access to a channel or services that transmits the Motion Picture along with other programming substantially free of advertising; or (iii) to the operator of a hotel or similar temporary living place located distant from where the broadcast signal originated for use of a decoding device to receive a channel that broadcasts the Motion Picture and other programming and retransmit it throughout the temporary living place for viewing in private rooms.

*Satellite Pay TV* means an initial uplink broadcast of a Motion Picture Copy by means of an encoded signal to a satellite and its downlink broadcast to terrestrial satellite reception dishes for television viewing located in the immediate vicinity of the reception dishes where a recurring charge is made: (i) to viewers in private living places for use of a decoding device to view a channel that broadcasts the Motion Picture along with other programming; or (ii) to the operator of a hotel or similar temporary living place located distant from where the broadcast signal originated for use of a decoding device to receive a channel that broadcasts the Motion Picture and other programming and retransmit it throughout the temporary living place for viewing in private rooms.

*Catch-Up Pay TV* means making available an unaltered digital Motion Picture Copy of the Authorized Telecast in encoded form for Internet Streaming by Authorized Subscribers to a Website operated by the Authorized Broadcaster for a limited period of time not exceeding thirty (30) days from the initial Authorized Telecast.

*Basic Pay TV* means Pay TV exploitation of a Motion Picture by means of other than Premium Pay TV.

*Premium Pay TV* means Pay TV exploitation of a Motion Picture by means other than Basic Pay TV and when the viewer is charged a separate and recurring fee for access to a specific Authorized Channel which is only available to its Authorized Subscribers and does not include third-party advertising.

## E.     Free TV Rights Definitions:

*Free TV* means only *Terrestrial Free TV, Cable Free TV, Satellite Free TV,* and *Catch-Up Free TV*

exploitation of a Motion Picture.

*Terrestrial Free TV* means over-the-air broadcast by Hertzian waves of a Motion Picture Copy for television reception in private living places without a charge to the viewer for the privilege of viewing the Motion Picture, provided that for this purpose government television assessments or taxes (but not a charge for PayPerView or Pay TV) will not be deemed a charge to the viewer.

*Cable Free TV* means the originating transmission by coaxial or fiber-optic cable of a Motion Picture Copy for television reception in private living places without a charge to the viewer for the privilege of viewing the embodied Motion Picture, provided that for this purpose neither government television assessments or taxes nor the regular periodic service charges (but not a charge for PayPerView or Pay TV) paid by a subscriber to a cable television system will be deemed a charge to the viewer.

*Satellite Free TV* means the uplink broadcast to a satellite and its downlink broadcast to terrestrial satellite reception dishes of a Motion Picture Copy for television viewing in private living places located in the immediate vicinity of a viewer's reception dish without a charge to the viewer for the privilege of viewing the embodied Motion Picture, provided that for this purpose government satellite dish or television assessments or taxes (but not a charge for PayPerView or Pay TV) will not be deemed a charge to the viewer.

*Catch-Up Free TV* means making available an unaltered digital Motion Picture Copy of the Authorized Telecast in encoded form for Internet Streaming by Authorized Subscribers to a Website operated by the Authorized Broadcaster for a limited period of time not exceeding thirty (30) days from the initial Authorized Telecast.

## F.     Video Rights Definitions:

*Video* means only *Video Rental* and *Video SellThru* exploitation of a Motion Picture.

*Video Rental* means exploitation of a Motion Picture Copy embodied in a Videogram that is rented to the viewer from a retail location, at a kiosk, or through mail order only for non-public viewing of the embodied Motion Picture in a linear form within a private living place where no admission fee is charged for such viewing.

*Video SellThru* means exploitation of a Motion Picture Copy embodied in a Videogram that is sold to the viewer only for non-public viewing of the embodied Motion Picture in a linear form within a private living place where no admission fee is charged for such viewing.

