## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 7 |
| CHICKEN SOUP FOR THE SOUL ENTERTAINMENT, INC., *et al.*, | Case No. 24-11442 (MFW) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| GEORGE L. MILLER, CHAPTER 7 TRUSTEE, | Adv. Proc. No. 25-ap-50399 (MFW) |
| Plaintiff. | [Related Docket Nos. 1, 31, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47] |
| v. | |
| WILLIAM J. ROUHANA, JR., AMY L. NEWMARK, CHRISTOPHER MITCHELL, FRED M. COHEN, COSMO DENICOLA, MARTIN POMPADUR, CHRISTINA WEISS LURIE, DIANA WILKIN, VIKRAM SOMAYA, JASON MEIER, AMANDA R. EDWARDS, CHICKEN SOUP FOR THE SOUL PRODUCTIONS, LLC, CHICKEN SOUP FOR THE SOUL, LLC, CHICKEN SOUP FOR THE SOUL HOLDINGS, LLC, | |
| Defendants. | |

## TRUSTEE'S OMNIBUS <u>RESPONSIVE BRIEF II</u> IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE TRUSTEE'S COMPLAINT FOR (I) BREACH OF FIDUCIARY DUTY; (II) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY; (III) AVOIDANCE OF FRAUDULENT TRANSFERS; (IV) RECOVERY OF ILLEGAL DIVIDENDS; (V) DAMAGES FOR NONPAYMENT OF EMPLOYEE WAGES, BENEFITS, AND PAYROLL TAXES; (VI) EQUITABLE SUBORDINATION; AND (VII) DISALLOWANCE OF CLAIMS

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I. PRELIMINARY STATEMENT ........................................................................................1

II. LEGAL ARGUMENT .................................................................................................4

    A.    The Aiding and Abetting Breach of Fiduciary Duty Claims  Are Plausible and Survive the Motions to Dismiss ........................................................................4

        1.    The Trustee Is Entitled to Plead, in the Alternative, Both Breach of Fiduciary Duty Claims and Aiding and Abetting Claims Against the Defendants ..........................................................................................7

        2.    Serving in a Fiduciary Capacity to the Company Does Not Eliminate Claims for Aiding and Abetting a Breach of Fiduciary Duty..................................................................................................9

    B.    The Complaint Sets Forth a Plausible Claim That the Insider Releases Are Avoidable as Constructively Fraudulent Transfers and, Therefore, the Insider Releases Do Not Bar Any of the Trustee's Claims (Eighth and Ninth Claims for Relief) ...........................................................................11

        1.    The Transfer of the Insider Releases Was Made Within Two Years of the Petition Date ..................................................................13

        2.    Avoidance of the Insider Releases Is Not Barred by Any So-Called "Integrated Transaction Doctrine" ............................................14

    C.    The Complaint States a Plausible Claim to Avoid the Insider Revenue Transfers as Constructive Fraudulent Transfers (Sixth and Seventh Claims for Relief)..................................................................................................16

        1.    The Insider Revenue Transfers Are Adequately Identified ......................16

        2.    The Trustee Has Adequately Pled Claims Under Section 550(a) of the Bankruptcy Code................................................................18

    D.    Lack of Reasonably Equivalent Value, Insolvency and the  Existence of a "Triggering Creditor" Are Adequately Pleaded ....................................................19

        1.    Lack of Reasonably Equivalent Value Is Adequately Pleaded..................19

        2.    Insolvency Is Adequately Pleaded ...........................................................20

        3.    The Trustee Is Not Required to Identify a Specific Triggering Creditor ..................................................................................................22

    E.    The Complaint States a Plausible Claim to Recover Preferred Dividends and Insider Revenue Transfers as Illegal Dividends (Tenth Claim for Relief) ......................................................................................................23

        1.    Payments Made Under the Insider CSS License Agreement and CSS Management Agreement Constitute Improper Dividend Payments Under the DGCL ......................................................................23

i

2.      Courts Examine the Substance of a Transaction to Determine an
        Unlawful Dividend.............................................................................24

3.      Insider Revenue Transactions Are Adequately Pleaded as
        Unlawful Dividends ...........................................................................28

4.      The Director Defendants Negligently or Willfully Issued
        Dividends in the Absence of a Surplus ...............................................29

5.      The Director Defendants Failed to Evaluate Assets and Liabilities
        in Good Faith  on the Basis of Acceptable Data ................................30

6.      Determination of Surplus Is a Factual Issue ......................................31

7.      The Allegations Pleaded in the Complaint Support Claims for a
        Willful or Neglectful Determination of Surplus at the Times the
        Preferred Dividends Were Paid and the Insider Revenue Transfers
        Were Made ..........................................................................................32

F.      Other Issues Raised in the Motions to Dismiss .......................................34

1.      The CSS Entities Are Controlling Shareholders With Attendant
        Fiduciary Duties .................................................................................34

2.      The Trustee Is Not Asserting an "Alter-Ego" Cause of Action
        Against the CSS Entities ....................................................................37

3.      The Complaint States a Plausible Claim for Equitable
        Subordination (Thirteenth Claim for Relief) .....................................39

4.      The Complaint Seeks Disallowance or Subordination of
        Defendants' Claims Only to the Extent Such Claims Are Asserted
        Against the Estates, and Dismissal of These Causes of Action
        Based on an Assumption That Underlying Claims for Relief Will
        Be Dismissed Is Premature .................................................................40

5.      The Nonpayment of Employee Obligations Is an Egregious
        Violation of the Defendants' Fiduciary Duties and Damages
        Relating to the Violations of the Fair Labor Standards Will Be
        Prosecuted in Connection With Pending Class Action Litigation ............41

III. CONCLUSION ....................................................................................................42

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AgFeed USA*
 546 B.R. 318 (Bankr. D. Del. 2016) ............................................................. 21

*AT&T Corp. v. Walker*
 2006 U.S. Dist. LEXIS 74272 (W.D. Wash. Oct. 12, 2006) ........................... 25

*Beskrone v. OpenGate Cap. Grp. (In re Pennysaver USA Publ'g)*
 587 B.R. 445 (Bankr. D. Del. 2018) ............................................ 17, 19, 21, 22

*Beskrone v. OpenGate Cap. Grp. (In re Pennysaver USA Publ'g)*
 602 B.R. 256, 266 (Bankr. D. Del. 2019) ................................................. 17, 22

*Blixseth v. Kirschner (In re Yellowstone Mt. Club)*
 436 B.R. 598 (Bankr. D. Mont. 2010) ........................................................... 11

*Brehm v. Eisner*
 746 A.2d 244 (Del. Ch. 2000) ....................................................................... 30

*Brown v. Adams (In re Fort Worth Osteopathic Hosp., Inc.)*
 2008 Bankr. LEXIS 3155 (Bankr. N.D. Tex. Oct. 28, 2008) .................... 11, 12

*Buchwald Cap. Adv. v. Schoen (In re OPP Liq.)*
 2022 Bankr. LEXIS 651 (Bankr. D. Del. March 14, 2022) ............................. 4, 7, 8, 9, 20

*Buckhead America Corp.*
 178 B.R. 956 (D. Del. 1994) .......................................................................... 30

*Burtch v. Huston (In re USDigital, Inc.)*
 443 B.R. 22 (Bankr. D. Del. 2011) ............................................................. 5, 10

*Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*
 2014 Bankr. LEXIS 1362 (Bankr. D. Del. April 2, 2014) ................. 4, 5, 39, 40

*Chemours Co. Deriv. Litig.*
 2021 Del. Ch. LEXIS 258 (Del. Ch. Nov. 1, 2021) ....................................... 30

*Crimson Expl. Stockholder Litig.*
 2014 Del. Ch. LEXIS 213 (2014) ............................................................. 35, 36

*Crowthers McCall Pattern, Inc. v. Lewis*
 129 B.R. 992 (S.D.N.Y. 1991) ...................................................................... 25

*Cysive, Inc., S'holder Litig.*
 836 A.2d 531 (Del. Ch. 2003) .................................................................. 35, 36

*Dubroff v. Wren Holdings*
    2009 Del. Ch. LEXIS 89 (May 22, 2009) ........................................................................ 35

*Emerald Cap. Adv. v. Bayerische Moteren Werke Aktiengesellschaft (In re FAH Liq.)*
    572 B.R. 117 (Bankr. D. Del. 2017) ............................................................................ 20

*Emergency Monitoring Techs.*
    366 B.R. 476 (W.D. Pa. 2007) ..................................................................................... 14

*Field v. Bank of Utah (In re Wing Spirit, Inc.)*
    2025 Bankr. LEXIS 5 (Bankr. D. Haw. Jan. 2, 2025) .................................................. 31

*Friedman v. Wellspring Cap. Mgt. (In re SportCo Holdings)*
    2021 Bankr. LEXIS 2848 (Bankr. D. Del. Oct. 14, 2021) ............................................... 4

*FSLIC v. Musacchio*
    695 F. Supp. 1053 (N.D. Cal. 1988) .......................................................................... 31

*Geyer v. Ingersoll Publ'ns*
    621 A.2d 784 (Del. Ch. 1992) ..................................................................................... 38

*Giuliano v. Ferdinand (In re Liquid Holdings Grp.)*
    2018 Bankr. LEXIS 2650 (Bankr. D. Del. Sep. 4, 2018) ............................................. 23

*Giuliano v. Schnabel (In re DSI Renal Holdings)*
    574 B.R. 446 (Bankr. D.Del. 2017) .......................................................................... 8, 9

*Golden v. Cmty. Health Sys. (In re Quorum Health Corp.)*
    2023 Bankr. LEXIS 1471 (Bankr. D. Del. Apr. 18, 2023) ............................................ 23

*Growe v. Bedard*
    2004 U.S. Dist. LEXIS 23746 (D. Me. Nov. 23, 2004) ................................................ 26

*Gulf Oil Corp. v. Comm'r.*
    914 F.2d 396 (3d Cir. 1990) ........................................................................................ 27

*Halperin v. Moreno (In re Green Field Energy Svcs.)*
    2015 Bankr. LEXIS 2914, 2015 WL 5146161  (Bankr. D. Del. Aug. 31, 2015) ............ 21

*Horbal v. Three Rivers Holdings*
    2006 Del. Ch. LEXIS 53 (March 10, 2006) ................................................................ 24

*IT Group, Inc. v. D'Aniello*
    2005 U.S. Dist. LEXIS 27869 (D. Del. Nov. 15, 2005), reconsideration denied,
    2006 U.S. Dist. LEXIS 5035 (D. Del. Feb. 9, 2006) .................................................... 27

*JPMorgan Chase Bank, N.A. v. Ballard*
    213 A.3d 1211 (Del. Ch. 2019) ................................................................................... 24

*KKR Fin. Holdings LLC S'holder Litig.*
    101 A.3d 980 (Del. Ch. 2014) ..................................................... 35

*Klang v. Smith Food & Drug Ctrs.*
    702 A.2d 150 (Del. 1997) ............................................................. 30

*Le Cafe Crème v. Le Roux (In re Le Cafe Crème, Ltd.)*
    244 B.R. 221 (Bankr. S.D.N.Y. 2000) ................................... 13, 14

*Malpiede v. Townson*
    780 A.2d 1075 (Del. 2001) ........................................................ 4, 7

*Metzger v. Farris (In re e2Communications, Inc.)*
    320 B.R. 849 (Bankr. N.D. Tex. 2004) ........................................ 11

*Michaelson v. Farmer (In re Appleseed's Intermediate Holdings)*
    470 B.R. 289 (D. Del. 2012) ....................................................... 22

*Miller v. ANConnect, LLC (In re Our Alchemy, LLC)*
    2019 Bankr. LEXIS 2905 (Bankr. D. Del. Sep. 16, 2019) .......... 8, 21

*Miller v. Bradley (In re W.J. Bradley Mortg. Cap.)*
    598 B.R. 150 (Bankr. D. Del. 2019) ...................................... 7, 9, 10

*Miller v. Kirkland & Ellis LLP (In re IH 1, Inc.)*
    2016 Bankr. LEXIS 4604 (Bankr. D. Del. Sep. 28, 2016) ............. 12

*Miller v. McCown De Leeuw & Co. (In re The Brown Schools)*
    368 B.R. 394 (Bankr. D. Del. 2007) ......................................... 7, 8

*Minnesota Corn Processors, Inc. v. American Sweeteners, Inc. (In re American
    Sweeteners Inc.)*
    248 B.R. 271 (Bankr. E.D. Pa. 2000) .......................................... 12

*NM Holdings*
    407 B.R. 232 (Bankr. E.D. Mich. 2009) ...................................... 14

*Off. Comm. of Unsec'd Creditors v. Blackstone Fam. Inv. P'ship (In re Color Tile, Inc.)*
    2000 U.S. Dist. LEXIS 1303 (D. Del. Feb. 9, 2000) ...................... 29