## G.     VOD Rights Definitions:

*VOD* (View on Demand) means only *AdVOD, FVOD, SVOD* and *TVOD* exploitation of a Motion Picture.

*AdVOD* (or *Advertiser Supported VOD*) means making available a digital Motion Picture Copy by Internet Streaming to a user who is not required to pay a fee to view the Motion Picture Copy but where advertising, such as trailers or commercials, are included before, after, or within the continuity of the Motion Picture Copy, or where other advertising, such as banners, icons, hyper-text, meta-tags, or similar identifying information for a product or service or their supplier, is included on the same Website as the Motion Picture Copy.

*FVOD* (or *Free to the User VOD*) means making available a digital Motion Picture Copy by Internet Streaming to a user who is not required to pay a fee to view the Motion Picture Copy and there is no advertising content embodied in or associated with the Motion Picture Copy.

*SVOD* (or *Subscription VOD*) means making available a digital Motion Picture Copy by Internet Streaming to a user who is required to pay a set fee for a specified period to view the Motion Picture Copy along with other Motion Pictures available on the licensed service making available such Motion

Pictures.

*TVOD* (or *Transactional VOD*) means making available a digital Motion Picture Copy by Internet Streaming to a user who is required to pay a set fee for a specified period to view the Motion Picture.

*Internet Streaming* means making available a digital Motion Picture Copy on the Internet in a manner that allows substantially continuous viewing of the Motion Picture Copy in substantially linear form on a Computer but which does not allow making another digital Copy except for a transient period of time necessary to facilitate such viewing.

## H.    EST Rights Definition:

*EST* (Electronic Service Transaction) means only *Single-Use EST*, *Limited-Use EST* or *Extended-Use EST* exploitation of a Motion Picture.

*Single Use EST* means providing access to a digital Motion Picture Copy for Internet Downloading by a user who is required to pay a separate fee for each act of downloading and who only retains possession of or access to the Motion Picture Copy for a limited period of time in close proximity to the act of downloading as needed to view the Motion Picture.

*Limited Use EST* means  providing access to a digital Motion Picture Copy for Internet Downloading by a user who is required to pay a single fee for a specified number or period of downloads (*e.g.* unlimited downloads for *x* days, or *x* downloads maximum, or *x* downloads within *y* days) and who only retains possession of or access to the Motion Picture Copy for a limited period of time in close proximity to the act of downloading needed to view the Motion Picture for the authorized downloads.

*Extended Use EST* means providing access to a digital Motion Picture Copy for Internet Downloading by a user who is required to pay a separate fee to obtain possession of a digital copy of the Motion Picture Copy which may be viewed, but not further copied, without express limitations as to the number or duration of such viewings by the user.

*Internet Downloading* means providing access to a digital Motion Picture Copy on the Internet in a manner that allows its transmission to a Computer for making another exact digital Copy on such device and retaining such Copy for use for more than a transient period of time on such device after completion of the initial continuous period of transmission.

## I.   Additional Definitions:

*Access* (*access, accessing*) means to make available a digital Motion Picture Copy on the Internet or a Closed Network in a manner that allows a user to copy, view, stream, download or use, or to obtain data or information about or related to, the Motion Picture Copy or its embodied Motion Picture.

*Affiliate* means any Person, including any officer, director, member, employee or partner of a Person controlled by, controlling or under common control with a Party.

*Attribution procedure* means a procedure to verify that an authentication, display, message, record or performance is that of a particular Person as an Authorized Subscriber, or to detect changes or errors in information.

*Authentication procedure* when used in connection with verifying an Authorized Subscriber using the Internet to access the Motion Picture means the same as an attribution procedure.

*Authorized Broadcaster* means the broadcaster authorized to exploit the Motion Picture in the Territory.

*Authorized Channel* means a specific television channel identified as authorized to broadcast a Motion Picture.

*Authorized Format* means a physical format in which Videograms embodying a Motion Picture are authorized to be exploited.

*Authorized Language* means a language in which a Motion Picture is authorized to be exploited.