*Official Comm. of Unsec'd Creditors v. Reliance Cap. (In re Buckhead Am. Corp.)*
    178 B.R. 956 (D. Del. 1994) ....................................................... 24

*Omega Door Co.*
    399 B.R. 295 (B.A.P. 6th Cir. 2009).......................................... 14

*PAH Litig. Trust v. Water St. Healthcare Prtnrs (In re Physiotherapy Holdings)*
    2016 Bankr. LEXIS 2810 (Bankr. D. Del. June 20, 2016) ............. 12

*Pardo v. Avanti Corp. Health Sys. (In re APF Co.)*
  274 B.R. 634 (Bankr. D. Del. 2001) ............................................................... 23

*Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*
  458 B.R. 87 (Bankr. S.D.N.Y. 2011) .............................................................. 17

*Quadrant Structured Prods. Co. v. Vertin*
  102 A.3d 155 (Del. Ch. 2014) ....................................................................... 24

*Rafool v. Goldfarb Corp. (In re Fleming Pkg.)*
  2005 Bankr. LEXIS 1740 (Bankr. C.D. Ill. Aug. 26, 2005) ........................... 11

*Responsible Person v. Best Buy Co. (In re Musicland Holding Corp.)*
  398 B.R. 761 (Bankr. S.D. N.Y. 2008) ........................................................... 26

*Schubert v. Lucent Techs. (In re Winstar Commc'ns)*
  554 F.3d 382 (3d Cir. 2009) ........................................................................... 39

*Sheffield Steel Corp.*
  320 B.R. 405 (Bankr. N.D. Okla. 2004) ............................................. 26, 27, 29

*Sheldon v. Pinto Tech. Ventures*
  220 A.3d 245 (Del. 2019) ............................................................................... 34

*Smith v. Weinshanker (In re Draw Another Circle)*
  602 B.R. 878 (Bankr. D. Del. 2019) ............................................................... 10

*Stanziale v. Brown-Minneapolis Tank ULC (In re BMT-NW Acq.)*
  582 B.R. 846 (Bankr. D. Del. 2018) ............................................................... 19

*Stanziale v. Medi Biotech LLC*
  2025 Bankr. LEXIS 677 (Bankr. D. Del. Mar. 20, 2025) ........................... 19, 21

*SV Inv. Prtnrs v. ThoughtWorks, Inc.*
  7 A.3d 973 (Del. Ch. 2010), *aff'd*, 37 A.3d 205 (Del. 2011) ........................... 30

*Syntax-Brillian Corp.*
  573 F. App'x 154 (3d Cir. 2014) ....................................................................... 7

*Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*
  429 B.R. 73 (Bankr. S.D.N.Y. 2010) .......................................................... 13, 17

*U.S. Bank N.A. v. Verizon Commc'ns*
  892 F. Supp 2d 805 (N.D. Tex. 2012) .......................................... 25, 28, 29, 30, 31

*Unencumbered Assets, Tr. v. JP Morgan Chase Bank (In re Nat'l Century Fin. Enters.,
  Inc. Inv. Litig.)*
  617 F. Supp. 2d 700 (S.D. Ohio 2009) .......................................................... 17

*Union Bankers Ins. v. Comm'r*
    64 T.C. 807 (1975) ........................................................................ 27

*Zazzali v. Hirschler Fleischer, P.C.*
    482 B.R. 495 (D. Del. 2012) .......................................................... 22

*Zazzali v. Mott (In re DBSI, Inc.)*
    445 B.R. 344 (Bankr. D. Del. 2011) ............................................. 20

*Zohar CDO 2003-1 v. Patriarch Prtnrs (In re Zohar III, Corp.)*
    631 B.R. 133 (Bankr. D. Del. 2021) ............................................. 21

**Statutes**

11 U.S.C. § 502 ...................................................................................... 23

11 U.S.C. § 544 ...................................................................................... 22

11 U.S.C. § 544(b) ................................................................................. 14

11 U.S.C. § 544(b)(1) ............................................................................ 23

11 U.S.C. § 548 ...................................................................................... 13

11 U.S.C. § 548(a) ................................................................................. 13

11 U.S.C. § 550(a) ............................................................................ 16, 18

11 U.S.C. § 550(a)(1) ............................................................................ 18

11 U.S.C. § 550(a)(2) ............................................................................ 18

8 Del. Code Ann. § 154 ......................................................................... 30

8 Del. Code Ann. § 170 ......................................................................... 29

8 Del. Code Ann. § 174(a). .................................................................... 23

**Rules**

Delaware Chancery Court Rule 23.1 ...................................................... 30

Federal Rule of Civil Procedure 12(b)(6) ................................................ 3

Federal Rule of Civil Procedure 8(a) ....................................................... 3

George L. Miller, the duly appointed chapter 7 trustee of the above-captioned Debtors' estates (the "Trustee"), on behalf of Chicken Soup for the Soul Entertainment, Inc., and its related debtors (the "Company"), and as Plaintiff in the above-captioned adversary proceeding, hereby submits this *Omnibus Responsive Brief II in Opposition to Defendants' Motions to Dismiss the Trustee's Complaint for (I) Breach of Fiduciary Duty; (II) Aiding and Abetting Breach of Fiduciary Duty; (III) Avoidance of Fraudulent Transfers; (IV) Recovery of Illegal Dividends; (V) Damages for Nonpayment of Employee Wages, Benefits, and Payroll Taxes; (VI) Equitable Subordination; and (VII) Disallowance of Claims* ("Responsive Brief II").[1]

## I.

## PRELIMINARY STATEMENT

The Complaint here sets forth the causes of action asserted against each of the Defendants and the detailed and specific facts underlying each of the claims.  The Complaint details (a) the breach of fiduciary duty claims against Rouhana, the other D&Os, and the CSS Entities relating to, among other things, the Redbox Merger, the Insider Releases, the Insider Revenue Transfers, the payment of the Preferred Dividends, and the nonpayment of Employee Wage, Benefit and Tax Obligations (First through Fourth Claims for Relief); (b) the claims against each Defendant for aiding and abetting said breaches of fiduciary duty of the other Defendants (Fifth Claim for Relief); (c) the claims against Rouhana, Newmark and the CSS Entities seeking to avoid the Insider Revenue Transfers as fraudulent transfers (Sixth and Seventh Claims for Relief); (d) the claims against all Defendants seeking to avoid the Insider Releases as fraudulent transfers (Eighth and

---

[1] Filed concurrently herewith is the Trustee's *Omnibus Responsive Brief I in Opposition to Defendants' Motions to Dismiss the Trustee's Complaint for (I) Breach of Fiduciary Duty; (II) Aiding and Abetting Breach of Fiduciary Duty; (III) Avoidance of Fraudulent Transfers; (IV) Recovery of Illegal Dividends; (V) Damages for Nonpayment of Employee Wages, Benefits, and Payroll Taxes; (VI) Equitable Subordination; and (VII) Disallowance of Claims* ("Responsive Brief I").  Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in Responsive Brief I.

Ninth Claims for Relief); (e) the claims against all Defendants for recovery of the Preferred Dividends and Insider Revenue Transfers as illegal dividends (Tenth Claim for Relief); and (f) related claims, including disallowance and equitable subordination of any claims asserted by any Defendant (Twelfth and Thirteenth Claims for Relief).

The Defendants collectively submitted over 228 pages of briefing in seven separate motions seeking dismissal of each and every cause of action set forth in the Complaint (the "Motions to Dismiss"), along with 147 exhibit references, and 8,549 pages of exhibits in response to the allegations set forth in the Complaint, in an effort to dispute the Trustee's factual allegations.[2]

In light of the voluminous nature of the Motions to Dismiss, the Trustee provides his response to the Defendants' Motions to Dismiss in two parts. This is the Trustee's Responsive Brief II, which responds to, and addresses, the following issues:

- The Complaint's aiding and abetting breach of fiduciary duty claims against all Defendants are plausible and survive the Motions to Dismiss. Responsive Brief II § II.A.

- The Complaint sets forth a plausible claim that the Insider Releases are avoidable as constructively fraudulent transfers and, therefore, the Insider Releases do not bar any of the Trustee's claims for relief. *Id.* § II.B.

- The Complaint sets forth a plausible claim that the Insider Revenue Transfers are avoidable as constructively fraudulent transfers. *Id.* § II.C.

---

[2]    Rouhana Motion to Dismiss and related brief [D.I. 36, 37] ("Rouhana Br."); Newmark Motion to Dismiss and related brief [D.I. 38, 39] ("Newmark Br."); CSS Entities Motion to Dismiss and related brief [D.I. 40, 41] ("CSS Entities Br."); Other Directors Motion to Dismiss and related brief [D.I. 31, 35] ("Other Directors Br."); Mitchell Motion to Dismiss and related brief [D.I. 45, 46] ("Mitchell Br."); Meier Motion to Dismiss and related brief [D.I. 43, 44] ("Meier Br."); Edwards Motion to Dismiss and related brief [D.I. 33, 34] ("Edwards Br."). Rouhana, Newmark and the CSS Entities also filed an 805-page Appendix of Exhibits [D.I. 42] and Mitchell filed 1,543 pages of exhibits attached to the Declaration of Douglas P. Baumstein [D.I. 47].

- The Complaint adequately pleads a lack of reasonably equivalent value, insolvency, and the existence of a "triggering creditor" in connection with the Trustee's fraudulent transfer claims. *Id.* § II.D.

- The Complaint sets forth a plausible claim to recover Preferred Dividends and Insider Revenue Transfers as illegal dividends. *Id.* § II.E.

- Other issues raised by the Motions to Dismiss, including that the CSS Entities are properly considered to be "controlling shareholders," that the claims for relief for disallowance and equitable subordination are proper and should not be dismissed at this juncture, and that the nonpayment of Employee Wages, Benefits, and Payroll Tax Obligations form part of the Trustee's breach of fiduciary duty allegations (and that liability for such nonpayment will be determined in connection with a pending class action brought on behalf of the employees themselves). *Id.* § II.F.

Filed concurrently herewith is the Trustee's Responsive Brief I, which responds to, and addresses, the following issues:

- The Complaint satisfies the notice and plausibility requirements of Rules 8(a) and 12(b)(6) of the Federal Rules of Civil Procedure. Responsive Brief I § II.A.

- The Complaint provides detailed and specific allegations sufficient to put each of the Defendants on notice of the Trustee's claims against him, her or it. *Id.* § II.B.

- The Complaint does not impermissibly rely on "group pleading." *Id.* § II.C.

- The existence and application of exculpatory provisions is an affirmative defense that is not properly considered at the motion to dismiss stage, and exculpation provisions do not, as a matter of law, bar breach of duty of loyalty claims against the Director Defendants, any breach of fiduciary duty claims against the Officer Defendants, or any claims for aiding and abetting a breach of fiduciary duty against any Defendant. Therefore, exculpation does not bar any of the Trustee's claims for relief. *Id.* § II.D.

- The "business judgment rule" is an affirmative defense that is not properly considered at the motion to dismiss stage and, therefore, does not bar any of the Trustee's claims. *Id.* § II.E.

- The Complaint's breach of fiduciary duty claims against all Defendants are plausible and survive the Motions to Dismiss. *Id.* § II.F.

As detailed herein and in Responsive Brief I, the Complaint contains detailed and specific allegations sufficient to withstand dismissal on all counts being pursued by the Trustee. The Trustee, therefore, respectfully requests that the Court deny the Motions to Dismiss.

## II.

## LEGAL ARGUMENT

### A.    The Aiding and Abetting Breach of Fiduciary Duty Claims Are Plausible and Survive the Motions to Dismiss

"'A valid claim for aiding and abetting a breach of fiduciary duty requires the plaintiff to show that (1) a fiduciary relationship existed; (2) the fiduciary breached its duty; (3) a non-fiduciary defendant knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted actions of the fiduciary and the nonfiduciary.'" *See Buchwald Cap. Adv. v. Schoen (In re OPP Liq*.), 2022 Bankr. LEXIS 651, *27 (Bankr. D. Del. March 14, 2022) (MFW) (quoting *Friedman v. Wellspring Cap. Mgt. (In re SportCo Holdings)*, 2021 Bankr. LEXIS 2848, *30 (Bankr. D. Del. Oct. 14, 2021)).  "In the context of aiding and abetting a breach of fiduciary duty, knowing participation 'requires that the third party act with the knowledge that the conduct advocated or assisted constitutes a breach.'" *Burch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*, 2014 Bankr. LEXIS 1362, *21-22 (Bankr. D. Del. April 2, 2014) (MFW) (quoting *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001)).