*Authorized Language Use* means dubbing, subtitling, or parallel tracking in an Authorized Language in which a Motion Picture is authorized to be exploited.

*Authorized Subscriber* means a Person who has been verified by the Network or Platform through an Attribution Procedure as someone who is legally entitled to access and utilize a service and Access the licensed Motion Picture.

*Authorized Telecast* means either a Run or Playdate in which a Motion Picture is authorized to be exploited.

*Authorized Telecaster* means the telecaster authorized to exploit the Motion Picture in the Territory.

*Availability Date* means the first day after the end of the Holdback Period for a Licensed Right.  If the Availability Date refers to a category of Licensed Rights, it refers to the first date on which Licensee may exploit any Licensed Right in the category.  For example, the Pay TV Availability Date is the first date on which Licensee may exploit the Pay TV Terrestrial, Pay TV Cable or Pay TV Satellite Right.

*Broadcast* (*broadcast, broadcasting*) means the communication to the public of a Motion Picture Copy by means of Hertzian waves, wire, cable casting, wireless diffusion, radio waves or satellite in a manner that allows the Motion Picture Copy to be viewed simultaneously with the broadcast on a television, but without use of an Internet Protocol.

*Broadcast* (*broadcast*) means *telecast*.

*Broadcaster* (*broadcaster*) means *telecaster*.

*Computer* means an electronic device that accepts, manipulates and stores digital information or data in response to a sequence of instructions that can be defined, selected, or entered by the user including a desktop, laptop, mobile device, receiver, Smart TV, or tablet.

*Copy* means the embodiment of a Motion Picture in any form, including film, tape, cassette, disc, storage device or digital file, *provided that* where exploitation of a Licensed Right is limited to an Authorized Format then Copy with respect to such Licensed Right is limited to such Authorized Format.

*Closed Network* means an Internet Website or telecommunications network or system which is only available to Authorized Subscribers and Authorized Computers.

*Digital Rights Management (DRM)* means a sequence of software or hardware instructions embodied in, related to, or activated by a Motion Picture Copy that controls or manages copying, viewing, altering, or accessing the Motion Picture, its content or elements or associated Rights Management Information.

*Dubbed* means a Version of the Motion Picture in which the voices of performers on the original soundtrack are replaced with the voices of other performers speaking dialogue in an Authorized Language.

*DVD* means a digitally encoded electronic storage device that conforms to one of the DVD Specifications for Read-Only Disc or Blu-ray Disc and that is designed for use in conjunction with an electronic device in a way that causes a Motion Picture Copy to be visible for private viewing on the screen of a monitor or television.

*DVD Rights* mean the same as *Video Rights*.

*EIDR* means a universal digital object identifier assigned by a duly authorized EIDR authority that uniquely identifies a Motion Picture with all information about the registered Program stored in a central registry. *EIDR* can be used for both physical and digital copies of a Motion Picture.

*Electronic record* means a record created, generated, sent, communicated, received, or stored by electronic means.

*Exhibition* means the same as public performance.

*First Release* means the earliest of: (i) the date on which the Motion Picture must be released in the Territory as designated in the Deal Terms; or (ii) the date on which the Program is first made generally available to the paying public in the Territory, either through exhibition in cinemas, sale of Videograms, or telecast; or (iii) six (6) months after Notice of Initial Delivery.

*First EST Release* means the date on which the Motion Picture is first made generally available for Internet Downloading by means of EST in the Territory.

*First Free TV Release* means the date on which the Motion Picture is first made generally available for public viewing by means of Free TV in the Territory.

*First Pay TV Release* means the date on which the Motion Picture is first made generally available for public viewing by means of Pay TV in the Territory.

*First Theatrical Release* means the date on which the Motion Picture is first made generally available to the paying public in cinemas in the Territory, excluding festival and awards screenings.

*First Video Release* means the date on which Videograms embodying the Motion Picture is first made generally available for sale to or rental by the paying public in the Territory.