As detailed in the Trustee's Responsive Brief I § II.F, the Trustee has stated plausible claims for breach of fiduciary duties against Rouhana, the other Board Defendants, the other Officer Defendants, and the CSS Entity Defendants.  In addition, as was the case in *OPP Liquidating*, in the event that the Trustee is ultimately unable to prove his direct breach of fiduciary allegations with respect to any of the Defendants, the Complaint has nonetheless alleged enough facts to support his claims that each such Defendant knowingly participated in the breach of fiduciary duties of the *other* Defendants.[3]  *OPP Liq.*, 2022 Bankr. LEXIS 651, at *27-28.  Directly

---

[3]    Contrary to the "strawman" argument in the Motions to Dismiss of Defendants Rouhana, Newmark, the CSS Entities and Mitchell, the Trustee is not asserting that any individual Defendant aided and abetted his, her, or its own breach of fiduciary duty, as was the case in *Burch v. Huston (In re*

applicable to the Trustee's claims that the Defendants aided and abetted Rouhana's breaches of fiduciary duty in this case, this Court has found that there is a plausible claim for knowing participation in another's breach of fiduciary duty based on allegations that the aiding and abetting defendant advocated for a transaction with the knowledge that the transaction would cause the debtor to default on its debt and that the fiduciary stood on both sides of the transaction.  *Advance Nanotech*, 2014 Bankr. LEXIS 1362, at *22.  This Court has also found that there is a plausible claim for aiding and abetting against a controlling entity where there is a lack of an arm's length transaction between the controlling entity and the debtor.  *Id.* at *22-23.

Specifically, the Complaint here alleges that each of the Defendants—even if they are ultimately found not to stand in a direct fiduciary capacity or to have limited duties due to the applicability of exculpation provisions—acted with knowledge that the conduct advocated or assisted constituted a breach of fiduciary duty and, therefore there are plausible claims that these Defendants "knowingly participated" in each such breach.  For example:

- Rouhana admittedly exerted unchecked control over the Company, the CSS Entities, and the D&Os, and their decision making, and this fact was disclosed and known to each Defendant in connection with each challenged action or inaction outlined in the Complaint.  Complaint ¶¶ 26-28.

- Rouhana, Newmark and Mitchell were self-interested and conflicted as they served in dual fiduciary capacities to both the Company and CSS, and this conflict was disclosed and known to each Defendant in connection with each challenged action or inaction outlined in the Complaint.  *Id*. ¶¶ 10-12.

- Rouhana was aided by Officers on his financial management and executive teams, including Mitchell, Meier, and Edwards, in adopting wildly unrealistic business projections and plans, which the other D&Os blindly accepted, leading the Company to a dire financial position and its ultimate bankruptcy filing.  *Id*. ¶ 29.

---

*USDigital, Inc.)*, 443 B.R. 22, 47 (Bankr. D. Del. 2011), cited by these Defendants for the noncontroversial point that a defendant cannot be found to have both breached his fiduciary duty and also aided and abetted that very same breach.  Rather, as discussed herein, the Trustee has appropriately asserted here that each Defendant aided and abetted the breaches of fiduciary duty of the *other* Defendants.

- The other D&Os failed to oversee Rouhana or curtail his entry into self-interested and unreasonable transactions; unreasonably relied on, did not question, and/or rubber-stamped Rouhana's determinations and dictates; and failed to obtain and/or ignored pertinent information that would have allowed them to make reasoned and informed decisions with respect to decisions that constituted breaches of fiduciary duty by Rouhana. *Id.* ¶ 30.

- Notwithstanding the Company's publicly reported negative financial performance, the D&Os failed to request, obtain, analyze, question, or consider sufficient financial information to allow them to act in the best interests of the Company; instead, they rubber-stamped Rouhana's self-interested plans and determinations. *Id.* ¶¶ 31-34.

- This failure to request, obtain, analyze, question, or consider sufficient financial information to allow them to act in the best interests of the Company, and the rubber-stamping of Rouhana's determinations even as the Company's internal controls over financial reporting and operations failed, was egregious. The Complaint alleges that the Defendants were, or should have been, aware of the issues with respect to each of the challenged transactions detailed in the Complaint, and should have acted to assess the propriety of the transactions and curtail Rouhana's actions, instead of participating in his and/or other's breaches of fiduciary duty. The Complaint alleges the underlying breaches—and each other Defendants' participation and assistance in such breaches—with respect to each challenged transaction:

    (a)  The disastrous Redbox Merger that lead to the demise of the Company. *Id.* ¶¶ 35-57.

    (b)  The self-interested Insider Releases purportedly granted in favor of the Company's own officers, directors, management and affiliates. *Id.* ¶¶ 58-61.

    (c)  The failure to assess the reasonableness of, and payments of over $55 million made pursuant to, the Insider Licensing and Management Agreements between CSS and the Company, with Rouhana, Newmark and Mitchell acting on both sides of the transactions. *Id.* ¶¶ 62-67.

    (d)  The entry into Intellectual Property License Agreements, some of which were with Rouhana's personal friend, at a time when the Company was in dire financial straits. *Id.* ¶¶ 68-72.

    (e)  The issuance of nearly $37 million in illegal Preferred Dividends at a time when the Company was in dire financial straits. *Id.* ¶¶ 73-77.

(f)    The nonpayment of over $15.5 million in employee obligations while payments to insiders were continuing to be made. *Id*. ¶¶ 78-81.

Contrary to the caselaw cited by the Defendants where the assertions of knowing participation lacked factual support,[4] the factual allegations here establish that the Trustee has set forth a plausible claim that each of the Defendants knowingly participated in and substantially assisted the other Defendants' breaches of fiduciary duty.

1.    The Trustee Is Entitled to Plead, in the Alternative, Both Breach of Fiduciary Duty Claims and Aiding and Abetting Claims Against the Defendants

Contrary to the Defendants' assertions, the Trustee is entitled to assert claims against each of the Defendants both for their *own* breaches of fiduciary duty and for claims for aiding and abetting the *other* Defendants' breaches of fiduciary duty, as set forth in the Complaint.  Claims for aiding and abetting a breach of fiduciary duty are not subject to exculpation.  *See, e.g., OPP Liq.*, 2022 Bankr. LEXIS 651, at *28 n.99 (citing *Miller v. Bradley (In re W.J. Bradley Mortg. Cap.*), 598 B.R. 150, 174-75 (Bankr. D. Del. 2019)) (holding that at the motion to dismiss stage, it is too early to determine the precise boundaries of each defendant's fiduciary duties, but directors shielded from liability by an exculpation clause could still be held liable for aiding and abetting a breach of fiduciary duty by another defendant); *Miller v. McCown De Leeuw & Co. (In re The Brown Schools)*, 368 B.R. 394, 402-03 (Bankr. D. Del. 2007) ("While a corporate director owes the corporation fiduciary duties, in some instances those duties may be limited (by corporate charter or statute).  Thus, the Court may find that a director had no fiduciary duty but aided and abetted a party that did.").

---

[4]    *See, e.g., In re Syntax-Brillian Corp.*, 573 F. App'x 154, 163 (3d Cir. 2014) (dismissing aiding and abetting claim based on "bald assertions of knowledge"); *Malpiede*, 780 A.2d at 1098 (allegations did not support inference of knowing participation).

At the pleading stage, it is entirely permissible to plead such claims in the alternative—especially where, as here, the Defendants have asserted that certain fiduciary duties either do not exist or have been limited under the Company's charter.  *See Miller v. ANConnect, LLC (In re Our Alchemy, LLC)*, 2019 Bankr. LEXIS 2905, *48 (Bankr. D. Del. Sep. 16, 2019) (cited by certain Defendants for the uncontroverted legal standard governing an aiding and abetting claim), notably also held that "[a]t the pleading stage, the Trustee is entitled to plead in the alternative and to assert claims of aiding and abetting to the extent that some defendants did not themselves have any fiduciary duties or were shielded from breach of fiduciary duty claims by exculpatory provisions of debtor's operating agreement."  *See also OPP Liq.*, 2022 Bankr. LEXIS 651, at *28 n.99 (citing *W.J. Bradley*, 598 B.R. at 174-75 (holding that at the motion to dismiss stage, it is too early to determine the precise boundaries of each defendant's fiduciary duties, but directors shielded from liability by an exculpation clause could still be held liable for aiding and abetting a breach of fiduciary duty by another defendant); *Brown Schools*, 368 B.R. at 402-03 ("While a corporate director owes the corporation fiduciary duties, in some instances those duties may be limited (by corporate charter or statute).  Thus, the Court may find that a director had no fiduciary duty but aided and abetted a party that did.").  As set forth by the court in *DSI Renal*:

> At this stage in the proceedings, determination of the precise outer boundaries of each D&O Defendant's or Centre Defendant's fiduciary duties is premature. For example, the directors may prove to be shielded by their exculpatory clauses, but liable for assisting officer Defendant Yalowitz; Centre Partners may be determined to have no fiduciary duties, but could be held liable for aiding and abetting a breach of fiduciary duty by any D&O Defendant. According all reasonable inferences in favor of the Trustee, the Complaint adequately pleads the elements of aiding and abetting a breach of fiduciary duty as to all D&O Defendants and Centre Defendants.

*Giuliano v. Schnabel (In re DSI Renal Holdings)*, 574 B.R. 446, 474-75 (Bankr. D. Del. 2017).

The Board Defendants here assert that they are exculpated from claims based on a breach of their fiduciary duty of care pursuant to the provisions of the Company's charter.  As discussed

in Responsive Brief I § II.D, however, whether exculpation applies, or does not apply, to claims against the Board Defendants is an affirmative defense not properly considered at the motion to dismiss stage. In addition, the Court could ultimately determine that one or more of the Defendants did not serve in a fiduciary capacity with the Company at relevant times, as the CSS Entities, Mitchell, Meier, and Edwards assert. The precise boundaries of each Defendant's fiduciary duties are not ripe for determination at this stage of the proceedings. Therefore, the Trustee's aiding and abetting claims should not be dismissed.

> 2.  Serving in a Fiduciary Capacity to the Company Does Not Eliminate Claims for Aiding and Abetting a Breach of Fiduciary Duty

Each of the Defendants assert that they are not, as a matter of law, subject to claims for aiding and abetting a breach of fiduciary duty because they served in a fiduciary capacity to the Company. But this is not the law. As set forth in *W.J. Bradley*, "'[a]lthough the elements of a claim for aiding and abetting a breach of fiduciary duty count are couched in terms of the primary violator being a fiduciary and the aider and abettor and non-fiduciary, there is no case law that precludes such a claim against a fiduciary. *While a corporate director owes the corporation fiduciary duties, in some instances those duties may be limited (by corporate charter or statute). Thus, the Court may find that a director had no fiduciary duty but aided and abetted a party that did.*" 598 B.R. at 174 (quoting *DSI Renal*, 574 B.R. at 474, n.87).

Indeed, this Court has addressed—and rejected—this very argument made by Defendants. In *OPP Liquidating*, the BOD Defendants contended that there were no facts in the complaint supporting that they did not owe fiduciary duties to the debtor and that, because they were co-fiduciaries, there could be no aiding and abetting claim asserted against them under Delaware law. 2022 Bankr. LEXIS 651, at *26. In response, the trustee asserted that the complaint stated a claim against all defendants for breach of fiduciary duty; however, if the Court were to conclude that the

BOD defendants did not breach their own fiduciary duties, the complaint nonetheless stated sufficient facts (as to knowledge and substantial assistance) to support a claim that they aided and abetted the breach of fiduciary duties of the remaining defendants. *Id.* at \*26-27. The trustee further asserted that the complaint stated a claim against the BOD Defendants for aiding and abetting the other defendants' breaches of fiduciary duty and that it would be premature to dismiss the aiding and abetting claims because it was too early to determine the culpability of each defendant. *Id.* at \*27. This Court, agreeing with the trustee's position, stated as follows:

> The Court agrees with the Liquidating Trustee. As explained above, the Court concludes that the Liquidating Trustee has successfully stated claims for breach of fiduciary duties against the Officer Defendants and BOD Defendants in Counts I and II. However, if the Liquidating Trustee is unable to prove its allegations with respect to any BOD Defendant, the Court concludes that the Amended Complaint has nonetheless alleged enough facts to support its claims that the BOD Defendants knowingly participated in the breach of fiduciary duties by the other Defendants. Accordingly, the Court will deny the Motions to Dismiss Count III [for aiding and abetting breach of fiduciary duty].

*Id.* at \*27-28 (footnote omitted).[5]

Likewise, in this case, the Trustee's claims against all Defendants for aiding and abetting withstand dismissal.

---

[5] The cases cited by the Defendants do not lead to a different result. These cases simply stand for the uncontroversial proposition that a defendant cannot be held liable for both a breach of fiduciary duty and aiding and abetting a breach of that same duty. *See, e.g., Smith v. Weinshanker (In re Draw Another Circle)*, 602 B.R. 878, 905 (Bankr. D. Del. 2019) ("Delaware law generally prohibits aiding and abetting claims against parties that already stand in direct fiduciary relationships. This is because wrongful conduct on the part of the fiduciary would give rise to direct liability for a breach of duty, rather than secondary liability on the theory of aiding and abetting.") (footnote omitted); *USDigital, Inc.*, 443 B.R. at 47 (a defendant cannot be found to have both breached a fiduciary duty and also aided and abetted that very same breach).