*First VOD Release* means the date on which the Motion Picture is first made generally available for Internet Streaming by means of VOD in the Territory.

*First Worldwide Release* means the date on which the Motion Picture is first made available to the general public in any country worldwide in any medium, whether in cinemas, through sale of Videograms, by broadcast or telecast, or by EST or VOD.

*First Negotiation* means that Licensor will negotiate exclusively with Licensee in good faith for a period of ten (10) days after receipt of Notice by Licensor regarding the subject matter of Licensee's First Negotiation right before entering into negotiations regarding the matter with any other Person. If no agreement is reached within this time period, then Licensor will be free to stop negotiations with Licensee and then to negotiate and conclude an agreement regarding the proposed matter with any other Person on any terms.

*License Fee* means the Minimum License Fee and the Additional License Fee, if any, set forth in the Deal Terms.

*Guarantor Certificate* means a certified statement in a record authenticated by a professional completion guarantor who has License Feed completion and delivery of a Motion Picture that specific physical materials for the Motion Picture: (i) are of technical quality sufficient for customary commercial exploitation of applicable Licensed Rights; and (ii) have been placed in the hands of a shipper or air carrier for delivery F.O.B. to the required delivery location for such materials.

*Internet* means the interconnected facilities of a publicly available or closed communications network including mobile networks which uses Internet Protocol for data transmission to Computers.

*Internet Protocol* means the Transmission Control Protocol (TCP) and Internet Protocol (IP) or successors or substantially similar substitute protocols.

*International Standard Audiovisual Number* (*ISAN*) means an international standard audio-visual number assigned to a Motion Picture, or any of its Versions, that uniquely identifies the Motion Picture or the Version and is assigned by a duly authorized ISAN authority.

*Kiosk* means obtaining ownership or possession of a Videogram through an automated dispenser or so-called "kiosk."

*Laboratory Certificate* means a certified statement in a record authenticated by a professional motion picture or sound laboratory which holds physical materials for a Motion Picture confirming that such materials: (i) are of technical quality sufficient for customary commercial exploitation of applicable Licensed Rights; and (ii) are available for access at the laboratory or facility under its customary terms and conditions.

*Law* means any statute or ordinance, whether municipal, state, national or territorial, any executive, administrative or judicial regulation, order, judgment or decree, any treaty or international convention, or any rule, custom, or practice with force of law.

*Linear* means the exploitation of a Motion Picture Copy in a sequential manner so that the Program can be viewed from start to finish but without the ability of the viewer to start, stop and rewind.

*Live Performance* means performance of a Motion Picture or its Underlying Material by live players, whether by reading, performance, music-dramatic rendition or pantomime, where the performance occurs directly before a live audience or is broadcast live and without prerecorded material directly to the public, but excluding performances less than fifteen (15) minutes in length done for the purpose of advertising or publicizing the Motion Picture.

*Local Language(s)* mean the primary language(s) spoken in each country of the Territory.

*Mail Order* means Video SellThru exploitation in which the sale occurs by placing an order for and receiving delivery of the Videogram through use of the postal service or other shipping service and not at a retail establishment, but not including ordering a Videogram over the telephone or through the Internet or a Closed Network.

*Merchandising* means making, distribution, and sale of tangible goods, other than Copies of a Motion Picture or any of its Versions, that are based on or utilize the title of the Program, the names, likenesses or characteristics of artists in their roles in a Motion Picture, or physical materials appearing in or used for a Motion Picture and that are made for sale to the general public, but not including Interactive Multimedia, interactive networked multimedia, Internet or Publishing.

*Mobile Device* means a portable Computer a substantial purpose of which is facilitating telephonic communication through a Closed Network.

*Motion Picture* means the licensed audiovisual work consisting of a series of related images that, when shown in succession impart an impression of motion, with accompanying sounds, if any.

*Network* means a set of interconnected data facilities or resources on a broadcast, cable or satellite system.