**B.**    **The Complaint Sets Forth a Plausible Claim That the Insider Releases Are Avoidable as Constructively Fraudulent Transfers and, Therefore, the Insider Releases Do Not Bar Any of the Trustee's Claims (Eighth and Ninth Claims for Relief)**

All Defendants claim that, as beneficiaries of the gratuitous Insider Releases purportedly granted by the Company to the Company's directors, officers, managers, and affiliates as of the consummation of the Redbox Merger on August 11, 2022, the Trustee's claims against them that pre-date the Insider Releases are barred.[6]   However, the Insider Releases *cannot* bar any claims if the releases are avoided, as the Trustee seeks by way of the Complaint's Eighth and Ninth Claims for Relief.[7]

The Trustee alleges that the Insider Releases are constructively fraudulent transfers that were transferred for no value at a time when the Company was insolvent, undercapitalized, and/or unable to pay its debts as they came due.   *See, e.g., Blixseth v. Kirschner (In re Yellowstone Mt. Club)*, 436 B.R. 598, 668 (Bankr. D. Mont. 2010) (avoiding a prepetition agreement to release an insider as a fraudulent transfer where the debtors "received absolutely nothing in exchange" for releasing their claims against the insider); *see also Rafool v. Goldfarb Corp. (In re Fleming Pkg.)*, 2005 Bankr. LEXIS 1740, *45 (Bankr. C.D. Ill. Aug. 26, 2005) ("A release is a transfer of an interest of the debtor in property and is subject to avoidance as a preferential or fraudulent transfer.") (citing *Metzger v. Farris (In re e2Communications, Inc.),* 320 B.R. 849, 855 (Bankr. N.D. Tex. 2004)); *Brown v. Adams (In re Fort Worth Osteopathic Hosp., Inc.)*, 2008 Bankr. LEXIS 3155, *19-20 (Bankr. N.D. Tex. Oct. 28, 2008) ("Even if the releases might serve as a bar to a suit

---

[6]    Rouhana Br. at 30; Newmark Br. at 35-36; CSS Entities Br. at 19-20; Other Directors Br. at 9; Mitchell Br. at 7-10; Meier Br. at 14; Edwards Br. at 14-15.

[7]    The Complaint also asserts that, by causing the Company to enter into the Release Agreement—which was an interested-party transaction—and to proceed with the Redbox Merger to guarantee their Insider Releases, the Defendants placed their own interests ahead of those of the Company in violation of their fiduciary duties. Complaint ¶¶ 58-61.  The breach of fiduciary duty issues, including the provision of the Insider Releases, are addressed by the Trustee in Responsive Brief I § II.F.

by the Trustee, the releases themselves would be subject to avoidance by the Trustee upon a showing that they were preferential or fraudulent under applicable fraudulent transfer law.").

The Trustee did not execute the Release Agreement and is not bound by the Insider Releases from asserting avoidance claims on behalf of creditors. *See, e.g., Miller v. Kirkland & Ellis LLP (In re IH 1, Inc.)*, 2016 Bankr. LEXIS 4604, *31 (Bankr. D. Del. Sep. 28, 2016) ("a trustee bringing an avoidance action does not stand in the shoes of the debtor, and thus defenses which may be successful against the prepetition debtor, may not preclude an avoidance action") (citing *PAH Litig. Trust v. Water St. Healthcare Prtnrs (In re Physiotherapy Holdings)*, 2016 Bankr. LEXIS 2810, *54 (Bankr. D. Del. June 20, 2016) (debtor in possession's prepetition release is not binding on trustee and creditors bringing a postpetition avoidance action because they were not party to the release)); *Minnesota Corn Processors, Inc. v. American Sweeteners, Inc. (In re American Sweeteners Inc.)*, 248 B.R. 271, 276 (Bankr. E.D. Pa. 2000) ("prior to bankruptcy a debtor may not waive bankruptcy rights that inure to the benefit of unsecured creditors not a party to that waiver"); *Brown v. Adams (In re Fort Worth Osteopathic Hosp., Inc.)*, 2008 Bankr. LEXIS 3155, *19 (Bankr. N.D. Tex. Oct. 28, 2008) ("when a trustee stands in the shoes of creditors— e.g., when pursing a fraudulent transfer—a prepetition release by a debtor will not bar the trustee's suit").

The Defendants nevertheless argue that the Insider Releases cannot be avoided because (1) they were not made within two years of the Petition Date, and so cannot be avoided under section 548 of the Bankruptcy Code; (2) they are barred by the "integrated transaction doctrine;" and (3) the allegations concerning lack of reasonably equivalent value and insolvency are inadequate.[8]  None of these arguments support dismissal of the Trustee's claims.

---

[8]     Rouhana Br. at 37-40; Newmark Br. at 35-37; CSS Entities Br. at 19-21; Other Directors Br. at 27-30, Mitchell Br. at 27-29.

1.    <u>The Transfer of the Insider Releases Was Made Within Two Years of the Petition Date</u>

The Defendants contend that any claim to avoid the Insider Releases accrued more than two years before the Petition Date and, thus, any avoidance claim under section 548 of the Bankruptcy Code (*i.e.,* the Eighth Claim for Relief) is time-barred.[9]  The Defendants are incorrect.

The Defendants acknowledge that, by its express terms, the Release Agreement was not effective until the consummation of the Redbox Merger (with which they assert the Insider Releases were "interrelated").  The Redbox Merger did not close until August 11, 2022.  Thus, because the relevant transfer was actually made less than two years prior to the Petition Date (June 24, 2024), it is subject to avoidance under section 548(a) of the Bankruptcy Code.  That the Release Agreement was *executed* earlier (in May 2022) does not change the *effective* date of the transfer (*i.e.,* the date the claims were allegedly released) pursuant to the very terms of the Release Agreement—August 11, 2022 (a date which is within the two-year reachback period).

The only case cited in support of the Defendants' novel theory is *Le Cafe Crème v. Le Roux (In re Le Cafe Crème, Ltd.)*, 244 B.R. 221, 234 (Bankr. S.D.N.Y. 2000).  In that case, the debtor transferred security interests and equity into escrow to secure future installment payment obligations, which the court held were indivisible from the underlying agreements; as a result, the court held that those obligations dated back to the original date of the underlying agreements and claims to avoid them were time-barred.  Notably, the court's holding in *Le Cafe Crème* has been repeatedly rejected and criticized.  *See, e.g., Tronox Inc. v. Anadarko Petroleum Corp. (In re Tronox Inc.)*, 429 B.R. 73, 101-02 (Bankr. S.D.N.Y. 2010) ("*Le Cafe Crème* has not been followed in a number of jurisdictions, and numerous courts have explicitly disagreed with it.") (citing *In re*

---

[9]    Rouhana Br. at 38; Newmark Br. at 35-36; CSS Entities Br. at 19-20; Other Directors Br. at 27; Mitchell Br. at 28.

*Omega Door Co.*, 399 B.R. 295, 303 n.3, 304 (B.A.P. 6th Cir. 2009) (trustee could avoid installment payments under § 544(b) made within reachback period although underlying contract was signed outside of reachback period); *In re Emergency Monitoring Techs.*, 366 B.R. 476, 503 (W.D. Pa. 2007) ("[T]he Court holds that, if it were necessary…then the Court would reject such holding in *Le Cafe Crème*."); *In re NM Holdings*, 407 B.R. 232, 267-68 (Bankr. E.D. Mich. 2009) (declining to apply the relevant portion of *Le Cafe Crème*, characterizing it as "contrary to the unambiguous language of 11 U.S.C. § 544(b)").

And, in any event, the *Le Cafe Crème* decision is inapposite.  The Release Agreement is not an installment payment obligation.  As alleged in the Complaint and by its express terms, the Release Agreement is an independent agreement that purports to grant gratuitous releases to insiders that are not even parties to the Redbox Merger transaction as of a date within two years of the Petition Date.  Complaint ¶¶ 58-61, 151-157.  In any event, to the extent the Defendants dispute the effective date of the Insider Releases, that is a fact question not subject to resolution at the motion to dismiss stage.  Moreover, the Trustee's Ninth Cause of Action—asserting avoidability of the Insider Releases as constructive fraudulent transfers under section 544(b) of the Bankruptcy Code and Delaware state law—is unchallenged as time-barred, as the Insider Releases were indisputably transferred within the four-year reach back period provided by section 544(b).  Complaint ¶¶ 58-61, 158-164.

2.    <u>Avoidance of the Insider Releases Is Not Barred by Any So-Called "Integrated Transaction Doctrine"</u>

The Defendants argue that the "integrated transaction doctrine" bars the Trustee from avoiding the Insider Releases unless the entire Redbox Merger transaction is avoided.[10]  The only

---

[10]    *See, e.g.,* Rouhana Br. at 38-39 (asserting, "[u]nder the Integrated Transaction Doctrine, the Complaint must seek to avoid the entire Merger transaction under Section 548 if the Trustee wants to avoid the Release").

authorities cited in support of this argument are cases in which courts have "collapsed" multiple steps of an integrated transaction to determine whether a debtor received reasonably equivalent value in exchange for making a transfer or incurring an obligation[11]—a circumstance not at issue here.

Not surprisingly, the Defendants fail to cite a single case—whether applying the "integrated transaction doctrine" or otherwise—in which a court held that a trustee may not avoid a transfer (let alone a gratuitous transfer in favor of a debtor's insiders) simply because the agreement documenting the transfer was entered into concurrently with another transaction. Neither the Complaint nor the Defendants allege that any of them were even parties to any of the agreements entered into in connection with the Redbox Merger. Moreover, the Release Agreement expressly provides that it embodies the parties' entire agreement.[12] The Trustee has no obligation to avoid any part of the Redbox Merger transaction in order to avoid Insider Releases that were gifted in a stand-alone, self-interested transaction to the Company's insiders for no consideration whatsoever while the Company was insolvent.[13]

Even assuming that there were an "integrated transaction doctrine" theory that applied conceptually to the Insider Releases, the relationship between the Insider Releases and any other transaction would present an inherently factual question that cannot be resolved at the motion to dismiss stage.

---

[11]  *See id.* (citing cases and stating, "[i]n each of these cases, the courts dismissed fraudulent conveyance counts because . . . the plaintiffs failed to show that the debtor received less than reasonably equivalent value for the overall transaction").

[12]  *See* Release Agreement § 4.3.

[13]  Because reasonably equivalent value and insolvency are issues relevant to each of the Trustee's causes of action to avoid the Insider Releases (Eighth and Ninth Claims for Relief) and Insider Revenue Transfers (Sixth and Seventh Claims for Relief) as fraudulent transfers, these issues are discussed in § II.D, below.

**C.    The Complaint States a Plausible Claim to Avoid the Insider Revenue Transfers as Constructive Fraudulent Transfers (Sixth and Seventh Claims for Relief)**

The Complaint's Sixth and Seventh Claims for Relief seek to avoid the Insider Revenue Transfers to CSS, Rouhana, Newmark and the Other CSS Entities pursuant to the Insider Management and Licensing Agreements as constructively fraudulent under the Bankruptcy Code and Delaware law, respectively.  Complaint ¶¶ 62-67, 135-142, 143-150.

The Defendants named in the Sixth and Seventh Claims for Relief argue that the Trustee failed to adequately identify the Insider Revenue Transfers by aggregating such transfers by year rather than individually, and that the Complaint does not sufficiently allege how they were fraudulent, or specify amounts which were subsequently transferred.[14]  They also argue that the allegations regarding reasonably equivalent value and insolvency are insufficient, and complain that the Trustee failed to allege "that CSS did not perform the services for which it was paid, [nor] that the CSS brand name was not made available to or used by any Debtor under the CSS License Agreement."[15]  Further, these Defendants assert that the Complaint fails to state a "subsequent transferee claim" under section 550(a) of the Bankruptcy Code with respect to the Sixth and Seventh Claims for Relief because the Complaint does not allege facts establishing which of the Insider Revenue Transfers were transferred to which Defendants.  As set forth below, these arguments are incorrect or ill-conceived.

1.    The Insider Revenue Transfers Are Adequately Identified

The transfers here are adequately identified.  The Complaint aggregates the Insider Revenue Transfers by type and by year (Complaint ¶¶ 62-64), just as they are reported in the Company's own public securities filings.  This is entirely appropriate at this juncture of the

---

[14]    Rouhana Br. at 33-34; Newmark Br. at 31; CSS Entities Br. at 15.

[15]    Rouhana Br. at 34-35; Newmark Br. at 32; CSS Entities Br. at 15.

proceedings. "[A]llegations aggregating transfers into lump sums over several years without identifying the number of transfers, the dates of the transfers, or the amount of any specific transfer will satisfy Rule 8(a) pleading requirements." *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC)*, 458 B.R. 87, 113 (Bankr. S.D.N.Y. 2011) (citing *Unencumbered Assets, Tr. v. JP Morgan Chase Bank (In re Nat'l Century Fin. Enters., Inc. Inv. Litig.)*, 617 F. Supp. 2d 700, 722 (S.D. Ohio 2009) ("Though the complaint fails to specify the exact dates and amounts of the dividend payments, this claim is subject to Rule 8's liberal pleading standard . . . .")); *see also Tronox*, 429 B.R. at 102 ("A constructive fraudulent conveyance claim is sufficient under Rule 8(a)(2) even if it alleges an aggregate monetary amount for multiple transfers during a multi-year period without a breakdown of individual transfers.").