*NonLinear* means the exploitation of a digital Motion Picture Copy so that the viewer can manipulate viewing the Program in a manner that alters its continuity or sequence of scenes.

*Original Language* means the primary language spoken in the dialogue of a Motion Picture in its original version.

*Outside Release Date* means the date on which Licensee must release the Program in the First Release Medium, if so specified in the Deal Terms.

*Parallel Tracked* means embodying a Copy of the Original Language Version of the Program in a Compact Disc or DVD that also contains a Dubbed or Subtitled Version of the Program in the Authorized Language Uses.

*Parties* mean each Party to the Agreement.

*Party* means either Licensor or Licensee.

*Pay-Cable TV* means the same as Cable Pay TV.

*Person* means any natural person or legal entity.

*Platform* means a Website which provides its Authorized Subscribers access to Motion Pictures using Internet Protocol.

*Playdate* means one or more telecasts of the Program during a twenty-four (24) hour period over the non-overlapping telecast facilities of an authorized telecaster such that the Program is only capable of reception on televisions within the reception zone of such telecaster during such period.

*Principal Photography* means the actual photographing of a Motion Picture, excluding second-unit photography or special effects photography, requiring the participation of the director and the on-camera participation of a featured member of the principal cast.

*Publishing* means exploitation of hard cover or soft cover printed publications of a novelization of a Motion Picture or artwork, logos, or photographic stills created for use in the Motion Picture that are included in such novelization.

*Quality Control Report* means a statement in a record authenticated by a professional motion picture or sound laboratory which attests whether physical materials for a Motion Picture identified in the report are of technical quality sufficient for customary commercial exploitation of applicable Licensed Rights.

*Record* means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

*Remake* means a new Motion Picture derived from an existing Motion Picture or its Underlying Material in which substantially the same characters and events as shown in the existing Motion Picture are depicted.

*Rights* means rights, licenses, and privileges under copyright, trademark, neighboring rights or other intellectual property rights with regard to any type of exploitation of a Motion Picture or its Underlying Material, including the rights to duplicate, adapt, distribute, perform, display, and make available in accordance with the customary requirements of each specific licensed media.

*Rights Management Information (RMI)* means any information embodied, attached, related or appearing in or on a Motion Picture Copy that may include a copyright notice or other identifier, that identifies the copyright owner, producer, author, writer, director, performers or other Persons who have contributed to the making of the Motion Picture, or that describes any authorized terms and conditions for licensing or use of the Motion Picture or the Motion Picture Copy.

*Run* means one (1) telecast of the Motion Picture during a twenty-four (24) hour period over the non-overlapping telecast facilities of an authorized telecaster such that the Program is only capable of television reception within the reception zone of such telecaster once during such period. A simultaneous telecast over several interconnected local stations (*i.e.* on a network) constitutes one (1) telecast; a telecast over non-interconnected local stations whose signal reception areas do not overlap constitutes a telecast in each station's local broadcast area.

*Secondary Audio Programming (SAP)* means the right to exploit Program in its Original Language in simulcast by an alternative audio channel known as "SAP" embedded within a television broadcast signal that caters to special needs groups and/or Authorized Language-speaking viewers. It is sometimes referred to as Multichannel Television Sound ("MTS").

*Secondary Rights* means the right to grant, exploit or authorize any secondary use or exploitation of a Motion Picture or any of its elements, and to claim, collect and administer any Secondary Royalty Income generated by any such use of a Motion Picture to be collectively managed pursuant to any Law or collective contractual agreement, and administered by any government agency or collective management society or organization including the following: (i) use or sale of blank videograms and any other playback devices or storage media that facilitates private copying, (ii) the rental or lending of videograms or comparable Motion Picture Copies; (iii) the simultaneous retransmission or transmission including by direct injection of a Motion Picture; (iv) surcharges on ticket sales in connection with theatrical exhibition; (v) any communication or performance made to the public of the Program(s) by television broadcasts in publicly accessible businesses or institutions (including, but not limited to, hotels, bars, pubs, hospitals, retirement homes, shops, schools and libraries), and other entities that communicate the Program(s) directly to their patrons, customers, or students in the course of instruction; or the public viewing at no charge of videocassettes and videodiscs of the Program(s) in institutions authorized by law, primarily including such institutions as schools, universities, and libraries, regardless