The Defendants' own authority states simply that a complaint must identify the relevant transfers with "sufficient particularity to provide the defendant with fair notice of the charges against him."[16] There is no question that these Defendants have fair notice of the Insider Revenue Transfers because they were quick to identify those transfers as the 16 or 32 transfers made quarterly to CSS under the CSS Agreements during the two and four year reachback periods applicable to the Trustee's claims.[17] To be more precise would require discovery. "Courts liberally review constructive fraud claims brought by a trustee, given his position as a third party outsider to the debtor's transactions." *Beskrone v. OpenGate Cap. Grp. (In re Pennysaver USA Publ'g)*, 587 B.R. 445, 457 (Bankr. D. Del. 2018).

---

[16]   *See* Rouhana Br. at 34, Newmark Br. at 31, CSS Entities Br. at 15 (citing *Beskrone v. OpenGate Cap. Grp. (In re Pennysaver USA Publ'g)*, 602 B.R. 256, 266 (Bankr. D. Del. 2019)).

[17]   *See id.*

2.      The Trustee Has Adequately Pled Claims Under Section 550(a) of the Bankruptcy Code

Rouhana, Newmark and the CSS Entities argue that the Sixth and Seventh Claims for Relief fail to state a "subsequent transferee claim" under section 550(a) of the Bankruptcy Code because the Complaint does not allege facts establishing which of the Insider Revenue Transfers were transferred to which Defendants.[18]   These Defendants appear to misapprehend the relief sought in the Complaint and the remedies available to the Trustee under section 550(a).   Complaint ¶¶ 142, 150.   Initially, the Complaint seeks to recover the value of each of the Insider Revenue Transfers from CSS pursuant to section 550(a)(1), which permits such recovery from "the initial transferee of such transfer."   There is no dispute that the Company made each of the Insider Revenue Transfers directly to CSS.

The Complaint also seeks to recover the value of each of the Insider Revenue Transfers from "Rouhana, Newmark or the other CSS Entities as the entity for whose benefit such transfer was made," pursuant to section 550(a)(1).   Complaint ¶¶ 142, 150.   There is no dispute that Rouhana, Newmark and the other CSS Entities owned or were under common control with CSS. The Complaint adequately alleges that the Insider Revenue Transfers were, therefore, made for the benefit of those Defendants.

Alternatively, the Complaint seeks to recover the value of the Insider Revenue Transfers from the named Defendants as subsequent transferees pursuant to Bankruptcy Code section 550(a)(2), to the extent that any of those transfers were subsequently transferred to those Defendants.   *Id.* ¶¶ 142, 150.   The Defendants are on adequate notice of the Trustee's claims, which is all that is required at the motion to dismiss stage.

---

[18]     *See, e.g.*, Rouhana Br. at 35; Newmark Br. at 32-33; CSS Entities Br. at 16-17.

**D.**    **Lack of Reasonably Equivalent Value, Insolvency and the Existence of a "Triggering Creditor" Are Adequately Pleaded**

The Complaint's allegations regarding a lack of reasonably equivalent value and insolvency are also adequately pleaded.  The Complaint describes each type of Insider Revenue Transfer as one that was charged to the Company as a flat percentage of revenue without regard to its financial condition, without regard to any metric reasonably approximating the value of services allegedly provided in exchange for the extraordinary amounts paid to these insiders (and inexplicably resulting in precisely the same payment of $18.4 million in both 2022 and 2023), that no consideration was given in exchange for the Insider Releases, and that these transfers were paid or provided when the Company was in extreme financial distress.  *Id.* ¶¶ 62-67, 135-142, 143-150. The Complaint also adequately pleads the existence of a "triggering creditor" under applicable law.  *Id.* ¶¶ 140, 148, 156, 163.

1.    Lack of Reasonably Equivalent Value Is Adequately Pleaded

"[D]isputes over reasonably equivalent value are not appropriate for determination on a motion to dismiss.  Rather, they are issues to be addressed in the discovery process."  *Pennysaver,* 587 B.R. at 457 (footnote omitted); *see also Stanziale v. Medi Biotech LLC*, 2025 Bankr. LEXIS 677, *7 (Bankr. D. Del. Mar. 20, 2025)* ("The question of whether a transaction was for reasonably equivalent value is one of fact not amenable for determination on a motion to dismiss.").  Indeed, the Complaint alleges that the Insider Releases were made in exchange for *no* consideration. Complaint ¶ 60 (alleging that none of the Defendants provided any consideration in exchange for the Insider Releases).  That is more than sufficient to overcome a motion to dismiss.  *See, e.g., Stanziale v. Brown-Minneapolis Tank ULC (In re BMT-NW Acq.)*, 582 B.R. 846, 858 (Bankr. D. Del. 2018) ("at this stage of the proceedings, the Trustee need only identify the transfer by date and face amount, and allege that it was for no consideration"); *see also Emerald Cap. Adv. v.*

*Bayerische Moteren Werke Aktiengesellschaft (In re FAH Liq.),* 572 B.R. 117, 127 (Bankr. D. Del. 2017) (same).

Not only does the Complaint allege that the Insider Revenue Transfers were paid without regard to any metric of their value, but (as discussed in detail in § II.C of the Trustee's Responsive Brief I), the Complaint further alleges that the Defendants failed to act in good faith and breached their fiduciary duties in authorizing the Insider Revenue Transfers, which allegations, at the very least, raise questions concerning the value provided by the Defendants in exchange.  Complaint ¶¶ 66-67, 89, 101, 113, 125.  *See, e.g., OPP Liq.*, 2022 Bankr. LEXIS 651, at *31 ("The allegations of the Amended Complaint that the Defendants failed to act in good faith or to perform their essential fiduciary duties in conducting and monitoring the Debtor's operations and expansion do raise a question as to the value of the services the Defendants provided to the Debtor.  Therefore, the Court concludes that the Amended Complaint does contain factual allegations sufficient, if true, to establish that the Debtor received less than reasonably equivalent value for the compensation paid to the Defendants.").

### 2.   Insolvency Is Adequately Pleaded

As to insolvency, the Complaint's allegations of the Company's insolvency and financial distress over several years, as evidenced by the Company's own public securities filings, more than suffices to raise a factual issue.  Complaint ¶¶ 31-34, 49-56.  "[I]nsolvency is generally a factual determination not appropriate for resolution in a motion to dismiss."  *Zazzali v. Mott (In re DBSI, Inc.)*, 445 B.R. 344, 349 (Bankr. D. Del. 2011); *OPP Liq.*, 2022 Bankr. LEXIS 651, at *29 ("to state a claim to avoid a constructively fraudulent transfer under state law or the Code, the plaintiff must allege, inter alia, facts showing that the debtor was insolvent at the time of the transfer.  While the allegations of the Amended Complaint with respect to the solvency of the Debtor are conclusory, the Court concludes that the Amended Complaint contains detailed

allegations of the significant continuing losses suffered by the Debtor during the expansion efforts.") (footnotes omitted); s*ee also Zohar CDO 2003-1 v. Patriarch Prtnrs (In re Zohar III, Corp.)*, 631 B.R. 133, 173 (Bankr. D. Del. 2021) ("[i]nsolvency is a fact-intensive inquiry and precise calculations are not needed" at the motion to dismiss stage); *FAH Liq.,* 572 B.R. at 128 ("Insolvency is a factual inquiry that often evades determination at the motion to dismiss stage") (citing *Halperin v. Moreno (In re Green Field Energy Svcs.)*, 2015 Bankr. LEXIS 2914, 2015 WL 5146161, *7 (Bankr. D. Del. Aug. 31, 2015) (explaining that the trustee-plaintiff need not provide a detailed valuation as to the timing of the debtors' insolvency at the motion to dismiss stage so long as there is some factual basis as to the debtors' financial condition)); *Miller v. ANConnect, LLC (In re Our Alchemy, LLC)*, 2019 Bankr. LEXIS 2906, *25-26 (Bankr. D. Del. Sep. 16, 2019) ("'Insolvency [is] generally [a] factual determination[] that should be reserved for discovery. This is because the determination of insolvency is highly fact-specific and should be based on seasonable appraisals or expert testimony.'") (quoting *Pennysaver*, 587 B.R. at 456, 459).

As a whole, the allegations in the Complaint as to the Company's insolvency and financial distress go well beyond anything required to defeat a motion to dismiss. *See, e.g., Pennysaver,* 587 B.R. at 456 ("At the motion to dismiss stage, to plead adequately a constructive fraud claim 'all that is needed is an allegation that there was a transfer for less than reasonably equivalent value at a time when the Debtors were insolvent.' The Trustee must do more than merely recite statutory elements, but needs only to state facts with sufficient particularity to provide the defendant with fair notice of the charges against him.") (quoting *In re AgFeed USA*, 546 B.R. 318, 336 (Bankr. D. Del. 2016)); *see also Stanziale v. Medi Biotech LLC*, 2025 Bankr. LEXIS 677, *7 (Bankr. D. Del. Mar. 20, 2025) (at the motion to dismiss stage, "Federal Rule 8(a) only requires the Trustee to allege that there was a transfer for less than reasonably equivalent value at a time when the

Debtor[s] was insolvent") (quoting *FAH Liq.*, 572 B.R. at 127).[19]    Here, the Complaint has adequately pled both insolvency and a lack of reasonably equivalent value, sufficient to move past the motion to dismiss stage.

>    3.    The Trustee Is Not Required to Identify a Specific Triggering Creditor

The Complaint's Sixth, Seventh, Eighth and Ninth Claims for Relief allege that "[a]t all relevant times, the Company had actual creditors holding unsecured claims allowable within the meaning of sections 502 and 544(b) of the Bankruptcy Code."  Complaint ¶¶ 140, 148, 156, 163. The Defendants subject to these claims for relief contend that, as to the Trustee's "strong arm" claims under section 544 of the Bankruptcy Code (Seventh and Ninth Claims for Relief), the Trustee was required to identify a specific unsecured creditor to withstand a motion to dismiss.[20] No relevant precedent from within this circuit is cited, and the law in this district is to the contrary. *See, e.g., Michaelson v. Farmer (In re Appleseed's Intermediate Holdings)*, 470 B.R. 289, 301 (D. Del. 2012) ("Plaintiff need not identify a specific unsecured creditor by name, address and phone number even under heightened pleading standards.  The argument has no merit and the Motion will be denied as to this argument.") (citations omitted); *see also Pennysaver*, 587 B.R. at 457 ("At the pleading stage, the Trustee does not need to allege the existence of or name an unsecured creditor . . ."); 5 *Collier on Bankruptcy* ¶ 548.02 (16th ed. 2025) ("[S]o long as the

---

[19]    Cases cited by the Defendants are obviously distinguishable.  *See, e.g., Zazzali v. Hirschler Fleischer, P.C.*, 482 B.R. 495, 520 (D. Del. 2012) (finding complaint failed to adequately allege a lack of reasonably equivalent value because it "merely recites the statutory elements of this claim, *pleading no facts* to support this claim or that give rise to an inference that Defendant received less than a reasonably equivalent value.") (emphasis added); *see also Pennysaver*, 602 B.R. at 268 (complaint failed to identify the transferor or the transferee with respect to the challenged transfers).

[20]    *See* Rouhana Br. at 36-37, 40; Newmark Br. at 33-3, 38; CSS Entities Br. at 17-18, 22.

trustee pleads the existence of a creditor who could have avoided the transfer, the trustee need not identify a specific creditor by name.").[21]

Indeed, the Defendants acknowledge that courts in this district do *not* require a plaintiff to specifically identify a triggering creditor for purposes of defeating a motion to dismiss. *See, e.g.,* Rouhana Br. at 37, n.35 (citing *Golden v. Cmty. Health Sys. (In re Quorum Health Corp.)*, 2023 Bankr. LEXIS 1471, *6 (Bankr. D. Del. Apr. 18, 2023) ("'When analyzing the sufficiency of a complaint for purposes of Rule 12(b)(6), courts do not generally require a trustee to plead the existence of an unsecured creditor by name, although the trustee must ultimately prove such a creditor exists.'") (quoting *Pardo v. Avanti Corp. Health Sys. (In re APF Co.)*, 274 B.R. 634, 639 (Bankr. D. Del. 2001)).