of whether such videocassettes and videodiscs are owned, rented or copied from a satellite or television broadcast or cable retransmission); (vi) any government copying; or (vii) any comparable use subject to collective management. Secondary Rights are exclusively reserved to the Licensor.

*Secondary Royalty Income* means all royalties, levies, rebates, remuneration and any other amounts generated or payable from the use and exploitation of the Secondary Rights of a Motion Picture. Secondary Royalty Income is the sole property of Licensor and not part of the Gross Receipts.


*Simulcasting* means providing on a Website operated by the Authorized Telecaster licensed to exploit Free TV Rights, an unedited, unaltered, and unabridged Free TV Authorized Telecast of the Motion Picture in the Authorized Language(s) in the Territory.

*Simultaneous Retransmission* means the simultaneous, unedited, unaltered and unabridged retransmission of the telecast of a Motion Picture by an operator other than the initial telecaster by cable, microwave (including MMDS), satellite, digital (including DTT and DVB), wireless or telephonic means for reception by the public of the initial telecast.

*Soundtrack* means the manufacture and exploitation of recordings in any form embodying all or any part of the soundtrack of the Motion Picture or any re-recording of all or any part of the Motion Picture (packaged and labelled in such a way as to be identifiable with the Motion Picture) in lieu of the actual soundtrack thereof.

*Subtitled* means a Version of the Program in which a translation of the original dialogue appears on the bottom of the screen.

*Telecast (telecast)* means the communication to the public of a Motion Picture Copy by means of Hertzian waves, wire, cable casting, wireless diffusion, radio waves or satellite in a manner that allows the Motion Picture Copy to be viewed simultaneously with the broadcast on a television, but without use of an Internet Protocol.

*Telecast* (*telecast*) means *broadcast*.

*Telecaster (telecaster)* means *broadcaster*.

*Transmit (transmit* or *transmission)* means to make available a Motion Picture Copy utilizing Internet Protocol by wire or wireless means.

*Underlying Material* means the literary and other material from which a Motion Picture is derived or on which it is based, including all versions of the screenplay, all notes, memos, direction, comments, ideas, stage, business, and other material incorporated in any version of the Motion Picture, and, to the extent necessary rights and licenses have been duly obtained, all existing novels, stories, plays, songs, events, characters, ideas, or other works from which any version of the Motion Picture is derived or on which it is based.

*Version* means an adaptation of a Motion Picture that is not accomplished by merely mechanical reproduction or use of minimal originality but instead uses original artistic or intellectual expression to create a new Work in its own right which contains materials or expressions of authorship not found in the original Motion Picture.

*Videogram* means a cassette, disc, or comparable magnetic or electronic storage device designed to be used with a reproduction apparatus that causes a Motion Picture Copy to be visible on a television screen for private viewing in a substantially linear manner.

*View-On-Demand* means the same as *Video on Demand*.

*Website* means a set of interconnected data resources at an addressable location on the Internet or a Closed Network which is accessible by other users or Authorized Subscribers of the applicable network.

*Wireless* means exploitation of a digital Motion Picture Copy by making it available on a Closed Network for over-the-air transmission to a Mobile Device which allows access to a Motion Picture Copy.

*Wireless system* means a Closed Network of integrated telecommunications facilities that allow system Subscribers to access an over-the-air digital signal embodying a Motion Picture Copy on a Computer including a Mobile Device.

*Work* means an original expression of authorship in the literary, scientific or artistic domain, whatever may be the mode or form of its expression.