### E.     The Complaint States a Plausible Claim to Recover Preferred Dividends and Insider Revenue Transfers as Illegal Dividends (Tenth Claim for Relief)

#### 1.     Payments Made Under the Insider CSS License Agreement and CSS Management Agreement Constitute Improper Dividend Payments Under the DGCL

Section 174(a) of the Delaware General Corporation Law ("DGCL") provides that directors are jointly and severally liable for an unlawful dividend for a period of six years after its payment. 8 Del. Code Ann. § 174(a). Certain Director Defendants have asserted that insider fees paid under the CSS License Agreement and the CSS Management Agreement are not properly considered dividends subject to the DGCL.[22] This is incorrect. Courts have applied the DGCL's

---

[21]    The Defendants cite *Giuliano v. Ferdinand (In re Liquid Holdings Grp.)*, 2018 Bankr. LEXIS 2650, at *5 (Bankr. D. Del. Sep. 4, 2018) in support of their position, but that case does not help them. The court in *Liquid Holdings* held simply that "Section 544(b)(1) requires the following allegations: (1) a creditor, (2) holding an unsecured claim and (3) that is allowable under Section 502." *Id.* The trustee in that case alleged only that the debtor had at "least one creditor prior to making the Transfers," which the court held did not satisfy the most basic pleading requirements described in section 544(b)(1). In contrast to the complaint at issue in *Liquid Holdings*, the Complaint here *does* allege the existence of creditors holding unsecured claims allowable under section 502.

[22]    *See* Other Directors Br. at 20. In support, the Defendants cite to three lower Delaware state court decisions that have interpreted these DGCL provisions strictly; rejecting, as a general matter, a

unlawful dividend provisions to transactions that are not strictly related to the issuance of dividends to shareholders on account of a debtor's stock.

2.   Courts Examine the Substance of a Transaction to Determine an
      Unlawful Dividend

Courts do not construe the DGCL's unlawful dividend provisions strictly, but will examine the substance of the transaction to determine whether these provisions are applicable.   For example, in *Official Comm. of Unsec'd Creditors v. Reliance Cap. (In re Buckhead Am. Corp.)*, 178 B.R. 956, 959 (D. Del. 1994), a Delaware district court rejected the defendants' motion to dismiss causes of action predicated on the DGCL's unlawful dividend (and/or stock purchase) provisions relating to payments made by a subsidiary (DIA) for the acquisition of the outstanding shares of its parent company's (DIC) stock in a go-private LBO transaction in which DIA incurred $175 million in debt to finance the purchase. Seeing through the defendants' efforts to seize upon a technicality to escape liability by arguing that the DGCL's illegal dividend provisions are inapplicable "because neither transaction involved 'purchase' of DIA stock nor payment of a 'dividend' to DIA shareholders," the court stated "that DIA's financing of these transactions may properly be treated as an unlawful dividend payment or distribution from DIA to its parent company and sole shareholder, DIC." *Id.* at 973.  The court concluded:

> it is apparent that disposition of this claim should await further briefing and further development of the factual record, particularly since the purposes underlying the statutory dividend payment and stock repurchase restrictions appear to be at stake here.  Accordingly, defendants' motion to dismiss this claim will be denied.

---

"constructive" dividend cause of action.  *See JPMorgan Chase Bank, N.A. v. Ballard*, 213 A.3d 1211 (Del. Ch. 2019) (implying "dividends" must be "distributed to all stockholders"); *Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155 (Del. Ch. 2014) (adopting formalistic view of statutory construction and indicating "dividends" could be challenged through breach of fiduciary duty); *Horbal v. Three Rivers Holdings*, 2006 Del. Ch. LEXIS 53 (March 10, 2006) (court unable to find Delaware decisions recasting excessive compensation as dividends or permitting cause of action to be asserted by shareholders).  These decisions are contrary to the weight of authority.

*Id.* at 973.

In a similar context, the court in *Crowthers McCall Pattern, Inc. v. Lewis*, 129 B.R. 992, 1001 (S.D.N.Y. 1991), denied a motion to dismiss causes of action that asserted unlawful dividends arising from a sale transaction involving an entity (TLC Pattern) later merged into what would become a chapter 11 debtor under a new name (Crowthers McCall Pattern).  In addition to the sale transaction itself, the plaintiff (the creditors' committee appointed in the Crowthers McCall Pattern case) challenged as unlawful dividends a variety of types of transfers termed "Additional Payments" relating to the transaction, specifically, "1) the payment by TLC Pattern to third parties of fees and expenses in connection with attempts to sell or recapitalize TLC Pattern; 2) the payment by TLC Pattern to TLC Group [its former majority stockholder] of a note held as part of the purchase price for warrants of TLC Pattern stock; 3) the payment by TLC Pattern to TLC Group for certain management and other services; and 4) the payment by TLC Pattern of attorney's fees." *Id.* at 1000.  The court determined that, "at least at this stage of the proceedings, dismissal of the claim for unlawful dividends, stock purchases or stock redemptions would be inappropriate.  If the plaintiff's allegations are true, as must be assumed on these motions to dismiss, the economic substance of the transactions in question brings them within the purview of the relevant sections of the Delaware General Corporation Law."  *Id.* at 1001.

Indeed, "most courts have adopted an expansive view of what constitutes a dividend under the Delaware unlawful dividend statute. As a result, the court will look to the substance of transactions to see if it depleted a corporation's assets." *U.S. Bank N.A. v. Verizon Commc'ns*, 892 F. Supp 2d 805, 822-23 (N.D. Tex. 2012) (citing, inter alia, *AT&T Corp. v. Walker*, 2006 U.S. Dist. LEXIS 74272, *6 (W.D. Wash. Oct. 12, 2006) (economic effect of a transaction that "depletes the debtor's assets and transfers them to shareholders may be actionable as unlawful dividends.")).

*See also, Responsible Person v. Best Buy Co. (In re Musicland Holding Corp.)*, 398 B.R. 761, 784 (Bankr. S.D. N.Y. 2008) ("The Amended Complaint avers that the Debt Instruments were created to facilitate the repayment of a portion of Best Buy's investment.  If the Debt Instruments represented equity, any payments made in connection with the Debt Instruments represented dividends rather than the repayment of legitimate debt.  The Court looks to the substance, not the form, of the transaction, and the allegations are sufficient to state a claim that the Transfers were actually dividends."); *Growe v. Bedard*, 2004 U.S. Dist. LEXIS 23746, *44 (D. Me. Nov. 23, 2004) (denying summary judgment, holding that "the recurring nature of the payments in this case, which unquestionably had the ultimate effect of transferring corporate assets to GNP's shareholder, the payments made during the Outside Directors' tenure could be characterized as dividends (and given GNP's insolvency, illegal dividends)").

Also, dismissing claims for unlawful dividends is inappropriate at the pleading stage, where simple notice of the basis of such claims, read in the light most favorable to the plaintiff, is all that is required.   For example, in *In re Sheffield Steel Corp.*, 320 B.R. 405, 414 (Bankr. N.D. Okla. 2004), the court found that the plaintiff's allegations in the complaint that the directors declared and authorized the payment of dividends to shareholders notwithstanding that the company lacked a surplus or net profits from which dividends could be legitimately paid under Section 170, "alleged facts that would establish, if proven, a violation of Section 173, i.e., the payment of dividends contrary to the limitations contained in Section 170."  The court concluded:

> A liberal reading of the Complaint, taken as a whole and in the light most favorable to Sheffield, allows the Court to reasonably infer that Karol, Ackerman and HMK knew or should have known that the negative financial position, as alleged by Sheffield, precluded the lawful payment of dividends. … The Complaint alleges that Karol and Ackerman, as directors, were grossly negligent or reckless in authorizing the dividends when no surplus or net profits existed, and that unlawful dividends were paid to (and accepted by) themselves or in the case of HMK, a company within Karol's "control." … The Court can

> reasonably infer that as directors with duties to exercise due care and to be well informed, Karol and Ackerman knew or should have known of Sheffield's negative financial condition before declaring dividends ….

*Id.* at 416. The court, therefore, did not dismiss the unlawful dividend claim.

Similarly, in *IT Group, Inc. v. D'Aniello*, 2005 U.S. Dist. LEXIS 27869, *57 (D. Del. Nov. 15, 2005), reconsideration denied, 2006 U.S. Dist. LEXIS 5035 (D. Del. Feb. 9, 2006), a Delaware District Court refused to dismiss an unlawful payment of dividends claim arising from amounts paid over a three-year period while the company was insolvent. Rejecting the defendants' arguments that allegations of insolvency and the directors' knowledge of it were not adequately pleaded, the court noted that mere allegations "that the [company] was insolvent or in the vicinity of insolvency" and that "the booked goodwill … is alleged to have inflated the [company's] assets," among other allegations, were relevant "for both the allegations of insolvency and of the directors' knowledge" of it, giving the defendants "notice of the basis of Plaintiff's claims." *Id.*

In accordance with these decisions, the Third Circuit Court of Appeals has recognized a longstanding two-part test in the tax context used to "determine whether a transfer of property from one corporation to another corporation constitutes a constructive dividend to a common shareholder in both corporations": first, there must be a distribution of funds, second, "'the business justifications [for the transfer] put forward are not of sufficient substance to disturb a conclusion was *primarily* for shareholder benefit.'" *Gulf Oil Corp. v. Comm'r.*, 914 F.2d 396, 413 (3d Cir. 1990) (quoting *Sammons v. Comm'r*, 472 F.2d 449, 452 (5th Cir. 1972)); *see also Union Bankers Ins. v. Comm'r*, 64 T.C. 807, 823 (1975) ("[T]he subsidiary is deemed to have discharged the parent's obligation when it purchases its parent's stock from one of its parent's stockholders. It follows that when Bankers purchased stock of its parent, Union, from Union's stockholder, General, that Union did receive a constructive dividend to the extent of Bankers' earnings and profits by virtue of Union's having redeemed its own stock with the funds of Bankers . . . .").

Applied here, the distribution of funds to CSS occurred through the CSS Management Agreement and CSS License Agreement.  There is little business justification for a fixed percentage of net revenues having nothing to do with the extent of services actually rendered or value actually conferred, other than siphoning funds to CSS and its owners and affiliates.

       3.      <u>Insider Revenue Transactions Are Adequately Pleaded as Unlawful Dividends</u>

In this case, the transfers to the Company's controlling shareholder by way of the Insider Agreements was a transaction that had the economic effect of depleting the Company's assets. Therefore, under applicable law, the transfers are properly considered as unlawful dividends under the DGCL.  *U.S. Bank*, 892 F. Supp. 2d at 822-23.

The Complaint describes in detail the material terms of the CSS Management Agreement and CSS License Agreement—the two "Insider Agreements."  Complaint ¶¶ 62-67.  The Complaint details how the CSS Management Agreement obligated the Company to pay CSS 5% of its net revenues for each fiscal quarter to its parent company for insider services (*id.* ¶ 62) and how, similarly, the CSS License Agreement obligated the Company to pay CSS 5% of its revenues in the aggregate each quarter in exchange for a license to utilize the brand name and related content and for marketing support.  *Id.* ¶ 63.  The Tenth Claim for Relief identifies the amount of Insider Revenue Transfers and the DGCL provisions violated, and pleads that such transfers are properly considered as dividends, that there was a lack of surplus, insufficient profits and insolvency at the time of such transfers, and that the Director Defendants failed to exercise due care and that they negligently or willfully approved such transfers in violation of the DGCL.  *Id.* ¶¶ 165-173.

Certain Director Defendants seek to dismiss the Tenth Claim for Relief against them for transferring cash to CSS as de facto dividends because the Trustee allegedly "failed to plead that the Company did not have sufficient surplus or that each of the Independent Directors acted

willfully or negligently in declaring those dividends."[23]   To the contrary, the Complaint states plainly that "[a]t the time the Preferred Dividends and the Insider Revenue Transfers were paid, the Company . . . lacked sufficient surplus as defined in and computed in accordance with sections 154 and 244 of the DGCL."  *Id.* ¶ 170.  Similar to the allegations discussed in *Sheffield Steel*, the Complaint also alleges:

> Each of the Defendants knew or should have known that the Preferred Dividends and the Insider Revenue Transfers violated the DGCL. . . . In causing the Company to declare the Preferred Dividends and to make the Insider Revenue Transfers, the Defendants did not exercise due care . . . [t]he declarations of the Preferred Dividends and the Insider Revenue Transfers were not grounded in any reasonable business objective, and were the result of negligence, gross negligence, and a gross abuse of discretion by the Defendants.

*Id.* ¶¶ 172-73.

Accordingly, the illegal dividend cause of action has been adequately pleaded.

4.      The Director Defendants Negligently or Willfully Issued Dividends in the Absence of a Surplus

A corporation's directors may declare and pay a dividend to shareholders from the corporation's capital stock only out of the corporation's "surplus" pursuant to section 170 of the DGCL.  8 Del. Code Ann. § 170.  "The purpose of the unlawful dividend statutes is to protect the rights of creditors by preventing directors from depleting their corporation's ability to repay its debts."  *U.S. Bank*, 893 F. Supp. 2d at 283; *see also Off. Comm. of Unsec'd Creditors v. Blackstone Fam. Inv. P'ship* (*In re Color Tile, Inc.*), 2000 U.S. Dist. LEXIS 1303, *9 (D. Del. Feb. 9, 2000).  "There are few, if any, doctrines more firmly rooted in our jurisprudence than that the capital stock of a corporation is a trust fund for the payment of the corporate indebtedness, before any distribution among the shareholders."  *In re Buckhead America Corp.*, 178 B.R. 956, 972 (D. Del.

---

[23]    Other Directors Br. at 20-21.

1994).  If a corporation pays a dividend to its stockholders that is greater than the corporation's

surplus at the time, that corporation's creditors have a cause of action against the directors of the

indebted corporation.  *U.S. Bank*, 892 F. Supp. 2d at 822.

     5.    <u>The Director Defendants Failed to Evaluate Assets and Liabilities in Good Faith
on the Basis of Acceptable Data</u>

Where a corporation's assets at fair value do not exceed its liabilities, the directors may not

declare a dividend.  *Klang v. Smith Food & Drug Ctrs.,* 702 A.2d 150, 153 (Del. 1997); *see also*

8 Del. Code Ann. § 154.  This requirement prohibits "distributions to stockholders that would

render the company balance-sheet insolvent, but instead of using insolvency as the cut-off, the line

is drawn at the amount of the corporation's capital."  *SV Inv. Prtnrs v. ThoughtWorks, Inc.*, 7 A.3d

973, 982 (Del. Ch. 2010), *aff'd*, 37 A.3d 205 (Del. 2011).  There is no blueprint for determining

surplus.  The statute "'does not require any particular method of calculating surplus, but simply

prescribes factors that any such calculation must include . . . the corporation's total assets and total

liabilities.'"  *In re Chemours Co. Deriv. Litig.*, 2021 Del. Ch. LEXIS 258, *46 (Del. Ch. Nov. 1,

2021) (quoting *Klang*, 702 A.2d at 155).[24]

The factual determination of whether the corporation has a surplus does not simply look to

a balance sheet showing an excess of assets over liabilities or a lack thereof.  In this regard, the

Delaware Supreme Court in *Klang* noted:

> Balance sheets are not, however, conclusive indicators of surplus or a lack
> thereof. Corporations may revalue assets to show surplus, but perfection in that
> process is not required.  Directors have reasonable latitude to depart from the
> balance sheet to calculate surplus, *so long as they evaluate assets and liabilities*

---

[24]   The *Chemours* court's dismissal of an unlawful dividend claim has no bearing here.  The plaintiffs in
that case were stockholders seeking to recover improper distributions derivatively.  The court had to
assess whether the prerequisites for proceeding derivatively under Delaware Chancery Court Rule 23.1
were met, including a heightened pleading requirement beyond "notice pleading" that a plaintiff "set
forth . . . particularized factual statements that are essential to the claim," a determination not required
with respect to the Complaint here.  *Chemours*, 2021 Del. Ch. LEXIS 258 at *34 (quoting *Brehm v.
Eisner*, 746 A.2d 244, 254 (Del. Ch. 2000)).

> *in good faith, on the basis of acceptable data, by methods that they reasonably*
> *believe reflect present values, and arrive at a determination of the surplus that*
> *is not so far off the mark as to constitute actual or constructive fraud.*

702 A.2d at 152 (emphasis added).

Here, as set forth in the Complaint, the Director Defendants failed to evaluate assets and liabilities in good faith. The Complaint alleges that they did nothing more than accept what Rouhana and his officers told the Board. Complaint ¶¶ 26-32, 40-44, 52, 55-57, 67, 72, 77, 81. Moreover, the Director Defendants neither sought nor received acceptable data. *Id.* ¶¶ 33-34, 40-44, 52, 55-57, 67, 72, 77, 81. Nor did they apply any methodology—much less a reasonable methodology—that would have allowed them to arrive at a determination that the balance sheet's valuation of assets and liabilities was not so far off the mark as to constitute actual or constructive fraud. *Id.* ¶¶ 30, 34, 39-44, 52, 55-57, 67, 72, 77, 81.

6. <u>Determination of Surplus Is a Factual Issue</u>

A director is liable for "willfully or negligently declar[ing] an unlawful dividend." *U.S. Bank*, 892 F. Supp. 2d at 822. Accordingly, a director's state of mind in declaring a dividend is at issue in making this determination and, consequently, a determination of willful or neglectful determination of surplus is a disputed factual issue. *See, e.g., id.* at 823 ("Because there is a dispute of material fact as to [the director]'s state of mind [as to whether a surplus existed] at the time of the spin-off, the defendants' motion for summary judgment must fail."). As such, it is not an issue that may be decided on a motion to dismiss. *See, e.g., Field v. Bank of Utah (In re Wing Spirit, Inc.),* 2025 Bankr. LEXIS 5, *7 (Bankr. D. Haw. Jan. 2, 2025) (question of value is a "question of fact that is not appropriately resolved on a motion to dismiss"); *FSLIC v. Musacchio*, 695 F. Supp. 1053, 1064 (N.D. Cal. 1988) (questions of fact are "wholly inappropriate for consideration on a motion to dismiss").

7.      The Allegations Pleaded in the Complaint Support Claims for a Willful or
        Neglectful Determination of Surplus at the Times the Preferred Dividends Were
        Paid and the Insider Revenue Transfers Were Made

As described in the Complaint, at the times the Preferred Dividends were paid and the

Insider Revenue Transfers were made, the Company did not have more assets at fair value than

liabilities.  The Director Defendants knew or should have known that this was the case.  Complaint

¶¶ 31-57.  Instead, the Director Defendants ignored numerous "red flags" that indicated a surplus

did not exist at the times of the payment of the Preferred Dividends and Insider Revenue Transfers,

including:

- ***It should have been clear to reasonable directors that there was a lack of surplus once acceptable data regarding the Company's real assets and liabilities was considered***.  The Company's reliance on the "fake" asset valuation of "goodwill" and "net intangible assets" demonstrates a lack of surplus.   These intangible assets rose from $21.4 million and $19.4 million, respectively, in 2020,[25]  $40 million and $18 million in 2021,[26] and then soared to $260.7 million and $305.4 million in 2022,[27] the year of the Redbox transaction.  Indeed, $506 million of the ostensible $598 million asset acquisition value of Redbox was attributed to the goodwill and intangibles of a money-losing company with an antiquated business model that had issued a going concern warning.[28]

- ***The Company admitted that its valuation of goodwill and net intangible assets was fake***, acknowledging: "[i]n the third quarter of 2023, we recorded an impairment charge related [to] certain intangibles and goodwill of $380.8 million principally related to the underperformance of Redbox."[29]  By 2022, the Company's assets were dwarfed by its liabilities once goodwill and net intangible assets were

---

[25]   CSSE 2021 Annual Report at F-3.

[26]   *Id.*

[27]   CSSE 2022 Annual Report at F-3.

[28]   Complaint ¶¶ 29, 37-44, 55-57.

[29]   CSSE 2023 Annual Report at 24.

subtracted.[30]  Therefore, the Complaint plausibly alleges that there was a lack of surplus once acceptable data was considered.[31]

- ***The value of management's asserted "goodwill" as a percentage of total company assets would have alarmed reasonable directors not beholden to their controlling shareholder.***  According to the Company's publicly reported financial statements, the value of the Company's "goodwill" as a percentage of its total assets consistently rose between 2020 and 2023: 2020: 13.74%;[32] 2021 (revised): 16.32%;[33] 2022: 29.5%;[34] 2023: 29.53%.[35]  The percentage of "goodwill" of the total asset value of the Redbox transaction by itself was an astonishing 36.01%.[36]  When faced with such numbers, reasonable directors would have questioned whether the balance sheet's asset values reflected the fair value of those assets.[37]

- ***Management grossly exaggerated the valuations of the Company's assets***.  That management's reported valuations of assets on the balance sheet were grossly exaggerated when made may be inferred from the fact that goodwill was written down by 75% within a year,[38] and the acknowledged failure of internal financial controls.[39]

- ***It should have been clear to reasonable directors that declaring a surplus was unreasonable when the Company was balance-sheet insolvent***.  Pursuant to the Redbox Merger, the Company assumed additional liabilities that totaled approximately $528 million.  By the end of 2023, the first full year following the Merger, the Company's total gross debt had exploded to approximately $562.4 million (nearly ten times the amount of the Company's debt prior to the Merger) and its annual interest expense had ballooned to over $76 million (nearly sixteen

---

[30]    CSSE 2022 Annual Report at F-3 (Consolidated Balance Sheet, December 31, 2022:  Total Assets ($883,879,409) – Goodwill ($260,748,057) – Intangible Assets, Net ($305,425,709) = $317,705,643; Total Liabilities = $804,131,470); CSSE 2023 Annual Report at F-6 (Consolidated Balance Sheet, December 31, 2023:  Total Assets ($422,300,625) – Goodwill ($120,494,059) – Intangible Assets, Net ($35,937,646) = $265,868,920; Total Liabilities = $925,862,510).

[31]    Complaint ¶ 55.

[32]    CSSE 2021 Annual Report at F-3.

[33]    CSSE 2022 Annual Report at F-3.

[34]    *Id.*

[35]    CSSE 2023 Annual Report at F-6.

[36]    CSSE 2022 Annual Report at F-17.

[37]    *See, e.g.*, "A Year-End Check on Goodwill Assets" (Nov. 14, 2024) https://www.calcbench.com/blog/post/blogger4144481095261452446/A-Year-End-Check-on-Goodwill-Assets (From 2019 to 2024, goodwill as a percentage of total assets of S&P 500 companies fell from 9.3% to 8.9%).

[38]    Complaint ¶ 55.

[39]    *Id.* ¶¶ 33-34.

times the amount of the Company's interest expense prior to the Merger).[40] Reasonable directors would have understood that there was no realistic way the Company could service the debt on the balance sheet.  Reasonable directors would have questioned why a company that was balance sheet insolvent was declaring that it had a surplus sufficient to justify the payment of Insider Revenue Transfers and Preferred Dividends.

- ***In 2023, the Company's liabilities exceeded the book value of its assets by over $500 million***.[41]  Nevertheless, the Directors authorized the declaration and payment of the Preferred Dividends through 2023.[42]

- ***The Company's balance sheet showed that the Company never had the ability to service the liabilities it incurred as a result of the failed Redbox transaction***.  As of December 31, 2022, the Company had unrestricted cash and cash equivalents of approximately $15 million, while its total gross debt outstanding was approximately $500.2 million.  As of December 31, 2023, the Company had *no* unrestricted cash, while its total gross debt outstanding was approximately $562.4 million.[43]

These circumstances should have alerted the Director Defendants that they were not being presented with acceptable data regarding the Company's assets and liabilities on which they could rely to base a determination of surplus.  Thus, the Complaint articulates plausible and adequately pleaded allegations relating to the illegality of the issuance of Insider Revenue Transfers and Preferred Dividends in the absence of a surplus.

**F.**     **Other Issues Raised in the Motions to Dismiss**

1.     The CSS Entities Are Controlling Shareholders With Attendant Fiduciary Duties

A stockholder is controlling under Delaware law "'where the stockholder (1) owns more than 50% of the voting power of a corporation or (2) owns less than 50% of the voting power of the corporation but exercises control over the business affairs of the corporation.'"  *Sheldon v. Pinto Tech. Ventures,* 220 A.3d 245, 251 (Del. 2019) (quoting *In re KKR Fin. Holdings LLC*

---

[40]   *Id.* ¶ 55.

[41]   *Id.* ¶ 31.

[42]   *Id.* ¶ 75.

[43]   *Id.* ¶ 50.

*S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014)).  Also, "multiple stockholders together can constitute a control group exercising majority or effective control, with each member subject to the fiduciary duties of a controller" where such stockholders are "'connected in some legally significant way—such as by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal.'" *Id.* at 251-52 (quoting *In re Crimson*, 2014 Del. Ch. LEXIS 213, *49 (Oct. 24, 2014): *Dubroff v. Wren Holdings*, 2009 Del. Ch. LEXIS 89, *14 (May 22, 2009)).

The CSS Entities dispute that they are "controlling shareholders" with attendant fiduciary duties.[44]  However, a determination as to whether an entity is a "controlling stockholder" is not appropriate at the pleading stage of litigation because the analysis is necessarily fact intensive. *See, e.g., In re Cysive, Inc., S'holder Litig.*, 836 A.2d 531 (Del. Ch. 2003) ("Because the question of whether a large block holder is so powerful as to have obtained the status of a 'controlling stockholder' is intensely factual, it is a difficult one to resolve on the pleadings. . . . In cases when the determination of whether control exists turns on disputed facts, it is impossible to determine whether a large block holder is a controlling stockholder until an evidentiary hearing is held."). After review of numerous cases involving a "controlling stockholder" dispute, the Delaware Chancery Court recognized that "the cases do not reveal any sort of linear, sliding-scale approach whereby a larger share percentage makes it substantially more likely that the court will find the stockholder was a controlling stockholder.  Instead, the scatter-plot nature of the holdings

---

[44]   CSS Entities Br. at 6-8.

highlights the importance and fact-intensive nature of the actual control factor." *In re Crimson Expl. Stockholder Litig.*, 2014 Del. Ch. LEXIS 213, *33-34 (2014).

For example, in *Cysive*, the company's founder, CEO, chairman and 35% shareholder, Nelson Carbonell, his brother, and brother-in-law had collective holdings (including the group's options) of as much as 40% of the company's common stock.  The court held that "the analysis of whether a controlling stockholder exists must take into account whether the stockholder, as a practical matter, possesses a combination of stock voting power and managerial authority that enables him to control the corporation . . . ."  836 A.2d at 553.  Considering the managerial control exerted by this group—including Carbonell's family members and manager he installed—the court determined that, "as a practical matter [the group] control[led] the corporation." *Id.*

Here, the Trustee makes plausible allegations that the CSS Entities, which are owned and controlled by Rouhana and Newmark (and for which Mitchell served as CFO), and directly or indirectly hold 85% of the Company's voting stock, are controlling shareholders with fiduciary duties to the Company.  Specifically, the Complaint alleges that (i) CSSP is the parent and controlling stockholder of the Company, holding 85% of the voting power of the Company, (ii) CSS owns 100% of CSSP, and (iii) CSS Holdings owns 100% of CSS.  Complaint ¶¶ 22-24. The Complaint alleges that the CSS Entities are the direct and indirect parent companies of the Company, were under Rouhana's control and controlled the Company as controlling shareholders (*id.* ¶¶ 10, 26), and that CSS was the counter-party to the Insider Management and Licensing Agreements at the time of the Redbox Merger (2022), the Insider Releases (2022), and when the Company authorized payments on account of the Insider Management and Licensing Agreements

(2020-2024), and Preferred Dividends (2020-2023), entered into Intellectual Property Agreements (2022-2024), and the Company failed to meet its obligations to its employees (2023-2024). *Id.* ¶¶ 62-64.

Indeed, as quoted in the Complaint, the Company has repeatedly and publicly conceded that the CSS Entities are essentially part of a controlling stockholder group. The CSS Entities consist of CSSP, CSS and CSS Holdings. The Company's public filings have stated:

> Our chairman and chief executive officer, William J. Rouhana, Jr., has control over the vast majority of all the outstanding voting power as represented by our outstanding Class B and Class A Common Stock and effectively controls *CSS Holdings and CSS, which controls CSS Productions, and, in turn, our company*. Further, our bylaws provide that *any member of our board may be removed with or without cause by the majority of our outstanding voting power*, thus Mr. Rouhana exerts significant control over our board. *This concentration of ownership and decision making may make it more difficult for other stockholders to effect substantial changes in our company* and may also have the effect of delaying, preventing or expediting, as the case may be, a change in control of our company.

*Id.* ¶ 26 (emphasis added).

Accordingly, even if a "controlling stockholder" determination were susceptible to disposition at the pleading stage, the Complaint offers numerous detailed allegations sufficient for the Court to conclude that it is plausible that the CSS Entities are "controlling stockholders" of the Company.

      2.    <u>The Trustee Is Not Asserting an "Alter-Ego" Cause of Action Against the CSS Entities</u>

The CSS Entities assert that: "Rather than alleging any actionable conduct by the CSS Entities, the Complaint seeks to hold them all liable for the acts of Mr. Rouhana (or perhaps CSS)

under a disguised theory of alter-ego or piercing the corporate veil.  The Complaint sets forth no bases for doing so."[45]

In Delaware, "a court can pierce the corporate veil of an entity where there is fraud or where a subsidiary is in fact a mere instrumentality or alter ego of its owner."  *Geyer v. Ingersoll Publ'ns*, 621 A.2d 784, 793 (Del. Ch. 1992).  However, as the CSS Entities acknowledge, the Complaint sets forth no causes of action for "alter ego" or "piercing the corporate veil," and the Complaint does not assert liability against the CSS Entities on those grounds.  The Complaint asserts claims against the CSS Entities in connection with ten claims for relief.  Two claims for relief relate to the disallowance and equitable subordination of their claims as a consequence of their liability to the bankruptcy estate and their misconduct articulated in the Complaint (Twelfth and Thirteen Claims for Relief).  Complaint ¶¶ 180-189.  With respect to the eight causes of action that seek affirmative recoveries from the CSS Entities:  The Fourth and Fifth Claims for Relief assert liability for the CSS Entities' breaches of fiduciary duty as "controlling shareholders" of the Company, as well as for their aiding and abetting breaches of fiduciary duties of other Defendants, all relating to the facilitation of, and failing to prevent, the various transactions described in the Complaint.  *Id.* ¶ 120-134.  The Sixth and Seventh Claims for Relief seek to recover the value of the Insider Revenue Transfers from each of the CSS Entities as fraudulent transfers, either as an initial transferee (with respect to CSS), subsequent transferees, or entities for whose benefit such transfers were made.  *Id.* ¶¶ 143-150.  Similarly, the Eighth and Ninth Claims for Relief seek the avoidance and recovery of fraudulent transfers on similar bases and grounds with respect to the Insider Releases.  *Id.* ¶¶ 151-164.  The Tenth Claim for Relief alleges that the CSS Entities (and the other Defendants) permitted the payment of illegal dividends in the forms of the Preferred

---

[45]    CSS Entities Br. at 28.

Dividends and Insider Revenue Transfers.  *Id.* ¶¶ 165-173.  Finally, the Eleventh Claim for Relief places responsibility for the Company's failure to pay Employee Wage, Benefit, and Tax Obligations on the CSS Entities and the other Defendants, although such claim will be pursued in connection with pending litigation, and will not be pursued by the Trustee (as discussed below). None of the causes of action pursued by the Trustee against the CSS Entities involve a finding that they are alter egos of another party or require the Court to "pierce the corporate veil."

       3.    <u>The Complaint States a Plausible Claim for Equitable Subordination (Thirteenth Claim for Relief)</u>

The Trustee's assertion of plausible claims for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty—as set forth in detail in the Trustee's Responsive Briefs[46]— are sufficient to support the Trustee's claims for equitable subordination (Thirteenth Claim for Relief).

A claim for equitable subordination has three elements:  "(1) inequitable conduct by the claimant; (2) resulting in injury to other creditors or an unfair advantage to the claimant; and (3) equitable subordination is consistent with the Bankruptcy Code."  *See Advance Nanotech*, 2014 Bankr. LEXIS 1362, at *23 (citing *Schubert v. Lucent Techs. (In re Winstar Commc'ns),* 554 F.3d 382, 411-12 (3d Cir. 2009)).  In determining whether a creditor engaged in inequitable conduct, an insider's conduct is rigorously scrutinized.  *Id.* at *24.

Each of the Defendants here are insiders, as members of the Board or Officers in the case of the D&O Defendants, and as controlling shareholders in the case of the CSSE Entities.  To the extent that any Defendant asserts claims against the estate (as Rouhana and CSS have done to date), the Trustee's claims for equitable subordination of such claims are not subject to dismissal

---

[46]    *See* Responsive Brief I § II.F. (breach of fiduciary duty) and § II.A., above (aiding and abetting breach of fiduciary duty).

because, as discussed in the Responsive Briefs, the Trustee has asserted plausible claims for breach of fiduciary duty and aiding and abetting a breach of fiduciary duty against each of the Defendants. As this Court has held, these assertions are also sufficient to support a claim for equitable subordination. *Id.* at *26-27 (finding that plausible claims for breach of fiduciary duty and aiding and abetting breach of fiduciary duty are sufficient to support a claim for equitable subordination). Therefore, the Complaint's Thirteenth Claim for Relief should stand.

4.     <u>The Complaint Seeks Disallowance or Subordination of Defendants' Claims Only to the Extent Such Claims Are Asserted Against the Estates, and Dismissal of These Causes of Action Based on an Assumption That Underlying Claims for Relief Will Be Dismissed Is Premature</u>

Certain Defendants assert that the Twelfth Claim for Relief (disallowance of claims) (Complaint ¶¶ 180-183) and Thirteenth Claim for Relief (equitable subordination of claims) (*id.* ¶¶ 184-189) should be dismissed because they have not asserted claims in the bankruptcy cases.[47] The Complaint sets forth that, to date, CSS and Rouhana have filed proofs of claim, in the amounts of $12,640,273.50 and $1,000,000, respectively, relating to the Insider Agreements. *Id.* ¶¶ 82-83. Because the bar date for asserting claims has not yet been set, the Complaint further provides for the possibility of other Defendants asserting claims. *Id.* ¶ 84.  In the absence of a Defendant expressly and fully waiving any claims against the estates, the Twelfth and Thirteenth Claims for Relief should survive as to all Defendants pending a final determination as to the liability of each Defendant on account of the Trustee's allegations of breaches of fiduciary duties, aiding and abetting said breaches, receipt of fraudulent transfers, and/or payment of illegal dividends, as asserted by the Complaint.  Likewise, the argument that the Twelfth and Thirteenth Claims for Relief should be dismissed based solely on the assumption that the Defendants will prevail on their

---

[47]     *See* Edwards Br. at 30; Meier Br. at 17; Mitchell Br. at 30; Other Directors Br. at 30.

request for dismissal of each and every Claim for Relief set forth in the Complaint[48] is clearly premature at this juncture.

5.    The Nonpayment of Employee Obligations Is an Egregious Violation of the Defendants' Fiduciary Duties and Damages Relating to the Violations of the Fair Labor Standards Will Be Prosecuted in Connection With Pending Class Action Litigation

It is beyond question that one of the most fundamental and basic functions of a corporation is to pay its obligations to its employees and ensure that the funds necessary to make such payments on account of payroll, medical benefits, and withholding taxes are sufficient and properly accounted for and applied to these obligations.  As set forth in the Complaint, and discussed in detail in the Responsive Briefs, the Defendants here violated their most fundamental fiduciary obligations by failing to pay the Employee Wage, Benefit, and Tax Obligations, including over $15.5 million in payroll withholding taxes, to the Company's employees.  Complaint ¶¶ 78-81. The nonpayment of such obligations forms part of the basis for the Trustee's claims for breaches of fiduciary duty and aiding and abetting these breaches of fiduciary duty asserted against the Defendants.  *See* Responsive Brief I, § II.F (breach of fiduciary duty) and § II.A, above (aiding and abetting breach of fiduciary duties).  *See also* Complaint ¶ 92 (First Claim for Relief for Breach of Fiduciary Duty Against Rouhana); ¶ 104 (Second Claim for Relief for Breach of Fiduciary Duty Against Non-Rouhana Directors Defendants); ¶ 116 (Third Claim for Relief for Breach of Fiduciary Duty Against Non-Rouhana Officer Defendants); ¶ 128 (Fourth Claim for Relief for Breach of Fiduciary Duty Against CSS Entity Defendants); and ¶ 133 (Fifth Claim for Relief for Aiding and Abetting Breaches of Fiduciary Duties Against all Defendants).

---

[48]    *See, e.g.*, CSS Entities Br. at 22.

The Defendants deny any liability for the nonpayment of the obligations to the Company's employees and claim that the Trustee has no standing to assert a claim for damages for violations of the Fair Labor Standards Act ("FSLA").

Subsequent to the filing of the Complaint, an amended complaint was filed by a class of employees seeking damages related to the nonpayment of employee obligations and violations of FSLA. *Skajem v. Chicken Soup for the Soul Ent.*, No. 24-ap-50128 (Bankr. D. Del. Sept. 6, 2024). Motions to dismiss have been filed and are fully briefed and pending determination in that adversary proceeding. In light of the currently pending litigation with respect to the FSLA claims, the Trustee has determined not to pursue damages against the Defendants by way of the Eleventh Claim for Relief against the Defendants for Nonpayment of Employee Wage, Benefit, and Tax Obligations. Complaint ¶¶ 174-179. The nonpayment of the Employee Wage, Benefit, and Tax Obligations, however, continue to form part of the basis for the breach of fiduciary duty and aiding and abetting causes of action asserted against the Defendants.

## III.

## CONCLUSION

Based on the foregoing, and for the reasons set forth in Responsive Brief I, the Trustee requests that the Court deny the Motions to Dismiss, and allow this matter to proceed to discovery and a trial on the merits.

*[Remainder of Page Intentionally Left Blank]*

Dated:  August 29, 2025                                   **PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ James E. O'Neill*

Richard M. Pachulski (admitted *pro hac vice*)
Alan J. Kornfeld (admitted *pro hac vice*)
James E. O'Neill (DE Bar No. 4042)
Tavi C. Flanagan (admitted *pro hac vice*)
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  rpachulski@pszjlaw.com
        akornfeld@pszjlaw.com
        joneill@pszjlaw.com
        tflanagan@pszjlaw.com

*Counsel to George L. Miller, Chapter 7 Trustee*